# EXHIBIT "B"

# DEPOSITION TRANSCRIPT OF NICOLE GEORGE

LOUISVILLE LEXINGTON LONDON FLORENCE CINCINNATI INDIANAPOLIS ORLANDO JACKSONVILLE TAMPA

KENTUCKIANA
COURT REPORTERS

**CASE NO. 2:16-CV-00134-DLB-CJS**

**SHEILA JACKSON**

V.

**REGAL BELOIT AMERICA, INC.**

**DEPONENT:**

**NICOLE GEORGE**

**DATE:**

**June 26, 2017**

a courtroom powerhouse

schedule@kentuckianareporters.com

877.808.5856 | 502.589.2273

www.kentuckianareporters.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF KENTUCKY

COVINGTON DIVISION

CASE NO. 2:16-CV-00134-DLB-CJS

SHEILA JACKSON,

PLAINTIFF

V.

REGAL BELOIT AMERICA, INC.,

DEFENDANT

DEPONENT: NICOLE GEORGE

DATE: JUNE 26, 2017

REPORTER: KELLEY BOHAN

Page 6

A. Yes.
Q. Was there any -- in January, was there any switch over when management?
A. Management switch over, no.
Q. Yeah, okay. So all that occurred in February of 2015, the transition from Emerson to Regal.
A. Yes.
Q. Okay, all right. So was it Regal or Emerson that actually required Ms. Jackson to attend this appointment with Dr. Haskell?
A. It was an Emerson policy that we had in place.
Q. And Regal just followed that policy in Ms. Jackson's instance?
A. Yes, we kept it in place.
Q. All right. And what is your job duties or job title with Regal?
A. I'm the human resource manager.
Q. All right. And how long have you been in that position?
A. In Florence, about five-and-a-half years.
Q. 2012-ish?
A. Yes.
Q. All right. Where were you before Florence?
A. I was in the Maysville location.
Q. So in your role as HR manager in Florence, you

Page 7

just oversee human resources for the Florence plant?
A. No. I oversee for Chino, California and Baltimore.
Q. California; Baltimore, Maryland; and Florence?
A. Yes, which includes a field sales group.
Q. Okay. What does the Regal plant in Florence manufacture?
A. We manufacture couplings for Kop-Flex and components for System Plast.
Q. Okay. And the sales force is out of Florence as well; did you say?
A. They are paid out of Florence, yes.
Q. Okay, all right. Outside of your employment with Regal or Emerson, have you received any specialized treatment in -- I'm sorry, specialized training in federal labor laws, labor employment laws?
A. No.
Q. Okay. What about labor employment laws in the Commonwealth of Kentucky?
A. No.
Q. All right. Have you received any training in-house?
A. Yes.
Q. Okay. Can you explain the training you've received?

Page 8

A. Well, just various seminars I've attended.
Q. Are they like CLEs for lawyers you would attend, or are these different?
A. Are they what?
Q. Continuing legal education training seminars that lawyers would be at, for instance?
A. Yes.
Q. Okay. And when was the last seminar that you attended related to labor and employment law?
A. It was earlier this year.
Q. Do you remember where?
A. February, March.
It was -- I can't remember the legal firm's name, but it was through a legal firm. They were putting it on.
Q. Which state was it in?
A. Kentucky.
Q. It was in Kentucky. What did they cover in that training; do you recall?
A. It was a wide variety of things. They went over some of the FS -- FLSA changes. They went over some overtime rules for non-exempts. There were some updates on ADA.
Q. Okay. And I'm sure you know, in this lawsuit she's brought claims under the Americans with

Page 9

Disabilities Act, the federal and the state; the Family Medical Leave Act; the Genetic Information Anti-discrimination Act; and Title VII and 42 U.S.C 1981 and the Kentucky equivalent related to race discrimination. Are you familiar generally with those statutes?
A. Yes.
Q. -- and areas of law?
A. Generally, yes.
Q. Okay. The discovery responses that you all submitted, the verification, was that your signature on the verification page?
A. Yes.
Q. Looking at Question No. 15, I'm asking how many employees are employed -- and I can't read it upside down, but basically how many employees were you with you all in 2013, '14, '15, and '16 within a certain mile radius, are those numbers down there accurate?
A. Yes.
Q. Okay. So for 2013, we've got hourly employees 291, salaried 237, for a total of 528; is that right?
A. Yes.
Q. 2014: 304 hourly employees, 241 salaried, for a total of 545; is that accurate?
A. Yes.
Q. Okay. 2015: 280 hourly, 234 salaried, for a

total 514; is that accurate?
A. Yes.
Q. And then the final year I asked for was '16: 270 hourly and 221 salaried for a total of 491; is that accurate?
A. Yes.
Q. All right. And just for the record, what I was requesting was the number of employees employed in each of twenty or more weeks in the calendar years of those years within a 75 mile radius of the Florence, Kentucky plant, is that what that question asks for?
A. It does.
MR. SCUDDER: And I think, just for the record, I think we narrowed the response just to the Florence facility. So if you went out 75 miles, it might be bigger.
MR. STILZ: Bigger.
MR. SCUDDER: Yeah.
MR. STILZ: Right, okay.
This will be Plaintiff's Exhibit 1.
(EXHIBIT 1 MARKED FOR IDENTIFICATION)
BY MR. STILZ:
Q. Take a look -- yeah.
MR. SCUDDER: She'll give me the --
MR. STILZ: I'm sorry, Mark, I probably should



have handed that to you.
A. This one?
MR. SCUDDER: You'll get the official one with the sticker, yeah.
Q. Just take a second, Ms. George, and take a look at these documents that I've provided you.
Are you familiar -- or are you done?
A. Yeah -- yes.
Q. Can you generally explain to me what I just handed to you?
A. You handed the letter from our chairman about our commitment to Equal Employment Opportunity and then the Global Respect and Dignity Policy for Regal Beloit.
Q. And these documents would have been in force and effect for the Florence --
A. Yes.
Q. -- office in the years 2015 and 2016?
A. Yes.
Q. Okay. On the second page, which is actually the first page of the Respect and Dignity Policy, under heading "2. Policy Provisions"?
A. Okay.
Q. Can you read 2.2 into the record for me?
A. "We will not tolerate discrimination against you on the basis of race, color, religion, dex, national



origin, age, ancestry, gender -- gender identity, sexual orientation, marital status, citizenship status -- unless required by applicable law or government contract -- disability or veteran status or any other status or characteristic protected by law.
Q. Okay. And I guess paragraph 2.3 says substantially the same thing?
A. Yes.
Q. Okay. Is that -- was that the policy of Regal in 2015 and 2016?
A. Yes.
Q. Okay. Do you remember the start date of my client's employment with Emerson?
A. I would have to look it up.
Q. Okay. I think she's testified to what it is - -
A. Yes.
Q. -- I was just curious as to whether you knew?
A. Not off the top of my head.
Q. Okay. When you would have been transferred to the Florence office in 2012, Ms. Jackson, if she'd had a problem with her employment or had to bring up something with the policy, she'd come to you; is that accurate?
A. Either myself or someone else in the HR department.



Q. How many people were in the HR department in Florence in 2015?
A. In the 2015, in the beginning of 2015, there was three -- well, including our health and safety person, four including myself.
Q. In 2016, did that number change?
A. Yes, were down to three.
Q. All right. Could you tell me the names of those individuals and what their job titles were?
A. Well, myself; Megan Caldwell was an HR assistant specialist; and Deborah Bennett was a benefits specialist; and Dave Moloney, health and safety supervisor.
Q. In 2016, who would not have been there, would that have been Ms. Bennett?
A. Uh-huh.
Q. All right. So typically when someone has an anti-harassment or anti-discrimination problem, somebody in Ms. Jackson's for instance, if they were wanting to report somebody for sexual harassment say, how would they go about doing that in Florence?
A. They would either go to their supervisor, manager, or to the HR department, and state the claim of discrimination and we would get pertinent information to be able to investigate.

Q. Okay. And how do those investigations usually take place, are they in-house or do you all outsource that?

A. We do them in-house.

Q. Okay. Are they confidential?

A. Yes.

Q. Now, these issues with the medical screening -- this will be Exhibit 2.

(EXHIBIT 2 MARKED FOR IDENTIFICATION)

Q. I'd like you to take a look at the packet of documents I just handed to you, and let me know when you've had a chance to review it. I think we've already looked at one of these already today?

A. Yes. Okay.

Q. Are you ready?

A. Uh-huh.

Q. Can you explain for the record what these documents are that I've handed you?

A. I guess there's more than one. The first set is the powered industrial equipment licensing procedure. And then the second part is the medical screening as it pertains to that.

Q. And that's the last two pages; correct?

A. Yes.

Q. All right. In Ms. Jackson's, I think -- is



this the procedure that applied to Ms. Jackson such that she had to go see Dr. Haskell?

A. Yes, this procedure was in place.

Q. Okay. Now, she wasn't a new hire; correct?

A. Correct.

Q. All right. So that wouldn't have applied to her then?

A. No.

Q. That particular section?

A. Correct.

Q. All right. Was she considered a transfer or a change in responsibilities?

A. No.

Q. Okay. Would she have been considered a licensed removal?

A. Yes.

Q. All right. Is that why she was sent to Dr. Haskell?

A. Yes.

Q. All right. How often does Regal do these license removals for PIE or power -- what do we call -- power --

A. Powered Industrial Vehicle.

Q. Thank you.

A. PIV or PIE, I don't know if we want to shorten



it. It's every three years for license renewals.

Q. Was that policy uniformly applied prior to Regal taking over?

A. Yes.

Q. All right. So I believe, if Ms. Jackson's testimony was that she hadn't re-upped her license for four years, and obviously without having her employee file in front of me, would that be an aberration?

A. This policy went into place, and then prior to this policy, the medical screenings was not apart of the license renewal. When this policy went into place and it was time for her renewal, this policy applied.

Q. Okay. When did the medical screening policy go into place?

A. This revision was -- this "revision 3" was in '14, I believe it was 2013.

Q. Okay. All right, and without her file in front of you, can you tell me when she would have renewed her license prior to 2015?

A. I cannot.

Q. Okay. Was she the only one that had her -- that up for having her license renewed --

A. No.

Q. -- in her department?

A. In her department, I do not know.



Q. Okay. Well, how about in the manufacturing side of the facility?

A. Anyone that required the use of PIE would have been scheduled. We have usually a couple each month that are due for renewal.

Q. Okay. In the last -- all right, so 2013. All right, in the last four years, can you estimate for me how many employees have had to visit Dr. Haskell or another physician for medical screening?

A. I would say at least 200.

Q. All right. And of those 200, do you know how many were required to provide copies of their medical records to the physician?

A. I do not.

Q. Would it be possible -- would there be a record that would indicate whether or not an employee had been specifically requested to provide medical records to a physician in a medical screening?

A. If there was, we would not get that.

Q. Okay. I'm assuming unless the medical provider alerted you that a screening was incomplete?

A. Correct.

Q. Okay. Did you use any physicians other than Dr. Haskell to perform the medical screenings?

A. Well, we use the Business Health, St.

Page 18

Elizabeth Business Health, I'm not sure. It wasn't -- it might not have always been Dr. Haskell.
Q. Okay. And I was going to say my understanding he's retired so it's got to be somebody different at this point?
A. Yes.
Q. All right. So looking at page 5 of the policy at the paragraph 4.15 the medical exams?
A. Yes.
Q. Is there anything in this policy that requires an employee to provide medical records to the company or to the doctor to pass the exam, just in that one para -- 4.15, anywhere in there or subparagraphs?
A. Depending on what was asked in 4.15.2.2 about taking necessary actions to pass the medical exam.
Q. Okay. So that could be interpreted to require the employee to turn over medical records?
A. If that's what was asked of them.
Q. Okay. And then turning to the actual, the last two pages, the screening policy itself -- if I can find it. It looks like the last page under the paragraph that says "The Examination." That last sentence: "This may include the review of medical records supplied by the patients." So this policy actually does specifically ask for medical records if

Page 19

the doctor wants them?
A. This is from St. Elizabeth's.
Q. This isn't your all's policy?
A. No. This is --
Q. Okay.
A. This is -- I'm sorry.
Q. No, I'm glad you clarified that. So just so we're --
MR. STILZ: Exhibit 2, is that right, what we're looking at?
COURT REPORTER: Yes.
Q. All right, the last two pages are not Regal's pages, this is Business Health's policy?
A. Yes.
Q. Okay. And do you all -- does Regal have a contract with Business Health to perform these medical screenings?
A. Yes.
Q. All right. Can you, without disclosing any trade secrets or any confidential information, can you give me the terms of that contract? Have you seen it?
A. Yes.
Q. All right. All right, that was a bad question I asked you.
Have you seen the contact to perform medical

Page 20

screenings between Regal and St. Elizabeth Business Health?
A. Yes.
Q. Okay. Again, without disclosing any trade secrets or confidential information, can you generally tell me what the terms of the contract is?
A. I've seen it. I don't know the exact language in it.
Q. All right. So you haven't read it?
A. No.
Q. Okay. Do you know whether or not the contract calls for employees to enter into a patient-physician relationship with the examining physician?
A. State that again?
Q. Does the contract indicate that -- does the contract indicate that an employee that has to go for a medical screening is going to enter into a patient-physician relationship with the doctor they're going to see?
A. I do not know if that's what it says.
Q. Okay. And you'll agree with me though that the employee isn't allowed to choose which doctor they want to see at St. Elizabeth Business Health; are they?
A. Correct.
Q. All right. And these medical screenings are

Page 21

performed on behalf of Regal and no other entity?
A. Yes.
Q. All right. Now, these were an exhibit to Ms. Jackson's deposition, but they're going to be Exhibit 3 to yours.
(EXHIBIT 3 MARKED FOR IDENTIFICATION)
Q. If you can just take a second.
A. Okay.
Q. All right, I count eleven. Just make sure my copy machine didn't eat one.
A. Yes.
Q. All right. Can you identify in general what these documents are that I provided you?
A. It would be information that we would have needed in terms of short-term disability and FMLA.
Q. Okay. The first two pages look to me to be short-term disability related; is that accurate?
A. Yes.
Q. All right. And can you -- the first page, would that have opened the claim?
A. Yes.
Q. Okay. And then the second page, that would have been the physician's statement supporting the claim; is that accurate?
A. Yes.

Q. All right. And I had Ms. Jackson read the first paragraph of page of 2 into the record. Based upon your exper -- have you had any training on the Genetic Information Nondisclosure Act of 2008?
A. I have not.
Q. Okay. Is this form a standard Regal form?
A. Well, at the time we were Emerson.
Q. Or Emer -- okay. Bad question, thank you. At the time that this was completed, was this a standard form for Emerson?
A. Yes.
Q. Okay. Has Regal kept this form in substantially similar condition, or is there a new form for them?
A. There's a new process with a different carrier.
Q. All right. Did you all keep this document in Ms. Jackson's employee file on premises in Florence?
A. It would have been in short-term disability file.
Q. Okay. All right, third page, this was just Ms. Jackson's request for leave; is that accurate?
A. Yes.
Q. With the dates that she needed?
A. July 29th of 2014 to September 2nd of 2014.



Q. Okay. And just for clarification for the record, what was her official first date that she was on leave, would it have been January 20 -- or July 29th, 2014?
A. Without looking at payroll records, I don't know.
Q. And you probably don't recall off the top of your head the date that she actually physically returned to work?
A. No.
Q. All right, the following page, is this -- you'd agree with me this is where Emerson designated the leave as it looked like continuous leave?
A. Yes.
Q. Okay. And then the next document dated July 23rd, 2014, was this the letter that Ms. Jackson would have received from Emerson telling her the leave was approved?
A. Yes.
Q. And then the next document would have been the certification Emerson would have required from her physician to process the FMLA?
A. Yes.
Q. And that would have included the next three pages; correct?



A. Yes.
Q. All right. Would you have read this document?
A. At the time of her request?
Q. At the time of the request, yes.
A. No.
Q. Who would have read the document?
A. This was handled with Megan and Deborah.
Q. All right. And who in your office coordinated with St. Elizabeth Business Health to set up the medical screenings?
A. At the time, it was my -- the medical screens, myself mainly because we were trying to get a large group through.
Q. Okay. So in January 2015 when Ms. Jackson's screening would have been set up, you think you would have been the one that would have called to have set it up?
A. Yes.
Q. Okay. Would have spoken with any of the physicians directly?
A. No.
Q. Do you know whether or not anybody at Emerson or Regal provided Dr. Haskell with Ms. Jackson's FMLA paperwork?
A. I do not.



Q. You didn't actually fax over any documentation to Dr. Haskell indicating that my client had colon cancer; did you?
A. No.
Q. All right. Do you know whether or not Deborah or Megan would have?
A. I do not know, but not prior to an appointment.
Q. Okay. So you don't know -- based upon Ms. Jackson's testimony that Dr. Haskell was the one that brought up the colon cancer, it's your testimony you don't know how he knew that?
A. Correct.
Q. If what Ms. Jackson is telling the truth?
A. Yes.
Q. Okay. But at least as of July 2014, somebody in the human resources at Emerson was aware of Ms. Jackson's diagnosis?
A. Yes.
Q. Okay, all right. And then on page 4 of this, it looks like at the bottom -- yeah, this is a Form WH-380. You all just used the form provided by the federal government to complete your certification, don't you --
A. Yes.
Q. -- for FMLA?

Okay. And on page 4 of that document, that last paragraph in bold above the health care provider's signature, do you know what that is?
A. It's a paragraph about the Genetic Information Nondiscrimination Act.
Q. All right. Requesting that the provider not provide you with any genetic information; correct?
A. Correct.
Q. All right. And then the final two pages, do you recognize these two documents?
A. Yes.
Q. Have you seen these previous to today?
A. I've reviewed them, yes.
Q. Did you review them at the time they were submitted?
A. No.
Q. Okay. Who would have reviewed them at the time of submission?
A. Deborah and/or Megan.
Q. Okay. And I guess that's because Deborah you said was the benefit coordinator?
A. Yes.
Q. And this would have fallen under that title; is that accurate?
A. Yes.



Q. Okay. The only reason that they would have brought any benefit or FMLA issue to your attention would have been some kind of abnormality?
A. Yes.
Q. All right. Now, Ms. Jackson has testified about a conversation she had following her appointment with Dr. Haskell where she says that you told her she didn't need to provide him with the medical records, she just needed a note of some kind from her doctor; do you recall that conversation?
A. I recall the conversation, yes.
Q. What's your version of it?
A. The conversation, when we got the information back from St. E's that she needed to provide more information, we had that discussion that she needed to provide additional information. She said, "Like what?" I said, "I don't know what they would be requiring." She said, "What if I got a release from my doctor." I said, "All I can do is provide that information to them, and they would have to make that determination."
Q. Okay. So you didn't --
A. And I asked her if she wanted to send it directly to them, or if she wanted it to come to us and we could get it to them if she wanted to do that.
Q. Okay. Let's look at that now. Exhibit 4.



(EXHIBIT 4 MARKED FOR IDENTIFICATION)
A. Yes.
Q. Can you describe the documents that I just gave you?
A. It is a fax from Dr. Moon's office regarding Sheila Jackson.
Q. All right. And the fax number on there is 859-727-5215, do you know who's fax number that is?
A. That's HR department's fax.
Q. Okay. The second page dated January 16th of 2015, do you know who in HR received this?
A. I'm not sure if I initially did, but I ended up with it.
Q. Okay. Did anybody forward it to Dr. Haskell?
A. Yes.
Q. Did you forward it to Dr. Haskell personally?
A. Yes.
Q. When?
A. That day.
Q. Did you get any kind of response back from him following submission of that letter?
A. Not from him, no -- not until we got the final determination.
Q. All right. Well, let's look at those documents next. That will be Number 5.



(EXHIBIT 5 MARKED FOR IDENTIFICATION)
A. Okay.
Q. Can you identify what these documents are?
A. The one appears to be a sheet that would have been given to Sheila to provide the additional information. And the second one was the notice we got that she was seen, but it's pending. And the third one is the final determination on February 10th.
Q. All right. That second document, that January 15th, 2015 letter, would that have prompted your conversation with Ms. Jackson?
A. Yes.
Q. Where you would have asked her for more information?
A. Yes.
Q. Okay. And you said the first page, you've not -- you didn't see initially?
A. No.
Q. Okay. I think you testified you think this might have been something he provided to Ms. Jackson. Have you seen this document before and not written out to her, but just in general for other employees that need to provide other information to a physician for the medical screening?
A. No.

Page 30

Q. Okay. So you're just assuming that Dr. Haskell gave this to her?
A. Yes.
Q. And what you just testified about, the final determination, is page 3?
A. Yes.
Q. And Dr. Haskell doesn't indicate to you what other information he's needing; correct?
A. Correct.
Q. All right. So it is your testimony that you never knew what additional information Dr. Haskell wanted for Ms. Jackson?
A. That is correct.
Q. Any specific information?
A. Correct.
Q. All right. For instance, you didn't know that Dr. Haskell wanted all of her medical records related to her colon cancer or surgery?
A. I did not.
Q. You did not?
A. No.
Q. Okay. Did anybody in your office?
A. Not to my knowledge.
Q. What happens to an employee of Regal if they refuse to go to the medical screening at all?

Page 31

A. If driving a PIE is an essential part of their position then they would need to be displaced from that position.
Q. Okay. So you'd agree with me that St. Elizabeth Business Health actually, for purposes of carrying out the medical screening, serves as an agent for Regal?
A. Yes.
Q. Does anybody at Regal review -- strike that question. The policies and procedures that we just went over, I think 3 -- are we on 3? Not the main policy, the licensing procedure?
MR. SCUDDER: I think that's 2.
A. 2.
MR. SCUDDER: 2.
Q. 2, all right. So the last two pages you indicated were St. E's medical screening policy?
A. Process.
Q. Process, all right. Would that be incorporated into Regal's policy and procedure ESH -- EHS-009?
MR. SCUDDER: I'll object. But you can answer.
A. I'm not sure what you mean by that.
Q. In other words, if an employee goes to a

Page 32

medical screening for St. E Business Health and they don't comply somehow with the medical screening procedures of St. E Business Health, they haven't complied with Regal's policy and procedure either?
A. They -- I'm struggling. Because if they don't comply with how St. E's is able to determine if they can operate a PIE safely, then we would get notification of that which would comply with this.
Q. Right. And, for instance, if the medical screening -- well, just like in Ms. Jackson's case where Dr. Haskell says the medical screening came back incomplete, Regal acted upon that statement by Dr. Haskell and pulled Ms. Jackson off of her duties with PIE?
A. Yes.
Q. Okay. Exhibit 5, page 1, we were just looking at. Do you see anywhere on this particular document, even assuming that Ms. Jackson got it -- let's just assume that for a second -- where like the FMLA certification that I showed you with the GINA warning, do you see a similar warning on this document anywhere?
A. I do not.
Q. Okay. And assuming that this document is actually from Dr. Haskell where it says "Medical Condition of Concern," whoever wrote this note:

Page 33

"Surgery, all medical records." Is that accurate?
A. Yes.
Q. Okay. Do you recall the conversation that Ms. Jackson testified about between, it would have been the second conversation I think in chronology, with you and Mr. Tobias?
A. Regarding the medical records?
Q. Yes.
A. Yes.
Q. All right. Can you tell me your version of how that conversation went?
A. Because of the length of time because we had exceeded the two weeks -- I don't remember the date -- I did reach out to St. E's and ask the status. And they said that they had received the note from Dr. Moon, but it wasn't adequate to be able to release her. So at that point I let Mike know that she was still pending, the medical or the documentation needed. And when Mike told her, that's when they came in and I explained it further that we still needed -- she still needed to provide the documentation needed for them to be able to release her to be able to drive a PIE, and if not, that she could potentially be displaced per the policy.
Q. Okay. Do you all have the ability or does human resources have the ability to overrule the medical

screening physician on a decision to take an employee off of a job that requires PIE operation?

A. We would not.

Q. And I guess a more specific question is: In Ms. Jackson's case when Dr. Moon provided that January 16th, 2015 letter, you all wouldn't have looked at it and go, well, look she's cleared, we're going to let her drive?

A. Correct. By using St. E's, they were a third-party that consistently applied the rules into who was cleared to operate or not.

Q. All right. So Regal adopts their decision?

A. Yes.

Q. Okay. I forgot to make copies of this one so we're just going to have to share it.

MR. STILZ: All right, what are we on?

COURT REPORTER: 6.

Q. 6, and I think we've seen this before, but just --

A. Yes.

(EXHIBIT 6 MARKED FOR IDENTIFICATION)

Q. Can you identify this document for me, Ms. George?

A. This would be our job posting, a general job posting for the value added packer position.



Q. All right. Was this for Ms. Jackson's position?

A. The description, yes.

Q. Okay. Before her displacement, was she -- was her job position a value added packer?

A. Yes.

Q. Okay. And the swing shift that she was talking about, can you add any more light to what that would have -- why she would have been on a swing shift?

A. It was the hours that were needed based upon the production or the levels for getting production out.

Q. Okay. So is a swing shift, is that ever a posted position or is that something that's just assigned when needed?

A. No. It would -- the position, the hours would be posted per what hours would be needed.

Q. So instead of, say for instance first shift, it would have just said the hours of operation?

A. Yes.

Q. Okay, all right. But looking at the purpose of the position, the position description, these were the essential job functions of Ms. Jackson's job prior to displacement?

A. Yes.

Q. Okay, all right.



MR. SCUDDER: Just -- I'll put those in this stack.

MR. STILZ: Thank you.

MR. SCUDDER: If you need something just let us know.

Q. This will be 7.

(EXHIBIT 7 MARKED FOR IDENTIFICATION)

A. Yes.

Q. Can you identify these documents for me?

A. This was a document to show what jobs had been posted within the time of Sheila's displacement that did not require a PIE license.

Q. Okay. Are any of these jobs substantially similar, in your opinion, to the job duties that we've established Ms. Jackson would have been performing on January 6th?

A. Similar in responsibilities?

Q. Yeah, essential functions.

A. No.

Q. None?

A. No.

Q. Okay. And I believe, you know, there's an issue with the grading of these positions and the pay, are all grade 3 jobs paid the same? All grade 5 jobs paid the same? All grade 7 jobs paid the same?



A. They have the same wage grade scale, yes.

Q. All right. What's a wage grade scale?

A. A grade 3, if you're hired in, you're started at one rate and every three months you get increased through the top out of the progression.

Q. Okay. And really the grading, the only thing that's similar about the grading is the wage scale; is that accurate? In other words, the jobs aren't similar, the job functions aren't similar, it's just the pay?

A. The job -- how do I want to say it? The jobs would be similar in experience, education, type of work -- not necessarily the type of work performed, but the complexity of the work performed would be similar.

Q. Okay, okay. And you'll agree with me, at least on page 1 on the comments section, is that you writing in the comments?

A. Yes.

Q. All right. There's nothing in there that indicates that any of these jobs that Ms. Jackson was assured of getting these positions; correct?

A. Correct.

Q. She could have bid for them?

A. Yes.

Q. But bidding is not the same as offering?

A. Correct.

Q. Okay. All right, and the job that Ms. Jackson was displaced to in February of 2015, do you recall what job that was?
A. What she was displaced to?
Q. Correct.
A. When we displace and they don't choose an open position, they remain at the same grade level and we utilize them where needed within the operation.
Q. Okay, and I think we established that. During that year long period, Ms. Jackson's pay didn't change?
A. Correct.
Q. But she didn't get a raise though either; correct?
A. She would have gotten the -- depending. We were in the July -- she would have gotten the normal general wage increase during the process.
Q. Okay. And I believe she's -- I think she's testified and please correct me if I'm wrong, that the job she was working during that year was a grade 3 position; does that sound accurate?
A. It would probably have fallen in line with grade 3 responsibilities, yes.
Q. Okay. And if I saw correctly, Regal has a policy where they'll keep the people in the position for a year, and if they don't make a decision one way or the



other by the end of that year, if they don't try and bid on another job, they're fired?
A. They would be presented with what is open at the time that they are eligible for, and they -- if they choose not to take that, then, yes, they would choose termination.
Q. All right. And, again, but they're not choosing a job, they're choosing to bid on the job?
A. At that point, no.
Q. It's a job offer?
A. Yes.
Q. Okay. I'm sorry, just give me a minute. I think I missed placed this --
MR. SCUDDER: Mind if we take a quick restroom break?
MR. STILZ: Sure, absolutely.
MR. SCUDDER: Thanks.
(OFF THE RECORD)
BY MR. STILZ:
(EXHIBIT 8 MARKED FOR IDENTIFICATION)
Q. All right, can you explain for me what that document is that I just handed to you?
A. This would have been the document that we would have prevented -- sent it to Sheila at the end of the year to notify her of what was open and available



for her to choose from.
Q. Okay. And at this point, I think what you said was those jobs, in other words, those were actual job offers?
A. These were the open jobs that she would have been placed in had she chosen one of them.
Q. Okay. And two of the jobs were grade 3 positions; correct?
A. Three of them.
Q. Three of them. I'm going off the top of my head. One is -- and the other two are grade 7 positions; correct?
A. Yes.
Q. All right. The grade 3 positions, there's one on first shift, second shift, and third shift; is that accurate?
A. Yes.
Q. All right. Would you agree with me though that those grade 3s would have been a demotion from the grade 5?
A. It would have been lower pay, yes.
Q. Okay. And the two grade 7s positions, what does "Team D, Night" mean?
A. Our Team A, B, C, and D are 12-hour rotations. So As on days. Bs are on night, 7 to 7. And one week



they work three days, the next week they work four. So in a course of 14 days they work seven.
Q. All right. And then the second was second shift CNC operator grade 7, and I think we've established that second shift was 3:30 to 11:45?
A. It depends. There's some departments that do 3 to 11:30; some do 3:15 to 11:45.
Q. Okay. But given you heard Ms. Jackson's testimony she had that second DHL job from 11 to 5. The second and third shift positions would have -- there would have been overlapping time periods; would you agree with me there?
A. I would, but we were not aware of that.
Q. Okay. So she never told you about the --
A. No.
Q. -- DHL job, or that's one of the reasons she had a problem taking those positions?
A. Correct.
Q. Okay. And the same thing with the grade 7 position at night, depending upon what night that fell on, it could have interfered with her other job; correct?
A. Yes.
Q. All right. And then the second shift grade 7 position, same question? Yes?

Q. Okay. All right, so between February 11th 2015 and February 11th of 2016, I think we've gotten testimony on two conversations you had with Ms. Jackson personally about the, you know, the one we've already discussed, were there any other conversations you had with her about anything work related?
A. Not that I specifically recall.
Q. Okay. Did you at any point tell her she needed to be looking at the job postings for bidding?
A. No.
Q. Okay.
A. Except -- sorry -- except during the placement discussion.
Q. Well, outside of those two conversations --
A. Yeah.
Q. -- which you've already provided testimony on?
A. Not that I recall.
Q. All right. So on -- and I think we've established this, but let's go ahead and do it formally. This will be 10.
(EXHIBIT 10 MARKED FOR IDENTIFICATION)
Q. Have you had a chance to go through those?
A. Yes.
Q. All right. Can you generally describe what these documents are? And they should be one, two, three



-- seven pages.
A. The first one would be the initial displacement discussion. The next two is a form we use to process, on our end, terminations. Third is verification that their system access was terminated. What are we, fifth and sixth? The letter would be what we sent to Sheila notifying her of benefit options and whatnot. And then the last one is a verification that she received at the training.
Q. And the documentations following the February 11, 2015 letter, does that verify her date of termination February 11, 2016?
A. Yes.
Q. Okay. All right, and this will be 11.
(EXHIBIT 11 MARKED FOR IDENTIFICATION)
A. Okay.
Q. Yeah, can you describe what this document is?
A. It's just documentation that I wrote after meeting with Sheila on February 2nd.
Q. And in it notes -- sorry.
A. That's all right.
Q. "I asked her if she wanted to set her up for a medical screening since it wasn't because she failed that they hadn't cleared her." Is that statement accurate?



A. Yes.
Q. Okay. So you'll agree, she didn't actually fail the exam, she just didn't -- she hasn't -- strike that question. All right, were you acknowledging that she didn't actually fail the physical?
A. Yes.
Q. Okay. How did you know that?
A. I was acknowledging that it was -- they didn't have enough information to clear her.
Q. Okay. Because in the next sentence it says she asks if they are going to need her medical history, and you told her yes. Is that the first time that you were aware that Dr. Haskell wanted her medical history?
A. No. When we -- when she provided the information from Dr. Moon on the 16th, she had let me know that they were requesting medical records.
Q. All right. So they was the day after the exam?
A. Yes.
Q. All right. So you knew at that point that they wanted all of her medical records?
A. I knew that they were requesting medical records.
Q. Okay. You just didn't know which ones specifically?



A. Correct.
Q. All right, okay. At what point in time was it your understanding that she hadn't actually failed the physical part of the examination?
A. I don't think they had enough infor -- I don't know. We do not get that. We just get if they're clear, if they have restrictions, or if they didn't -- in this case -- provide the information.
Q. Then why would you have said to Ms. Jackson on February 2nd since it wasn't because she failed that they hadn't cleared her?
A. My comment to that was that I didn't know if she would have failed it or not, but if she had provided her medical history to them, that they could have evaluated the whole situation for her.
Q. Okay.
A. I wasn't making a statement that I knew that she hadn't failed the --
Q. Well, I mean, would Dr. Haskell, if she had actually failed the physical part, he probably would have let you know that, right, in that letter from -- the letter from February 10th indicates he doesn't have enough information; correct?
A. Correct.
Q. Have you ever seen one of those letters where

an employee has failed because they haven't passed the physical where the doctor notes "failed physical exam"?

A. No.

Q. Okay. All right, in the next sentence: "They needed to understand her history so they could authorize her to be safe to operate PIE." Were you assuming that that's why they needed it, or did they tell you that's why they needed it?

A. I was assuming that's why they needed it.

Q. Okay, all right.

MR. STILZ: Why don't we take five because we got through it pretty quick.

(OFF THE RECORD)

BY MR. STILZ:

Q. We have Joe DeVillez's deposition scheduled for later this week, Ms. George. Do you have any firsthand knowledge of whether or not he's had any discussions with Dr. Haskell?

A. I don't. I wouldn't believe he would though.

Q. Do you know or do you have personal knowledge of what his hand was, if any, in the decision to terminate Ms. Jackson's position? In other words, was it ultimately his decision, or did he just have some input in it?

A. Are you talking about the initial displacement



or the --

Q. The termination.

A. He was in the meeting and based upon our practice of displacement, he was going by what we do.

Q. Okay. Well, who ultimately made the decision "your employment is terminated, Ms. Jackson"?

A. Sheila Jackson.

Q. Who told her with Regal, was it you or was it Joe?

A. It was when she chose not to take an open position, she was told her employment was terminated.

Q. By who?

A. Joe, I believe.

Q. All right. So you never told her that her employment was terminated?

A. I believe we both did. I mean when I went through this and said if you don't take one of these you will be choosing termination, and then I think Joe reiterated that.

Q. Okay. Is this an accurate statement and we'll make it specific to Ms. Jackson: Dr. Haskell says I don't have enough information to complete the medical screening. Regal then makes the decision, well then, Ms. Jackson, you can't operate PIE and we have to displace you?



A. Because we did not get a screen that said she was cleared?

Q. Correct.

A. Yes.

Q. All right. Was human resources aware of any problems with Ms. Jackson's employment, for instance -- well, actually specifically operation of PIE, between her return to work on or about September 23rd and January 15th?

A. No.

Q. So is it fair to say she was performing the essential functions of her job adequately?

A. Yes.

Q. For lack of a better term, similarly situated workers that Ms. Jackson has brought up in her testimony: Sheila Lawson, was her testimony accurate? Was Sheila a grade 5 during -- and let's use the time period February 11th of '15 to February 11th of '16?

A. I believe so, yes.

Q. Okay. Is that in complex packing?

A. It was in our Kop-Flex --

Q. Kop-Flex?

A. Kop-Flex department.

Q. All right. Was her job significantly different from Ms. Jackson's?



A. I don't -- similar-type responsibilities.

Q. Okay. And would Ms. Lawson in that job be operating PIE?

A. I believe at one time that department required it, but I don't believe it does now.

Q. Okay. Are you aware of any instance where Ms. Lawson didn't provide a physician at St. E Business Health with her medical records?

A. No.

Q. Do you know if during this time period she underwent a medical screening?

A. I believe so. I'm not -- I know we got a screen back on her, yes.

Q. Okay. Same realm of questions for Mr. Jarvis, I think she testified he was grade 5 during that period; is that accurate?

A. I believe so.

Q. All right. And cycle counting?

A. Yes.

Q. Is that job similar at all to Ms. Jackson's job?

A. It would be a similar.

Q. Okay. In job function?

A. Yes.

Q. Okay. And would Mr. Jarvis have been

operating PIE during that time period?

A. Yes.

Q. Okay. Do you know whether or not he had to attend a medical screening?

A. Yes.

Q. All right. Are you aware of any instance where he had refused to provide medical records to the medical provider?

A. No.

Q. Do you know for a fact he didn't, or that he wasn't asked to?

A. I don't know.

Q. Either way?

A. No.

Q. Okay. Just because I have to make the record: Did Regal discriminate against Ms. Jackson because of her race?

A. No.

Q. When they displaced her?

A. No.

Q. When they terminated her employment?

A. No.

Q. Were you aware of any complaints or other procedures that were started, either by Ms. Jackson or another employee, that would have alerted you to



potential racially harassment or discrimination against Ms. Jackson?

A. State that again.

Q. Well, let me try and do it two ways: Did Ms. Jackson ever file a claim in human resources claiming racial harassment or discrimination?

A. I know there were some issues previously years ago with...

Q. Well, I don't want to know -- all relative to the lawsuit, how about that?

A. No, no.

Q. No, okay. Any coworkers ever filed anything saying Sheila is getting harasses or discriminated against because of her race --

A. No.

Q. -- based upon what we brought up in the lawsuit?

A. No.

Q. Okay. Same question but with as far as disability is concerned: Did you regard Ms. Jackson as having a disability when she was displaced from employment?

A. No.

Q. What about when she was terminated from employment?



A. No.

Q. All right. So her colon cancer condition didn't even factor into your decision making?

A. No.

Q. Okay. Any complaints filed by Ms. Jackson with human resources that would have put you on notice of disability, harassment, or discrimination?

A. No.

Q. Any coworkers who've filed any complaints on her behalf or referencing disability discrimination aimed at her?

A. No.

Q. All right. Were you aware that she filed a charge of -- and I'm only looking because I want to make sure I get --

MR. SCUDDER: I think you're referencing the EEOC charge?

MR. STILZ: Yeah, the EEOC charge.

Q. September 21 of 2015, were you aware that Ms. Jackson, either on that date or afterwards, were you aware that she'd filed an EEOC charge alleging violation of the ADA and GINA?

A. Yes.

Q. Okay. When did you become aware of that?

A. Around that time we got the notification of



the filing.

Q. Okay. Did you view Ms. Jackson as an employment problem following that EEOC charge?

A. No.

Q. Okay. Was she terminated from employment at any -- strike that question.

Was her termination from employment the result in any way as a result of her filing that EEOC charge?

A. No.

Q. Are you aware of any person in Regal management that made any derogatory comments regarding Ms. Jackson as the result of the EEOC charge she filed?

A. No.

Q. Any emails exist between members of Regal management discussing the EEOC charge?

A. Not that I'm aware of --

MR. SCUDDER: I'll just object on the basis of privilege --

MR. STILZ: Right, I mean if something is privileged, I'm not going to get it anyway.

A. Right.

Q. Not that you're aware of?

A. No.

Q. Okay. Is there any document that you haven't turned over to me regarding Ms. Jackson that you maybe

Page 62

what, I don't want to go to Business Health. I've got my own doctor, and they said it's okay. Here's documents." Is that good enough?
A. No.
Q. Okay. Why do you send people to get these renewals even when they've been doing okay and maybe haven't had any accidents?
A. It's the procedure to have a licensed renewal every three years?
Q. Okay. Why is that? Why don't you just say, you know what, if you're doing fine, just drive forever?
A. I think it's part of an OSHA reg that for the renewal of it.
Q. Okay. And to make clear: When she got the letters -- if I can find them. I think they were -- you know, the letter in February of '15 that listed some jobs and then the letter of February '16 that listed some jobs, would she have gotten those jobs if she would have said that day "I want them"?
A. Yes.
Q. Or did she have to -- or was there like a bidding process she had to go through?
A. No. Those were open and available to her, and that would have been explained to her.
Q. Okay. Did any of those jobs on either one of

Page 63

those lists require the use of PIE?
A. No.
Q. Did any of them require a medical exam that would have required her to go back to Dr. Haskell?
A. No.
Q. Okay. Now, I know that on I think particularly the 2016 one, there's a job that is a grade -- yeah, it's right here -- I think a grade 7, how much more money would somebody make as a grade 7 compared to grade 5?
A. It would be a couple dollars. I don't know exact dollar figure, but it would be...
Q. A couple dollars per hour?
A. Yes.
Q. Okay, okay. Now, what about -- had those jobs, particularly the grade 7 jobs here, what would -- I think there was some testimony in Ms. Jackson's deposition, she felt that she may not have been qualified for some of these positions. What would you have done if she would have said that day, "hey, I do want one of those jobs. I don't think I'm qualified." What would you have done?
A. We would have taken the necessary steps to get her the training she needed to be able to adequately perform the job.

Page 64

Q. Do you have access to that kind of training? I mean how do -- what kind of things can you do to train somebody?
A. We would pair them, on-the-job training, we would partner. We partner with Gateway to do blueprint reading classes that we would help her with. And we have, we've brought them on-site before to do training.
Q. Okay. Let me show you what we've marked as Plaintiff's Exhibit 5, and in particular I'm looking at the last page. And so am I right that this is what you would receive from Dr. Haskell; is that right?
A. Or any physician performing the test at St. E's, yes.
Q. Okay. And it looks like there's a lot of different boxes that can be checked?
A. Yes.
Q. The top one says they can perform the essential functions?
A. Yes.
Q. The next one is they can perform the essential functions but with some accommodations?
A. Yes.
Q. And then there's one they can't do it, and you can't accommodate it?
A. Yes.

Page 65

Q. You've got a direct threat box. And then we have this last one which is checked for her. "Additional medical information has not been received concerning this individual, physical results are incomplete"?
A. Yes.
Q. Now, how do you -- based on this, how did you characterize what you got back from Dr. Haskell?
A. I characterize this as not able to operate a PIE because there was not sufficient information provided.
Q. Okay. And what might happen if she provided the additional information?
A. I don't know. I mean we could have gotten something back that said she was able to.
Q. And as opposed to it's also possible they could have said she's not able to; right?
A. Right.
Q. Okay. And is that why you told her in the later meetings in 2016, if you provided the records --
A. Right.
Q. -- we'll see what he says, he may say okay and he may not say okay?
A. Yes.
Q. Okay. Now, have you had other people for whom

the doctor has come back and said, "yeah, they can't perform the work"?
A. Yes.
Q. And they check a different box?
A. Yes.
Q. Okay. Have you ever had anybody, for example, get a "no" and then they want to fight about the "no"? They say, "well, my doctor thinks I can. Let's try to hash this out." Have you ever had anything like that?
A. No.
Q. Okay. Have you had situations where somebody says, "well, whatever problem prevented me from doing this, I think it's better, and I think I should be reexamined"?
A. If they got a "no," we would displace them.
Q. Okay.
A. And if they then were able to want to bid back into the job that required a PIE, they would have to go through the screening again.
Q. Have to go through it again?
A. Yes.
Q. Okay. And have you had that happened with some people?
A. Which part?
Q. The part where the doctor says, "well, I don't



think you can do it. You need to have something addressed." And then they go get it addressed. And they said, "hey, the doctor" for example maybe it was a vision problem, the doctor says, "hey, I think there's a vision issue." And then they say, "I've got it corrected"?
A. Yes. We've had employees go and get that corrected within that two week or whatever time frame that the doctor's requested.
Q. Oh, they do it before you even get this form?
A. Yes.
Q. Oh, they'll do it with this form. What will that form say?
A. So this form --
Q. And then just for the record, this is the form that I think is maybe, what, the second page of Exhibit 5.
A. It could vary. We would -- it would -- like in Sheila's case or in someone else's case, it would just say pending additional information for whatever reason. And then typically, again, it's like a two-week time frame that they would then need to provide that information.
Q. Okay. Because Sheila's for example says -- the second sentence -- "the examination has been placed



on medical hold" --
A. Yes.
Q. -- "pending receipt of additional information concerning this individual"?
A. Yes.
Q. So you're saying that other folks might have something different written there like --
A. Pending results or something, it could vary slightly, yes.
Q. Okay, okay. Have you ever had anybody for whom you got a letter and a note like this saying they need additional information that hasn't been provided?
A. No.
Q. Have you ever had anybody get a check like this, have a year to do it, and they don't bid on something or or return the medical -- requested medical documents?
A. No.
Q. Okay. During the year when Ms. Jackson is displaced, she was still paid as if she was grade 5?
A. Yes.
Q. I know there was some question about cost of living adjustments, if grade 5 people got a cost of living, would she have got it as well during that period?



A. Yes.
Q. Okay. The job that she actually performed during that year, what grade would that have been?
A. It would have been modified, but mostly like performing a grade 3 job.
Q. Okay. So -- never mind, strike that.
Okay, these other folks I think that we mentioned: Sheila Lawson, let's start with her. Do you recall her being sent for a medical examination renewal for her PIE license?
A. I believe she got sent for a fit for duty.
Q. Oh, fitness for duty?
A. Yes.
Q. Is that different?
A. Yes.
Q. Okay. Why was she sent for a fitness for duty?
A. Because of accidents, workers comp-type related incidents.
Q. Okay. Were you ever told by the doctor as part of that fitness for duty that she was refusing to produce medical records?
A. No.
Q. Okay. How about Ms. Jarvis, my -- do you remember him ever being sent for a renewal?

Page 70

A. We would have been sent for a renewal.
Q. Okay. Did you receive anything back from the doctor saying that he -- his was incomplete because he refused to produce records?
A. No.
Q. Okay
MR. SCUDDER: Okay, I don't think anything further
MR. STILZ: All right, I just have a couple of follow-ups based upon those. Sorry about that.
MR. SCUDDER: Yeah, no, you're okay.

REDIRECT EXAMINATION

BY MR. STILZ:
Q. EHS-009 --
A. Yes.
Q. -- the reg you were noting, is that right below?
A. Yes.
Q. All right. And I believe per this -- and I don't have the reg in front of me so if it says something different I'm going to look like a moron -- but training may be only delivered by an experience qualified licensed equipment operator for that specific piece of equipment?
A. Yes.

Page 71

Q. Is that what the OSHA reg says on this? Have I left anything out of what written here?
A. No.
Q. All right. The OSHA reg that we've got listed on here, it says nothing about medical screening, does it, specifically?
A. The reference to that, no.
Q. Okay. So is the medical screening, is that something that Regal or Emerson implemented on its own?
A. It was a -- it was a directive of Emerson.
Q. Okay. Is part of that policy to identify employees that may or may not have disabilities as defined in the ADA?
A. What's the question? I'm sorry.
Q. Is the medical screening policy, is the purpose behind it to identify any current employees that may or may not have disabilities as defined by the ADA?
A. No.
Q. All right. I think you testified that the grade 7 may have provided more money, but you'll agree with me that's only more money if that particular employee is allowed or able to stay in that position; correct?
A. Correct.
Q. For instance, if they don't -- if they show

Page 72

that they're not able to do the job, I think you've already testified, they're not going to stay in it, they're either going to be terminated or displaced again?
A. Well, not displaced. Offered whatever was available.
Q. Whatever the term is.
A. Right, yes.
Q. Yeah, okay. All right, I know we've harped on this a lot but Exhibit 5. Mr. Scudder went through the list of seven things here that are specified underneath the -- where it says "surgery, all medical records"?
A. Yes.
Q. You'd agree with me that on January 16th, Ms. Jackson presented you with more medical information from Dr. Moon, correct, that you forwarded to Dr. Haskell?
A. Yes.
Q. Okay. And obviously because of Dr. Haskell's response to that, he still didn't clear her; did he?
A. No.
Q. Okay. So we really don't know what Dr. Haskell wanted other than where it says -- whatever this form specifically asks for?
A. Yes.
Q. Okay. And that includes all medical records?

Page 73

A. Yes.
Q. Okay.
MR. STILZ: Thank you very much.
MR. SCUDDER: Just one more quick question.

RECROSS-EXAMINATION

BY MR. SCUDDER:
Q. The letter from Dr. Moon, it didn't have a diagnosis; right?
A. I don't believe so.
Q. It didn't say what kind of treatment she received?
A. No.
Q. It didn't have a prognosis?
A. No.
Q. It didn't have any test results?
A. No.
Q. It didn't list any medications?
A. No.
Q. So I mean it didn't have any of the numbered things that were on here?
A. Correct.
MR. SCUDDER: Okay, that's it. Nothing further.
(DEPOSITION CONCLUDED AT 3:39 P.M.)

REGAL

Regal-Beloit Corporation Beloit, Wisconsin 53511 www.regalbeloit.com

## EQUAL EMPLOYMENT OPPORTUNITY POLICY

It is a guiding principle at Regal-Beloit Corporation and its subsidiaries and divisions that we value diversity and treat each other with dignity and respect. As employees of Regal-Beloit, we all have the personal responsibility to live up to that principle. All of us need to create an atmosphere every day where every Regal-Beloit Corporation employee knows that he or she is valued as an individual, and is treated with dignity and respect. This Policy on Equal Employment Opportunity is our commitment to this principle and to the law.

Regal-Beloit Corporation's employment policy is to provide equal opportunity to all qualified employees and applicants without regard to race, color, religion, gender, sexual orientation, marital status, age, national origin, disability and military status. This includes, for example, recruitment and hiring, training and development, compensation, transfer and promotion, and discipline and discharge. The same principles will be applied in the employment of veterans.

Our policy of equality for all is monitored and we take whatever affirmative action is necessary to comply with the law and make sure we meet the greater need for fairness and honesty, and this assures a better place to work. Since these matters are important to us, you may be asked to put in writing any concerns you have. By doing this, we can help insure your concerns are dealt with on a formal basis and appropriate follow-up takes place. We will assist you in this process in any way we can. Your supervisor, manager, the local human resource representative or if necessary, the Corporate Office (1-800-833-7901) can be of assistance if you have questions or concerns.

As part of our policy we also counsel, assist, and encourage employees in matters related to on-the-job performance. We also offer counseling, encouragement, and support for employees wishing to handle more responsible positions.

Mark J. Gliebe

July 2012

Mark J. Gliebe, Chairman and Chief Executive Officer

KENTUCKIANA COURT REPORTERS
Date 6-26-17
Reporter KB Exhibit # 1
Case 2:16-cv-00134-DLB-CJS
Deponent Nicole George

REGAL-BELOIT CORPORATION
CORPORATE HUMAN RESOURCES

# 300.100 Global Respect & Dignity Policy

**This document is controlled and has been released electronically. The version posted and available on the policy page of every employee's compliance portal is the up-to-date document. Hard copies are uncontrolled and may not be up-to-date. Users of hard copies should compare the version with the electronically controlled version. 2014-February.**

| | |
|---|---|
| Function/Business Unit: | Human Resources & Legal (Ethics & Compliance Office) |
| Review Frequency: | Annually |
| Authors (Department, Title & Email): | HR: Denise Lofquist, Talent Director (denise.lofquist@regalbeloit.com) and Tim Oswald, VP – Compensation & Benefits (tim.oswald@regalbeloit.com ) and Legal: Laurel Burke, AGC – Compliance (laurel.burke@regalbeloit.com |
| Review Team: | Legal, EHSS, Human Resources |
| Approver(s): | General Counsel, Corp HR – VP |
| Languages issued in: | Same as Code of Conduct |
| Revision History | 2012-Jun, changed branding and CEO name<br>2013-Feb-12 formatting, change name, added workplace violence prohibition |

1. **Application and Purpose**
   1.1. This global policy (the "Policy") applies to Regal-Beloit Corporation and its controlled affiliates (collectively, "Regal" or the "Company") and all Regal employees at all levels (individually, "you" and collectively, "we").
   1.2. Consistent with our values and other Regal policies and Regal practices, Regal is committed to ensuring a safe and respectful work environment – one where employees, customers, contractors, suppliers, business partners, visitors and shareowners are treated with dignity, respect and courtesy. This policy reinforces our tradition of developing and maintaining a professional environment with people who respect one another and who act consistently with Regal's core values of integrity, performance and high energy.

2. **Policy Provisions**
   2.1. We will treat all employees fairly and respectfully in an environment free from harassment.
   2.2. We will not tolerate discrimination against you on the basis of race, color, religion, sex, national origin, age, ancestry, gender identity, sexual orientation, marital status, citizenship status (unless required by applicable law or government contract),disability or veteran status or any other status or characteristic protected by law.
   2.3. Equal Employment Opportunity (EEO). Regal will not discriminate against any Employee or applicant for employment because of his or her race, color, religion, sex, national origin, age, ancestry, gender identity, sexual orientation, marital status, citizenship status (unless required by applicable law or government contract), disability or veteran status or any other status or characteristic protected by law.
   2.4. We will not tolerate harassment, whether verbal, physical, written, intentional or unintentional, and regardless of whether it rises to the level of an illegal act, and regardless of whether it occurs at the workplace or in another work-related situation supported by the Company.
   2.5. We will not tolerate workplace violence.
   2.6. No weapons are permitted at work.
   2.7. We expect you to report to work and remain at work in a condition to perform assigned duties free from the presence or influence of alcohol, illegal drugs or other substances which could impact safety, productivity or your ability to work.
   2.8. We expect you to follow our Code of Conduct.

3. **Examples of Unacceptable Behavior.** The following examples illustrate behavior that is unacceptable under this Policy. However, since there are many types of behaviors that are unacceptable, you must exercise good judgment to avoid acting in a way that may reasonably be perceived by others as harassing, intimidating, violent or otherwise unacceptable.

3.1. Racial, ethnic or religious insults, slurs, jokes or other comments.
3.2. Unwelcome sexual advances or touching.
3.3. A supervisor telling an employee that he or she can be promoted or get a salary increase if he or she grants the supervisor a sexual favor of any kind.
3.4. Sexual comments, jokes, stories or innuendos.
3.5. Managerial requests for sexual favors as a condition of employment or to impact any personnel decision such as hiring, promotion, compensation or termination.
3.6. Abusive conduct that is threatening, humiliating, or intimidating.
3.7. Acts, activities or conditions that create a hostile, intimidating or offensive environment.
3.8. Talking about hurting others.
3.9. Displaying or sharing derogatory, demeaning, sexually explicit or otherwise offensive posters, pictures, or other materials.
3.10. Threats – implied or express, verbal or physical.
3.11. Saying things or acting in a way that leaves someone associated with the Company feeling threatened.
3.12. Standing too close to someone or blocking their way.
3.13. Reporting to work in a condition that is not free from alcohol or illegal drugs.
3.14. Consuming, possessing, distributing, being under the influence of or selling illegal drugs on Company premises.
3.15. Shoving, intimidating, hitting or acting violently toward another person.

4. Potential Personal Liability. In some countries, an employee or supervisor who harasses another employee may be held individually liable and subject to the same kind of penalties imposed on employers.

5. Reporting and Investigating Misconduct.

5.1. If you think or feel that you or any other employee is being harassed, discriminated against or is the victim of any other bad behavior described in this policy, *do not assume that the Company is aware of the situation.* You have a responsibility to report these concerns so that they can be addressed and resolved.
5.2. If you are unclear whether behaviors are harassment or in some other way unacceptable, report them or ask your manager, another manager in your location, a Human Resources representative, or the Ethics and Compliance office.
5.3. Reports may be oral or written. When matter is brought to our attention, we take it seriously and promptly investigate. Each of us is expected to make reports in "good faith."
5.4. Reports should be made promptly so that the problem can be remedied at the earliest opportunity. You may report these incidents and concerns directly to:
   - Your immediate supervisor or any manager at your location
   - A Human Resources representative locally
   - A business leader at your facility or the Plant Manager
   - A Human Resources Director or Vice President outside your location
   - The Ethics & Compliance Office at Corporate
   - The Regal Integrity Alert Line

5.5. Employees at all levels must cooperate in investigations. We will take steps to keep the matter as confidential as possible as well as ensure actions are taken to stop the bad behavior. We will not try to determine the identity of anonymous reporters. We may need to ask for additional information before we begin an investigation.
5.6. Regal will appropriately discipline (up to and including termination) employees whc conduct violates this Policy. If we find that a customer, vendor or other person conduc

business with Regal is harassing an employee, we will take steps to see that the offensive behavior stops.

6. Retaliation is Prohibited. No one may retaliate against you in any way for making a report. If you have made a report and feel you are being retaliated against, immediately contact the Ethics and Compliance office (integrity@regalbeloit.com) or the Regal Integrity Alert Line or www.regalbeloitintegrity.alertline.com (or if you work in the EU, www.regalbeloitEUintegrity.alertline.com).

7. Associated Documents, Policies and Procedures (additional requirements)
Code of Business Conduct and Ethics (open page, choose language)

8. Regal Resources and Questions
8.1. Do not try to resolve uncertainties on your own. Participate in training and complete assessments and certifications provided to you. Not following this policy or any associated procedures will be looked at seriously and may be grounds for discipline up to and including termination with cause.
8.2. In addition to your local and corporate resources, employees may ask for guidance and report concerns by contacting Regal's Integrity Alert Line.

REGAL

**Power Transmission Solutions**

## EHS-009 Powered Industrial Equipment Licensing Procedure

**NOTE:** Per OSHA 1910.178(l)(2)(iii), training may only be delivered by an experienced, qualified, licensed equipment operator for that specific piece of equipment.

**1.0 Purpose:**
To ensure all Powered Industrial Equipment operators are properly trained and licensed.

**2.0 Scope:**
All personnel who operate Powered Industrial Equipment in the PTS Florence, KY facility.

**3.0 Medical Screening**
The Company will review each instance where an employee, or a prospective employee, does not pass the medical exam. In these situations, a representative from Human Resources and the department Supervisor or Manager will discuss the matter with the person to determine, if appropriate, whether any reasonable accommodation(s) exist that would allow the person to complete the essential functions of the position.

**4.0 Procedure:**
It is the policy of PTS to conduct a thorough assessment of each employee (new hire and current) whose job responsibilities involve operating Powered Industrial Equipment (PIE). The assessment includes medical screening, written quizzes, and demonstrated competencies by the employee for each piece of equipment they will operate.

**New Hires:**

**Medical Screening:**

4.1 HR will schedule medical exams, and advise the appropriate personnel of the results.

- 4.1.1 If the potential employee passes the medical exam they are eligible to proceed with the training and licensing process as described in this policy.
  - 4.1.1.1 If the employee passes the medical exam but with restrictions HR will review those restrictions, and involve other appropriate personnel as necessary.

4.2 If the potential employee does not pass the medical exam:

- 4.2.1 But the medical situation is deemed to be correctable they may apply again in the future.
- 4.2.2 If the medical situation is deemed to be uncorrectable the potential employee will not be hired for the position.

4.3 **Equipment Licensing and Training (New Hires and Temporary Employees):** The supervisor/designee will deliver the classroom training to the trainee including:

- 4.3.1 The Overview - Powered Industrial Equipment Operator Training presentation.
- 4.3.2 The Powered Industrial Equipment Overview Quiz which is a written quiz.



KENTUCKIANA
Date 6-26-17
Reporter KB Exhibit # 7
Case 2:16-CV-00134-DLB-CJS
Deponent Nicole George

REGAL

4.3.2.1 A passing grade of 80% (which is 16 out of 20 questions correct) is required before the driving test may be administered.

4.3.2.2 If necessary, the presentation may be reviewed again, and the written quiz taken up to three times.

4.3.2.3 If the trainee has not successfully passed the written portion of the assessment within three attempts the EHS Supervisor must be advised.

4.3.2.4 After the written quiz has been successfully completed it should be forwarded to the EHS Supervisor for filing.

4.4 Upon successful completion of the steps outlined in 3.3, the trainee's supervisor will schedule the operating portion of the training. The trainee will observe an experienced, licensed operator demonstrate the proper steps required to inspect and operate the equipment in a safe manner.

4.4.1 The demonstration will include at a minimum the following elements:

4.4.1.1 An explanation of all "controls" (buttons, levers, knobs, etc. on the equipment), and their purpose and function.

4.4.1.2 How to operate the "controls" (see them in action).

4.4.1.3 Equipment inspection procedures and completion of the Powered Industrial Equipment (PIE) Checklist.

4.4.1.4 How to start, steer, move, accelerate, stop, park, and place controls in neutral.

4.4.1.5 How to operate the equipment in a controlled and safe manner. Demonstrations of the major, and any relevant minor tasks that may be completed while operating the equipment should be demonstrated. (I.E. stacking and unstacking pallets, placing a pallet in, and removing a pallet from an elevated rack location, battery charging, etc.).

4.4.1.6 Explain the safety rules and signs.

4.4.1.7 Other elements not mentioned but deemed important by the supervisor/designee conducting the training.

4.5 Under the observation of the supervisor/designee the trainee must perform the necessary inspection steps, and demonstrate how to properly, and safely operate all controls on each piece of equipment they are to be licensed for.

4.5.1 The supervisor/designee will give the trainee verbal commands relative to the equipment's operation, and the trainee must successfully perform each task.

4.5.2 The trainee will complete the Powered Industrial Equipment (PIE) Checklist.

4.5.3 When the supervisor/designee feels the trainee is competent with the basic operating requirements of the equipment, an obstacle course will be set up that will test the necessary skills needed to safely operate that particular piece of equipment.

REGAL

4.5.3.1 The course should include realistic obstacles and tasks that the trainee will encounter in the normal course of operating the equipment. For example:

- Stacking pallets.
- Driving up/down a ramp.
- Maneuvering between obstacles without hitting them.
- Placing and retrieving pallets from an elevated rack location.
- Driving through intersections.
- Other, including elements outlined in the Powered Industrial Equipment Driving Test for that specific equipment.

4.5.4 After the trainee has successfully passed the Powered Industrial Equipment Driving Test the supervisor/designee will update the Licensed Powered Industrial Equipment Operators Log for each appropriate piece of equipment.

4.5.5 The supervisor/designee will generate a new Powered Industrial Equipment Operator's License highlighting or punching the equipment that the license certifies.

**Department Transfers/Changes in Responsibilities**

**Medical Screening:**

4.6 If an employee transfers to another department, and/or there is a change to the employee's job responsibilities that requires them to operate powered industrial equipment that they are not currently licensed to operate, and they have not had the required medical exam for operating powered industrial equipment within the last three years, must receive a medical exam prior to operating the equipment.

4.7 HR will schedule medical exams, and advise the appropriate personnel of the results.

4.7.1 If the employee passes the medical exam they are eligible to proceed with the training and licensing process as described in this policy.

4.7.1.1 If the employee passes the medical exam but with restrictions HR will review those restrictions, and involve other appropriate personnel as necessary.

4.8 If the employee does not pass the medical exam:

4.8.1 But the medical situation is deemed to be correctable they may apply again in the future.

4.8.2 If the medical situation is deemed to be uncorrectable the employee will not be permitted to operate powered industrial equipment, and will remain in their current position.

4.9 **Equipment Licensing and Training:** The supervisor/designee will deliver the classroom training to the trainee including:

4.9.1 The Overview – Powered Industrial Equipment Operator Training presentation.

4.9.2 The Powered Industrial Equipment Overview Quiz which is a written quiz.

4.9.2.1 A passing grade of 80% (which is 16 out of 20 questions correct) is required before the driving test may be administered.

4.9.2.2 If necessary, the presentation may be reviewed again, and the written quiz taken up to three times.

REGAL

4.9.2.3 If the trainee has not successfully passed the written portion of the assessment within three attempts the EHS Supervisor must be advised.

4.9.2.4 After the written quiz has been successfully completed it should be forwarded to the EHS Supervisor for filing.

4.10 Upon successful completion of the steps outlined in 3.9, the trainee's supervisor will schedule the driving portion of the training. The trainee will observe an experienced, licensed operator demonstrate the proper steps required to inspect and operate the equipment in a safe manner.

4.10.1 The demonstration will include at a minimum the following elements:

4.10.1.1 An explanation of all "controls" (buttons, levers, knobs, etc. on the equipment), and their purpose and function.

4.10.1.2 How to operate the "controls" (see them in action).

4.10.1.3 Equipment inspection procedures, and completion of the Powered Industrial Equipment (PIE) Checklist.

4.10.1.4 How to start, steer, move, accelerate, stop, park, and place controls in neutral.

4.10.1.5 How to operate the equipment in a controlled and safe manner. Demonstrations of the major, and any relevant minor tasks that may be completed while operating the equipment should be demonstrated. (I.E. stacking and unstacking pallets, placing a pallet in, and removing a pallet from an elevated rack location, battery charging, etc.).

4.10.1.6 Explain the safety rules and signs.

4.10.1.7 Other elements not mentioned but deemed important by the supervisor/designee conducting the training.

4.11 Under the observation of the supervisor/designee the trainee must perform the necessary inspection steps, and demonstrate how to properly, and safely operate all controls on each piece of equipment they are to be licensed for.

4.11.1 The supervisor/designee will give the trainee verbal commands relative to the equipment's operation, and the trainee must successfully perform each task.

4.11.2 The trainee will complete the Powered Industrial Equipment (PIE) Checklist.

4.11.3 When the supervisor/designee feels the trainee is competent with the basic operating requirements of the equipment, an obstacle course will be set up that will test the necessary skills needed to safely operate that particular piece of equipment.

4.11.3.1 The course should include realistic obstacles and tasks that the trainee will encounter in the normal course of operating the equipment. For example:

- Stacking pallets.
- Driving up/down a ramp.
- Maneuvering between obstacles without hitting them.
- Placing and retrieving pallets from an elevated rack location.
- Driving through intersections.
- Other, including elements outlined in the Powered Industrial Equipment Driving Test for that specific equipment.

REGAL

4.11.4 After the trainee has successfully passed the Powered Industrial Equipment Driving Test the supervisor/designee will update the Licensed Powered Industrial Equipment Operators Log for each appropriate piece of equipment.

4.11.5 The supervisor/designee will generate a new Powered Industrial Equipment Operator's License highlighting or punching the equipment that the license certifies.

**Licenses Renewals:**

4.12 A Powered Industrial Equipment Operator License must be renewed every three years in the anniversary month of when the license was issued. For example, if the license was issued on May 3, 2012, it must be renewed in the month of May of 2015.

4.13 Monthly, all involved supervisors/designees will review the Licensed Powered Industrial Equipment Operators Log to determine which of their employees require their licenses to be renewed.

4.13.1 The names of each employee whose license is up for renewal must be provided to HR 60 days in advance of the renewal month.
*NOTE: Every attempt should be made to plan ahead in order to avoid an expired license. Employees may not operate any equipment that they do not have a valid license for.*

4.13.2 If during the review of the log it is discovered than an employee no longer operates a particular piece of powered industrial equipment, or they are no longer employed at PTS a note must be made that reflects those changes.

4.13.2.1 The names must not be deleted, rather a note indicating any changes made.

4.14 **Revoked/Expired Licenses:** Expired and/or revoked licenses will be confiscated by the employee's supervisor.

4.15 **Medical Exams:** HR will schedule medical exams, and advise the appropriate personnel of the results.

4.15.1 If the employee passes the medical exam, proceed with the renewal process as described in this policy.

4.15.1.1 If the employee passes the medical exam but with restrictions, HR must review those restrictions, and involve other appropriate personnel as necessary.

4.15.2 If the employee does not pass the medical exam their license must be suspended immediately!

4.15.2.1 If operating powered industrial equipment is not a job requirement the employee may remain in their current position but are no longer eligible to operate powered industrial equipment.

4.15.2.2 If operating powered industrial equipment is a job requirement, and the employee is incapable of, or unwilling to take the necessary actions to pass the medical exam they will be displaced, and allowed to bid on a job that does not require a powered industrial equipment operator's license.

REGAL

4.15.2.3 If operating powered industrial equipment is a job requirement, and the employee may be capable of passing the medical exam, and they show evidence of corrective actions being taken they will be temporarily reassigned until a final determination has been made.

4.16 The supervisor/designee will administer the Powered Industrial Equipment Driving Test to all employees whose licenses are up for renewal. Again, a driving test is required for each piece of equipment the employee is intended to operate.

4.16.1 If an employee is licensed for multiple pieces of equipment with multiple renewal dates, all should be renewed at the same time.

4.16.2 If the employee passes the medical exam and driving test their license will be renewed for the specific equipment involved.

4.16.3 If an employee is unable to achieve a passing score for a piece of equipment that is necessary for them to perform their job duties, they may not operate that equipment. The supervisor should contact HR and the EHS Supervisor for further direction.

4.17 As necessary, the supervisor/designee will update the Licensed Powered Industrial Equipment Operator Log, and generate the new Powered Industrial Equipment Operator's License.

**Refresher Training**

4.18 In the event of any of the following instances, the employee must receive refresher training and successfully demonstrate the skills to properly and safely operate the equipment involved.

4.18.1 The employee is observed operating powered industrial equipment in an unsafe manner.

4.18.2 The employee has been involved in an accident or near miss incident that is considered to be serious by supervision or management.

4.18.3 The employee is assigned to operate a different type of powered industrial equipment.

4.18.4 There is a change in the conditions of the workplace that could affect safe operation of the equipment. For example, now the employee is asked to operate the powered industrial equipment outside.

4.19 If a member of management or supervision feels it is appropriate given a certain situation, the Powered Industrial Equipment Driving Test may be reissued at any time.

4.20 **Contractors:** Prior to allowing a contractor to operate any PTS owned Powered Industrial Equipment their qualifications/licenses will be verified.

**5.0 Reference Documents:**

- Overview - Powered Industrial Equipment Operator Training
- Powered Industrial Equipment (PIE) Checklist
- Powered Industrial Equipment Overview Quiz
- Licensed Powered Industrial Equipment Operators Log
- Powered Industrial Equipment Driving Test
- Powered Industrial Equipment Operator's License

REGAL

**6.0 Revisions:**

| Revision | Date | Change |
|---|---|---|
| 1 | 2-27-13 | Added the PIE Checklist |
| 2 | 3-28-13 | Section 3.3 added New Hire training requirements. Section 3.20 added Contractor PIE qualification requirements. |
| 3 | 4-26-13 | Added a new section 3.0 Medical Screening. |

OSHA does not mandate specific medical standards for PIV operators. But as with most safety sensitive positions, a certain level of medical fitness is advisable to insure that the operator can perform the essential functions of the job without presenting a hazard to themselves or others. Each person's fitness should always be judged individually in light of the job requirements. The medical status of the operator is matched to the driving task and recommendations are made on that basis. In general, the requirements of the DOT Commercial Driver Medical Standards are used as a starting point.

PIV operators should be screened prior to starting driving duties. Periodic screening is recommended as operators medical status can change. The interval may vary from one to five years depending on the nature of the job and the health of the operator. In older operators, for example over 65 years, annual reassessment is suggested. Reassessment is recommended any time the employer has concerns about the fitness of the operator or if the operator has suffered a significant medical problem (usually noted by a prolonged absence from work).

Medical requirements:

1. General:
    a. Full movement of the trunk, neck, arms and legs with normal agility and strength is normally required. Loss or disability of a limb may, in some circumstances, be accommodated either by restricting the type of vehicle driven or making modifications to the equipment.
    b. A history of mental illness is not disqualifying unless the operator is presently having significant symptoms. (such as suicidal behaviors or violent tendencies)
    c. Operators who have active substance abuse (alcohol or drugs) should not be PIV operators.
    d. Use of prescription medications may be problematic if the effects or side effects of the medications may impair attention, judgment or coordination.

2. Vision: Safe operation of a PIV in close proximity to other workers and in tight quarters requires good vision. Distance vision should be that required for a commercial vehicle. Operators with vision in only one eye or those with double vision may have difficulty with judging distance in close quarters. For monocular operators who are well adapted to monocular vision, a practical test is often the best way to assess their fitness.

3. Hearing: The ability to hear warning signals such as backup alarms is important for PIV operators. An audiogram is useful to assess the operators hearing. Those with a severe hearing loss in both ears not corrected with hearing aids may have difficulty in safely operating a PIV.

4. Other Medical Conditions: Any medical condition that places the operator at a significant risk of a sudden or subtle incapacitation should be viewed with caution. An example of this would be an operator with poorly controlled epilepsy that is likely to have a seizure. An operator with medically well controlled epilepsy and unlikely to have a seizure would not represent a significant risk. Another example is that of diabetic operators. Those diabetic operators well controlled with diet or medications are normally acceptable. Those well controlled with insulin are acceptable as long as they do not have frequent, severe, or unrecognized episodes of low blood sugar. Operators with heart disease are individually assessed to determine their risk of suffering an incapacitating event.

The Examination:

The general examination for PIV operator should include the following for all applicants and for reassessment. Special operating environments or special equipment may require additional medical testing. For example, color vision testing is not recommended for all operators but may be necessary in some operating environments if recognition of specific colors is required.

Vision test (distant vision) and an assessment of depth perception,
Audiogram,
Vital Signs (height, weight, blood pressure, pulse),
Completion of a general medical history form and review by the medical provider,
A general physical examination including assessment of the eyes, ears, nose and throat, lungs and heart and examination of the movement and strength of the musculoskeletal system,
Other specific tests as recommended by the medical provider to investigate any specific abnormality. This may include the review of medical records supplied by the patient.

The Report:

The employer will be provided with a report that gives the applicants name and identifying information and a recommendation as to whether the applicant is fit, unfit or fit with restrictions. The medical information provided to the examiner is not released to the employer without the written consent of the applicant. The medical provider will work with the employer to determine acceptable accommodations for recommended restrictions.

St. Elizabeth HEALTHCARE

Business Health Services

*"Partnering for Employee Health and Productivity"*

# Medical Condition Clarification

Date: 1-15-15

Name: Sheila Jackson Date of Birth: 12-12-61

SS#: 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 Position Seeking: Forklift

Please provide the following information from your treating medical provider to the Business Health Center within two weeks.

**Medical Condition of concern** SURGERY - ALL MEDICAL RECORDS

1. Current diagnosis of your medical condition
2. The treatment you have received to date
3. The prognosis
4. Any relevant tests (include results)
5. List of any medications you are receiving and any restrictions arising from their use
6. Any restrictions or limitations that may limit your activities at home or at work and the time period during which those restrictions will be in effect
7. Any additional information that your medical provider thinks would help us to make our medical recommendation.

Please fax or bring this information to the Business Health Center.
**ATTENTION Dr.** HASKELL. Fax numbers are listed below.
It is important that you inform your medical provider about your expected job duties so that he/she can provide the most complete information to us.

**You may be unable to perform any work related duties until you provide the requested information.**

If you or your medical provider has any questions, feel free to contact the medical provider named above. Contact numbers are listed below. After the requested information is provided, you will be contacted if additional medical information is required.

Comments:

Thank you,
St. Elizabeth Business Health Center

Business Health - Hebron
2200 Conner Rd.
Hebron, KY 41048
Phone (859) 344-2030
Fax (859) 344-2027

Business Health - Mt. Zion
10095 Investment Way
Florence, KY 41042
Phone (859) 301-9050
Fax (859) 301-9055

Business Health - Edgewood
200 Medical Village Drive
Edgewood, KY 41017
Phone (859) 301-2999
Fax (859) 301-2997

www.stelizabeth.com/businesshealth

#1072 Rev. 06/2012

Date 6-26-17
KENTUCKIANA Reporter KB Exhibit # 5
Case 2:16-CV-00134-DLB-CJS
Deponent Nicole George

St. Elizabeth HEALTHCARE
Business Health Services

"Partnering for Employee Health and Productivity"

01/15/2015

Emerson Power Transmission
7120 New Buffington Road
Florence, KY 41042

Dear Valued Client,

This is to inform you that ____Sheila Jackson____ was seen for a physical examination on 01/15/2015. The examination has been placed on medical hold pending receipt of additional information concerning this individual. The patient has been instructed to provide the requested documentation within two weeks in order for the provider to make a medical determination. If the information is not received within the time allotted the physical results will be reported as incomplete.

Please feel free to contact St Elizabeth Business Health - Mt Zion (859) 301-9050 if you have any questions.

Sincerely,
Business Health Center
St. Elizabeth Healthcare

#1112 Rev 02/2012

St. Elizabeth HEALTHCARE
Business Health Services

*"Partnering for Employee Health and Productivity"*

## Occupational Evaluation

Date: 02/10/2015

Company: Emerson Power Transmission Position Applying For: ____________

Name: Sheila Jackson DOB: 12/12/1961

This applicant had a ********** physical examination in our office on 01/15/2015. The recommendation is based on available medical information and the results of the physical examination.

- [ ] This individual can perform the essential functions of the job. There is no anticipated need for special considerations or accommodations for this individual. The applicant was advised of any medical findings and was advised to seek appropriate medical care.
- [ ] This individual can perform the essential functions of the job with the following recommended accommodations.
  - [ ] No operation of powered industrial vehicles until vision is adequately corrected.
  - [ ] Prescription medication use may adversely affect performance of safety sensitive work.
  - [ ] I recommend the following restrictions and/or accommodations:
- [ ] This individual cannot perform the essential job functions and no reasonable accommodation can be made.
- [ ] Based on a significant risk of substantial harm, this individual poses a direct threat to the health or safety of himself/herself and/or others that cannot be reduced or eliminated by reasonable accommodations.
- [✓] Additional medical information has not been received concerning this individual. Physical results are incomplete.

If you have any questions concerning this examination do not hesitate to contact us. Thank you for allowing us to assist you in this matter.

Brent Haskell, MD

better together | www.stelizabeth.com

St Elizabeth Business Health - Mt Zion
10006 Investment Way, Suite 2
Florence, KY 41042
Phone: (859) 301-0050
Fax: (859) 301-0050

www.stelizabeth.com/businesshealth

EMERSON. Industrial Automation

# Power Transmission Solutions
## Florence, Kentucky

Exhibit # 6
Date 6-26-17
KENTUCKIANA Reporter KB
Case 2:16-CV-00134-DLB-CJS
Deponent Nicole George

| | |
|---|---|
| **Number of Positions:** | Position(s) – 2 (two) |
| **Position:** | Value Added Packer |
| **Shift:** | 7:00 a.m. to 3:30 p.m. – 1st shift |
| **Grade:** | Hourly – Labor Grade 5 |
| **Department:** | Distribution – Drive Kits |
| **Supervisor:** | Mike Tobias |
| **Educational Requirements:** | Must have High School Diploma or equivalent |
| **Purpose of position:** | • Process specific customer orders which require special processing and a high degree of accuracy |
| **Position Description:** | • All duties as assigned by supervisor<br>• Determine special instructions/rules for customer<br>• Specific quality guidelines may require additional auditing, labeling, markings, etc.<br>• Report all questionable material or irregularities<br>• Follow established packing procedures |
| **Special Skills\Requirements:** | • High attention to detail<br>• Ability to read and follow specific instructions<br>• Good judgment |
| **Physical Requirements:** | • Must be able to lift up to 70 lbs.<br>• Must be comfortable with heights up to 20 ft.<br>• Must be able to stand and / or walk for long periods of time |

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (48 hours)

| | | | |
|---|---|---|---|
| Date Posted: | 6/5/2013 | Time: | 8:00am |
| Removal Date: | 6/7/2013 | Time: | 8:00am |

Maysville (72 hours)

| | | | |
|---|---|---|---|
| Date Posted: | 6/5/2013 | Time: | 8:00am |
| Removal Date: | 6/10/2013 | Time: | 8:00am |

| Date | Position | Shift | Grade | Comments |
|---|---|---|---|---|
| 2/13/2015 | Production Operator - Stuffing | 1 | 3 | No Bids |
| 3/10/2015 | Team Lead (SP) | 1 | 7 | Interview Based - Unsure |
| 3/18/2015 | Process Technician II | 2 | 8 | Interview Based - Unsure |
| 3/23/2015 | Extrusion Set up Tech | B | 7 | No Bids |
| 3/23/2015 | Production Operator - Molding | 1 | 3/5 | Would have been successful candidate based on seniority |
| 3/23/2015 | Molding Set up Tech | 2 | 7 | No Bids |
| 3/30/3015 | Production Tech - Flex | 2 | 7 | No Bids |
| 4/7/2015 | Production Operator - Extrusion | A | 3 | No Bids |
| 4/7/2015 | Extrusion Set up Tech | A | 7 | No Bids |
| 4/7/2015 | Extrusion Set up Tech | D | 7 | Interview Based - Unsure |
| 4/22/2015 | Process Technician I/II | 2 | 5/8 | Interview Based - Unsure |
| 5/15/2015 | Distribution Clerk | 1 | 3 | Would have been successful candidate based on seniority |
| 6/4/2015 | Production Tech - Flex | 1 | 5 | Would have been successful candidate based on seniority |
| 6/4/2015 | Production Operator - Molding | 2 | 3/5 | No Bids |
| 7/6/2015 | Production Operator - Molding | 2 | 3/5 | No Bids |
| 7/6/2015 | Extrusion Set up Tech | D | 7 | No Bids |
| 7/6/2015 | Production Operator - Asseembly | 2 | 3 | No Bids |
| 7/6/2015 | Process Tech II | 1 | 8 | Interview Based - Unsure |
| 7/14/2015 | Extrusion Set up Tech | A,B,D | 7 | Interview Based - Unsure |
| 8/10/2015 | Production Tech - Flex | 1 | 5 | No Bids |
| 8/10/2015 | Distribution Clerk | 1 | 3 | Would have been successful candidate based on seniority |
| 8/24/2015 | Distribution Services - Team Lead | 1 | 7 | Interview Based - Unsure |
| 10/14/2015 | Production Tech - Flex | 2 | 5 | Would have been successful candidate based on seniority |
| 10/14/2015 | Extrusion Set up Tech | B, D | 7 | Interview Based - Unsure |
| 11/3/2015 | Production Operator - Asseembly | 1 | 3 | Would have been successful candidate based on seniority |
| 11/11/2015 | Production Operator - Molding | 1 | 3/5 | No Bids |
| 11/11/2015 | Extrusion Set up Tech | C | 7 | Interview Based - Unsure |
| 12/8/2015 | Set up Tech - Molding | 1 | 7 | Interview Based - Unsure |
| 12/28/2015 | Production Operator - Molding | 1,2,3 | 3/5 | Would have been successful candidate based on seniority |
| 1/5/2016 | Production Operator - Stuffing | 1 | 3 | No Bids |
| 1/5/2016 | Production Operator - Molding | 3 | 3/5 | No Bids |
| 1/15/2016 | Production Operator - Molding | 2 | 3/5 | No Bids |
| 1/28/2016 | Set up Tech - Molding | 3 | 7 | No Bids |

KENTUCKIANA COURT REPORTERS
Date 6-26-17
Reporter KB Exhibit # 7
Case 2:16-CV-00134-DLB-CJS
Deponent Nicole George

EMERSON
Industrial Automation

# Power Transmission Solutions
# Florence, Kentucky

**Number of Positions:** Position(s) – 1 (one)

**Position:** **Production Operator**

**Shift:** 3:00pm – 11:30pm (2nd shift)

**Grade:** Hourly – Labor Grade 3

**Department:** Solus Production – Assembly

**Supervisor:** Connie Hand

**Educational Requirements:** Must have High school or equivalent

**Purpose of position:** Serve as a team member performing multi-tasked duties as required to produce quality parts. These tasks include but are not limited to light assembly, injection molding, and guide rail assembly.

**Position Description:**

- Setup and operate as required to produce quality parts.
- Read and interpret oral, written and visual instruction for operation and setup.
- Monitor machine performance and make adjustments as necessary.
- Monitor quality of parts using visual and inspection techniques.
- Perform daily housekeeping duties as required to keep entire work area clean and organized.
- Actively participate in group problem solving and continuous improvement techniques.
- Assist others as required.
- Rotate job assignments as required to assure cross-functional training of the group.
- Communicate status of operations to co-workers at shift change on a daily basis.
- Actively participate in the development and attainment of group goals.
- Other work related duties as assigned.

**Physical Demands**

- Extensive use of machinery, hand tools, walking, stooping, sitting, standing, reaching, lifting up to 70 pounds.

**Special Skills\Requirements:**

- Able to understand, interpret and carry out job instructions.
- Able to indentify dimensions and tolerances from drawings.
- Able to convert decimals to fractions and vice versa.
- Able to add and subtract decimals and fractions.
- Able to accurately measure parts using micrometers, calipers, scale, etc.

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (72 hrs)

| | | | |
|---|---|---|---|
| Date Posted: | 9/16/14 | Time: | 10:30am |
| Removal Date: | 9/19/14 | Time: | 10:30am |

# Power Transmission Solutions
# Florence, Kentucky

**Number of Positions:** Position(s) – 1 (one)

**Position:** **Production Operator**

**Shift:** 7 a.m. to 3:30 p.m. – 1st shift

**Grade:** Hourly – Labor Grade 3

**Department:** Solus Production – Stuffing

**Supervisor:** Debbie Hilterbrand

**Educational Requirements:** Must have High school or equivalent

**Purpose of position:** Serve as a team member performing multi-tasked duties as required to produce quality parts. These tasks include but are not limited to light assembly, injection molding, and guide rail assembly.

**Position Description:**

- Setup and operate as required to produce quality parts.
- Read and interpret oral, written and visual instruction for operation and setup.
- Monitor machine performance and make adjustments as necessary.
- Monitor quality of parts using visual and inspection techniques.
- Perform daily housekeeping duties as required to keep entire work area clean and organized.
- Actively participate in group problem solving and continuous improvement techniques.
- Assist others as required.
- Rotate job assignments as required to assure cross-functional training of the group.
- Communicate status of operations to co-workers at shift change on a daily basis.
- Actively participate in the development and attainment of group goals.
- Other work related duties as assigned.

**Physical Demands**

- Extensive use of machinery, hand tools, walking, stooping, sitting, standing, reaching, lifting up to 70 pounds.

**Special Skills\Requirements:**

- Able to understand, interpret and carry out job instructions.
- Able to indentify dimensions and tolerances from drawings.
- Able to convert decimals to fractions and vice versa.
- Able to add and subtract decimals and fractions.
- Able to accurately measure parts using micrometers, calipers, scale, etc.

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (72 hours)

| | | | |
|---|---|---|---|
| Date Posted: | 1/5/16 | Time: | 8:30am |
| Removal Date: | 1/8/16 | Time: | 8:30am |

# Power Transmission Solutions
# Florence, Kentucky

| | |
|---|---|
| **Number of Positions:** | Position(s) –1 (one) |
| **Position:** | **Production Operator** |
| **Shift:** | 3:00pm – 11:45pm |
| **Grade:** | Hourly – Labor Grade 3/5** |
| **Department:** | Solus Production – Injection Molding |
| **Supervisor:** | Connie Hand |
| **Educational Requirements:** | Must have High school or equivalent |
| **Purpose of position:** | Serve as a team member performing multi-tasked duties as required to produce quality parts. These tasks include but are not limited to light assembly, injection molding, and guide rail assembly. |

**Position Description:**

- Setup and operate as required to produce quality parts.
- Read and interpret oral, written and visual instruction for operation and setup.
- Monitor machine performance and make adjustments as necessary.
- Monitor quality of parts using visual and inspection techniques.
- Perform daily housekeeping duties as required to keep entire work area clean and organized.
- Actively participate in group problem solving and continuous improvement techniques.
- Assist others as required.
- Rotate job assignments as required to assure cross-functional training of the group.
- Communicate status of operations to co-workers at shift change on a daily basis.
- Actively participate in the development and attainment of group goals.
- Other work related duties as assigned.

**Physical Demands**

- Extensive use of machinery, hand tools, walking, stooping, sitting, standing, reaching, lifting up to 70 pounds.

**Special Skills\Requirements:**

- Able to understand, interpret and carry out job instructions.
- Able to indentify dimensions and tolerances from drawings.
- Able to convert decimals to fractions and vice versa.
- Able to add and subtract decimals and fractions.
- Able to accurately measure parts using micrometers, calipers, scale, etc.

** Must meet and demonstrate ALL qualifications to progress to grade 5

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (72 hours)

| | | | |
|---|---|---|---|
| Date Posted: | 9/7/16 | Time: | 9:00am |
| Removal Date: | 9/12/16 | Time: | 9:00am |

# Power Transmission Solutions
# Florence, Kentucky

| | |
|---|---|
| **Number of Positions:** | Position(s) – 1 (one) |
| **Position:** | **Production Operator** |
| **Shift:** | 7:00am – 7:00pm (Team A)<br>(Will be on 24/7 rotation)<br>Hourly - Labor Grade 3 |
| **Department:** | Solus Production – Extrusion |
| **Supervisor:** | Debbie Hilterbrand / Connie Hand |
| **Educational Requirements:** | Must have High school or equivalent |
| **Purpose of position:** | Serve as a team member performing multi-tasked duties as required to produce quality parts. These tasks include but are not limited to light assembly, injection molding, and guide rail assembly. |

**Position Description:**

- Setup and operate as required to produce quality parts.
- Read and interpret oral, written and visual instruction for operation and setup.
- Monitor machine performance and make adjustments as necessary.
- Monitor quality of parts using visual and inspection techniques.
- Perform daily housekeeping duties as required to keep entire work area clean and organized.
- Actively participate in group problem solving and continuous improvement techniques.
- Assist others as required.
- Rotate job assignments as required to assure cross-functional training of the group.
- Communicate status of operations to co-workers at shift change on a daily basis.
- Actively participate in the development and attainment of group goals.
- Other work related duties as assigned.

**Physical Demands**

- Extensive use of machinery, hand tools, walking, stooping, sitting, standing, reaching, lifting up to 70 pounds.

**Special Skills\Requirements:**

- Able to understand, interpret and carry out job instructions.
- Able to indentify dimensions and tolerances from drawings.
- Able to convert decimals to fractions and vice versa.
- Able to add and subtract decimals and fractions.
- Able to accurately measure parts using micrometers, calipers, scale, etc.

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (72 hours)

| | | | |
|---|---|---|---|
| Date Posted: | 4/7/15 | Time: | 10:00am |
| Removal Date: | 4/10/15 | Time: | 10:00am |

EMERSON
Industrial Automation

# Power Transmission Solutions
# Florence, Kentucky

**Position:** **Process Technician III**

**Grade:** Hourly – Labor Grade 8

**Number of Positions:** Position(s) – 1(one)

**Department:** Kop-Flex

**Projected Start Date:** August 22nd – September 22nd

**Supervisor:** Bill Lynne

**Shift:** 1st shift (7:00am – 3:30pm)

**Educational Requirements:** Must have High School Diploma or equivalent

**Experience:** Over 3 years

****RESUME REQUIRED****

**Purpose of Position:** Performs setups, machine adjustments, minor repairs, test, calibrate and operate CNC and manual machinery and other equipment related to production. Involved with implementations programs to minimize production change over's and machine down time.

**Position Description:**

- Read and interpret complex oral, written and visual instructions for machine set up.
- Set up machines or cells of machines according to instructions or established practice.
- Ensure proper tools and set up sheet is used.
- Make checks, adjust tools and program parameters to maintain proper dimensions, maintain proper coolant and lubrication levels as required.
- Operate designated machines as instructed.
- Break down set ups and clean up work area as directed
- Responsible for creating, saving and establishing a set up sheet. Programs will be stored on the network for future use.
- Obtain first piece inspection when runs are more then 3 pieces.
- Responsible for approving set-up based on measurements made at the cell.
- Report equipment malfunctions, material discrepancies, and unusual conditions to supervisor.
- Complete all relevant training provided by Power Transmission Solutions.
- Maintain safe and clean work area.
- Promote team concept and train new employees.
- Adhere to all safety procedures.
- Understand and adhere to all relevant ISO 9001 QOP's and API 671 guidelines.
- Perform any other related duties as directed

**Special Skills / Physical Requirements:**

- Able to understand, interpret and carry out job instructions.
- Able to use arithmetic, decimals and fractions
- Complex products, machines, programming and processes such as heat treat, gear cutting, grinding, complex turning and milling utilizing multiple machine axis.
- Must be able to lift up to 55 lbs.
- Must be able to stand and/or walk for long periods of time

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (48 hours)

| | | | |
|---|---|---|---|
| Date Posted: | | Time: | |
| Removal Date: | | Time: | |

Maysville (72 hours)

| | | | |
|---|---|---|---|
| Date Posted: | | Time: | |
| Removal Date: | | Time: | |

# Power Transmission Solutions
# Florence, Kentucky

**Number of Positions:** Position(s) - 1 (one)

**Position:** Distribution Clerk

**Shift:** 8:00 am – 5:00 pm

**Grade:** Hourly – Labor Grade 3

**Department:** Distribution Office
Reports to Kathy Hibbard

**Educational Requirements:** Must have High School Diploma or equivalent

**Purpose of position:** Maintain document files and provide administrative support

**Position Description:**

- Input, maintain and retrieve documents utilizing Trade Automation and Smart Search software
- Assist Regal Logistics and Trade Compliance with document retrieval
- Order Completion Distribution Clerk duties as required
- Provide administrative support for Shipping Supervisors
- All other duties as assigned by manager

**Special Skills\Requirements:**

- Attention to detail
- Strong communication skills
- Efficient data entry and PC skills

**Physical Requirements:**

- Must be able to lift up to 70 lbs.
- Must be comfortable with heights up to 20 ft.
- Must be able to stand and / or walk for long periods of time

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (72 hours)

| | | | |
|---|---|---|---|
| Date Posted: | 8/8/16 | Time: | 8:00am |
| Removal Date: | 8/11/16 | Time: | 8:00am |

EMERSON
Industrial Automation

# Power Transmission Solutions
# Florence, Kentucky

**Position:** **Process Technician I/II**

**Grade:** Hourly – Labor Grade 5/8

**Number of Positions:** Position(s) – (8) eight

**Department:** Kop-Flex

**Supervisor:** Adam Berger

**Shift:** 2nd shift (3:15pm – 11:45pm)

**Educational Requirements:** Must have High School Diploma or equivalent

**Experience:** Over one year up to and including 18 months

****RESUME REQUIRED****

**Purpose of Position:** Performs setups, machine adjustments, minor repairs, test, calibrate and operate CNC and manual machinery and other equipment related to production. Involved with implementations programs to minimize production change over's and machine down time.

**Position Description:**

- Read and interpret complex oral, written and visual instructions for machine set up.
- Set up machines or cells of machines according to instructions or established practice.
- Ensure proper tools and set up sheet is used.
- Make checks, adjust tools and program parameters to maintain proper dimensions, maintain proper coolant and lubrication levels as required.
- Operate designated machines as instructed.
- Break down set ups and clean up work area as directed
- Responsible for creating, saving and establishing a set up sheet. Programs will be stored on the network for future use.
- Obtain first piece inspection when runs are more then 3 pieces.
- Responsible for approving set-up based on measurements made at the cell.
- Report equipment malfunctions, material discrepancies, and unusual conditions to supervisor.
- Complete all relevant training provided by Power Transmission Solutions.
- Maintain safe and clean work area.
- Promote team concept and train new employees.
- Adhere to all safety procedures.
- Understand and adhere to all relevant ISO 9001 QOP's and API 671 guidelines.
- Perform any other related duties as directed.

**Special Skills / Physical Requirements:**

- Able to understand, interpret and carry out job instructions.
- Able to use arithmetic, decimals and fractions
- Complex products, machines, programming and processes such as gear cutting, grinding, complex turning and milling utilizing multiple machine axis.
- Must be able to lift up to 70 lbs.
- Must be able to stand and/or walk for long periods of time

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (72 hours)

| | | | |
|---|---|---|---|
| Date Posted: | 11/13/14 | Time: | 10:00am |
| Removal Date: | 11/18/14 | Time: | 10:00am |

# Power Transmission Solutions
# Florence, Kentucky

**Number of Positions:** Position(s) – 1 (one)

**Position:** Team Leader

**Shift:** 7:00am – 3:30pm (1st shift)

**Grade:** Hourly – Labor Grade 7

**Department:** Production-Solus

**Supervisor:** Tim Fincham

**Educational Requirements:** Must have High School Diploma or equivalent

**Purpose of position:**

- Coordinate activities in assigned area of responsibility
- Advisor, counselor, and trainer for area of responsibility
- Maintain service levels and promote customer satisfaction
- Anticipate and avoid operational problems

**Position Description:**

- Perform all duties as assigned by Supervisor
- Perform all functions of jobs in department
- Help resolve problems by working with support areas
- Keep the flow of work moving in a positive direction
- Coordinate training new personnel
- Monitor employee performance
- Utilize proper care of equipment, observe good housekeeping practices and prescribed safety precautions.

**Special Skills\Requirements:**

- Good leadership and communication skills
- Ability to anticipate and avoid potential operational problems
- Ability to read and interpret special instructions
- **Resume required**

**Physical Requirements:**

- Must be able to lift up to 70 lbs.
- Must be comfortable with heights up to 20 ft.
- Must be able to stand and / or walk for long periods of time

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (72 hours)

| | | | |
|---|---|---|---|
| Date Posted: | 4/15/16 | Time: | 10:00am |
| Removal Date: | 4/20/16 | Time: | 10:00am |

# Power Transmission Solutions
# Florence, Kentucky

| | |
|---|---|
| **Number of Positions:** | Position(s) - 1 (one) |
| **Position:** | Distribution Services Team Lead |
| **Shift:** | 7:30 am – 4:30 pm |
| **Grade:** | Hourly – Labor Grade 7 |
| **Department:** | Distribution Services<br>Reports to Kathy Hibbard |
| **Educational Requirements:** | Must have High School Diploma or equivalent |

**Purpose of position:**

- Coordinate activities in assigned area of responsibility
- Advisor, counselor, and trainer for area of responsibility
- Maintain service levels and promote customer satisfaction
- Anticipate and avoid operational problems

**Position Description:**

- Perform all functions of jobs in department as required
- Help resolve problems by working with support areas
- Provide support and direction to the Distribution International and Domestic Clerks
- Correspond with Customer Service/Transportation & Logistics
- All other duties as assigned by manager

**Special Skills\Requirements:**

- Self Motivated
- Efficient in analyzing and prioritizing tasks
- Attention to detail
- Strong communication skills
- Effective problem solving skills
- Strong data entry and PC skills
- Proficient in Excel and Word
- CSW and Control II system knowledge
- Flexible work schedule
- Excellent attendance
- **Resume Required**

**Physical Requirements:**

- Must be able to lift up to 70 lbs.
- Must be comfortable with heights up to 20 ft.
- Must be able to stand and / or walk for long periods of time

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (72 hours)

| | | | |
|---|---|---|---|
| Date Posted: | 8/24/15 | Time: | 9:00am |
| Removal Date: | 8/27/15 | Time: | 9:00am |

# Power Transmission Solutions
# Florence, Kentucky

| | |
|---|---|
| **Number of Positions:** | Position(s) – 1 (one) |
| **Position:** | Set-Up Technician |
| **Shift:** | 11:00pm – 7:30am (3rd shift) |
| **Grade:** | Hourly – Labor Grade 7 |
| **Department:** | Molding (Solus) |
| **Supervisor:** | Daniel Thompson |
| **Educational Requirements:** | Must have High School Diploma or equivalent |

**Purpose of position:**

- Maintain service levels and promote customer satisfaction

**Position Description:**

- Perform all duties as assigned by Supervisor
- Perform all functions of jobs in department
- Help resolve problems by working with support areas
- Keep the flow of work moving in a positive direction
- Utilize proper care of equipment, observe good housekeeping practices and prescribed safety precautions.
- Maintain high level of safety awareness in work area while performing tasks

**Special Skills\Requirements:**

- Blueprint reading
- Ability to use measurement tools (i.e. – calipers, micrometers, gauges as required)
- Ability to anticipate and avoid potential operational problems
- Ability to read and interpret special instructions
- **Resume required**

**Physical Requirements:**

- Must be able to lift up to 70 lbs.
- Must be comfortable with heights up to 20 ft.
- Must be able to stand and / or walk for long periods of time

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (72 hours)

| | | | |
|---|---|---|---|
| Date Posted: | 1/28/16 | Time: | 9:00am |
| Removal Date: | 2/2/16 | Time: | 9:00am |

# Power Transmission Solutions
# Florence, Kentucky

| | |
|---|---|
| **Number of Positions:** | Position(s) – 1 (one) |
| **Position:** | Set-Up Technician |
| **Shift:** | 7:00am – 7:00pm (Team A)<br>(Will be on 24/7 rotation) |
| **Grade:** | Hourly – Labor Grade 7 |
| **Department:** | Solus Production – Extrusion |
| **Supervisor:** | Debbie Hilterbrand / Adam Berger |
| **Educational Requirements:** | Must have High School Diploma or equivalent |
| **Purpose of position:** | • Maintain service levels and promote customer satisfaction |
| **Position Description:** | • Perform all duties as assigned by Supervisor<br>• Perform all functions of jobs in department<br>• Help resolve problems by working with support areas<br>• Keep the flow of work moving in a positive direction<br>• Utilize proper care of equipment, observe good housekeeping practices and prescribed safety precautions.<br>• Maintain high level of safety awareness in work area while performing tasks |
| **Special Skills\Requirements:** | • Blueprint reading<br>• Ability to use measurement tools (i.e. – calipers, micrometers, gauges as required)<br>• Ability to anticipate and avoid potential operational problems<br>• Ability to read and interpret special instructions<br>• **Resume required** |
| **Physical Requirements:** | • Must be able to lift up to 70 lbs.<br>• Must be comfortable with heights up to 20 ft.<br>• Must be able to stand and / or walk for long periods of time |

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (72 hours)

| | | | |
|---|---|---|---|
| Date Posted: | 8/31/16 | Time: | 9:00am |
| Removal Date: | 9/6/16 | Time: | 9:00am |

Power Transmission Solutions
7120 New Buffington Road
Florence, KY 41042
T 859 727 5251

February 11, 2016

Sheila Jackson,

Per the Displacement Agreement that you signed February 13, 2015, you understood that:

> you had until February 11, 2016 to bid into another internal opportunity that does not require the operation of a powered industrial vehicle. Failure to bid and take another opportunity before February 11, 2016, will result in you being placed into any open available job at the time. Should you refuse the placement, your employment will be terminated.

As of today, you have not bid into another position and you have elected not to go and get a medical screening that could have cleared you to operate a Powered Industrial Vehicle and have more opportunities within the facility.

At this time, your options are:

To accept an open position that does not require the use of a powered industrial vehicle:

- 1st Production Operator – Molding (Grade 3)
- 2nd Production Operator – Molding (Grade 3)
- 3rd Production Operator – Molding (Grade 3)
- Extrusion Set Up Tech - Team D (night) (Grade 7)
- 2nd shift CNC Operator - SP (Grade 7)

To refuse placement into an open position and terminate employment.

I confirm and understand the above. The option I choose is:

______ the open position of: ______________________________

______ Termination

______________________________ Employee Signature ______________ Date

[signature] Supervisor Signature ______ 2-11-16 Date

[signature] Human Resources Signature ______ 2/11/16 Date

*Employee has chosen not to accept an open position and will be terminated. Sheila elected not to sign the form. [signature] Nicole George

Date 6-26-17
KENTUCKIANA Reporter KB Exhibit # 8
Case 2:16-CV-00134-DLB-CJS
Deponent Nicole George

REGAL 00159

ADH#16360 9114CIA
Sheila Jackson

| | | |
|---|---|---|
| 7/6 | Production Operator - Molding | Grade 3/5 |
| | Set Up Tech Extrusion | Grade 7 |
| | Production Operator - Assembly | Grade 3 |
| | Process Tech II | Grade 8 |
| 7/14 | Set Up Tech Extrusion | Grade 7 |
| 8/10 | Production Tech - Flex | Grade 5 |
| | Distribution Clerk | Grade 3 |
| 8/24 | Distribution Services - Team Lead | Grade 7 |
| 10/14 | Production Tech - Flex | Grade 5 |
| | Set Up Tech Extrusion | Grade 7 |
| 11/3 | Production Operator - Assembly | Grade 3 |
| 11/11 | Production Operator - Molding | Grade 3/5 |
| | Set Up Tech Extrusion | Grade 7 |
| 12/8 | Set Up Tech - Molding | Grade 7 |
| | Production Operator - Molding | Grade 3/5 |
| 1/5 | Production Operator - Stuffing | Grade 3 |
| | Production Operator - Molding | Grade 3/5 |
| 1/15 | Production Operator - Molding | Grade 3/5 |
| 1/28 | Set Up Tech - Molding | Grade 7 |

* List of positions posted since July 2015 that did not require the use of a powered industrial vehicle.