UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION
CASE NO. 2:16-CV-00134-DLB-CJS

SHEILA JACKSON,
PLAINTIFF

V.

REGAL BELOIT AMERICA, INC.,
DEFENDANT

DEPONENT: SHEILA JACKSON
DATE: JUNE 26, 2017
REPORTER: KELLEY BOHAN

APPEARANCES

ON BEHALF OF THE PLAINTIFF, SHEILA JACKSON:

W. KASH STILZ, JR.
ROUSH AND STILZ, PSC
NINE WEST ELEVENTH STREET
COVINGTON, KENTUCKY 41011
TELEPHONE NO.: (859) 291-8400
FACSIMILE NO.: (859) 291-6555
E-MAIL: KASH@ROUSHANDSTILZLAW.COM

ON BEHALF OF THE DEFENDANT, REGAL BELOIT AMERICA, INC.

MARK D. SCUDDER
BARNES & THORNBURG, LLP
888 SOUTH HARRISON STREET, SUITE 6004
FORT WAYNE, INDIANA 46802
TELEPHONE NO.: (260) 423-9440
FACSIMILE NO.: (260) 424-8316
E-MAIL: MARK.SCUDDER@BTLAW.COM

ALSO PRESENT:

TIM OSWALD, VICE PRESIDENT OF HUMAN RESOURCES REGAL
NICOLE GEORGE, HUMAN RESOURCES MANAGER REGAL

INDEX


| | Page |
|---|---|
| DIRECT EXAMINATION BY MR. SCUDDER | 6 |
| CROSS-EXAMINATION BY MR. STILZ | 115 |
| REDIRECT EXAMINATION BY MR. SCUDDER | 136 |


EXHIBITS


| | | Page |
|---|---|---|
| 1 | COMPLAINT | 9 |
| 2 | INTERROGATORIES | 10 |
| 3 | PLAINTIFF'S F.R.C.P. 26 INITIAL DISCLOSURES | 11 |
| 4 | POWERED INDUSTRIAL EQUIPMENT LICENSING PROCEDURE | 30 |
| 5 | ST. ELIZABETH OCCUPATIONAL EVALUATION | 39 |
| 6 | DISPLACEMENT SIGNED FORM | 47 |
| 7 | POSITION OPENINGS | 56 |
| 8 | MEETING NOTES BY NICOLE GEORGE | 62 |
| 9 | FINAL DISPLACEMENT FORM | 71 |
| 10 | VALUE ADDED PACKER POSITION LISTING | 116 |
| 11 | STATEMENT OF CLAIM - WEEKLY INDEMNITY INSTRUCTIONS | 124 |
| 12 | OHC MEDICAL RECORD | 128 |

EXHIBITS (CONTINUED)

| | Page |
|---|---|
| 13 COLONOSCOPY REPORT | 130 |
| 14 ST. ELIZABETH MEDICAL RECORD | 131 |

STIPULATION

The deposition of SHEILA JACKSON taken at the offices of Roush & Stilz, PSC, 19 West Eleventh Street, Covington, Kentucky on Monday, the 26th day of June, 2017 at approximately 9:50 a.m.; said deposition was taken pursuant to the Federal Rules of Civil Procedure.

It is agreed that Kelley Bohan, being a Notary Public and Court Reporter for the State of Kentucky, may swear the witness.

PROCEEDINGS

COURT REPORTER: Would you please raise your right hand for me? Do you solemnly swear or affirm that the testimony you are about to give is the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

DIRECT EXAMINATION

BY MR. SCUDDER:

**Q. Hi, Ms. Jackson --**

A. Hello.

**Q. -- I'm Mark Scudder. I'm one of the attorneys for Regal Beloit with the law firm Barnes & Thornburg. Have you ever had your deposition taken before?**

A. Yes.

**Q. Okay. So you sort of understand the process then?**

A. Yes.

**Q. Perfect. Okay, I'm going to go over just a little bit again just to make sure you understand, but that's good to know that you've already done this, this isn't new to you. The idea today is this is the one chance I have outside of the trial to talk to you about your claims in this case under oath. And so our court reporter today, she's going to write down everything**

that the two of us say so that we have a record of it; does that make sense?

A. Uh-huh.

Q. The only tricky thing is that because it's going to be taken from an oral conversation to a written conversation, we need to make sure that we speak in a way that translates well into the record. So for example, it's hard for us if we both talk at the same time. When you look at it in a transcript it doesn't make any sense. So I'll try to make sure I stop talking when you talk, and then if you could wait until I'm done with my question, we'll be in good shape; does that make sense?

A. Yes.

Q. Okay. And then the only other thing is when we talk sometimes we nod our heads or we say "uh-huh" or "huh-uh." And it makes sense until you see it in writing, and then it doesn't make any sense. So if you can give us a "yes" or a "no," that will really make everybody's job easier, okay?

A. Yes.

Q. Any time today you need a break or anything, just let me know and we'll take a break. And then if you don't understand me and my questions today, I would ask you to repeat it; does that make sense?

A. Yes.

**Q. And I can rephrase it and try to make sure that you understand it. If you answer one of my questions, we're going to assume that you understood it; is that fair?**

A. Yes.

**Q. Okay. Okay, and you understand that you're under oath today just like you would be if you were in court?**

A. Yes.

**Q. Very good, okay. Can we agree that it's important that you provide truthful and complete answers today?**

A. Yes.

**Q. Is there any reason, any medical reason that you'd be unable to give fair and complete and honest answers to my questions today?**

A. No.

**Q. Okay. Other than the fact that you're being deposed, is there anything in your life bothering you today that might in some way make it difficult for you to give me the answers to my question today?**

A. Can you explain?

**Q. Oh, maybe your mom is having some medical procedure when we get done or something like that. And**

**sometimes that can stress people out, and then later they'll say, "well, I gave funny answers because I was worried about my mom" or something like that. I understand that being deposed is stressful, but is there anything else that you think might affect your answers today?**

A. I think that I am under a lot of stress, getting this thing over, and bills and, you know, phone calls from bill collectors and everything.

**Q. Okay. Anything else?**

A. No.

**Q. Okay, thank you. Thank you. I'm going to show you some documents today, and the procedure will be I'll give them to the court reporter and she'll mark them with an exhibit sticker and then I'll show them to you and I'll ask you what they are.**

A. Okay.

**Q. Does that make sense?**

A. Uh-huh.

**Q. Here, this is going to be our first one, and I think this is your complaint if you want to take a look at that.**

(EXHIBIT 1 MARKED FOR IDENTIFICATION)

**Q. Yeah, I think this is a complaint, which is the document that you filed with the court to start the**

**lawsuit; is that right?**

A. Yes.

**Q. Okay. Did you get a chance to review this before you filed it, before your attorney filed it with the court?**

A. Yes.

**Q. Okay. And as we sit here and I don't necessarily -- you're welcome to review it if you like, but coming into today, is there anything in your complaint that you thought, boy, that's incorrect and I need to correct it?**

A. Not that I know of.

**Q. Perfect, okay. We're going to mark here as Exhibit 2.**

(EXHIBIT 2 MARKED FOR IDENTIFICATION)

**Q. I believe that these are your responses to my discovery request. Those are the questions that we send to you to answers, and I think these are the answers you gave us; is that right?**

A. Yes.

**Q. Okay. Did you get a chance to review those answers before your attorney sent it to me?**

A. I did.

**Q. Okay. And as you sit here today, is there anything think that it -- that you know of that's**

**incorrect that you need to correct?**

A. No.

**Q. Okay.**

MR. SCUDDER: And, Kash, I'm not sure, she may not have verified -- as I look through it, I'm not sure she verified it.

MR. STILZ: I think we sent it separate.

MR. SCUDDER: Separate, perfect, okay.

MR. STILZ: If we didn't, let me know.

MR. SCUDDER: Okay.

BY MR. SCUDDER:

**Q. Do you remember if at some point you'd signed a thing saying that you verified these under oath, do you remember signing anything like that? You may or may not, it's okay.**

A. I don't remember.

**Q. Okay. I assume it's possible you might have done it, you just forgot? Just like I think Kash sent it to me and I forgot.**

MR. STILZ: Maybe.

**Q. Does that make sense?**

A. Yes.

**Q. Okay. Okay, and then one last document.**

(EXHIBIT 3 MARKED FOR IDENTIFICATION)

**Q. I believe these are what we called your**

**initial disclosures, in particular where you listed a series of witness for us -- if you can confirm that that's what this is??**

A. Yes.

**Q. Thank you.**

MR. STILZ: These are already numbered, right?

MR. SCUDDER: Yeah, I think the sticker is right there.

MR. STILZ: Okay.

**Q. I want to get into what you did to prepare for today, but before I ask you some questions I just want to make clear that the things that you and Kash talked about are privileged, attorney-client privileged, and I do not want to know anything that the two of you talked about. So other than talking with your attorney, what did you do to prepare for today?**

A. I looked over some of my notes.

**Q. And are those the notes I think that your attorney produced to me in the course of the lawsuit?**

A. Yes.

**Q. Okay. The little handwritten ones that are in that notebook?**

A. Yes.

**Q. Okay. Anything else that you looked at to prepare for today?**

A. No.

**Q. Okay. Have you given your attorney all the documents that you know of that relate to your employment at Regal Beloit or your claims in this case?**

A. Yes, I have.

**Q. Okay. And to your knowledge, he produced all the stuff that you gave him that was responsive to our request?**

A. Yes.

**Q. Okay. What's your -- for the record, what's your full name?**

A. Sheila Lanita Jackson.

**Q. Okay. Any other names that you go by?**

A. No.

**Q. Okay. I have your birth date as [redacted]; is that right?**

A. Yes.

**Q. Okay. And I have the last four digits of your social security number as [redacted]?**

A. Correct.

**Q. Okay. Where do you live right now?**

A. 4210 Nolin Court, Erlanger, Kentucky.

**Q. Okay. And do you live by yourself?**

A. Yes.

**Q. Okay. Have you been married before?**

A. No.
**Q. Okay. Any kids?**
A. No.
**Q. Okay. It looked like in your -- I think in your discovery responses we went through your work history. If I remember right you started at Regal Beloit in 2001; is that right?**
A. Yes.
**Q. Okay. Have you only worked for Regal -- and just for the record, initially in 2001 when you started you were at the Florence facility, right?**
A. Yes.
**Q. Okay. That was not Regal Beloit then, right, it was I think Emerson?**
A. Yes, Emerson.
**Q. Okay. And then when did it go from Regal to Emerson?**
A. I'm not sure of the date when they switched over.
**Q. Okay. If I remember correctly, I think it's in 2015 or 2016; is that right? Does that sound about right? Just not sure?**
A. I'm not sure.
**Q. Okay. From your perspective, what changed when the ownership of the company changed, if anything?**

A. Well, we was told that there was going to be some changes coming up and -- in two years, but I wasn't there when the changes came.

**Q. Okay. So if I'm hearing you right, nothing -- they told you there would be some changes, but nothing really changed when you were there?**

A. We -- they never really talked to us about Regal. It was really considered Emerson.

**Q. Okay. For example: Did you get -- did they give you any new policies when all of a sudden Regal took over?**

A. No.

**Q. Okay, all right. Did your pay change when Regal took over?**

A. My pay change?

**Q. Like did you get more money or less money or anything like that?**

A. It was still the same. It was the same.

**Q. Okay. You did the same job before and after?**

A. Yes.

**Q. Did your supervisor change?**

A. I had different supervisors at different times.

**Q. Okay. But as you -- do you ever remember the change in your supervisor having anything to do with the**

**change in companies?**
A. Not on the warehouse side. I'm not sure what Regal did on the manufacturer side. I was mainly I was on the warehouse side, so.
**Q. I want you to explain for us, as I understand it, there's kind of a production side of the facility and then a warehouse side; is that right?**
A. Yes.
**Q. Okay. And in the production side, they're -- hence the name -- they're actually making stuff, right?**
A. Right.
**Q. Okay. What's going on on the warehouse side?**
A. We most pick and pack the things.
**Q. Okay. So if I understand it, they're making the stuff over on the production side, and then they take it and store it over on the warehouse side until they ship it somewhere; is that right?**
A. Some of it gets stored; some get shipped out the door right away.
**Q. Okay. And what was your job?**
A. Me, my job was packing -- I put together kits and pack it in and ship it out.
**Q. Okay. What does it mean to put together a kit?**
A. We have kits they call drive kits that consist

of different parts that the customer want. We pick these different parts we put in a box that makes up a kit. And then we sent it, ship it, through truck or UPS.

**Q. Okay. So if I'm understanding you right, the idea would be a customer would order a particular motor and then you would go through the facility and get all the parts that you need to get the motor to work for the customer?**

A. Yes.

**Q. And that's like a kit?**

A. Yes.

**Q. Okay. And so it sounds like part of your job was to know where to go to get all the stuff that's goes in that kit?**

A. Yes.

**Q. Okay. Were you driving some piece of equipment?**

A. Yes.

**Q. What were you driving?**

A. I was driving a Taylor-Dunn and a forklift -- not a forklift -- I'm sorry, a Crown.

**Q. Okay. First of all, you say a Taylor-Dunn; is that right?**

A. Yes.

**Q. What's that?**

A. It's one of them go-cart that has like three wheels. You can go forward, reverse, have a ladder on the back if you need to stand up to climb up to get the parts.

**Q. Okay. Kind of like a golf cart?**

A. Yeah, sort of.

**Q. Okay. And do you -- you say it's got a ladder on the back?**

A. Uh-huh.

**Q. Okay. As I understand, the warehouse, they stack stuff pretty high, right?**

A. Yes.

**Q. Okay. And what was that second piece of equipment?**

A. It's a Crown.

**Q. What's a Crown?**

A. It's sort of like a forklift. It goes up and down. You can pick up equipment. And you can drive it forward and reverse -- geared from the back.

**Q. Now, did you need any special training to operate these things?**

A. You have to be trained on it but no special.

**Q. Who you trained you?**

A. It was the lead.

**Q. When did you get the training?**

A. My last training with him probably was, it's -- I want to say it would have been like four years ago. I think four years ago. I haven't had training with him in a long time.

**Q. Okay. Did you get more training like right when you started? Because I'm looking here, it looks like you started in November of 2001; is that right?**

A. Yes.

**Q. Okay. And did you come right away into this job?**

A. Not -- no. I came into picking.

**Q. Okay. And did you use any powered equipment in picking?**

A. Yes.

**Q. Okay. Did they train you on that stuff when you started?**

A. Yes.

**Q. Okay. How did they train you when you started?**

A. We had a lady that came across and pull you off to side and says "I need to see you on this equipment," and that's been a long time ago because she left a long time ago.

**Q. Okay. And you said that about four years ago you got some training on the Taylor-Dunn and Crown; is**

**that right?**

A. (NODS HEAD AFFIRMATIVELY)

**Q. And was that training that you -- one phrase I've heard is "refresher training" meaning it's training that you've already had, and they're just doing it over to refresh you. Did you ever have anything like that?**

A. That might have been what it was because the lead just called and says, "it's your time, you know, get on this equipment and drive here" and that was it. There was no "let me see your license" or anything, you know, you pass and that was it.

**Q. Did she tell you anything you didn't already know?**

A. No.

**Q. Okay. So it's not like she taught you a new switch or something that you didn't know how to work on the machine, right?**

A. No.

**Q. Okay. So it was stuff you already knew?**

A. Yes.

**Q. And it sounds like was she just making that -- like you would do things and she would watch to make sure you were doing it right?**

A. Yes.

**Q. Okay. Did you have any problem passing that**

**test?**

A. Yes. The only one I didn't pass was the Hyster.

**Q. What's that?**

A. It's equipment that sends you -- you have to have a net, it goes up and down.

**Q. Oh, okay. Is that something you worked with before?**

A. No, my first time, no.

**Q. Okay. And you didn't pass that?**

A. No.

**Q. Okay. But did you need to use it, was it a big deal?**

A. No.

**Q. Okay. Was anybody upset about it or anything?**

A. No.

**Q. Okay. Now, I have here that you went to high school at Holmes High School; is that right?**

A. Yes.

**Q. Okay. Where's that at?**

A. 25th and Madison in Covington, Kentucky.

**Q. Here in Covington?**

A. Yes.

**Q. Okay, okay. And then what year did you graduate?**

A. 1979.
**Q. Okay. And then I have that you went -- you did some college at Northern Kentucky?**
A. Yes.
**Q. And at Mount St. Joseph University?**
A. Yes.
**Q. Okay. Did you get a degree from either of those places?**
A. No.
**Q. Okay. How much did you do at Northern Kentucky?**
A. I think I did like two semester.
**Q. Okay. What were you studying there?**
A. I didn't have any.
**Q. Do you remember what you took, classes you took?**
A. I took mostly a reading course, English. I did a little bit of typing. Sociology or something.
**Q. Okay. And then was that right out of high school?**
A. Yes.
**Q. Okay. So you spent about a year there?**
A. Uh-huh.
**Q. When did you go to Mount St. Joseph?**
A. I can't remember the year.

**Q. Was it right after you stopped at Northern Kentucky?**

A. No, it was later.

**Q. Okay. Why did you stop going to Northern Kentucky?**

A. Because I had a bad experience at Northern.

**Q. Okay. And then -- what kind of bad experience, just didn't like it or?**

A. No. It was kind of -- I don't want to say it, but kind of like racial.

**Q. Racial, okay, okay. Did you bring any kind of complaint or lawsuit or anything?**

A. No.

**Q. Okay, okay. But then -- and then what did you do after you stopped, did you then go to work somewhere?**

A. I just went to work.

**Q. Okay. And then you went to Mount St. Joseph and you think that was a few years later?**

A. Yes.

**Q. How long did you go to Mount St. Joseph?**

A. I went to one semester, yeah.

**Q. Okay. Did you have a certain thing you were trying to study?**

A. Social psych.

**Q. Okay. And then why did you leave Mount St.**

**Joseph?**

A. It was too expensive. I was paying for it on my part-time job. And I was catching a couple buses, and one of the nuns told me be careful because my class was at night, catching the bus from downtown Cincinnati to Covington.

**Q. Oh, okay. Is that a Catholic school, Mount St. Joseph?**

A. It's a private school.

**Q. Private school, okay. Have you ever thought about going back to school?**

A. Plenty of times.

**Q. Okay. I don't know, have you gone to any schools since you left Regal?**

A. No.

**Q. Okay. Let's see here. And I'm going to go through, if you look at Exhibit 2, and Question Number -- Interrogatory 10. I wanted to go through and look at these. We asked you some other lawsuits and things that you've been apart of. And it looks like you've had a few, and I just want to kind of make sure I understand. Yeah, there you go, you're at the right thing.**

**It looks like this first one was a -- looks like you had a complaint where somebody, you were in a car accident, does that sound right, it sounds like that**

**was in 2008?**

A. Yes.

**Q. Okay. So you were the plaintiff and you were saying somebody had hurt you in the accident?**

A. Yes.

**Q. Okay. How did it get -- did that case settle?**

A. Yes.

**Q. Okay. Who represented you in that case?**

A. Christopher Jackson.

**Q. Okay. How about -- let's see, the next one, looks like you had a small claims complaint. Looks like somebody tried to fix your car and made it worse?**

A. Oh, yeah it's --

**Q. With Ken Conley?**

A. Yes.

**Q. Yeah, what happened there?**

A. What happened to car or what happen --

**Q. Just tell me the story.**

A. I took my car in because I had a slow leak, and they use an air thing to screw my bolts off and I told them not to because the key was inside of the thing and he says no. And they went ahead and used it to take my bolt off and they broke the -- what is the -- nut and so they broke one of them off. And they refused to pay for it, and they said it's just something that just

happened.

**Q. Okay. And then you -- and how did that case get worked out?**

A. They reimbursed me.

**Q. Okay. So you won that one?**

A. Yes.

**Q. Okay. And then it looks like these next ones, you had some work comp injuries; is that right? It looks like the next two, you had a back injury and a foot injury; is that right?**

A. The foot injury, no, that's incorrect.

**Q. Oh, okay. Well, tell me then about the -- what happened with the back injury?**

A. I was taken out of my department to help UPS, I was like in return goods, and Herb Beach took me, and they had me strapping down the power boxes, power package, I had to put like four bands on it. Later on I told Herb, I said "This is starting to make my back hurt." And he says, "Okay" he says "you don't have to do that tomorrow." Because like the end of the month, they would always come in return goods, get us out of our department, and send us to UPS to help out. So Dan came the next day to get me, and I told Dan, I said, "Dan, this is making my back hurt." I said, "Herb said I don't have to come up there." He says, "Well, you

don't have no note saying that your back hurt, you know, and you didn't get hurt here." So I went up there, and I was banding and my back was starting to hurt so I decided not to bend because bending was making my back hurt. And because I wasn't banding, the leads told Dan that I was -- there was nothing wrong with me, I just didn't want to do it. So Dan called me and asked me, "Well, what was the matter?" I said, "Dan, I told you, this is making my back hurt." He said, "No, it don't. No, it don't. You just don't want to do it. You know you just want me to send you back, but I'm not going to send you back, you know." I said whatever. You know so I went back to banding, you know, and about that time I was getting behind, so he had to have somebody to help me band. And then it wasn't much longer that my back popped. And then I asked -- I told Dan, I says, "I need to go to the doctor." He goes "Why?" I said, "My back just popped." He goes, "Well, how did that happen?" I said, "From banding." You know, so that was the end of that.

**Q. So then did you file like a formal worker's compensation claim?**

A. No.

**Q. Okay. Did you ever get -- did you miss any work for that?**

A. No.

**Q. Okay. Did you have any medical treatment for that?**

A. They took me to that physical therapy. I received physical therapy for my back.

**Q. And did the company pay for the therapy?**

A. Yes.

**Q. Okay. How's your back now, is it better or do you still have trouble with it?**

A. No. I start lifting weights and my doctor recommended me to do something outside so I started pumping iron, lifting weights, and doing backs things.

**Q. Okay. Let's see here. Now, this one, one of the things you have listed is that there was some foot injury in '05 that you didn't file a claim. Did you not really have -- and you said that wasn't right, did you really not have a foot injury?**

A. I didn't have a foot injury, no.

**Q. Okay. Do you remember anything? It says, we have a specific date of June 24 of '05, do you remember anything --**

A. I had surgery on my foot, but that has nothing to do with hurting it at work.

**Q. Okay. What kind of surgery did you have on your foot?**

A. I had a bunion removed, and I had an extra bone in my baby toe and a pinched nerve.

**Q. Okay. And then I assume the company didn't pay for it though?**

A. No.

**Q. Okay. How's your foot now, is it better?**

A. It's better, but I stand on my foot a lot.

**Q. Okay, yeah. And we've got here that you had a -- that you were with DHL Express, and that you had hurt your left wrist in June of '99?**

A. Yes.

**Q. Okay. But that you didn't file a claim, just had an injury?**

A. Yes.

**Q. Okay. And then let's see here. Were you working at some point for Kenton County Fiscal Court, and it says you had an upper extremity injury in 1993; does that ring a bell?**

A. Yes.

**Q. Okay. What was that?**

A. I strained a muscle in my shoulder or arm, I'm not sure which one.

**Q. Okay. Did you miss work for that?**

A. No.

**Q. Okay. Did you get any medical treatment for**

**it?**

A. No.

**Q. Okay, okay. All right, I'm going to go through here. Why don't you -- let me start with this document, Exhibit 4.**

(EXHIBIT 4 MARKED FOR IDENTIFICATION)

**Q. All right, have you ever seen this document before?**

A. No.

**Q. Okay. Do you know what it is?**

A. No.

**Q. Okay. My understanding is that this is Regal Beloit's -- you see the title -- it's "Power Industrial Equipment Licensing Procedure"?**

A. Uh-huh.

**Q. And that it explains when you need to have -- excuse me -- what you need to do to be licensed to operate powered industrial equipment. Have you ever heard that term before "powered industrial equipment," maybe they call it PIE?**

A. Just when I -- they sent me out, was my first time hearing it.

**Q. Okay. Now, when you first started, did you have to have a medical exam to say it was okay for you to drive powered industrial equipment?**

A. I don't remember having any exam.
**Q. Do you remember being sent to a doctor?**
A. My first year there, no.
**Q. Okay. As I understand it, in a lot of why we're here is that you get sent to the doctor I think in early 2015, right?**
A. Yes.
**Q. Okay. Now, had you ever been sent before I think January of 2015, had the company ever sent you to a doctor to get an exam to see if you were okay to drive powered industrial equipment?**
A. Previous years, but they never said it was to drive equipment. It's just you got to go to the doctor, you know, to take a physical or something.
**Q. Okay. And as I understand it, at some point you take some medical leave because you had some cancer treatment; is that right?**
A. That's true.
**Q. Okay. When was that?**
A. January 14 of 2014.
**Q. Okay. Did you miss some work for that?**
A. Yes.
**Q. How much work do you think you missed?**
A. From July until September, about two-and-a-half months.

**Q. Okay, okay. And as I understand it, you would have taken FMLA leave for that, right?**

A. Yes.

**Q. Okay. And what position were you in when you left?**

A. Drive kits.

**Q. Okay. And did you come back in the same position?**

A. Yes.

**Q. Okay. Did you have any complaint with the fact that you were on leave and then came back?**

A. No.

**Q. Okay. Who did you deal with when you were trying to get your FMLA leave?**

A. The paperwork?

**Q. Yeah, yeah.**

A. Okay. It started out with Debbie Bennett.

**Q. Okay. And then who else?**

A. And I think that was -- yeah, I think that she was still here the last time I came back with my FMLA so it was her. It started with her.

**Q. Did you deal with Nicole at all?**

A. I did talk with Nicole.

**Q. Okay. And that was -- and was Nicole able to help you get your FMLA worked out?**

A. I talked to her about -- I showed her the letter, and, yes, she was I remember, I think so.
**Q. Okay. Now, if I understand right, I think at special point gentleman named Mike Tobias --**
A. Yes.
**Q. -- he supervised you; is that right?**
A. Yes.
**Q. Was Mike involved with your leave back in '14?**
A. He wasn't involved in my leave, no.
**Q. Okay. Was he supervising you then?**
A. He was my supervisor.
**Q. Okay. Did it go --**
A. Well, Jerry was my supervisor, but he was -- Jerry, supervisor.
**Q. What's Jerry's name?**
A. Jerry Oswald.
**Q. Okay. He's your immediate supervisor, and then Tobias is over Jerry?**
A. Yes.
**Q. Okay. Do you know Jerry's title?**
A. Supervisor of the warehouse side on second shift.
**Q. Okay. And if I understand, Mike Tobias, he was a production supervisor; is that his title?**
A. I'm not sure what his title was.

**Q. Just not sure his title, okay. And would you agree that Nicole probably knows the titles and who's --**

A. I'm sure she does.

**Q. Okay, okay. Now, as I understand it, how did you find out -- strike that.**

**As I understand it, in January of 2015 you're going to be sent to the doctor to get -- to see if you're able to operate powered industrial equipment; is that right?**

A. Yes.

**Q. Okay. Do you know why you were sent?**

A. No.

**Q. Who told you you needed to go?**

A. The lead sent me a letter, and told me -- a letter with my name on it, and told me the date and time and where to go at to have -- to see Dr. Haskell.

**Q. Okay. And does January 2015 sound like the right time frame?**

A. Yes.

**Q. Okay. Let's me see if I have that. Now, did -- is it possible that that was just a requirement that periodically if you operate that equipment you've got to go to the doctor?**

A. I didn't even think no second thought. I just didn't give no second opinion. They said go and I went.

**Q. Okay. Did other people have to go to the doctor periodically?**

A. Keith, who was in my same department, went before I did, I believe.

**Q. Who's Keith?**

A. He used to be in drive kits.

**Q. Okay. And just because and I think some of the claims we have, you know, we have a disability claim, we've got a race claim -- well, first of all, what's Keith's last name; do you know?**

A. I can't remember. I don't remember.

**Q. Okay. Is Keith -- well, what race is Keith?**

A. Keith is black.

**Q. Okay, all right. Do you know if Keith has any kind of health problems?**

A. He told us that he told a doctor that he had puss or something coming from his eyes.

**Q. Okay.**

A. We know he's a diabetic.

**Q. Do you know if he uses insulin?**

A. I don't know.

**Q. Okay. When you took FMLA leave, what sorts of medical records did you have to give the company to get the medical leave?**

A. Nothing, just what I gave her -- the date of

my surgery and that was it.

**Q. Okay. What kind of cancer did you have?**

A. Colon.

**Q. Okay. And then when you came back to work, did you have any restrictions or anything?**

A. No.

**Q. Okay. So you were out and then you came back, no restrictions and --**

A. Correct.

**Q. Okay. And you said you came back September of 2014?**

A. Yes.

**Q. Okay. So as I understand it, you would have been back for a few months before you were sent to the doctor again?**

A. Yes.

**Q. Okay, okay. Did anybody suggest to you that your trip to the doctor in January of 2015 had something to do with your medical leave?**

A. No.

**Q. Okay. So tell me what happened then when you went and saw, is it Dr. Haskell; is that right?**

A. Yes.

**Q. Okay. What happened?**

A. I went in and waited -- first of all, waited

for a while, and he came in and apologized. I'm like, no problem. Then he had me stand up. I had to do an eye test, urine test, and do a physical. He had me squat down and stand up and all of that.

**Q. Okay.**

A. And then he said -- I was sitting on the table, and he said, "Let's talk about your cancer."

**Q. Okay.**

A. And I said, "I don't want to talk about it." And he said, "Well, I want to talk about it." I said, "I don't want to talk about it." Then he said, "I want to talk about it." Then I says, "I'm not going to talk about it." I said, "You have the report, you know what it says."

**Q. Okay. So you had given him a report about --**

A. No.

**Q. Okay. How did he know anything about the cancer?**

A. He got it from Nicole.

**Q. Did you fill anything out before you go?**

A. None, no.

**Q. You didn't fill anything out about your medical history?**

A. No.

**Q. Okay. You didn't talk to him about your**

**medical history?**

A. No.

**Q. Okay, okay. So you don't -- how do you -- do you know that he talked, like did he tell you he talked to Nicole or somebody at Regal about it?**

A. No, no. She's the only one I confided in about my colon cancer.

**Q. Who was the only person?**

A. Nicole.

**Q. So you talked to Nicole about your colon cancer at some point?**

A. Yes.

**Q. Okay, okay. But you say you didn't talk to the doctor about it?**

A. No.

**Q. Okay. You didn't fill out any kind of questionnaire or anything at the doctor's office?**

A. No, no.

**Q. Okay. Like, you know, like sometimes when you're in the waiting room of the doctor, sometimes you've got to fill out a little sheet, anything like that you filled out?**

A. No.

**Q. Okay, okay. So he said he wanted to talk about the cancer, you said you didn't want to talk about it, and then how did that kind of end?**

A. He said -- as I was leaving, he said, "You get your medical records from your doctor" and then he had one hand on my shoulder as he was pushing me out the door, "I'm sure here you can get your medical record from your doctor, and he will give it to you, and let's see about getting you on equipment."

**Q. Okay. And what did you say?**

A. Nothing.

**Q. Okay. And then did you go get the medical records from your doctor?**

A. No.

**Q. Okay. How come?**

A. How come I didn't get my medical records?

**Q. Yeah.**

A. Because I went to Nicole and I told her that I had passed the test, the physical, the hearing, and drug test, and I said he don't need my medical records. And she agreed with me that he didn't need no medical records. And she asked me if I can get a doctor's -- an excuse from my doctor saying that I can drive a motorized vehicle, and that's what I did.

**Q. Okay. And I think -- okay, let me see here.**

I think I may have -- okay, let's mark this as Exhibit 5.

(EXHIBIT 5 MARKED FOR IDENTIFICATION)

Q. Okay, and I've put a few things together here as you can see, but why don't we kind of go through it page by page and make sure we understand. Have you seen this first page before?

A. No.

Q. Okay. So you just don't -- you just haven't seen it. But it says here that you had a physical exam at Dr. Haskell's office on January 15 of 2015?

A. Yes.

Q. Is that -- does that sound like the right dates to you?

A. Yes.

Q. Okay, okay. And then you see the checkmark, it says additional medical information has not been received and the physical results are incomplete. Do you see that little checkmark down there?

A. Yes.

Q. Okay, okay. And then let's go here to the second page, and then -- have you seen this letter at all?

A. I have not seen this letter. Sometime in, I believe -- I'm not sure -- god, let me see. I believe

it was August, I had -- so another attorney and he told me about this paper.

**Q. Oh, okay. And I don't want -- I'll stop you, I don't want you to say that would release privileged information at all. I'm just going to ask you: Was the attorney with Kash's firm or was it --**

A. No, this was another attorney.

**Q. Okay. A totally different firm and everything?**

A. Yes.

**Q. Okay, okay. And one question I will -- in this matter, has there been anybody who has represented you, other than the folks at Kash & Stilz -- or Roush & Stilz, I'm sorry. Kash, yeah, I'm getting this all goofed up.**

MR. SCUDDER: Roush & Stilz; am I right?

MR. STILZ: That's it.

MR. SCUDDER: Okay, sorry about that.

BY MR. STILZ:

**Q. Has any other attorneys represented you in this case other than Roush & Stilz?**

A. No.

**Q. Okay, sorry about that. Okay, but -- well, let's go through this letter and make sure at least that, even though haven't seen it, see what kind of**

**facts we can confirm. Business Health Center, is that where Dr. Haskell was?**

A. Yes.

**Q. Okay. And then we confirmed already that January 15, 2015 is when you went, right?**

A. Yes.

**Q. Okay. Did he -- it says here: "The patient has been instructed to provide the requested documentation within two weeks in order for the provider to make a medical determination." Did Dr. Haskell tell you that?**

A. No, he did not, no.

**Q. Well, what did he say?**

A. He didn't say anything. He just said -- told me to ask my doctor for my medical records, and that was it. We never discussed this. He didn't say anything about -- see, this is the first time I, you know, I've seen it since that one attorney that they want my medical records and everything else. I'm like he never asked for nothing but my medical records.

**Q. Okay. So he did tell you he needed some more documentation, he just say anything about this two week stuff?**

A. No. He just said the medical records and pushed me out the door.

Q. Okay. And then this thing about: "If the information is not received within the time allotted the physical results will be reported as incomplete." Did he say that to you?
A. No, he did not.
Q. Okay, okay. And then if we go to the next two pages. Let's see, it looks like this next one is a fax from Dr. Moon?
A. Yes.
Q. Who is Dr. Moon?
A. He was the one who did my surgery.
Q. Okay, okay. And then this is dated January 16th, 2015, this is the next page?
A. Uh-huh.
Q. And if I understand right, that's the day after you saw Dr. Haskell, right?
A. Oh, yes.
Q. Okay. And then that says: "Sheila Jackson is able to drive any type of vehicles since she was released to go back to work without restrictions. If you have any questions, please contact my office"?
A. Uh-huh.
Q. Okay. And so then that's the documentation you provided the company to give to Dr. Haskell?
A. Yes.

**Q. Okay. Did you give him anything else?**
A. I didn't give it to him; I gave it to either Debbie or Nicole. I didn't give him anything.
**Q. Okay. So you gave it to the folks at Regal?**
A. Yes.
**Q. Okay, very good. Let's see, take a look at this last page; do you see that?**
A. Yes.
**Q. Is that the letter you got telling you to go to Dr. Haskell? Well, first of all, have you seen this page before?**
A. No.
**Q. Okay. Did you tell Dr. Haskell at all that you had surgery?**
A. No.
**Q. Okay. Did he do any kind of exam of you that where he'd be able to tell that you --**
A. No.
**Q. But let me just finish the question just for the record. -- he'd be able to tell that you had any kind of surgery on your colon or anything?**
A. No.
**Q. Okay. Did you -- and I know this sometimes happens when you have colon surgery, did you have like a colostomy or anything bag --**

A. No.

**Q. -- when you saw him?**

A. No.

**Q. Okay, okay. The last page, the one marked 165, did you say you haven't seen that before?**

A. No.

**Q. Okay. Do you have the letter? And I don't remember if maybe you produced it to me, but do you have the letter that told you to go to the doctor?**

A. No.

**Q. Okay. So when were you -- when did you have to stop using the powered industrial equipment?**

A. The same day I went. You're not allowed on equipment until you're told by HR. He sent me the same day.

**Q. Okay. And then as I understand it, did you ever use powered industrial equipment again after January 15 of 2015?**

A. No.

**Q. Okay, okay. So tell me what happened, you take this letter that's in -- and just for the record, it's -- we got it marked and the Bate number at the bottom is Regal 164?**

A. Uh-huh.

**Q. Do you see that?**

A. Yes.

**Q. So you took this to the company, and you talked to you think either Nicole or maybe somebody else?**

A. It was faxed in so I don't know who got it from the fax.

**Q. Okay. And who did you talk about, did you have a conversation with anybody about this?**

A. What do you mean?

**Q. Did you sit down with Nicole and say, "hey, here's -- my doctor faxed you that stuff, can I drive the equipment again?"**

A. No.

**Q. Okay. Did anybody come talk to you after they got this?**

A. No.

**Q. Did you go check with anybody and say, "hey, did you get that fax?"**

A. No. Mike Tobias came to me -- I'm not sure what date -- and he wanted to -- he was asking me about my medical records. I said, "I don't need one." I says that Nicole says that I -- you know, I get this excuse from this doctor, you know, and so I said, and she have it. And he goes, "Well, no." I'm like, "Yes, like she has it, you know." So he went back to Nicole, and he

came back and got me and told me to come and follow him, and we sat in Nicole's office.

**Q. So you and Mike met with Nicole?**

A. Yes.

**Q. When do you think that was?**

A. I don't remember the date.

**Q. Well, the date is not too important --**

A. It wasn't --

**Q. -- I kind of want to get in the ballpark here. You go to the doctor on the 15th of January, right?**

A. Uh-huh.

**Q. And then the next day you send this note in. How close in time do you think that meeting was to sending this note in?**

A. I believe, I'm not sure, but I think it was my last -- if I'm correct -- I think it was in February when I had the meeting with Nicole and Mike Tobias.

**Q. Oh, the one where they told you you were displaced?**

A. Yes, along with this.

**Q. Okay, okay. This is Exhibit 6.**

(EXHIBIT 6 MARKED FOR IDENTIFICATION)

**Q. Okay, were you presented with this document that day?**

A. Yes.

**Q. Okay. And is that your signature on the first line of signatures?**

A. Yes.

**Q. And then we've got Mike and Nicole?**

A. Yes.

**Q. Okay. And is the date right that you guys would have met on the 13th of February 2015?**

A. Yes.

**Q. Okay, okay. So this says that they told you that you were being displaced from your first-shift value added packer, grade 5 position. And it says "due to the inability to operate a powered industrial vehicle per the incomplete medical screening results." Do you remember that?**

A. Yes.

**Q. Okay. Now, why don't you explain to me as you understood it what your options were at that point?**

A. She gave me a list of these three jobs that's posted here and told me who the supervisor was.

**Q. Okay. And then what were your other options?**

A. This was the only option they gave me was this here.

**Q. Okay. Now, I see in the, it looks like maybe one, two, three, the paragraph right after the bullets points, the one with the star?**

A. Uh-huh.
**Q. Okay. It says: "To know that you have until February 11, 2016 to bid into another internal opportunity that does not require the operation of a powered industrial vehicle." And that a "failure to bid and take another opportunity before February 11, 2016 will result in you being placed into any open available job at the time." And "should you refuse the placement, my employment will be terminated." Did you understand that?**
A. Yes.
**Q. Okay. Now, so you had a year to bid on other jobs, right?**
A. Yes.
**Q. Okay. Can you explain to me the bidding process?**
A. How do?
**Q. Yeah, how do you bid on a job?**
A. You look on the board and see what's up there.
**Q. Okay. And so in that year, did you go look on the board and see if there was some jobs?**
A. No.
**Q. Okay. How come?**
A. Because the job -- because I had another job.
**Q. What other job did you have?**

A. I work at DHL.
**Q. Okay. When do you work there?**
A. 11:00 to 5:00 in the morning or little bit after five.
**Q. So you work 11 to 5?**
A. 11 at night.
**Q. Okay. Third-shift, okay. So 11 p.m. to 5 a.m.?**
A. Yes.
**Q. Okay. What do you do for DHL?**
A. I'm an inductee.
**Q. What's a --**
A. You sort letters at a high speed.
**Q. Oh, so all those letters come in, and you've got to figure out, what, where they're going or?**
A. No. I just put it on a moving conveyor and it has to be straight, and the conveyer sends it down the line and takes a picture of it.
**Q. Okay. Are you driving a forklift or any kind of powered equipment there?**
A. It doesn't call for that.
**Q. Okay. Well, why did -- explain to me how the job at DHL, what -- as I understand it, you said that you didn't bid on anything because of the job at DHL. So why is the job at DHL prevent you from bidding on**

**stuff at Regal?**

A. Because there's night that I won't get home until like 5:30, and then if I have to take a first shift, I can't -- wouldn't be able to work from 5:00 to 7:00, I would go without any sleep. And nighttime, I have to be there, and I couldn't work second or third shift.

**Q. Well, what shift were you working for Regal?**

A. It was a swing shift.

**Q. What was your swing shift?**

A. From 11:30 to 8:00 at night.

**Q. So you were working -- well, let me -- okay, let me -- but doesn't your letter say, like Exhibit 6 at the top, I'm notified I'm being displaced from my first shift value added packer, grade 5 position. Weren't you working first shift?**

A. It wasn't first shift, it was a swing shift.

**Q. When does first shift start?**

A. First shift starts from 7 to 3:30.

**Q. Okay, okay. And when were you working?**

A. 11:30 to 8:00 at night.

**Q. So you're saying you were working at Regal from 11:30 to 8:00?**

A. Yes.

**Q. Why didn't you tell anybody when you got this**

**letter, hey, I'm not even working first shift?**

A. Because I just -- I just didn't, but I did try to tell Joe DeVillez at the last min -- at the last meeting

**Q. Okay. And if you go back to Exhibit No. 1, your complaint. If you -- yeah, no, if you look at numbered Paragraph 2, it's at the top of page 2. Do you see that? It's got that you were employed by Defendant as first shift value added packer?**

A. I don't see that.

**Q. Oh, I'm sorry. So are you saying that's not right?**

A. That's incorrect.

**Q. Okay. But you looked over this before you filed it, right, I think you said that earlier?**

A. Yeah.

**Q. Okay. Now, how do they -- did your swing shift have a name? You said you're working from 11:30 a.m. to 8 p.m.?**

A. Yes.

**Q. Okay. Did that have a -- did that shift have any kind of -- did that swing shift have any kind of title or anything?**

A. Just drive kits.

**Q. Okay, okay. Now, so if you were working 11:30**

**to 8 at Regal and then you're working at DHL from 11 p.m. to 5 a.m., when did you sleep?**

A. I get out Friday morning, Saturday morning at 6:00 in the morning or I want to stay to get some more hours, I can stay to at least like 7, but you have to be out and out Sunday --

**Q. Okay, but let's just take a regular day, like a Wednesday, a regular Wednesday, you know. If I understand right, you'd start working at Regal at 11 a.m., and you go until 8 at night?**

A. Uh-huh.

**Q. And then you'd three hours, would you sleep then or what would you do?**

A. Sometimes I would take a nap. I probably won't go com -- and sometimes I wouldn't. Sometimes I'd just wait because sometimes they have a late plane, you can come in early at work at 10. So it varies on different days.

**Q. Okay. And then you work at DHL from 11:00 at night until 5 in the morning, correct?**

A. Yes.

**Q. So then if I'm reading this right, you're going to be off from 5 in the morning until 11:30 in the morning, right?**

A. Yes.

**Q. So you've got like six hours there?**
A. Yes.
**Q. Okay. Would you sleep then?**
A. Yeah, because I live close by. It only takes me about ten minutes to get to Emerson.
**Q. Okay. So you live pretty close to Emerson, slash, Regal?**
A. Yes.
**Q. How close do you live to DHL?**
A. Twenty minutes.
**Q. So you're pretty close to both of them?**
A. Right.
**Q. Okay. Why couldn't -- if they offered you a first shift, why couldn't you have done that?**
A. Because I wouldn't have got any sleep. And then during the wintertime is our peak season, and our peak season runs from November until the end of Christmas. I have to be there until 10 until the sort get done.
**Q. Okay. So DHL, you're saying in the peak season, you're going to start an hour earlier at 10?**
A. Yes.
**Q. And when would it usually get done?**
A. About 6.
**Q. Okay. Why couldn't you -- if I'm looking at**

**this right, it seems like if you would have gone to first shift, then you would have had a short amount of time between DHL and Regal, but then you'd have a big amount of time in the afternoon. You'd be off at Regal at 3:30, and you'd wouldn't have to work again until 11. Wouldn't that give you a big block of time to sleep?**

A. No. Because I would get more sleepy because what I do is really physical and your body would really get tired and any time you sit down, you just want to sleep. So if I went to sleep I wouldn't have gotten up.

**Q. What's really physical where, at Regal or at --**

A. At DHL, it's all -- yeah. It's not all letters, it's boxes and stuff too, you know.

**Q. Okay. I guess I don't understand why you couldn't have slept in the afternoon, and then woke up and like start your day by going to DHL?**

A. In the afternoon?

**Q. Yeah.**

A. I don't understand what you're saying. About what time are you talking about?

**Q. Couldn't you have worked at Regal until 3:30, and then gone to bed at like 4:00 in the afternoon, slept until 10, and then woke up and gone to DHL?**

A. If I woke up at 10 to go to DHL?

**Q. Yeah.**

A. Well, if I worked -- that second shift was just 3 to 11:45, so I would have to be -- I would have to work from 3:30 to 11:45 on some of those jobs so I can't be at two places at the same time.

**Q. Where were you working from 3:30 to 11:45?**

A. Some of those job bids is from 3:30 to 11 -- 11:45.

**Q. Okay. Well, and I think you're talking about one of the documents I produced in discovery which kind of had a list of potential jobs, right?**

A. Uh-huh.

**Q. Okay. Let me show you that. I think I've got a couple. Yeah, let's mark this one.**

(EXHIBIT 7 MARKED FOR IDENTIFICATION)

**Q. Okay, as I understand it, this is a list of all the positions that were up on the board from the time that you started the displacement until they let you go to 2016?**

A. Uh-huh.

**Q. Do you have any reason to disagree that these things were actually on the board?**

A. I can't recall if these were the exact jobs that was posted.

**Q. You don't know?**

A. Right.

**Q. Okay. But it's possible they were, you just don't know?**

A. Right.

**Q. Okay, okay. Now, as I look here -- well, first of all, we see "shift" and so those numbers, those correspond to the shifts. Like you see "first shift" "second shift" and I think maybe a couple of third shifts on here. Now, what are these -- I also see "A" and "D," some letters, what are the letters?**

A. I have no idea.

**Q. My understanding is those are swing shifts; is that right?**

MR. SCUDDER: Is that?

NICOLE GEORGE: They're 12-hour shifts.

MR. SCUDDER: Okay. Is that --

NICOLE GEORGE: It's in our specific area.

BY MR. SCUDDER:

**Q. Okay, did you -- when you said that you worked a swing shift --**

A. I didn't -- I said I worked swing shift in drive kits. I work at night on third shift at DHL.

**Q. Okay, yeah. At Regal, you were saying you were working a swing shift on drive kits?**

A. Uh-huh.

**Q. Did that have a letter assigned to it?**

A. No.

**Q. Okay. But can we agree that there's some jobs on here, you know, like for example, I see on June 4 of 2015 there was a production tech and flex; do you see that? 6-4-15?**

A. 6-14, no, I don't see it. 6-14? Or 6-4?

**Q. 6-4, I'm sorry.**

A. 6-4?

**Q. Yeah.**

A. Uh-huh.

**Q. And that there was a first shift job and it was a grade 5, and you were a grade 5, right?**

A. Yes.

**Q. And so if I understand right, if you would have bid into another grade 5 job, you would have had the same pay, right?**

A. It's a possibility.

**Q. Is there any reason you wouldn't?**

A. If they had what you call consistent progress, if it's from a grade 3 to 5 or 5 to 8, it's a progress step that you have to take in order to get that grade pay.

**Q. Is that one of those -- like if you look on March 23 of 2015, production operator and molding. I**

**see 3, dash, 5. Is that one of those progressive things you're talking about?**

A. Yes.

**Q. Okay. Now, this one on June 4, that doesn't have one of those, right, it just says 5?**

A. Yes.

**Q. Right, okay.**

A. June 4.

**Q. And then it says over here that: "Would have been successful candidate based on seniority." Do you know if that's true that if you'd have actually -- if you would have bid on that job, would have gotten it based on your seniority?**

A. I'm not sure if based on my seniority or who else is going to bid on it. It could have been somebody else so I wouldn't say that's really a true statement. Somebody else with more seniority would have gotten it too.

**Q. Well, no, what I think they're saying is is that you were more senior than everybody else that bid on that position. Do you know if that -- do you have any reason to doubt that?**

A. If they thought I was, I guess it would be right.

**Q. Okay. And is that your understanding that**

**when they bid these positions out that seniority controls who gets it?**

A. No. With the Kop-Flex, they said it goes by skills too.

**Q. Who told you that?**

A. Well, when we had that meeting with Kop-Flex, and we was talking -- Joe DeVillez was talking about, what he said was, somebody asked him like, "what if I -- who would get that job, somebody that just came off the street that knew how to do CNC? Or, me, that's been there for a while and don't know it?" You know. And he said he would go with the person that has the ability to do the job that had more of a skill than the person that they trained.

**Q. Is that like -- I see some of these jobs, as I understand it, if it's a grade 7 or higher it says they're interviewed based, is that what you're taking about?**

A. I don't know about the interview because I never -- grade 7 and 8 is just too high. You have to really have some kind of knowledge and skills, which I don't have any.

**Q. Okay. You don't have any knowledge and skills in what?**

A. In cutting. I used to pack on Kop-Flex, and I

talked to those guys because I was going to bid in that job. And I went and talked to each one and see what they was doing and how the machine ran, you know. And from watching them, it was something that I really know that I'm not good at. I have no skills with no tools. Some of the knowledge, how they program it this and that, it just -- I couldn't even, you know, just let it sinked in.

**Q. When was -- when were you thinking about bidding into another job?**

A. Well, before the drive kit job came open.

**Q. So this was well in the past before all this stuff with the doctor and all that?**

A. Yes.

**Q. Okay. Did you ever sit down with Nicole and say, hey, what kind of jobs you guys have for me?**

A. No.

**Q. Why not?**

A. Because I knew what I liked, and drive kits is something that I know I was good at and what I like. I'm fast with my hands, and those are things that I like.

**Q. What are the other, tell me what the other shifts times are at Regal, you're saying that first shift is 7 to 3:30?**

A. Yes.

**Q. What's second shift?**
A. 3:30 to 11:45.
**Q. Okay. What's third?**
A. I guess 11 -- it depends on which department. It think it's 11:45 to 7:00 because we normally see them as we come in, you know, so.
**Q. Okay.**
MR. SCUDDER: All right, you want to take a little break? Five minutes?
MR. STILZ: Sure, that works.
(OFF THE RECORD)
BY MR. SCUDDER:
**Q. Thanks, we just took a little short break there. Let's mark this as our next exhibit, I think it's 8.**
(EXHIBIT 8 MARKED FOR IDENTIFICATION)
**Q. Now, I don't think you've seen this document before, is that right, or at least you didn't see it when you were working for Regal?**
A. No.
**Q. Okay. Now, according to this document, you had a meeting with Joe DeVillez and I think Nicole on February 2nd of 2016, do you remember a meeting like that?**
A. Yes.

**Q. Okay. Tell me about that meeting?**

A. My supervisor Jerry told me I need to meet with Joe DeVillez and Nicole in his office at a certain -- at 3:00, and I met them at 3:00. So I went in his office, and he asked me if he knew I was here, and I said yes. And he said, "Well, you know the time is coming up" and I'm like, "Yeah, I know." And I told him, I said, "I have until February 11" is what I said. And Nicole pulled out a piece of paper -- not a piece a paper -- a log, it looked like a log or something. And she told me that job that was open, and I told her, I says, "Where did this come from?" This was more like a grade 5 and 7. I asked her, "Where did those come from because that wasn't on the first sheet that I signed." And then she say, "Well, you know, you could have bid on those sheet -- those papers." Something like that, I'm not sure exact words. And that's who -- yeah, something about she saying about I could bid on another job, one of these higher grade pay job. And then I asked her if I had to give up my medical records, and she said yeah. I says, "Well, I'm not interested in it."

**Q. Well, if I understand right, you wouldn't have to give your medical records --**

A. I would have to.

**Q. But let me finish the question here. If you**

**would take a job where you didn't have to use the powered industrial equipment, you wouldn't need to give up your medical records, right?**

A. I'm not sure if that's true or not because I know they kept insisting on having my medical records.

**Q. Okay. Well, why would they need the medical records if you weren't going to use the equipment?**

A. I believe they was fish hunting for something.

**Q. What do you think they were fishing for?**

A. Because I felt that they -- okay, let me tell you: Nicole asked me why would I not give my medical records to Dr. Haskell, you know, and she said "after all he is a doctor, you know." He is not my doctor, and I didn't feel comfortable with him seeing my medical records because I don't know anything about him just that he works for them.

**Q. Okay. Didn't she tell you that she would not see the documents that you produced to Haskell?**

A. She already seen it, already seen my medical things, so -- and she gave that to him, so.

**Q. Well, okay, first of all answer, let me ask my question: Didn't she tell you, hey, any documents that you give to Haskell, he's not going to give to me. He's just going to tell me whether you're okay to drive or not?**

A. She said that they don't see our medical records.

**Q. And that "they" being Regal?**

A. (Gestures)

**Q. Okay, so she did tell you they don't see my medical records?**

A. Yes. And another thing he said -- she said, the reason he asked for my medical records was that he was suspicious of me not wanting to give up my medical records.

**Q. Okay. And --**

A. What I'm saying is because I didn't want to talk, you know, because I didn't want to talk about it, and that's why he became suspicious.

**Q. Is that bad or --**

A. Yes. Because you don't judge nobody because they don't want to talk about something that's really defimential [sic] to them, and try to say, well, if you don't talk about it, I'm going to -- I want your medical records.

**Q. Well, don't you think that if you were a doctor and you had to say whether it was safe for somebody to do something or not, wouldn't it concern you if there was something somebody refused to talk about?**

MR. STILZ: Object to form. You can try to

answer.

A. Okay, no.

MR. STILZ: No, no, you can and try and answer.

A. No, no, no, if I thought -- if I thought there was any reason I couldn't perform my job or any, I wouldn't have no problem of telling him or I can't do this or I couldn't lift this or something. This had nothing to do with my ability to do the work because I was doing the job. That's why I don't even understand why there was there because I did my regular job. I never asked for no help until they relieved me off my duty to where I couldn't pick anymore, then I had to have help for somebody to pick my stuff for me.

**Q. Well, can we agree that it's possible that somebody could have a medical problem that could cause a problem with them driving, and it might go okay for a while until something really bad happens, right?**

A. Well, you got people that is on drugs that they didn't know about that's driving those equipment so why send me out?

**Q. Okay. Well, let's stop here. First of all, answer my question now, you know: Can we agree that you can have a medical problem and on most days you'd be okay to drive, but then all of a sudden something**

**happens with that medical problem and it could cause a real serious accident?**

A. It depends on what the problem is.

**Q. But there are some, like for example, if you -- maybe if somebody had a really bad heart condition, most of the time they're okay, and then on a rare occasion they'll have a heart attack and that might be something that would be really dangerous, right?**

A. I guess.

**Q. Okay. Or somebody with epilepsy, maybe they go a period without having a seizure, and then all of a sudden they have a seizure while they're driving a forklift, that would be dangerous, right?**

A. Yes.

**Q. But they could go a stretch and be okay, right?**

A. Yes.

**Q. Okay. So can we agree that the company would have a reason to have medical examinations, even for people who've been doing the job seemingly okay for a while?**

A. No.

**Q. Okay. So you think that they just -- shouldn't be allowed to ask for an exam even if you've been doing the job for a while?**

A. I think it depends on a lot more. If they have a history of medical problems and they display some medical problems at work and they always taking off, yeah, I think the doctor, you know, they should ask. But, you know, for somebody like me who had colon cancer, and then he goes, oh, I want to see your medical records, you know. Look at my history, you know, you don't see nothing any other than that -- unless my foot surgery and I have an allergy problem.

**Q. Well, as I understand it, the policy says that everybody on a certain calendar has to go back to the doctor, just like every five years or something, everybody goes to the doctor. Are you saying you object to a policy like that?**

A. I never seen no policy like that.

**Q. Okay. But I think I showed you one --**

A. Oh, what you showed me, but, before that, no, no.

**Q. Okay. Were you familiar with all the policies at Regal?**

A. No.

**Q. Okay. It is possible they had a policy, you just didn't see?**

A. It's a possibility they never really showed people their policy.

**Q. Okay. Now, as I understand it, in this meeting, Nicole said -- asked you if you wanted to go back to the doctor and talk about your history, and then you'd be approved, maybe approved to drive, and you said that you were going to think about, and then the next day you told her no?**

A. No. She told me I would have to give up my medical records.

**Q. Yeah. And then --**

A. Yes.

**Q. -- and at least according to this, you said you'd think about it. And then the next day you said, no, I thought about it, I don't want to?**

A. Right.

**Q. Okay. Now, can we agree that the company already knew you had cancer, right?**

A. Yes.

**Q. So I guess you're not afraid that the company was going to find your medical records, they had already; right?**

A. No. But the company didn't know if I had to take radiation or any of that stuff, no, so.

**Q. Why do you think they would care?**

A. Why would they would care? They would care.

**Q. Why?**

A. Because they thought that maybe it's going to hurt their insurance. I'm going to be off of work.

**Q. What evidence do you have that they were worried about?**

A. The evidence that they kept insisting on seeing my medical records. There was no reason for them to have my medical records.

**Q. Anything other than the fact that -- well, first of all, they didn't ask for the records, Haskell asked for the records, right?**

A. But Haskell had the report so he don't -- he didn't need to see the medical records, he'd seen what the report says.

**Q. Do you have any reason to think that Haskell would have given documents that you gave to him to anybody at Regal?**

A. I don't know because I don't him. He's not my doctor so I don't -- I'm going to be skeptical of him.

**Q. Okay. Did anybody at Regal ask for you to give the medical records to them directly?**

A. No.

**Q. Okay. And then this note says that February 3rd of 2016, 3:05, Sheila stopped by and said that you were not interested in going to another medical screening?**

A. I didn't stop by, she'd seen me in passing.
**Q. Okay. You guys had a conversation?**
A. Yes.
**Q. And that's what you said, you weren't interested in going?**
A. Yes.
**Q. Okay.**
MR. SCUDDER: That was Exhibit 8; is that right?
COURT REPORTER: Yes, correct.
MR. SCUDDER: Thank you. Okay, let's make this 9.
(EXHIBIT 9 MARKED FOR IDENTIFICATION)
**Q. Okay, do you remember getting this document?**
A. I sure do, yes.
**Q. Okay. Now, if I'm looking at it right, it looks like you didn't sign this one; is that right?**
A. Yes.
**Q. Okay. But you did receive it?**
A. I looked at it, yes.
**Q. Okay. Who gave it to you?**
A. Nicole.
**Q. And it looks like, is that Joe's signature on supervisor's signature?**
A. Yes.

**Q. Was he in that meeting too?**
A. Yes, he was.
**Q. Okay. And as I understand it -- well, tell me about that meeting, what happened?**
A. Let me recall. He came -- I came in and -- let me see. Nicole showed me log of jobs that was open, and I don't remember what I said but I told her, I remember my response was I said, "I decline these jobs."
**Q. Okay.**
A. And then Joe DeVillez said, "Is it because you don't want to work for us anymore?" And I said, "No, it's not that" and before I can finish it, he shook his -- extended his hand out, and said, "Good luck to you." And that was the end of the conversation.
**Q. Did they offer you again that you could go to the doctor and turn your records in?**
A. They didn't mention it that time, no.
**Q. Okay. This handwritten sheet on the next page that has all these positions, did they give that to you that day or is that something they attached later?**
A. It was a log, and it was highlighted with red and yellow markings on it. I'm not sure what all was on there.
**Q. Was it a list of jobs; do you know?**
A. Yes.

**Q. Okay. Why did you refuse to sign it?**

A. Because I no longer trusted them on what they were saying. Because the first job that I signed, it says a grade 3 and I was told about the grade 5 and 7 until that day, and then I was like wait a minute. That's when -- I'm like so now you're saying that I can bid on these other jobs. She said, "Oh, you always could had." So, you know, I like I'm not signing it.

**Q. Well, were -- I mean you got one document in February of '15 and then this document is February '16, so that's a full year, right?**

A. Yes.

**Q. Now, in that year, weren't there jobs on the board?**

A. To my understanding, I was led to be, up until then, the whole -- nothing but the grade 3 job because that's what she introduced to me, and that's what I thought was all the grade 3 jobs that she wanted me in. It wasn't until then, that's when she said that "you could bid on something older than that." And I says, "No, I'm not going to sign that."

**Q. Why, did you look -- I mean were you looking at the board?**

A. I went past it, but I'm not going to bid on no grade 3, that's lower pay.

**Q. What about the grade 5 jobs that were on the board?**

A. A grade 5? They had a grade 5 they didn't offer to me which was in drive kits, and they wait -- they could have posted that job and gave it to me, and they waited until two weeks after I left.

**Q. But they had a whole bunch of jobs that were on that board that were grade 5, do remember Exhibit 7?**

A. Okay, what time and...

**Q. I mean why didn't you bid on any of those?**

A. Most of those jobs are going to be interfering with my schedule. Some of those jobs I couldn't even do anyway. Molding, I have a breathing and sinus allergy problem, and there's no way I would go to molding.

**Q. Well, how about production tech and flex, could you have done that job?**

A. Exactly what is that?

**Q. Well, I think -- I mean did you ever even look at the board to see if that's open?**

A. No. Because I knew it was in the time frame that would interfere with my work schedules.

**Q. Okay. And we've got another production tech and flex that was in August. Could you have been a production operator in molding?**

A. If it has to do with any type of heat, I

couldn't be around it.

**Q. Okay. You mentioned in your complaint, I think, that you thought that there was some other people who were treated differently than you?**

A. Yes.

**Q. Who do you think was treated differently than you?**

A. The one young lady Debbie. Let me see, what's Debbie's last name. I don't recall her last name. But she was allowed to go be on light-duty a couple of times where I wasn't.

**Q. Okay. Did she have a note from her doctor that said she needed to be on light-duty?**

A. I don't know if she had a note from her doctor.

**Q. Okay. Did you have a note from your doctor saying that you needed light-duty?**

A. Yes.

**Q. Okay. When did you -- I thought -- okay, when did you have a note from your doctor saying you needed light-duty?**

A. My doctor released me to go back to work before September. He said, "You good to go to work? You ready to go?" I'm like, "Yes, I'm ready to go." And I gave it to Debbie Bennett. She wasn't in the

office, but she left a -- she called me back and left a message on my answering machine and said that -- because like it was like a 20-pound restriction. And my doctor said I only needed somebody to help me lift the stuff and pull, just for me not to lift the item by myself. And she said that, she goes, "Sheila, I'm sorry, but under those restrictions I cannot accept you back. You need to come back without any restriction."

**Q. Who told you that?**

A. Debbie Bennett.

**Q. Okay.**

A. And then I went and told my doctor, he goes, "They won't let you come back to work?" And I'm like "no."

**Q. Okay. So do you have any idea -- what were your restrictions at that time?**

A. I believe it was no lifting more than -- I know he said don't lift more than 40 pounds by myself, you know.

**Q. Okay.**

A. No pulling, stretching for two weeks.

**Q. And so how much earlier could you have come back to work if they'd have let you come back light-duty?**

A. I think it was like August-something, I'm not

sure the date.

**Q. So you think that you could have come back maybe three or four weeks earlier?**

A. Yeah, he wanted me to be back.

**Q. Okay. And as I understand it, is Debbie the person I saw from your notes and she had cancer and some bleeding and stuff?**

A. Yes.

**Q. Okay.**

A. But I'm not sure if she had cancer. She said she had some -- a DNC. I don't know what DNC is.

**Q. Okay. So that was a -- DNC was term she used?**

A. Yes.

**Q. Okay, okay. Let's see here. Any other reason that you think that Debbie was treated better than you?**

A. Yeah, because they gave her light-duty, and she was working. First she thought she had water on her knee -- and she was temp to begin with -- and she said she had to wait until she get hired on, and then she's going to the real doctor to find out what's wrong with her knee because she kept having a knee pad. And there was days that she couldn't work because she couldn't bend down because she had this pad on her leg. And Herb took her off from picking and had her packing. And then she told me that when she get hired-on, she's going to

go to the doctor because she didn't have no insurance, and have her leg checked out and find out what the problem was. She did and she said -- she told me that they said that it was water, but she also had a cyst in her leg. And she said she's going to have to have surgery on it, but she was going to wait.

**Q. Okay. Did you ever ask for medical treatment through the company that you didn't get or? I mean I don't understand how you think that's better than -- I mean did you ask --**

A. Because she got on light-duty, yeah.

**Q. Okay, so light-duty. She was on light-duty, and you said you didn't want to be on light-duty?**

A. Yes.

**Q. And the only time you wanted to be on light-duty was --**

A. Was for those two weeks.

**Q. For those two weeks, okay, okay. Is Debbie, what's Debbie's race?**

A. She's white.

**Q. Okay, okay. Who else do you think was treated --**

A. Billy Spicer.

**Q. Okay. How do you think Billy -- well, first of all, what's Billy's race?**

A. He's white.

**Q. Okay. How was Billy Spicer treated differently or better than you?**

A. Because he was packing at UPS, and I was behind him. Mike Tobias came out, and Billy picked up this cart that had things in it for him to pack. Mike Tobias says, "Billy, be careful because you know you on light-duty." And he said, "Yeah." So I said, "Billy" I said "how long you been on light-duty?" He said, "Oh, about two years." I'm like, "Two years?" I said, "They won't even give it to me for two weeks."

**Q. Okay. And so any other way you think Billy was treated differently or better than you, other than he got light-duty and you didn't?**

A. Yeah, because he was working on light-duty. I wasn't allowed to come back and work and be on light-duty.

**Q. Okay. Anything other than the light-duty thing?**

A. What you mean?

**Q. I want you to tell me the ways in which you think that Billy was treated better than you, and you've mentioned --**

A. Because he was --

**Q. -- that he got -- he was able to work on**

**light-duty and you --**

A. Right.

**Q. Anything else?**

A. No, not that I know of.

**Q. Okay. Who else do you think was treated better than you?**

A. Joyce Loftin.

**Q. Okay. What's his race?**

A. She.

**Q. Oh, "she." George or?**

A. Joyce.

**Q. I'm sorry, that makes more sense. Joyce Loftin, okay, and that's her race?**

A. She's white.

**Q. Okay. How do you think Joyce was treated better?**

A. Because she too was allowed to come back and be on light-duty and not driving the equipment.

**Q. Okay. Do you know what -- well, first of all, what was -- you said, did Debbie have cancer, is that what was wrong with Debbie?**

A. I don't know if she had cancer. She said something that she has to get cleaned out or something. That's the term she used "cleaned out."

**Q. Okay. What was wrong with Billy?**

A. Brenda told me that he had a problem bleeding from a concern area.
**Q. Billy did?**
A. Yes.
**Q. Okay. Do you know where?**
A. Yeah, I know.
**Q. Okay, okay. Some kind of private area?**
A. Yes.
**Q. Is Billy a guy or a girl?**
A. He's a guy.
**Q. Okay, all right. So his private parts were bleeding or --**
A. That other part.
**Q. Okay. Like his, like from his, you know, like anus like -- okay, okay.**
A. Yes.
**Q. Okay, okay, so he had trouble with that. What was Joyce's medical problem?**
A. She came back having a valve operation on her heart.
**Q. Okay. All right, and you said she was allowed to work light-duty, but now you said when she was on light-duty she did not use powered industrial equipment?**
A. No. Before she did, but when she got on light-duty she couldn't drive any.

**Q. Okay. Now, as I understand it for you when you were displaced in February of '15, you did not drive powered industrial equipment either?**

A. Right.

**Q. But you did not receive a reduction in pay; correct?**

A. No, no, that's correct.

**Q. Your pay remained the same even though you were doing -- weren't doing the driving?**

A. Yes.

**Q. Okay, okay. Do you know of any of these other people who were able to keep their pay the same, but not drive for a year?**

A. Calvin Jarvis, he could drive and kept his pay.

**Q. Okay. Calvin Jarvis?**

A. Yes.

**Q. Okay. What's his race?**

A. White.

**Q. And what was Calvin's his issue?**

A. He has a lot of medication and he's diabetic.

**Q. Okay. And then you said there was a time for a while he didn't drive?**

A. No, he drove the whole time.

**Q. The whole time of what?**

A. When he refused to give his medical record, he kept driving until the time for him to bid on another job. That's when they told him he wasn't allowed on the equipment.

**Q. Okay. How do you know that -- do you know if he went to the doctor and was given an incomplete result like you were?**

A. Yes, he told me.

**Q. What exactly did he tell you?**

A. He came to my station, he goes, "Sheila, I heard you can't drive equipment." I said, "yes." He goes, "why?" And I says, "Because I won't give my medical records. He goes, "I didn't give them my medical records." I said, "You didn't?" He goes, "no." I said, "What did they say?" He said, "They didn't say nothing." And every couple months I would ask him if they said anything to him, and he said, "no."

**Q. Why did he go to the doctor?**

A. I don't know.

**Q. Okay. So you don't know if he went to the doctor for the same reason you did?**

A. The only thing I know is he didn't have to give up -- he refused to give up his medical record.

**Q. Okay. Do you know if he eventually did give up his medical records?**

A. When it was time for him to bid on another job, they told him he couldn't bid on another job until they seen his medical record.

**Q. And he did give them up?**

A. Yes.

**Q. Okay. And you didn't?**

A. No.

**Q. Okay. How long do you think between the time he was asked for his medical records and he actually produced them?**

A. It was a year because he waited until -- he waited a year because you have to wait a year to bid on another job, and he waited until his time was up to bid on another job. And when he went to bid on another job, that's when they told him that his medical record was incomplete and he couldn't bid on a job until they got -- received his medical record.

**Q. Okay. Were you in that meeting?**

A. No, this is what he told me.

**Q. Okay, okay. So as I understand it, it would be the same position that you were in except that if he would have -- if you would have produced your medical records in February of '16, you were given that same choice and you said no; when he was given that choice, he said yes?**

A. No, he said no, and he --

**Q. The first time he said no, but then the second time, they said, hey, you've got to produce your records or we've got to let you go and he produced them.**

A. Yes, but he stayed on his equipment too.

**Q. Okay. But did you have any loss of pay or anything because weren't on your equipment?**

A. No.

**Q. Okay. So how were you harmed by not using the equipment?**

A. Well, if they had kept me on my equipment, my equipment, and they couldn't deny me my medical records. They couldn't say, well, oh, okay, you know, you driving the equipment so therefore, you know, I'm going to hold your medical records. So if they let me continue to drive, then they would need my medical records.

**Q. Well, that's not what happened to Calvin Jarvis though. You said he drove for a year --**

A. He --

**Q. Well, hang on now.**

**-- you said he got to drive for a full year, and then they still asked him for his records even though he drove. And then he was only --**

MR. STILZ: Objection.

**Q. -- he was only allowed to stay because he**

**produced them right?**

MR. STILZ: Objection. I think that -- I think she answered he bid into another position and was then required to produce his medical records.

MR. SCUDDER: Oh, okay. Let me -- it was a misunderstand.

BY MR. SCUDDER:

**Q. Is that what happened?**

A. Yes.

**Q. So he drove for a full year, and then he went to different a position?**

A. Yes.

**Q. Okay. Did that position require him to drive?**

A. I do not know.

**Q. Okay. But he still -- so how do you think he was treated better than you? He got to drive during the year, but why is that --**

A. Because once they send you out to get a medical record, you're not allowed on any equipment until HR tell you you can get on it.

**Q. Okay. But he wasn't, even though you said he was allowed to drive for a year, he didn't get to stay in that job though; did he?**

A. He stayed in that job. He stayed in doing that same job that he told them no to until he bid into

another job.

**Q. And that was at the deadline when they told him he had to bid on something?**

A. No. It was his deadline when his time was up, and he went to bid on a different job because he didn't like the job that he was in.

**Q. Well, then what deadline was there if he didn't have to bid out --**

A. You have to stay in -- he didn't like the job, but once you bid into this job -- they said you have to stay in that job for a whole year, and once your year is up you can bid into another job and that's what he did.

**Q. So you're saying that you think that Calvin Jarvis, if he wanted to, he could have remained in that job the whole time?**

A. Probably so. They didn't say anything to him.

**Q. Okay. So why do you think -- it's just, what, you're guessing? You think he'd have been allowed, but you don't -- did anybody tell you he could have?**

A. Did anybody told me that he could what?

**Q. Did anybody tell you that Calvin Jarvis could have remained in that job forever without producing his medical records?**

A. Well, it shouldn't have took them -- took him -- they didn't even come to him while he was on the

equipment. They should have pulled him off immediately.

**Q. Okay, I really got to -- you really got to answer the question I'm asking you: Did anybody tell you that Calvin Jarvis, after refusing to produce his medical records, could have stayed in that job where he drove powered industrial equipment for as long as he wanted?**

A. Didn't nobody tell me, no.

**Q. Okay. Anybody else that you think, other than Debbie, Billy Spicer, Joyce Loftin, Calvin Jarvis --**

A. And there was Sheila Lawson.

**Q. Sheila Lawson?**

A. Yes.

**Q. How do you think Sheila Lawson was treated better than you?**

A. Because she was told that she needed to have -- she was told -- she told me that they asked for her medical record, you know. And I says, "why?" She said, "It's not because of safety" she said "they wanted to know if she could perform safely on the equipment." It wasn't for driving equipment, it was for safety reasons because she said she kept running into things.

**Q. Okay. So she was sent to the doctor for a different reason than you?**

A. Yes.

**Q. Okay. Did she refuse to produce those records?**

A. Yes.

**Q. And what happened?**

A. Nothing happen. She stayed on the equipment and kept driving.

**Q. Okay. How did you find all this out?**

A. She told me.

**Q. That's according to her, okay. What's her race?**

A. She's white.

**Q. Okay. And did she ever produce her records?**

A. She said, no, and definitely not that she wasn't going to give them that medical record.

**Q. Okay. And so as far as you know, she never produced them?**

A. According to her she never did.

**Q. Okay, okay. When did this happen with Sheila Lawson?**

A. Let's see, I'm not sure of the date because I came over in Kop-Flex where she worked, and she was packing and I was packing with her. We was partners. And that's when she told me because I was on there a year. So I bid that like, what, August '14 maybe. I'm guessing '13 because she had been over there, and I

waited a year to bid out and that's when she had told me.

**Q. But you think it was around 2013?**

A. Yes.

**Q. Okay. How about these -- well, some of these owners I think you mentioned in your notes, right, like Debbie; is she in your notes I think?**

A. Probably, yes.

**Q. Okay. Any other reason you think Sheila was treated better than you?**

A. Other than that she refused and she stayed on the equipment and then nobody said anything to her and she was a grade 5 too. And then nobody come and asked her for her medical record like they did me.

**Q. I thought you said they did ask her for her medical records?**

A. Mike Tobias kept asking me for my medical records, that's when I told him that I didn't need it. That Nicole said the only thing I need was that piece of paper from Dr. Moon saying that I could drive the equipment.

**Q. And then so Nicole initially, you're saying Nicole initially told you that the note from Dr. Moon was enough?**

A. Yes.

**Q. But then later they changed their mind and said it wasn't enough?**

A. Yes.

**Q. Okay. And anybody else that you think was treated better than you?**

A. I think that's all of it.

**Q. Okay. So I've Debbie, Billy Spicer, Joyce Loftin, Calvin Jarvis, Sheila Lawson, correct?**

A. Yes.

**Q. Okay. And all those folks are white folks?**

A. Yes.

**Q. Okay. How much money were you making per hour -- I'm assuming is that how you were paid, you were paid by the hour and you weren't salary?**

A. Yes.

**Q. Okay. What were making per hour --**

A. 19.20.

**Q. -- at Regal?**

MR. STILZ: Just let him finish before you answer.

THE WITNESS: Oh, I'm sorry.

**Q. Is that what you made at Regal?**

A. Yes.

**Q. How much were you making at DHL per hour?**

A. I started at 11.50.

**Q. What were you making, you know, kind of at the time you separated from Regal, what were you making at DHL?**

A. I started out at 11.50.

**Q. And that's -- I just want to make sure that you -- when you started, you were still at that starting pay at that time; is that right?**

A. Yes.

**Q. Okay, okay. Now, since you left Regal, what other jobs have you worked?**

A. I work through a temps.

**Q. Were you able to replace the income that you had at Regal at all?**

A. No.

**Q. Okay. So are -- let's see here, okay. Because it looked like -- I'm looking at your, I think we're looking at your tax returns, it looked like in 2016 you still had about 45,000 dollars of income and you didn't work for Regal for most of 2016; how did you --**

A. That was my 401(k).

**Q. Where was the 401(k), who was that --**

A. Regal.

**Q. Did you cash that out?**

A. I cashed -- yes, I cashed it out.

**Q. Okay. Did you get unemployment benefits at all after you left Regal?**
A. No, I didn't.
**Q. Did you apply for them?**
A. Yes.
**Q. And why -- and they refused it?**
A. Yes.
**Q. Okay. How often do you do temp jobs per week, how many hours do you think you're able to work?**
A. How many hours did I work as a temp?
**Q. Yeah, roughly.**
A. About 20, 25 hours a week.
**Q. And at what rate of pay?**
A. 9.75 or something.
**Q. Okay. And the temp work is all work you've done since you left Regal?**
A. And I got hired on with -- what's the name of it -- with Amazon.
**Q. Oh, okay. And so now you're working at Amazon and DHL?**
A. I used to work at Amazon.
**Q. Okay. What do you do at Amazon?**
A. I was -- what do you call that -- something like they call, something like a water spider where boxes drops into the container, and we have to -- I have

to close the container out, scan it and close the container out and move it and replace it with an empty one.

**Q. How often -- how many hours a week do you work at Amazon?**

A. It was part-time, it was only 25 hours a week.

**Q. When did you start?**

A. August, toward the middle of August.

**Q. August of '16; is that --**

A. No, I think August 15th -- late August of '15, I believe.

**Q. So you were working -- you didn't work at Amazon until after you left Regal, right?**

A. No. I worked as a temp and then Amazon when I left.

**Q. Was there -- I just want to make sure: Was there a time when you had three jobs?**

A. No.

**Q. Okay. So you started as a temp at Amazon after you left Regal Beloit?**

A. I was full -- not full-time -- part-time at Amazon.

**Q. Okay. You left Regal Beloit, then you started part-time at Amazon?**

A. No, I started as a temp.

**Q. Okay, you started as a temp?**
A. Yes, I had two temps job.
**Q. What I want to make sure of: You performed no work for Amazon, whether as a temp or anything else, during or before your time at Regal Beloit?**
A. No.
**Q. Okay. So the first time you started working for Amazon in any capacity was after Regal let you go?**
A. Yes.
**Q. Okay. What's your hourly rate at Amazon right now?**
A. I'm not at Amazon.
**Q. Okay. When you were there, what were your rates?**
A. 11.25.
**Q. Okay. When did you stop working at Amazon?**
A. I believe it was March.
**Q. Okay. Why did you leave Amazon?**
A. Because I became a full-time employee with DHL, slash, Amazon.
**Q. So DHL and Amazon are related?**
A. They're in the same building.
**Q. Okay, okay. So you weren't full-time -- when you were with Regal, you weren't full-time with DHL?**
A. No, I was part-time.

**Q. Okay. And then you increased to full-time after you left Regal?**

A. Not after, no, not after I left.

**Q. Well, not right away, but eventually after you --**

A. Yes.

**Q. Okay. And right now, how much money are you making at DHL an hour?**

A. 14, I think 14.30, 40 hours a week.

**Q. What hours do you work at Amazon now?**

A. I don't work at Amazon.

**Q. Who is it for?**

A. I'm at DHL.

**Q. DHL, okay.**

A. But it's Amazon/DHL, but it's at the -- in the DHL building.

**Q. The DHL -- okay.**

A. Yeah.

**Q. How many hours were you working for DHL when you were with Regal?**

A. Twenty-five.

**Q. Okay. And now you're up to 40?**

A. Yes.

**Q. Okay. Do you ever get overtime at DHL?**

A. DHL, you can get overtime, but not at --

Amazon, you can only get overtime if you come in on your day off.

**Q. Okay. So this year, how much is your total amount of money this year for 2017 that you're going to make from your wages, is that going to be lower or higher than it was like 2015 when you worked the whole year for Regal?**

A. It's going to be a lot lower.

**Q. How much lower?**

A. I'm not sure.

**Q. Okay. Now, I think in your complaint, in addition to wage loss, you have some claims for damage for I think emotional distress. I think you mentioned that in your interrogatories. Have you -- but if I understand right, you have not seen any doctors or anything, right --**

A. No.

**Q. -- for any kind of stress?**

A. No.

**Q. Okay. Can you describe for me what you're saying your emotional distress is?**

A. Because I no longer, well, talk to my family because I can't support them like I used to.

**Q. Who was it you were supporting?**

A. My sisters and brothers.

**Q. Sisters and brother, okay. Because they don't live with you, right, but you do help them out? Yeah, if you need to -- if you want to take a break or something, that's okay. I'm not trying to -- I just want to make sure I understand what you're talking about. Do they live here in Covington?**

A. Yes.

**Q. Okay. How were you helping them before?**

A. Because I was the person that always had the money that they could go to.

**Q. Okay. Are they older or younger?**

A. Younger and older.

**Q. Both. Are they working?**

A. My one brother started back two months ago.

**Q. What have they been doing since you haven't been able to help them out?**

A. I don't hear from them.

**Q. You don't hear from them. Okay. Anything else you can describe with your emotional distress? I know --**

A. All these bills, the collection agencies calling.

**Q. Okay.**

MR. SCUDDER: Why don't we -- want to take another short break?

MR. STILZ: Sure.

(OFF THE RECORD)

BY MR. SCUDDER:

**Q. We're back on record here. I've just got a few more questions here. I know -- let's see, first off, if we look at your initial disclosures, that was Exhibit 3. You've got that. You have a lot of people listed on here who I think are just kind of people who are coworkers of yours?**

A. Yes, yes.

**Q. And I just want to make sure if there's anything in particular that they really know. I mean, like, if we go down here to like, 11) Josh Wenning. Is there anything in particular that Josh is involved with the things that we've talked about today?**

A. He just knew that I was going to be replaced, and he was under the assumptions that I came back and I was on light-duty and I told him no.

**Q. Anything else he had to do with this case?**

A. No.

**Q. Okay. How about Robert Hatter?**

A. No, they all just knew that I was going to be replaced.

**Q. And that's the thing like with Mike Spegal and Jason Greenwell?**

A. Yes.
**Q. These two guys, Kirk and Ronnie; same thing?**
A. Yes.
**Q. Okay. Brenda Hamby, is she one of the people we talked about earlier?**
A. Oh, no, we didn't talk about her.
**Q. Okay. Who's Brenda Hamby?**
A. She works doing belts, she pick and pack belts.
**Q. Okay. How was she treated? It says you think she was treated better than you; how so?**
A. Because Dr. Haskell pass her, and she has a problem with her leg. She told me she has a rod and a plate in her leg and she does walk with a limp, and she used to complain all the time that driving the Taylor-Dunn was making her feet hurt.
**Q. Okay. Do you think if she produced her medical records?**
A. I don't even think he asked her for it.
**Q. Do you know?**
A. She never said that he asked her for it.
**Q. Okay. But you weren't at the meeting or anything?**
A. No.
**Q. Okay, okay. How about, let's see Joyce**

**Lawson?**

A. We talked about her.

**Q. Okay. Judy Wenz?**

A. Judy Wenz, she -- I don't know. She asked me why they needed my medical record, and that she knew that I was going to get replaced. And that I was over there helping them because I got kind of booted out of drive kits.

**Q. She's a coworker though?**

A. Yes.

**Q. She doesn't make any decisions --**

A. No.

**Q. Okay. How about Kate Planck?**

A. The same as Judy.

**Q. Or Kat, is it Kat Planck or Katie?**

A. Yeah, Kat.

**Q. Kat, okay, I'm sorry. How about Paula?**

A. We all pack UPS. We all knew -- we talk and stuff.

**Q. And Billy Spicer, we already talk about the Billy, right?**

A. Yes.

**Q. Cindy Laib.**

A. The same. She had called and we'd talk.

**Q. Okay, okay. Is Joyce Lawson the same as**

**Sheila Lawson?**

A. That should have been Loftin.

**Q. Loftin?**

A. L-O-F-T-O-N.

**Q. It should be Joyce Loftin?**

A. Yes.

**Q. How do you -- because I don't think we talked -- oh, okay, I understand. Okay, so it should be Loftin, and we did talk about her, okay. Okay. And then -- okay. Larry, is he just another coworker that you talk to?**

A. He was the one that was upset that they asked me for my medical records, and he was the one that told me not to give it to them. He's no longer there.

**Q. Okay. But he's just a coworker?**

A. Yes.

**Q. Okay. Any reason why you valued his opinion?**

A. Yeah, he's an older man. He's been around. And he was the one who was saying that Emerson was going to sell Regal because when they brought these two people up -- these two guys up, and he was saying that when you see these guys, they come her to make changes and they going to sell the company, you know. He was right about that, so.

**Q. Okay. And we talked about Calvin Jarvis**

**already; right?**
A. Yes.
**Q. Monti Edwards?**
A. Monti Edwards, he's a coworker.
**Q. Anything else?**
A. He worked on the side of Kop-Flex.
**Q. Anything else, is he just somebody you talked to about the case?**
A. He said that -- he had told me that Sheila had -- he thought that Sheila had give her record, and I told Sheila what he said. And she said, "No, I did not. You tell Monti that he's so" you know "I didn't not."
**Q. Okay. How about Kenny?**
A. Kenny? Oh, he's just second shift UPS.
**Q. Okay. Carlos?**
A. Another coworker second shift UPS.
**Q. And both those folks are just --**
A. These are just people that knew the problem, you know. Most of them thought that I failed the drug test.
**Q. Okay. How about Crystal?**
A. Crystal, she's the same.
**Q. Okay. How about Sheila Stephens?**
A. I think they both -- she assumed that I failed the drug test.

**Q. Okay. Beebe Ponds?**

A. It's same, they just knew that I failed the drug test.

**Q. Okay. Same thing with Chris and Kitty?**

A. Yes.

**Q. Okay. I think we've talked about the others. Are you -- MS Inspection and Logistics?**

A. I'm not there anymore.

**Q. Okay. Was that a place you were working as a temp for a while?**

A. Yes.

**Q. Okay. How long were you there?**

A. I want to say from April to August.

**Q. Okay. Now, as I understand it, if you would have taken a grade 3 job, that's about a 90 cent per hour reduction in pay; is that right?**

A. I'm not sure how much it would be, but I know it would be a lower pay grade.

**Q. Okay. Can you agree that Nicole would know what the difference would be?**

A. Yes.

**Q. Okay. You say you do not recall filling out a form at Dr. Haskell's office about your medical history at all?**

A. I know I didn't.

**Q. Okay. If he had anything like that -- I mean I don't know if we've seen his records yet -- but if he had something like that, is it possible you just forgot you did?**

A. The only thing I gave to him is what I gave to Nicole about my medical record.

**Q. Okay. What did you --**

A. My paper stating that's stating that I had colon cancer. That's the only thing I gave to her. I didn't give him any medical record.

**Q. Okay. Did you have any discussion, I mean didn't he ask you anything in his office about your history at all?**

A. I told you asked me about my colon cancer, I didn't want to talk about it.

**Q. Okay, okay.**

A. And I didn't even think he was going to bring that up, so.

**Q. Okay. These other folks that we mentioned, you know for example Debbie, was she in the same job you were in?**

A. I was in drive kits, and she was in packing. And then I moved to -- some days I would go and help packing, and she would be there.

**Q. Okay. So she was in a different job, but just**

**sometimes you'd go help --**

A. Yes.

**Q. Okay. Was she the same grade as you?**

A. No. She was a grade 3, I believe.

**Q. Okay. How about Billy Spicer, same job as you or different?**

A. He used to be in the office so I don't know what his grade was until he got kicked out of the office so I have no idea. After he came to packing, he left shortly after that so I'm not sure what his grade pay was.

**Q. So this whole thing with him being on light-duty, was he doing your job or a different job?**

A. No, he was doing a UPS job.

**Q. Okay. So he was in a different job, and you're not sure what his pay grade was?**

A. No.

**Q. Okay. How about Joyce Loftin?**

A. She's a grade 3.

**Q. Okay. So a different job --**

A. I mean a grade 1, grade 1.

**Q. Oh, grade 1. Different job?**

A. Yes.

**Q. Okay. How about Calvin Jarvis?**

A. He's a grade 5.

**Q. What job?**

A. I'm not sure what job he did because I left -- I wasn't there when he received, or if he did I don't know what job because I didn't see.

**Q. When he had this whole issue with, you know, potential diabetes and producing records --**

A. I think he said he was cycle counting.

**Q. Is it cycle --**

**Q. Okay. So a different job?**

A. Yes.

**Q. Okay. And then Sheila Lawson, same job or different job?**

A. She had a different job. She was in Kop-Flex packing.

**Q. Okay. And what grade?**

A. Grade 5.

**Q. Okay. Now, do you know if any of these people who -- you know some of these people you said, hey, they were on light-duty and you wanted to be on light-duty, do you know if they had conversations with management about what could and couldn't be accommodated in their job?**

A. No, I don't.

**Q. Do you know if some of these people had work comp injuries and that's why they were on light-duty?**

A. I don't know how Joyce would be like workman comp, it's a heart valve.

**Q. True. Do you know if some of them though, some of them may have been work comp?**

A. Like who?

**Q. I just don't know. I'm asking you if you know of any of them had work comp?**

A. No.

**Q. Okay. What days of the week did you work for Regal?**

A. Monday through Friday.

**Q. Okay. What days of the week back then were you working for DHL?**

A. Monday, Tuesday; off Wednesday, Thursday; worked Friday and Sunday.

**Q. Okay, so Monday, Tuesday. And then what other days here at DHL, off Wednesday?**

A. Yes. Off Wednesday and Thursday, worked Friday and Sunday.

**Q. Okay. And just so we're clear: When you're saying what days you worked because you were kind of a working overnight, right?**

A. Yes.

**Q. That's the day you started working? So like if you say Sunday and if -- well, let me -- you were**

**working, what was it 11? No, no, no, you were working 11 p.m. to 5 a.m.?**

A. Yes.

**Q. Okay, so six hours?**

A. (NODS HEAD AFFIRMATIVELY)

**Q. Okay. So when you say, for example Monday, that means that you start at 11 p.m. on Monday and then work until Tuesday morning?**

A. Yes.

**Q. Okay. And your hours you're saying at Regal were what, 11:30 a.m.?**

A. Yes, until 8 p.m.

**Q. 8 p.m., okay, okay. So you only had a three-hour gap to go to from Regal to DHL?**

A. Yes.

**Q. Okay. Would you typically sleep in that time, or what would you do?**

A. Some days I would sleep, and some days I wouldn't. Some days I would go in early. If there's a late plane I would go in early. They would say, "hey, we missed a plane, can you come in at, you know, 10?" And I'd go in at 10 and work, so it varies.

**Q. Now, let me make sure: When you say miss a plane, you're saying that you were working for DHL and you had to put the stuff on the planes in that sense;**

**right?**

A. No, no. We wasn't able to get it all sorted out so they hold it over for the next day.

**Q. Okay. Well, explain what the planes have anything to do with either one of these jobs?**

A. Sometimes it could be the weather or something on the east coast that would delay the plane, and we'd have until like 5:30 or 5:20 to get it out. And sometimes they say "it's so too late to even start, can you all come in the next day and start early?"

**Q. Which job is sending stuff out on planes: Regal or DHL?**

A. DHL.

**Q. Okay, I just want to make sure, we hadn't said that yet. That's why I was getting confused. Okay, okay. So if the planes got goofed up, that could goof up your hours for DHL?**

A. Yes.

**Q. Because that was dependent on what the planes were doing?**

A. Yes.

**Q. Regal did not depend on what the planes were doing?**

A. No, no.

**Q. Okay. So then you would normally have from 5**

**a.m. to 11:30 to -- between DHL and Regal?**

A. Yes.

**Q. Is that when you did most of your sleeping?**

A. Yes.

**Q. Okay. So you got like six-and-a-half hour gap between jobs there?**

A. Yeah, about that, yes.

**Q. Okay, okay. So if I'm understanding this right, if you would have shift -- if you would have moved to a traditional first shift at Regal where you started at 7 a.m., right, you would have gone 7 a.m. to what, 3:30, that's what first shift is at Regal?**

A. Yes.

**Q. Okay. That would have given you from 3:30 to 11:30 to sleep, right, that's like seven-and-a-half hours?**

A. Uh-huh.

**Q. Okay. And that would have been a bigger gap than you had under your schedule, right?**

A. All the way --

**Q. But just -- it's either a bigger gap or it's not; is it?**

A. It's not.

**Q. It's not? Seven-and-a-half hours is smaller than -- the biggest gap you had the other way is six-**

**and-a-half?**

A. It is if you're speaking at the time of -- during the winter season, no, it would be a smaller gap.

**Q. Why would it have been smaller?**

A. Because from November to December, it's our peak season and also August is our peak season when the kids go back to school early, so we end up staying a little bit later than we normally do or come in a little bit early.

**Q. How much earlier?**

A. Most of the time it's like at 10.

**Q. Okay. So it'd be an hour, so that's short --**

A. Uh-huh.

**Q. So at peak season the gap would be six-and-a-half hours which is the exact same gap you had before, just instead of being before you started Regal, it'd been after Regal?**

A. Yes.

**Q. Okay. As I understand it, you were making more money at Regal, right?**

A. Yes.

**Q. And working more hour -- more money per hour and working more hours?**

A. Yes.

**Q. Okay. I just want to look at these notes real**

**quick, I think we're about done. Did Dr. Haskell work in the same place as Dr. Moon?**

A. I don't know.

**Q. Okay. Do you know of anybody else who was asked by the doctor in an exam about powered industrial equipment for their medical records and then refused to produce them and was allowed to stay on forever?**

A. Let me see. I would say Monti.

**Q. Monti?**

A. Yes.

**Q. Monti went to the doctor for a kind of scheduled reevaluation for powered industrial equipment?**

A. Yes.

**Q. Okay. And he was asked for medical records?**

A. Yeah. But he said he didn't need it because they told him, his doctor said he didn't need it because he wouldn't be driving no equipment anyway so they didn't his medical record.

**Q. Okay. So he wasn't driving powered industrial equipment?**

A. He did for a short time after that, then he just stopped doing it.

**Q. He just stopped. So do you know of anybody who went for an exam for powered industrial equipment, refused to produce their medical records when asked, and**

**then get to keep driving?**

A. Just the list of people I gave you.

**Q. Okay. They had a little -- but as I understand, they were a little different than what I've just suggested. Do you know of any of those people who went -- who had an exam because it was a refresher doctor evaluation under the powered industrial equipment thing --**

A. No.

**Q. Let me finish. -- under that policy, they went, their doctor asked them for records, they refused to produce it, and got to keep driving for more than a year anyway?**

A. No.

**Q. Okay. And again just to make sure the record is clear: You've got a claim for attorney fees, but if you were to win your lawsuit and get your fees, you're only asking for fees for Roush & Stilz, right?**

A. I guess.

**Q. Okay, okay. I got their name right this time. Have you answered my questions today to the best of your ability?**

A. I think so.

**Q. Okay. And if there are any times when you didn't understand my questions, did you ask me to**

**rephrase it or tell me you didn't understand it?**

A. Yes.

**Q. Okay.**

MR. SCUDDER: I think that's all we have.

MR. STILZ: I've got a couple of follow-ups.

MR. SCUDDER: Yeah, okay.

CROSS-EXAMINATION

BY MR. STILZ:

**Q. And just more for my own clear head than anything else, the first issue I want to discuss with you, Sheila, has to do with the timing of the jobs. If I'm correct, your testimony has established that the second and third shift jobs that you were allegedly allowed to bid on, if you'd accepted one of those positions you would have had to have left -- leave your DHL job?**

A. Yes.

**Q. Okay. And the first shift job from 7 to 3:30, I think we've established when the break periods would have been for your longest period of possible sleep. That would have changed your sleep routine, correct?**

A. Yes.

**Q. Because the way it was, you were able to sleep in the morning, correct?**

A. Yes.

**Q. And the change would have required you to sleep much later in the day; is that accurate?**

A. Yes.

**Q. Okay. Now on these jobs that they have produced or have indicated were bid, were you ever guaranteed one of these positions?**

A. No.

**Q. In fact, all you could really do is bid on these positions, correct?**

A. Yes.

**Q. All right. So Ms. George, Mr. DeVillez -- I'm sorry if I mispronounced his name -- anybody in management at Regal, did they tell you you were going to get one of these jobs?**

A. No.

**Q. Okay. I'd like to show you a document that I think I found, was provided in discovery, and we're going to mark this as 10.**

(EXHIBIT 10 MARKED FOR IDENTIFICATION)

**Q. Can you take a look at this document for me?**

A. Yes.

**Q. Can you tell me what this document is?**

A. It's a job bid for drive kits. Drive kits and such.

**Q. Okay. It looks like the department has**

**distribution drive kits --**

A. Drive kits.

**Q. -- positions value added packer; is that accurate?**

A. Yes.

**Q. Okay. Was this essentially what your job was before your displacement?**

A. Yes.

**Q. Okay. Now, I know the shift is a little different, it's got 7 to 3:30, can you explain to me how you got on this swing shift?**

A. Yes. There was a guy that bid out of drive kits to go to Kop-Flex, and I bid on his position which was 11:30 to 8:00 at night.

**Q. Okay. But it had the same or similar job duties?**

A. The same job.

**Q. All right. Now, the job list that we've been provided -- and just clarification: This distribution department, is that what we would call the warehouse, the warehouse side?**

A. Our department, we call it drive kits.

**Q. You called it drive kits?**

A. The area that I worked, we call it drive kits.

**Q. Okay. But is it on the warehouse side of the**

**factory?**

A. Yes, yes.

**Q. Okay. These jobs that they've provided, you've had a chance to look at them, how many of them were on the warehouse side of the company?**

A. These jobs here?

**Q. Yeah.**

A. Oh my goodness, let's see.

**Q. And call them out when you see them too.**

A. Okay.

**Q. The date, the name, and the grade, if you could -- and the shift.**

A. Okay. 5-15-2015 was distribution clerk and shift one and it's a grade 3.

**Q. Okay.**

A. 8-24-2015 is the distribution clerk team leader. It's first shift and it's grade 7.

**Q. Did you miss one?**

A. Oh, I called that one -- okay, let me see. I thought I called it August the 10th, 2015 was distribution clerk, first shift, grade 3.

**Q. Any other jobs that you recognize that would have been on the warehouse or distribution side according to this list? And we're talking about Exhibit 7.**

A. Just the ones I called out.
**Q. Okay. Now, the distribution clerk on May 15th, you said that was a grade 3, were a grade 5, correct?**
A. Yes.
**Q. So that's a lower grade position; is that accurate?**
A. Yes.
**Q. All right. The 8-10 distribution clerk, is that the same situation?**
A. It's a -- yes.
**Q. A grade 3?**
A. Uh-huh.
**Q. And the 8-24 distribution services team lead, that's a higher grade position, correct?**
A. Yes.
**Q. Now, what are the comments over, could you read those for the record?**
A. It says "interviewing based - unsure."
**Q. All right, thank you. All right, the other jobs listed, they would have been on the production side of the plant?**
A. Yes.
**Q. Okay. Had you worked any production plant jobs at Regal?**

A. No.

**Q. All right. Were you familiar with any of these jobs -- actually, strike that question. Let's do it this way, let's look at the next pages. We've got this position. Can you read the name of the position for me?**

A. Production technician.

**Q. Okay. And then let's jump down here to position description, can you read some of the position descriptions out?**

A. Yes. "Ability to operate all general machines to accomplish daily program -- production goals. Must have blueprints stretched -- blueprints" --

**Q. Must. What was that second word?**

A. "Must read blueprints, sketches, drawings, manuals, specifications, or sample parts to determine dimensions of finished work piece, sequence to the operations, and set up requirements."

**Q. All right. When compared to the job duties you were doing, in your opinion, are these two jobs even close in nature, the same --**

A. Not at all.

**Q. Okay. Well, go to the second -- and the other question is: Is there any reason, if you had to operate general machines that you would have been allowed to do**

**that based upon Dr. Haskell's medical screening? In other words, do you think you would have had to give your medical records to Dr. Haskell to perform this job because it says you have to operate general machines?**

A. Yes.

**Q. All right. The next one here: Production operator. Can you just read some of the position descriptions?**

A. Yes. "Setup and operate as required to produce quality parts. Read and interpret oral, written and visual instruction for operation setup. Monitor machine performance and make adjustments as necessary."

**Q. All right, and I think those were the first three. Anything similar between the job you were doing and this job that you see?**

A. It has machines. I don't use machines. There's no machines...

**Q. Okay. And then we'll do the next one. What is it? I think that's just another production operator job. So is this one. There's that one. This one, what position are we on now?**

A. Process technician 3.

**Q. All right. And do you know, does it have a -- what's the grade?**

A. Eight.

**Q. All right. And I'm pointing at something, what does that indicate?**

A. Resume required.

**Q. All right. Are you even qualified to perform this job?**

A. No.

**Q. All right. The next one?**

A. Process technician 1 and 2.

**Q. What grade was it?**

A. Five and eight.

**Q. All right. Was a resume required for this one?**

A. Yes.

**Q. Do you believe you were even qualified for this position?**

A. Not at all.

**Q. That's the distribution clerk, we've gone through that one. What's this position?**

A. A team leader.

**Q. All right. What grade was it?**

A. It's a grade 7.

**Q. All right. Was a resume required for this one as well?**

A. Yes.

**Q. All right. Do you believe that you were**

**qualified to work this job?**

A. No. And also it says I have to be comfortable with heights up to 20 feet which means that I have to be on equipment if I'm going to be 20 feet up in the air, and I can't be on no equipment.

**Q. Okay. And this one, what's that one?**

A. Distribution service team lead.

**Q. What grade is it?**

A. It's a grade 7. It has strong communication skills --

**Q. Well, I mean in looking at the job duties, do you believe you were qualified for this position?**

A. No. I don't have any -- no.

**Q. Okay. The next one?**

A. Setup technician.

**Q. What grade was that?**

A. Grade 7.

**Q. All right. The same question with regard to the description and the skills, do you believe you were qualified for that?**

A. No.

**Q. Can you read blueprints?**

A. I have -- no.

**Q. Okay. And that's the last one I believe, okay. The next set of documents we've got here, Sheila.**

MR. STILZ: I believe we received these through discovery as well.

MR. SCUDDER: Yes.

MR. STILZ: This is 11?

COURT REPORTER: Yes.

(EXHIBIT 11 MARKED FOR IDENTIFICATION)

**Q. Take a second look through this for me.**

A. Okay.

**Q. Have you had a chance to review it?**

A. Yes.

**Q. All right. Can you just generally describe what these documents are?**

A. This is a report of the FMLA, and my Medicare record for surgery.

**Q. Okay. Does it also -- did you also have disability insurance at Regal through Aflac?**

A. I have Aflac.

**Q. Okay. Do any of these forms look like something you would have filled out to make a claim for weekly indemnity benefits?**

A. No.

**Q. Okay, all right. Let's just go through them really quickly. We're not going to worry about the first page. All right, the second page here, was this something that had to -- either you or potentially Dr.**

**Moon submitted to Regal on your behalf?**

A. Yes, Dr. Moon.

**Q. All right. Can you read into the record, and we're on page two here, just this first paragraph in this document?**

A. "The Genetic Information Nondiscrimination Act of 2008 -- GINA -- prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by the law."

**Q. Okay, and we don't need to go any further at that point. It looks like down here we've got Dr. Moon's name printed. Do you recognize his signature, have you seen that signature before?**

A. Yes.

**Q. Does that look like his signature?**

A. Yes.

**Q. Okay. It looks -- can you read the date into the record?**

A. July the 18th, '14.

**Q. All right. And what is he saying up here, how long does he have you off?**

A. Approximately -- surgery July 29th, '14 approximately 9-2-14.

**Q. Okay. And I think we've established from your testimony that you were going to return in September of '14?**

A. Yes.

**Q. All right. And this third page, was this the request for FMLA that you filled out to provide to Regal?**

A. Yes.

**Q. All right. This next page, this designation notice FMLA, does it look like your FMLA was approved?**

A. Yes.

**Q. All right. The next document, can you explain what this is?**

A. It says FMLA has been approved for September 2nd, 2014.

**Q. All right. Was this the letter you received from Emerson approving your FMLA?**

A. Yes.

**Q. All right. And this next document, can you read there at the top what it purports to be?**

A. It's the "Certification of Health Care Provider for Employee's Serious Health Condition."

**Q. All right. And looks like, was this completed by Dr. Moon?**

A. Yes.

**Q. And I think it goes on for a couple pages. I'm not going to have you read it, it's pretty self-explanatory. However, let's -- I do want to ask you on paragraph 4, what does it looks like -- Dr. Moon or whoever filled this out, can you read into the record what's stated there?**

A. This one here?

**Q. No, right here.**

A. "Cancer found in colon by gastroenterology physician, surgery to remove mass from colon on July 29th, '14. Patient needs approximately six weeks to heal properly before attempting to work."

**Q. All right. And this information, do you know -- and it looks like again here at the last -- on page 4 of that document, does that look like Dr. Moon's signature to you?**

A. Yes.

**Q. What's the date?**

A. July 18, '14.

**Q. All right. Did you submit this to Regal, or did Dr. Moon submit it?**

A. Dr. Moon.

**Q. Okay. So we'll have to establish later if they received it. And it looks like again right above the signature, do you agree with me that's another**

**Genetic Nondiscrimination Act, don't send us any genetic information warning?**

A. Yes.

**Q. All right. And these final two documents, have you seen these?**

A. Yes.

**Q. All right. What's the first one?**

A. The first sheet, it was the first statement that he allowed me to come back to work with restriction.

**Q. All right. And that's what you've testified to earlier, correct?**

A. Yes.

**Q. All right. And then the final document?**

A. Is the second statement saying I can come back without any restriction, normal duty.

**Q. All right. What is that dated?**

A. September 4th, '14.

**Q. Okay. And I've got three more documents I need to show you, and then I think I'm done.**

MR. STILZ: What is this, 12?

COURT REPORTER: 12.

(EXHIBIT 12 MARKED FOR IDENTIFICATION)

**Q. Exhibit 12, do you remember treating with a medical group called OHC Specialists in Cancer and Blood**

**Disorders?**

A. Yes.

**Q. All right. What did they treat you for?**

A. Blood disorder.

**Q. Okay. Did this have anything to do with your colon cancer?**

A. Yes.

**Q. All right. And these were apart of the medical records related to your treatment for colon cancer; correct?**

A. Yes.

**Q. Do you remember seeing these particular physicians on whatever the date of this record is, looks like 8-19 of '14; does that ring a bell?**

A. Yes.

**Q. All right. And on page 3 of this document down toward the bottom where is it says family history, can you read into the record what it's got at family history?**

A. Cancer, stomach; high blood pressure; stroke.

**Q. And the cancer, who is that relating to?**

A. My sister.

**Q. All right. Is that your older or younger sister?**

A. Older.

**Q. Okay. High blood pressure, who is that related to?**

A. My uncle.

**Q. All right. And final thing is a stroke, who is that related to?**

A. My uncle.

**Q. All right. Is this information you would have provided to these medical care providers?**

A. To OHC, yes.

**Q. Yeah, okay. They wouldn't have known about it otherwise, right?**

A. Right.

**Q. Okay. This is 13.**

(EXHIBIT 13 MARKED FOR IDENTIFICATION)

**Q. Do you remember treating with a medical provider called Tri-State Gastroenterology Associates?**

A. Yes.

**Q. What did they treat you for?**

A. She tested me if I had -- she was the one who find the cancer, and she tested me for polyps.

**Q. All right. So it was related to your colon cancer, correct?**

A. Yes.

**Q. All right. We're going to look at page -- where did it go? All right, at the bottom of the first**

**page, can you read into the record -- I know it's cut off a little bit, but as best you can?**

A. Okay. "Sheila has been assessed and approved for moderate sedation. The history and physical was reviewed and no changes were noted regarding medications, allergies, or medical history. She had colon cancer" -- what is that?

**Q. Resected.**

A. -- "resected in 2014."

**Q. Keep going.**

A. "And her sister had colon cancer" --

**Q. Actually, there at the top of the page.**

A. Oh, and -- oh, "colon cancer."

**Q. Okay. And that's the same sister that was referenced in the other medical record?**

A. Yes.

**Q. Okay. And you would have told that physician about that family history, correct?**

A. Yes.

**Q. And finally --**

(EXHIBIT 14 MARKED FOR IDENTIFICATION)

**Q. All right, do you remember treating with St. Elizabeth Healthcare?**

A. Yes.

**Q. Particularly Dr. Ryan Moon?**

A. Yes.
**Q. All right. And what did Dr. Moon treat you for?**
A. My cancer.
**Q. Okay. This medical record that we've got here, it looks like we've got a date around 6-27-14, do you remember treating with Dr. Moon on that date?**
A. Yes.
**Q. Okay. And on, let's see -- no, I didn't okay.**
**Did you also receive CT scans at St. Elizabeth?**
A. Yes.
**Q. Related to your colon cancer?**
A. Yes.
**Q. Okay. And that CT would have occurred around 6-27-2014?**
A. Yes.
**Q. Okay, all right. Can you read into the record on the last page of this -- under "diagnosis" what it says?**
A. "Family history of malignant neoplasm of gastro -- gastrointestinal tract."
**Q. All right. Now, in any of your conversations with Dr. Haskell, did he ever tell you he wanted your medical records redacted for family history information?**

A. No, he did not.
**Q. Did he explain to you he just wanted all of your medical records?**
A. Yes.
**Q. Related to your cancer treatment?**
A. Yes.
**Q. And you did not -- when you saw Dr. Haskell -- I think we've established, but just for record clarification -- you weren't going to see Dr. Haskell for treatment; were you?**
A. No.
**Q. Who did you understand Dr. Haskell to be representing when you saw him on January 15th of 2015?**
A. Regal.
**Q. All right. Calvin Jarvis and Sheila Lawson, I think we've established that they were both grade 5s, and I think your testimony was that they performed different jobs than you; is that correct?**
A. Yes.
**Q. Did they operate -- because I didn't get a clear answer for this or maybe I just didn't hear it -- did they operate powered industrial equipment?**
A. They both did.
**Q. Okay. Similar to you?**
A. Yes.

**Q. Okay. And during the time you had these conversations with them about them not having to provide their medical records, they were still operating power equipment?**

A. Yes.

**Q. As far as your knowledge?**

A. Yes.

**Q. Okay. Did you ever receive incremental raises while at Regal?**

A. I received cost of living.

**Q. And how often would you receive the cost of living raise?**

A. Once a year.

**Q. And how much was the cost of living raise?**

A. I'm not sure.

**Q. Do you remember what your last cost of living raise was?**

A. No, I don't remember.

**Q. Okay. And the final questions I've got for you, Sheila. Was it embarrassing or humiliating to lose your job?**

A. Yes. It was embarrassing because a lot of people in my family doesn't know that I lost my job. People at DHL still think that I'm working at Regal.

**Q. So you don't want to tell them about it?**

A. I didn't tell them, no.
**Q. Okay. Was it embarrassing or humiliating to get displaced by -- when you didn't want to provide your entire medical file?**
A. Yes. To have people come up and telling me that I failed the drug test because that's why I'm not on the equipment, and I can't tell them the real reason why because then they would know about my cancer. I didn't want to tell anybody about my cancer.
**Q. Okay. All you told them was you didn't provide your medical records?**
A. Right.
**Q. Okay. And just so the record is clear, were you displaced about February 11th of 2015?**
A. Yes.
**Q. And were you term -- was your employment terminated on February 11th, 2016?**
A. Yes.
**Q. Did anybody ever mention to you at work, either on the floor or in management, in conversations relative to the EEOC charge you filed in September of 2015?**
A. Not at all.
**Q. All right. At the time you were displaced from your position in February of 2015, did you think**

**you could perform all the essential functions of your job?**

A. Yes, I know I could.

**Q. In your grade 5 position?**

A. Yes.

**Q. All right, and did anybody make any comments to you, either in management or any coworkers, concerning your race while you worked at Regal?**

A. Concerning my race, no.

**Q. Okay.**

MR. STILZ: All right, thanks. That's all I've got.

REDIRECT EXAMINATION

BY MR. SCUDDER:

**Q. I've got just a couple follow-ups based on that. As I understand it, Calvin Jarvis and Sheila Lawson are the only two people that you know of that supposedly were asked for records and refused to give them; is that right?**

A. Yes.

**Q. Okay. And you think Calvin Jarvis also operated powered industrial equipment?**

A. He drove a Hyster.

**Q. That's what -- he drove a Hyster, okay. Okay, how about Sheila Lawson?**

A. She drove a forklift.

**Q. Okay. Now, if we look at back at, you know for example Exhibit 9, right, it says on there you could have done any of these production operator jobs without using powered industrial equipment, right?**

A. Yes.

**Q. Okay. And it also says extrusion setup and second shift CNC operator, right?**

A. Yes.

**Q. Okay. And all these jobs that you don't think you were qualified for, you didn't even try to bid on them, right?**

A. When I took my -- yes, I didn't, but when I took my test for Emerson, I scored lower on my math test, and I was asked by Northern Kentucky Human Resource if I wanted to improve my math scores. So I'm not good at math, I'm not good with no tools.

**Q. Okay. But do you know if they would have tried to help you or train you or anything like that?**

A. They send you to school for training for blueprints, that's what I heard.

**Q. Okay. All these FMLA documents that you had in Exhibit 11 --**

A. Yes.

**Q. -- you're saying the company had those**

obviously before they sent you to Dr. Haskell, right?
A. Yes.
Q. Okay. And so anything in here they already knew, right?
A. Yes.
Q. Okay. And so, for example, if the company were to find out that, you know, you had, you know, surgery to remove this cancer from your colon, that wouldn't have been a surprise to them, right?
A. No.
Q. And similarly -- well. And then with regard to our light-duty discussion, it looks like here -- and again just for the record, I'm in Exhibit 11, the second to last page. And then it looks like he was saying you could have come back on light-duty on 9-2 of '14. And then you actually came back to work on 9-23 of '14; right, so this light-duty dispute involves two weeks?
A. Yes.
Q. Okay, all right. And as I look at your complaint, I don't think you raised -- I don't think that issue is in your complaint, right?
A. No.
Q. Okay, okay. So that's not part of this lawsuit, the whole light-duty dispute, okay.
Now, Exhibit 12, is that something you gave to

**Regal, this thing from OHC?**

A. I didn't give to Regal --

MR. STILZ: Can we go off real quick?

MR. SCUDDER: Oh, yeah, yeah, yeah.

(OFF THE RECORD)

BY MR. SCUDDER:

**Q. Okay, so what I want to make sure here, did -- I know your counsel pointed out, hey, there's some spots in these records that say you've got some family members with some medical issues, right?**

A. Yes.

**Q. Okay. Now, did you ever try to talk to somebody at Regal and try to say, hey, I'm willing to provide certain medical records to Dr. Haskell, but I don't want to provide other parts? Like, for example, I'll provide what was done to me with my surgery that you already have, but I don't want to give you any information about family history or anything like that? Did you ever try to have that discussion with anybody?**

A. No.

**Q. Okay. So is it -- okay. When people came up to you at Regal and said -- if I'm understanding your testimony correctly, people were telling you "I think Sheila failed her drug test" and then how would you respond to that when they said that?**

A. I'd kind of snap and said, "I didn't fail it."

**Q. Okay. And you said, I think you said you told them that they wanted medical records and you weren't going to provide them?**

A. Right.

**Q. Okay. Okay. And do you have any reason to think that if -- well, let me back up. You filed an EEOC charge, right, during the time you were displaced but before you were terminated, correct?**

A. Yes.

**Q. Okay. But you're saying that no one mentioned that EEOC charge to you?**

A. Not from Regal, nobody, no.

**Q. Okay. So do you have any reason to think that your EEOC charge caused you to be terminated in February 2016?**

A. No.

**Q. Okay. And in fact, they told you in February 2015, before you filed your EEOC charge, that if you don't do anything they were going to fire you in February '16, right?**

A. I'm not sure if they said they was going to fire me, but they was trying to go -- to make a resolution about it.

**Q. Okay.**

MR. SCUDDER: Nothing further then.
MR. STILZ: All right.
(DEPOSITION CONCLUDED AT 1:03 P.M.)

CERTIFICATE OF REPORTER

COMMONWEALTH OF KENTUCKY AT LARGE

I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Title page hereof by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded by me and then reduced to typewritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skills and ability. I certify that I am not a relative or employee of either counsel, and that I am in no way interested financially, directly or indirectly, in this action.

KELLEY BOHAN,

COURT REPORTER / NOTARY

COMMISSION EXPIRES ON: 05/14/2018

SUBMITTED ON: 07/10/2017

**Exhibits**

**Exhibit 1** 9:23 52:5

**Exhibit 2** 10:14,15 24:17

**Exhibit 3** 11:24 99:7

**Exhibit 4** 30:5, 6

**Exhibit 5** 40:1, 2,3

**Exhibit 6** 47:21,22 51:13

**Exhibit 7** 56:15 74:8 118:24,25

**Exhibit 8** 62:16 71:8

**Exhibit 9** 71:13 137:3

**Exhibit 10** 116:19

**Exhibit 11** 124:6 137:23 138:13

**Exhibit 12** 128:23,24 138:25

**Exhibit 13** 130:14

**Exhibit 14** 131:21

**0**

**05** 28:15,20

**0917** 13:19

**1**

**1** 9:23 52:5 106:21,22 122:8

**10** 24:18 53:17 54:18,21 55:24, 25 109:21,22 112:11 116:18, 19

**10th** 118:20

**11** 49:3,6 50:5, 6,7 53:1,9 55:5 56:7 62:4 63:8 99:13 109:1,2,7 124:4,6 137:23 138:13

**11.25** 95:15

**11.50** 91:25 92:4

**11:00** 50:3 53:19

**11:30** 51:11,21, 23 52:18,25 53:23 109:11 111:1,15 117:14

**11:45** 56:3,4,6, 8 62:2,5

**11th** 135:14,17

**12** 128:21,22, 23,24 138:25

**12-hour** 57:15

**12th** 13:16

**13** 89:25 130:13,14

**13th** 48:7

**14** 31:20 33:8 89:24 96:9 125:21,24 126:3 127:11, 19 128:18 129:14 131:21 138:15,16

**14.30** 96:9

**15** 40:11 42:5 45:18 73:10 82:2 94:10

**15th** 47:10 94:10 119:3 133:13

**16** 73:10 84:23 94:9 140:21

**164** 45:23

**165** 45:5

**16th** 43:13

**18** 127:19

**18th** 125:21

**19.20** 91:17

**1961** 13:16

**1979** 22:1

**1993** 29:17

**1:03** 141:3

**2**

**2** 10:14,15 24:17 52:7 122:8

**20** 93:12 123:3, 4

**20-pound** 76:3

**2001** 14:7,10 19:7

**2008** 25:1 125:7

**2013** 90:3

**2014** 31:20 36:11 126:15 131:9

**2015** 14:21 31:6,9 34:6,17 36:18 40:11 42:5 43:13 45:18 48:7 58:5,25 97:6 118:20 133:13 135:14,22,25 140:19

**2016** 14:21 49:3,6 56:19 62:23 70:23 92:18,19 135:17 140:16

**2017** 97:4

**23** 58:25

**24** 28:20

**25** 93:12 94:6

**25th** 21:21

**29th** 125:24 127:11

**2nd** 62:23 126:15

**3**

**3** 11:24 56:3 58:21 59:1 73:4,16,18,25 99:7 104:15 106:4,19 118:14,21 119:3,12 121:22 129:16

**3:00** 63:4

**3:05** 70:23

**3:30** 51:19 55:5,22 56:4,6, 7 61:24 62:2 111:12,14 115:18 117:10

**3rd** 70:23

**4**

**4** 30:5,6 58:4 59:4,8 127:4,14

**40** 76:18 96:9, 22

**401(k)** 92:21,22

**4210** 13:22

**45,000** 92:18

**4:00** 55:23

**4th** 128:18

**5**

**5** 40:2,3 48:11 50:5,7 51:15 53:2,20,23 58:13,16,21 59:1,5 63:13 73:4 74:1,3,8 90:13 106:25 107:16 109:2 110:25 119:3 136:4

**5-15-2015** 118:13

**5:00** 50:3 51:4

**5:20** 110:8

**5:30** 51:3 110:8

**5s** 133:16

**6**

**6** 47:21,22 51:13 54:24

**6-14** 58:7

**6-27-14** 132:6

**6-27-2014** 132:16

**6-4** 58:7,8,9

**6-4-15** 58:6

**6:00** 53:4

**7**

**7** 51:19 53:5 56:15 60:16,20 61:24 63:13 73:4 74:8 111:11 115:18 117:10 118:17, 25 122:21 123:9,17

**7:00** 51:5 62:5

**8**

**8** 52:19 53:1,10 58:21 60:20 62:15,16 71:8 109:12,13

**8-10** 119:9

**8-19** 129:14

**8-24** 119:14

The Deposition of SHEILA JACKSON, taken on June 26, 2017

Case: 2:16-cv-00134-DLB-CJS Doc #: 1 Filed: 07/12/16 Page: 1 of 13 - Page ID#: 1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**COVINGTON DIVISION**

| | | |
|---|---|---|
| **SHEILA JACKSON** | : | |
| **Plaintiff,** | : | **Case No.:** |
| **V.** | : | **Judge:** |
| **REGAL BELOIT AMERICA, INC.** | : | |
| **Defendant.** | : | |

---

**COMPLAINT WITH JURY DEMAND**

---

Comes now the Plaintiff, Sheila Jackson, by and through counsel, and for her Complaint with Jury Demand against the Defendant states as follows:

**PRELIMINARY STATEMENT**

1. This is a damages action arising under 42 U.S.C. §12101, *et seq.*, the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C.§ 2000ff, *et seq.*, Title II of the Genetic Information Nondiscrimination Act of 2008 ("GINA"), as amended, 42 U.S.C. §2000e, *et seq.*, Title VII of the Civil Rights Acts of 1964, as amended, 42 U.S.C. §1981, the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C.S. § 2601, *et seq.*, and supplemental state law claims against the Defendant for disability discrimination (disparate treatment and disparate impact), failure to accommodate, and race discrimination.

**PARTIES AND JURISDICTION**

Plaintiff incorporates by reference all preceding paragraphs and further alleges as follows:

KENTUCKIANA COURT REPORTERS
Date 6-26-17
Reporter KB Exhibit # 1
Case 2:16-cv-00134-DLB-CJS
Deponent Sheila Jackson

2. The Plaintiff, Sheila Jackson, was at all times herein a resident of Covington, Kenton County, Kentucky. Prior to her termination from employment with Defendant, she was employed by the Defendant as a First Shift Value Added Packer, Grade 5, until she was displaced to a lower grade position on February 11, 2015 and terminated from employment on February 11, 2016. The Plaintiff's place of employment was located in Florence, Boone County, Kentucky.

3. The Defendant, Regal Beloit America, Inc., is a Kentucky foreign corporation, with its principal place of business in Beloit, Wisconsin, and licensed to do business and doing business in the Eastern District of Kentucky, including at its facility located in Florence, Boone County, Kentucky.

4. The Plaintiff filed two Charges of Discrimination related to this matter with the Equal Employment Opportunity Commission ("EEOC") against the Defendant. Charge No.1 (473-2015-01247) was filed on September 21, 2015 alleging discrimination and retaliation under the ADA and GINA. Charge No. 2 (473-2016-00590) was filed on April 25, 2016 alleging discrimination and retaliation under the ADA and Title VII of the Civil Rights Act of 1964.

5. The EEOC issued the Plaintiff a Right-to-Sue letter concerning Charge No.1 dated April 14, 2016 and received by the Plaintiff several days later. The EEOC issued the Plaintiff a Right-to-Sue letter concerning Charge No.2 dated May 3, 2016 and received by the Plaintiff several days later. The Plaintiff has exhausted her administrative remedies.

6. Jurisdiction is conferred on this Court under 42 U.S.C. § 12117, 42 U.S.C. §2000e-5, 42 U.S.C. §2000ff-6, and 28 U.S.C. §1331.

7. Jurisdiction over the state law claims is conferred upon this Court by 28 U.S.C. § 1367, which provides for supplemental jurisdiction over state law claims which are so related to the federal law claims that they form one case or controversy for Article III purposes.

8. Venue in this district is proper pursuant to 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

Plaintiff incorporates by reference all preceding paragraphs and further alleges as follows:

9. The Plaintiff was diagnosed with Sigmoid Carcinoma in July 2014. She underwent treatment for her cancer, which included surgical intervention in 2014. As a result of her condition, the Plaintiff was significantly limited in her ability to eat, walk, and work. Though currently in remission, this condition would substantially limit her ability to eat, walk, and work if active. This condition has also significantly impacted the anatomical structure of her digestive system, a major bodily function. The Plaintiff continues to treat for the condition by way of routine blood tests to monitor the presence of any cancerous cells.

10. Prior to her termination from employment, the Plaintiff was employed with the Defendant since the Defendant purchased her previous employer in January 2015. Prior to the acquisition by the Defendant, the Plaintiff worked at the plant in Florence, Kentucky for 14 years. At the time of her cancer diagnosis she was working as a First Shift Value Added Packer, Grade 5. This position required her to operate power equipment, including a forklift. The Plaintiff was a full time employee of the Defendant during her employment.

11. Upon information and belief, at all relevant times herein, the Defendant employed more than 15 employees for each working day in each of 20 or more calendar weeks in the current or preceding year of 2014 and otherwise meets the definition of an "employer" for purposes of the ADA, GINA, Title VII of the Civil Rights Act of 1964, and the Kentucky Civil Rights Act.

12. Upon information and belief, at all relevant times herein, the Defendant employed 50 or more employees for each working day during each of 20 or more calendar workweeks in the

current or preceding calendar year of 2014, and employed these individuals within 75 miles of the Plaintiff's worksite, and otherwise meets the definition of "employer" for purposes of the FMLA.

13. On or about July 22, 2014 the Plaintiff took a medical leave of absence to combat her cancer. Prior to taking leave, the Plaintiff provided Defendant's Human Resources representative with a copy of a medical report from her physician indicating her diagnosis, and requesting medical leave. The Plaintiff was required during her leave to provide the Defendant with Disability Status Reports. The last report she submitted to the Defendant on August 21, 2014 indicated she could return to work as soon as September 2, 2014, though with work restrictions which would last until October 1, 2014.

14. On or about September 4, 2014, the Plaintiff's treating physician completed a Return to Work Medical Certification Form which cleared her for full duty beginning October 1, 2014.

15. Following successful treatment of her condition, the Plaintiff returned to work in October 2014. At the time of her return to work the Plaintiff was able to perform the essential functions of her job with no accommodations, and was no longer taking prescribed medication.

16. Despite working her normal job duties, and performing her job duties competently (including the operation of power equipment), and the job duties of other employees, in January 2015 the Plaintiff was required by the Defendant to attend a fitness for duty examination in order to evaluate her ability to work the power equipment her position required her to operate.

17. On or about January 15, 2015 the Plaintiff attended a fitness for duty examination with St. Elizabeth Business Health Services physician Brent Haskell, M.D. The Plaintiff performed the physical examination demanded by Dr. Haskell, provided a urine sample, and underwent examinations of her ears and eyes. The examination lasted approximately half of an hour to an

Case: 2:16-cv-00134-DLB-CJS Doc #: 1 Filed: 07/12/16 Page: 5 of 13 - Page ID#: 5

hour. The Plaintiff did not refuse to perform any examination requested by Dr. Haskell. At the end of the examination Dr. Haskell did not indicate any deficiencies in the Plaintiff's performance or otherwise question her physical or psychological abilities to perform her job. However, following the examination Dr. Haskell requested the Plaintiff provide him with all of her medical records for his review. Upon information and belief, this request was made because of the conversation that took place at the end of the examination between the Plaintiff and Dr. Haskell concerning Dr. Haskell's knowledge of her cancer diagnosis. Upon information and belief, he had been made aware of the diagnosis by representatives of the Defendant. He did not ask the Plaintiff any specific questions related to the condition, he only informed her wanted he wanted to "talk about it." The Plaintiff surmised Dr. Haskell apparently had the information she provided to the Defendant before and during her medical leave concerning her cancer diagnosis. Following the examination, Dr. Haskell noted on two separate documents that the Plaintiff attended physical examination but was placing her on hold "pending receipt of additional information." The information requested concerned "Surgery – All medical records," "1. Current diagnosis of your medical condition, 2. The treatment you have received to date, 3. The prognosis, 4. Any relevant tests (include results), 5. List of any medications you are receiving and any restrictions arising from their use, 6. Any restrictions or limitations that may limit your activities at home or at work and the time period during which those restrictions will be in effect, 7. Any additional information that your medical provider thinks would help us to make our medical recommendation."

18. The Plaintiff did not want to provide Dr. Haskell, or anyone else associated with the Defendant, all of her medical records. Indeed, there was no need to request all of her medical records. The Plaintiff had successfully performed Dr. Haskell's examination and had submitted a

urine sample (which should have demonstrated she was no longer taking any prescription medication which might impair her ability to operate equipment). The Plaintiff's medical records contain information protected by GINA, including her family history and genetic information, information concerning genetic testing, and information concerning the manifestation of her Sigmoid Carcinoma. Dr. Haskell specifically requested this protected information ("4. Any relevant tests (include results)."

19. Furthermore, the Plaintiff successfully performed her job duties, without any instances of deficient work performance, following her return to work and until she was displaced from her position on February 11, 2015.

20. The day following the fitness for duty examination, the Plaintiff discussed the request for her medical records with Defendant's Human Resources employee Nicole George. Ms. George explained she agreed the Plaintiff's medical records were not needed by the Defendant and informed the Plaintiff that if she provided her with a written certification from her physician concerning her fitness for duty she could continue to work in her position. The Plaintiff promptly contacted her physician, M. Ryan Moon, M.D. with St. Elizabeth Physicians, who provided the requested certification to the Defendant on January 16, 2015, indicating "Sheila Jackson is able to drive any type of vehicles since she was released to go back to work without restrictions. If you have any questions please contact my office." The Defendant received identical information in the Plaintiff's Return to Work Medical Certification Form provided in September 2014.

21. Approximately two weeks following the January 15, 2015 fitness for duty examination and her meeting with Ms. George, the Plaintiff was approached during her shift by Defendant's employee Mike Tobias who informed the Plaintiff that she was going to be required to be provide her medical records to the Defendant. The Plaintiff explained to Mr. Tobias she believed

the situation was resolved after she provided Ms. George with the requested note from her doctor which allowed her return to work. Mr. Tobias indicated he would check with Ms. George.

22. The Plaintiff was subsequently summoned to a meeting with Ms. George and informed she now needed to provide all of her medical records to the Defendant. The Plaintiff refused to provide the Defendant with all of her medical records. Upon information and belief, the Defendant's policy concerning fitness for duty examinations does not contain a requirement that all employees must provide their medical records to the Defendant or a Defendant's medical representative in order to successfully pass the examination. Upon information and belief, the Defendant wanted to see her medical records to learn more about her cancer, including whether or not she could be afflicted with the condition in the future.

23. On February 11, 2015 the Plaintiff was displaced by the Defendant into a lower grade position, a Grade 3 position, due to "the inability to operate a powered industrial equipment per the incomplete medical screening results." She was instructed she had one year to bid into another position with the company that does not require operation of powered industrial equipment. She was informed failure to bid and accept another position before February 11, 2016 would result in her placement into any open job, and if she refused to accept that employment her employment would be terminated. It is clear that at least at the time of her displacement from her Grade 5 job the Defendant regarded the Plaintiff as being disabled.

24. The Plaintiff reluctantly accepted the displacement, realizing the only other option she had was losing her employment with the Defendant. During her employment in the Grade 3 position the Plaintiff performed her work exceptionally, and without incident.

25. The Plaintiff filed Charge No. 1 with the EEOC on September 21, 2015 as the result of her demotion.

26. Following her displacement, the Plaintiff discovered through conversations with co-workers that at least three Caucasian similarly situated employees had been treated better than she was treated. She discovered employee Brenda Hambry failed a fitness for duty examination and was allowed to remain in her position, which included operating power equipment. She discovered following a fitness for duty examination employee Calvin Jarvis's medical records were requested by the Defendant. He did not provide his medical records and was permitted to remain in his position. She discovered employee Sheila Lawson was not required to provide her medical records to the Defendant following a fitness for duty examination.

27. On February 11, 2016 the Plaintiff requested a return to her position as First Shift Value Added Packer, Grade 5. Instead, she received a document from Ms. George which indicated the Plaintiff had not bid into another position at the company and the Plaintiff "elected not to go and get a medical screening that could have cleared [her] to operate a Powered Industrial Vehicle and have more opportunities within the facility." She was offered three Grade 3 positions, a Grade 7 night position, and a Grade 7 2nd shift position. None of these positions were similar in nature to her First Shift Value Added Packer, Grade 5 position. The Plaintiff was informed that refusal to accept one of these positions would result in the termination of her employment. The Plaintiff did not desire these positions, and as a result the Defendant terminated her employment.

28. At the time of her termination, the Defendant was aware of Charge No. 1 which the Plaintiff had filed with the EEOC on September 21, 2015 as the result of her demotion.

29. At all times herein, the Plaintiff was qualified for her position as a First Shift Value Added Packer, Grade 5 with the Defendant as evidenced by her more than 14 years of employment with the Defendant or its predecessor, and her exemplary work record before and after her cancer diagnosis.

30. If not for the Plaintiff's disability, her participation with the EEOC in filing charge No. 1, her predisposition to cancer and potential future diagnosis as perceived by the Defendant, her refusal to allow the Defendant to collect her protected genetic information, her opposition to the Defendant's attempt to collect her protected genetic information or otherwise illegally discriminate against her, and her race, the Defendant would not have displaced the Plaintiff from her position and subsequently terminated the Plaintiff's employment.

31. Upon information and belief, the Plaintiff was eventually replaced by someone who did not suffer from a disability and was outside of her protected race-based class.

**COUNT I**

**(VIOLATION OF THE ADA AND KENTUCKY CIVIL RIGHTS ACT – DISPARATE TREATMENT AND RETALIATION)**

Plaintiff incorporates by reference all preceding paragraphs and further alleges as follows:

32. The acts of the Defendant, as previously described, constitute disability discrimination in violation of the ADA and the Kentucky Civil Rights Act. The Plaintiff was disabled, was qualified for her position with or without reasonable accommodation, the Defendant knew about the Plaintiff's disability, and displaced her from her job on February 11, 2015 and ultimately terminated her employment because of her disability on February 11, 2016. Upon information and belief, the Plaintiff was replaced by a nondisabled individual.

33. Additionally, the Plaintiff engaged in protected activity when she filed Charge No. 1 with the EEOC. As a result of filing Charge No. 1, alleging the Defendant engaged in disability discrimination, the Defendant terminated the Plaintiff's employment on February 11, 2016.

34. As a proximate result of the Defendant's illegal discrimination and retaliation, the Plaintiff has suffered and continues to suffer irreparable harm, including but not limited to loss of income, benefits, and other valuable job rights. Plaintiff has suffered from and continues to suffer from emotional distress, humiliation and embarrassment, all for which she should be compensated.

**COUNT II**

**(VIOLATION OF GINA – DISPARATE TREATMENT, UNLAWFUL REQUEST FOR INFORMATION, RETALIATION)**

Plaintiff incorporates by reference all preceding paragraphs and further alleges as follows:

35. The Defendant discriminated against the Plaintiff as the result of Defendant's perception that she was genetically predisposed to develop cancer to in the future, which could adversely affect her ability to work in the future in violation of GINA. As a result of this belief, the Defendant displaced the Plaintiff from her job position on February 11, 2015 and terminated her employment on February 11, 2016.

36. Additionally, the Defendant unlawfully required the Plaintiff to produce medical records which contain protected genetic information about the Plaintiff in violation of GINA. The Defendant displaced the Plaintiff from her job position on February 11, 2015 and terminated her employment on February 11, 2016 as a result of her refusal to provide this protected information.

37. Finally, the Plaintiff engaged in protected activity when she filed Charge No. 1 with the EEOC alleging violation of GINA. As a result of filing Charge No. 1, alleging the Defendant engaged violation of GINA, the Defendant terminated the Plaintiff's employment on February 11, 2016.

38. As a proximate result of the Defendant's illegal discrimination and retaliation, the Plaintiff has suffered and continues to suffer irreparable harm, including but not limited to loss of income, benefits, and other valuable job rights. Plaintiff has suffered from and continues to suffer from emotional distress, humiliation and embarrassment, all for which she should be compensated.

**COUNT III**

**(RACE DISCRIMINATION**

**UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §1981, AND THE KENTUCKY CIVIL RIGHTS ACT – DISPARATE TREATMENT)**

Plaintiff incorporates by reference all preceding paragraphs and further alleges as follows:

39. The Plaintiff is a member of a class of individuals protected by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §1981, and the Kentucky Civil Rights Act; specifically she is African-American.

40. Because of the Plaintiff's race, the Defendant treated her worse than other similarly situated employees outside of her protected class by displacing her from her position on February 11, 2015 and ultimately terminating her employment on February 16, 2016.

41. Upon information and belief, the Plaintiff was replaced by an individual outside of her protected race-based class.

42. As a proximate result of the Defendant's illegal conduct, the Plaintiff has suffered and continues to suffer irreparable harm, including but not limited to loss of income, benefits, and other valuable job rights. Plaintiff has suffered from and continues to suffer from emotional distress, humiliation and embarrassment, all for which she should be compensated.

**COUNT IV**

**(FMLA INTERFERENCE AND RETALIATION)**

Plaintiff incorporates by reference all preceding paragraphs and further alleges as follows:

43. The Plaintiff was entitled to 12 weeks of FMLA leave from July 22, 2014 until and including October 22, 2014.

44. After the Plaintiff returned to work the Defendant removed the Plaintiff from her normal job position, or a similar job position, and demoted the Plaintiff on February 11, 2015 and ultimately terminated her employment on February 11, 2016. The Defendant's actions effectively interfered with the Plaintiff's right to job restoration and job benefits, and also constitutes retaliation against the Plaintiff for exercising her rights under the FMLA to take protected leave and requesting job restoration and benefits. The Defendant's actions in this matter were willful and in bad faith.

45. As a proximate result of the Defendant's illegal conduct, the Plaintiff has suffered and continues to suffer irreparable harm, including but not limited to loss of income, benefits, and other valuable job rights. Plaintiff has suffered from and continues to suffer from emotional distress, humiliation and embarrassment, all for which she should be compensated.

**WHEREFORE**, Plaintiff demands judgment against the Defendant as follows:

A. For all back pay, pre-judgment interest, fringe benefits, and any other appropriate relief necessary to make Plaintiff whole, including compensatory damages for emotional distress, humiliation and embarrassment;

B. For reinstatement to her former position with Defendant;

C. For an award of punitive damages;

D. For an award of liquidated damages;

E. For Plaintiff's costs herein expended, including reasonable attorney's fees;

F. For a trial by jury on all issues so triable; and

G. For any and all other relief to which Plaintiff appears entitled.

RESPECTFULLY SUBMITTED,

ROUSH AND STILZ, P.S.C.

/s/ W. Kash Stilz, Jr.
W. KASH STILZ, JR.
19 West Eleventh Street
Covington, Kentucky 41011-3003
(859) 291 – 8400 telephone
(859) 291 – 6555 facsimile
kash@roushandstilzlaw.com
ATTORNEYS FOR PLAINTIFF

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**COVINGTON DIVISION**
**NO. 2:16-cv-00134-DLB-CJS**

**SHEILA JACKSON** **PLAINTIFF**

**VS.**

**REGAL BELOIT AMERICA, INC.** **DEFENDANT**

**PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST DISCOVERY REQUESTS**

**INTERROGATORIES**

1. Identify each document that is responsive to Defendant's request for production of documents but that you have not produced. With respect to each such document, give the following information:

A. the document request to which the document is responsive but not produced;

B. a description of the document, including the date, subject matter, person(s) mentioned in the document, person(s) involved with the creation of the document, and person(s) who received or have knowledge of the document's existence; and

C. the reason for nonproduction.

**ANSWER:**

**Plaintiff has not withheld any requested documents. If certain documents are responsive, but not received yet by the Plaintiff, the Plaintiff will provide the documents upon receipt.**

2. For Plaintiff, identify her full name (including nickname(s) and/or any aliases), current address and telephone number, date and place of birth, social security number, driver's license number (including state of issuance), marital status, and the names of all persons with whom Plaintiff has lived during the past five (5) years.

**ANSWER:**

**Sheila Lynita Jackson**
**4210 Nolan Court, Apt. 5**

KENTUCKIANA COURT REPORTERS Date 6-26-17
Reporter KB Exhibit # 2
Case 2:16-CV-00134-DLB-CJS
Deponent Sheila Jackson

**Erlanger, KY 41018**
**859-443-6040**
**DOB: [redacted] Kenton County, KY**
**SSN: [redacted]**
**Kentucky DLN: [redacted]**
**Marital Status: Single**

**The Plaintiff has resided alone for the past five years.**

3. Describe Plaintiff's educational background, identifying all schools, institutions, and programs Plaintiff attended, the dates of each, the address of each, and any degree(s) awarded.

ANSWER:

**Holmes High School**
**2500 Madison Avenue**
**Covington, KY 41014**
**1975 – 1979 (received high school diploma)**

**Northern Kentucky University**
**Nunn Drive**
**Highland Heights, KY 41099**
**1979 – 1980 (no degree)**

**Mount St. Joseph University**
**5701 Delhi Road**
**Cincinnati, OH 45233**
**1984 (no degree)**

4. Please identify each person, including any of Defendant's employees and/or former employees, having knowledge relevant to Plaintiff's claims. With respect to each such employee, former employee, or any other individual, please provide the following:

A. the name, address, and telephone number of the employee or individual;

B. if formerly or currently employed by the Defendant, please provide the position held by the employee and the name of the employee's supervisor;

C. please provide a summary of each individual's knowledge as it relates to Plaintiff's complaint allegations; and

D. identify all documents which Plaintiff contends support her answers to subparts (a) through (c) above, and identify all persons who presently have possession of such documents.

**ANSWER:**

**Objection. This request calls for a narrative response, is vague, overly broad, and overly burdensome, it further requests the Plaintiff to speculate about the testimony of potential witnesses. Without waiving said objection;**

**Plaintiff has previously provided this information to Defendant in her Initial Disclosures and incorporates by reference the information contained in the Initial Disclosures to these discovery requests.**

**/s/ W. Kash Stilz, Jr.**
**W. Kash Stilz, Jr.**

5. Identify each person whom Plaintiff expects to call as a witness in this action and, for each person identified, provide the person's address, telephone number, and a summary of his/her expected testimony.

**ANSWER:**

**The Plaintiff has not determined what witnesses she will call but will supplement this response. All individuals identified in the Plaintiff's Initial Disclosures and Defendant's Initial Disclosures are potential witnesses.**

6. Does Plaintiff claim that she suffered or incurred any physical, mental, emotional, or psychological injuries, conditions, disabilities, or symptoms as a result of her employment with Defendant, the cessation of that employment or any actions allegedly taken by Defendant? If so, for each physical, mental, emotional, or psychological injury, condition, disability, or symptom that Plaintiff contends was caused, exacerbated, or contributed to by her employment with Defendant, the cessation of that employment or any actions allegedly taken by Defendant, please identify:

(a) the nature of the injury, condition, disability, or symptom;

(b) the incident, event, or action allegedly causing the injury, condition, disability, or symptom;

(c) the name, mailing address, and telephone number for any doctor or medical provider with whom Plaintiff consulted or is currently consulting for the injury, condition, disability, or symptom, and the date(s) of such consultation(s); and

(d) any diagnosis, prognosis, treatment, or medication Plaintiff has received as a result of the injury, condition, disability, or symptom.

**ANSWER:**

**Plaintiff's displacement for her position with the Defendant, and her ultimate termination from employment was emotionally traumatic. However, she has not sought medical treatment as a result.**

7. Has Plaintiff ever been a patient of, consulted with, or been treated by any medical professionals, nurses, therapists, psychologists, psychiatrists, counselors, or other health care providers in the past ten (10) years? If so, for each state:

(a) the name, address, and telephone number; and

(b) the approximate date and reason for the consultation, treatment, or visit.

**ANSWER:**

**Objection. This interrogatory is overly broad, vague, and ambiguous, and the information requested is otherwise irrelevant or its probative value is substantially outweighed by prejudicial effect. Without waiving said objection;**

**To the best of her recollection at this time, the Plaintiff has treated with the following providers:**

[redacted]

[redacted]

[redacted]

**Ryan Moon, M.D.**
**St. Elizabeth Physicians**
**7370 Turfway Road, Suite 150**
**Florence, KY 41042**
**treatment for colon cancer: 7/2014 – 8/2014**

**Oncology Hematology Care, Inc.**
**651 Centre View Boulevard**
**Crestview Hills, Kentucky, 41017**
**treatment for colon cancer: 8/2014 through present (includes follow up lab work)**

[redacted]

**St. Elizabeth Medical Center**
**1 Medical Village Drive**
**Edgewood, KY 41017**
[redacted]
**6/2014 – present: treatment for colon cancer, including follow up lab work**
[redacted]

[redacted]

**Tri-State Gastroenterology Associates**
**425 Centre View Boulevard**
**Crestview Hills, KY 41017**
**colonoscopies: 6/2014, 7/2015, 8/2015**

[redacted]

**/s/ W. Kash Stilz, Jr.**
**W. Kash Stilz, Jr.**

8. Identify each person whom Plaintiff or Plaintiff's agent has interviewed, communicated with, or contacted regarding this action, in relation to this action, as a result of this action, and/or in relation to the facts and/or allegations underlying this action. For each, identify:

(a) whether the individual is an employee or former employee of Defendant;

(b) the date of each communication;

(c) the names of all persons present during each communication;

(d) whether the communication was recorded or documented in any way;

(e) whether the person(s) communicated with or interviewed gave any written statements; and

(f) whether the person(s) interviewed or contacted provided any documents to Plaintiff (and, if so, the nature and summary of the document(s)).

**ANSWER:**

**The Plaintiff has not obtained any statements from any persons regarding this matter. The Plaintiff is in possession of statements contained within the Equal Employment**

**Opportunity Commission file, previously provided to Defendant with her Initial Disclosures.**

9. Has Plaintiff ever been arrested or charged with, pled guilty (or no contest) to, or been convicted of a crime or participated in any diversion program offered by any prosecuting agency? If so, please describe the specific nature and date of the arrest and/or charges filed against Plaintiff, the court in which the matter(s) were or are pending, and the date of any guilty plea, no contest plea, conviction, and/or the date Plaintiff was assigned to any diversion program.

**ANSWER:**

**Objection. Relevance. Without waiving said objection;**

**No.**

**/s/ W. Kash Stilz, Jr.**
**W. Kash Stilz, Jr.**

10. Has Plaintiff ever been a party or witness in any legal action or proceeding (including, but not limited to, a criminal, civil, or bankruptcy proceeding or action of any type), or filed a claim, charge, or complaint with any legal, administrative, or other body? If so, please identify:

(a) all parties named in the action;

(b) the date that the action was initiated or filed;

(c) the cause number or docket number of the action, as well as the court or administrative body with which it was filed;

(d) the nature and subject matter of the action; and

(e) the status or disposition of the action or proceeding.

**ANSWER:**

**Objection. Relevance. Without waiving said objection;**

**Boone Co. Case No. 08-CI-2238**
**Plaintiff: Sheila Jackson**
**Defendants: Douglas C. Bradbury, Bradco Trucking Services, Inc.**
**Filed 7/18/2008**
**Dismissed with prejudice 3/4/2011**
**Plaintiff filed a complaint due to personal injuries suffered in a motor vehicle collision.**

**Boone Co. Case No. 97-S-351**
**Plaintiff: Sheila Jackson**
**Defendant: Ken Conley**
**Filed 9/15/1997**
**Judgment entered 10/20/1997**
**Plaintiff filed a small claims complaint due to damages Defendant inflicted upon her car while performing repair/maintenance services.**

**Kentucky Department of Workers' Claims Claim No. 2009-00876**
**Plaintiff: Sheila Jackson**
**Defendant: Emerson Power Transmission Corp. / Regal Beloit**
**Filed 7/30/2009**
**Dismissed 8/30/2010**
**Plaintiff filed a claim for a back injury suffered 7/31/2007 but the claim was dismissed without any judgment.**

**Kentucky Department of Workers' Claims Claim No. 2005-68782**
**Plaintiff: Sheila Jackson**
**Defendant: Emerson Power Transmission Corp. / Regal Beloit**
**The Plaintiff suffered a [redacted] injury at work on 6/24/2005; however she did not file a formal claim.**

**Kentucky Department of Workers' Claims Claim No. 2001-98240**
**Plaintiff: Sheila Jackson**
**Defendant: DHL Express, Inc.**
**The Plaintiff suffered a [redacted] injury at work 6/11/1999; however she did not file a formal claim.**

**Kentucky Department of Workers' Claims Claim No. 1993-50418**
**Plaintiff: Sheila Jackson**
**Defendant: Kenton County Fiscal Court**
**The Plaintiff suffered a [redacted] injury on or about 11/5/1993; however she did not file a formal claim.**

**/s/ W. Kash Stilz, Jr.**
**W. Kash Stilz, Jr.**

11. Has Plaintiff or any agent or representative of Plaintiff ever tape-recorded any conversations or meetings with Defendant? If so, please state:

(a) the date of each taping;

(b) the location of the tape(s);

(c) the names of all persons present during the conversation or meeting; and

(d) a summary of the content of each tape.

**ANSWER:**

**No.**

12. Please detail each and every item of damage, and the amount thereof, that Plaintiff contends she suffered as a result of any actions allegedly taken against her by Defendant. State separately the amount of damages claimed with respect to each specified type of damage and describe separately the method of computation for each type of damage. Identify any and all documents Plaintiff relies upon in providing the answer to this Interrogatory.

**ANSWER:**

**Past and future lost wages: Plaintiff will supplement this response.**
**Emotional distress/humiliation/embarrassment: $100,000.00.**
**Loss of benefits: Plaintiff will supplement this response upon receipt of documents which describe any benefits received from the Defendant.**

13. State any money or benefits (including but not limited to wages, disability benefits, worker's compensation benefits, and/or unemployment benefits) that Plaintiff has earned or received since her separation from Defendant. For all such money and/or benefits, please state the source of the money or benefits, the amount earned or received, the period of time over which Plaintiff received the money or benefits, whether she must repay all or some of the money or benefits, and whether there is a written document evidencing receipt of the money or benefits.

**ANSWER:**

**Objection. This request seeks information received from a collateral source and is irrelevant. Without waiving said objection;**

**Plaintiff will supplement this information upon receipt of requested documents.**

**/s/ W. Kash Stilz, Jr.**
**W. Kash Stilz, Jr.**

14. Does Plaintiff expect to call any expert witnesses in this case? If so, please give his/her name and address, the present occupation of each such expert witness, the subject matter of his/her anticipated testimony, a summary of his/her opinions, and a summary of the basis for each opinion including the identification of any documents he/she has reviewed in connection with this matter.

**ANSWER:**

**The Plaintiff has not determined what expert witnesses she will call but will supplement this answer in accordance with the Court's scheduling Order.**

15. Please identify each employer for whom Plaintiff has been employed from January 1, 1990 to the present, including any current employer and any periods of self-employment, and for each, state the complete name and address, the name(s) of her supervisor(s), the inclusive dates of employment, whether Plaintiff was ever disciplined, and for each former employer, please state the reason for Plaintiff's separation. If disciplinary action was taken, please state the nature of such discipline, and whether Plaintiff's separation was voluntary or involuntary.

**ANSWER:**

**Objection. Relevance. Additionally, the prejudicial value of the information requested is outweighed by its probative value. Without waiving said objection:**

**To the best of the Plaintiff's recollection at this time:**

**DHL Express, Inc.**
**1390 Donaldson Road**
**Erlanger, KY 41018**
**employed: approx. 11/1997 – 7/2002 (Plaintiff separated from this employer to work at Regal Beloit)**
**employed: 6/2013 – present**
**supervisor (11/1997 – 7/2002): Brent (last name unknown)**
**supervisors (6/2013 – present): Todd Gray and Kenny Russell**
**Plaintiff does not recall being disciplined**

**Amazon.com, LLC**
**3680 Langley Drive**
**Hebron, KY 41048**
**employed: 11/2016 – 3/2017**
**supervisor: Jamie (last name unknown)**
**Plaintiff does not recall being disciplined and separated from this employer due to a conflict with her work schedule at DHL Express, Inc.**

**MS Inspection and Logistics, Inc.**
**2000 Industrial Boulevard**
**Hebron, KY 41048**
**employed: 3/2016 – 11/2016**
**supervisor: Pat (last name unknown)**
**Plaintiff does not recall being disciplined and left this employer to make higher wages employed at Amazon.**

**PrideStaff, Inc.**
**2406 High Street**
**Crescent Springs, KY 41017**
**employed: for approximately 2 to 4 weeks in 2016 (Plaintiff does not recall specific dates) as an inspector for vehicle part manufacturer (Plaintiff does not recall name) in Erlanger, KY**
**supervisor: Plaintiff does not recall**
**Plaintiff does not recall being disciplined and separated from this employer to work at MS Inspection and Logistics, Inc.**

**Regal Beloit America, Inc.**
**7120 New Buffington Road**
**Florence, KY 41042**
**11/2001 – 2/2016**
**Supervisors: Jerry (Plaintiff does not recall last name), Tim Kitchens, Dan Norman, Dan Houston, Herb Beech, Doug Fox**
**Plaintiff recalls being disciplined due to conflict with a fellow employee for which she received a three day suspension. In addition, Plaintiff recalls receiving "write ups" from Dan Norman for allegedly improperly leaving her department during a shift and using foul language. Plaintiff also categorizes the events described in her Complaint as discipline,**

**including but not limited to, job relocation and termination from employment.**

**Wynnco Cleaning Services, Inc.**
**9176 Blossom Lane**
**Covington, KY 41015**
**employed: approximately 2011 until 6/2013**
**supervisor: Plaintiff does not recall**
**Plaintiff does not recall being disciplined and separated from this employer to work at DHL Express, Inc.**

**Between 1997 and 2001 Plaintiff recalls working for temporary staffing agencies performing cleaning duties as well as transferring documents to microfilm but does not recall their names or her supervisors. She does not recall being disciplined and does not specifically recall why she left each employer.**

**Parcel Distribution Service (Plaintiff does not recall employer's Northern Kentucky address; employer moved out of state after Plaintiff's separation)**
**Employed: 3/1995 – 11/1997**
**supervisor: Vince (last name unknown)**
**Plaintiff does not recall being disciplined and separated from this employer to work at DHL Express, Inc.**

**Kenton County Fiscal Court**
**303 Court Street**
**Covington, KY 41011**
**employed: approximately 1992 – 1997**
**supervisor: Plaintiff does not recall**
**Plaintiff does not recall being disciplined and does not specifically recall why she separated from this employer.**

**Plaintiff worked for various temporary staffing agencies from 1990 to 1995 but does recall their names or her supervisors. She does not recall being disciplined and does not specifically recall why she left each employer.**

**/s/ W. Kash Stilz, Jr.**
**W. Kash Stilz, Jr.**

16. Describe all efforts Plaintiff has taken to mitigate (minimize) her damages, and include every prospective employer she has contacted since her separation from Defendant. In your response, please include the following information:

(a) the name, address, telephone number, and contact at each employer;

(b) the date(s) on which Plaintiff contacted the employer;

(c) whether Plaintiff interviewed, and if so, with whom;

(d) whether Plaintiff completed an application;

(e) whether Plaintiff has received any job offers and, if so, the status of each;

(f) whether Plaintiff declined to accept any job offer and the reason she declined the offer; and

(g) the reason Plaintiff ultimately was not employed, if applicable.

**ANSWER:**

**The Plaintiff was employed at the time of her displacement and termination with DHL Express, Inc., 1390 Donaldson Road, Erlanger, KY 41018. Following her termination from employment with the Defendant, the Plaintiff also procured employment at Amazon.com, LLC, 3680 Langley Drive, Hebron, KY 41048, MS Inspection and Logistics, Inc., 2000 Industrial Boulevard, Hebron, KY 41048, and PrideStaff, Inc., 2406 High Street, Crescent Springs, KY 41017. The specifics of these employers is addressed in the Plaintiff's response to Interrogatory No. 15.**

17. Has Plaintiff given any written or oral statements and/or interviews to anyone regarding this case? If so, please state the date and location of each, who was present at each, whether the statement was oral, written, and/or recorded, and the person who currently has possession of any such statement.

**ANSWER:**

**The Plaintiff has provided statements to the Equal Employment Opportunity Commission which are contained within the Plaintiff's EEOC file, previously provided to Defendant with her Initial Disclosures.**

18. Please identify any attorney Plaintiff contacted in connection with her employment by Defendant and/or her allegations in this case, and for each, state the date Plaintiff first contacted such attorney, the method of contact (*e.g.*, phone or in person), the identity of all persons present, whether Plaintiff retained that attorney at any time, and the terms of any fee agreement.

**ANSWER:**

**Objection. Relevance and the information requested is subject to attorney-client privilege.**

**/s/ W. Kash Stilz, Jr.**
**W. Kash Stilz, Jr.**

19. Has Plaintiff kept a diary, calendar or day-timer of any type during her employment with Defendant? If so, please identify its location and the relevant time periods it covers.

**ANSWER:**

**Plaintiff is in possession of diaries she kept during her employment with Defendant, which cover the time period of 2/16/2015 through 11/4/2015. A copy of said diaries is included with these responses and bates numbered JACKSON00001 – 00124.**

## REQUESTS FOR PRODUCTION

**Request 1:** Please produce all documents identified or referenced in responding to Defendant's Interrogatories.

**RESPONSE:**

**Please see attached documents bates numbered JACKSON00001 – 00304. In addition, Plaintiff has previously produced to Defendant documents with her Initial Disclosures and incorporates by reference the information contained in said documents to these discovery responses.**

**Request 2:** Please produce all documents that support, reference, or relate to Plaintiff's allegation that Regal Beloit discriminated against her on the basis of the Americans with Disabilities Act of 1990 ("ADA").

**RESPONSE:**

**Please see attached documents bates numbered JACKSON00001 – 00124. In addition, Plaintiff has previously produced to Defendant documents along with her Initial Disclosures and incorporates by reference the information contained said documents to these discovery responses.**

**<u>Request 3:</u>** Please produce all documents that support, reference, or relate to Plaintiff's allegation that Regal Beloit retaliated against her for exercising her rights under the Family Medical Leave Act ("FMLA").

**RESPONSE:**

**Please see attached documents bates numbered JACKSON00001 – 00124. In addition, Plaintiff has previously produced to Defendant documents with her Initial Disclosures and incorporates by reference the information contained said documents to these discovery responses.**

**<u>Request 4:</u>** Please produce all documents that support, reference, or relate to Plaintiff's allegations that Regal Beloit interfered with, restrained, or denied Plaintiff's exercise of, or attempts to exercise, her rights under FMLA, in violation of 29 U.S.C. § 2601, *et seq.*

**RESPONSE:**

**Please see attached documents bates numbered JACKSON00001 – 00124. In addition, Plaintiff has previously produced to Defendant documents with her Initial Disclosures and incorporates by reference the information contained said documents to these discovery responses.**

**<u>Request 5:</u>** Please produce all documents that support, reference, or relate to Plaintiff's allegations that Regal Beloit discriminated against her in violation of Title II of the Genetic Information Nondiscrimination Act of 2008 ("GINA"), as amended, 42 U.S.C. § 2000, *et seq.*

**RESPONSE:**

**Please see attached documents bates numbered JACKSON00001 – 00124. In addition, Plaintiff has previously produced to Defendant documents with her Initial Disclosures and incorporates by reference the information contained said documents to these discovery responses.**

**<u>Request 6:</u>** Please produce all documents that support, reference, or relate to Plaintiff's allegations that Regal Beloit discriminated against her in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 1981.

**RESPONSE:**

**Please see attached documents bates numbered JACKSON00001 – 00124. In addition, Plaintiff has previously produced to Defendant documents with her Initial Disclosures and incorporates by reference the information contained said documents to these discovery requests.**

**Request 7:** Please produce all documents that relate to and/or support damages allegedly sustained or suffered by Plaintiff as a result of her employment and/or treatment by Defendant.

**RESPONSE:**

**Please see attached documents bates numbered JACKSON00125 - 00304. Plaintiff will supplement this response upon receipt of requested documents.**

**Request 8:** Please produce all tapes, transcripts, notes, or other evidence of or documents relating to any conversations Plaintiff recorded or participated in with former or current employees/agents of Defendant that in any way support, reference, or relate to Plaintiff's allegations in this lawsuit (including but not limited to telephone, voice mail, or e-mail messages).

**RESPONSE:**

**Please see attached documents bates numbered JACKSON00001 – 00124.**

**Request 9:** Please produce all audio or other recordings made by Plaintiff, her agents, or counsel, or any other individuals that relate in any way to Plaintiff's claims or allegations in connection with this case.

**RESPONSE:**

**The Plaintiff did not make any of the specified recordings.**

**Request 10:** Please produce any and all reports, letters, jottings, or other documents prepared, reviewed, or relied upon by any expert retained by Plaintiff in this case.

**RESPONSE:**

**The Plaintiff will supplement this request in accordance with the Court's scheduling order.**

**Request 11:** Please produce all documents that constitute, contain, or refer to (a) any statement by Defendant, and (b) any statement by Defendant that Plaintiff contends or will contend to be an admission by a party opponent.

**RESPONSE:**

**The Plaintiff has provided statements to the Equal Employment Opportunity Commission which are contained within the Plaintiff's EEOC file, previously provided Defendant. Plaintiff incorporates by reference the information contained said documents to these discovery responses.**

**Request 12:** Please produce all documents written, created, or prepared by Plaintiff (including, but not limited to, personal notes, diaries, calendars, and journals) either during or subsequent to her employment with Defendant that relate in any way to her employment or cessation of that employment, any individual employed by or associated with Defendant, or any matter that supports or relates to the allegations contained in Plaintiff's judicial complaint.

**RESPONSE:**

**Please see attached documents bates numbered JACKSON00001 – 00124.**

**Request 13:** Please produce all correspondence between Plaintiff and Defendant (including, but not limited to, letters, e-mails or personal notes) either during or subsequent to her employment with Defendant that may relate in any way to her employment or cessation of that employment, any individual employed by or associated with Defendant, her claims against Defendant, or her alleged damages.

**RESPONSE:**

**The Plaintiff does not possess the requested documents.**

**Request 14:** Please produce all documents relating to, referencing, or arising out of

Plaintiff's employment with Defendant, including, but not limited to, any and all personnel documents, booklets, notices, correspondence, evaluations, diary or journal entries, calendars, and notes of meetings, telephone conversations, or other contact between the Plaintiff and Defendant, which relate in any way to Plaintiff's claims or allegations or Defendant's defenses of this matter.

**RESPONSE:**

**Please see attached documents bates numbered JACKSON00001 – 00124.**

**Request 15:** Please produce all documents received by Plaintiff after her separation from Defendant that evidence receipt of or entitlement to money or benefits (including, but not limited to, disability benefits, worker's compensation, unemployment benefits, and pay stubs).

**RESPONSE:**

**The Plaintiff will supplement this response upon receipt of requested documents.**

**Request 16:** Please produce all of Plaintiff's income tax returns (both federal and state, including Form W-2's) for the past five (5) years.

**RESPONSE:**

**Please see attached documents bates numbered JACKSON00125 – 00304. The Plaintiff has requested additional documents and will supplement them upon receipt.**

**Request 17:** Please produce all documents that describe or relate to Plaintiff's mental, emotional, psychological, or physical condition at any time during and after her employment with Defendant.

**RESPONSE:**

**The Plaintiff has previously produced to Defendant documents with her Initial Disclosures and incorporates by reference the information contained said documents to these discovery responses.**

**Request 18:** Please produce all documents evidencing Plaintiff's efforts to mitigate her

damages, including any documents evidencing her efforts to obtain employment since her separation from Defendant.

**RESPONSE:**

**The Plaintiff has included W-2's with her tax records which indicate her employment subsequent to her termination by Defendant. The Plaintiff did not seek any other employment.**

**Request 19:** Pursuant to Federal Rule 26(b)(3), please produce all statements or records or recordings of statements made or taken by Plaintiff, her counsel, any agent, or representative, of any employee of Defendant either with or without their knowledge related in any way to the subject matter of Plaintiff's Complaint.

**RESPONSE:**

**The Plaintiff does not possess the requested documents.**

**Request 20:** Please produce all documents not already produced that in any way support or relate to Plaintiff's allegations.

**RESPONSE:**

**Please refer to the documents produced with these discovery responses and to those produced with Plaintiff's Initial Disclosures.**

**Request 21:** Please produce all documents received as a result of any subpoena served by Plaintiff in this case.

**RESPONSE:**

**The Plaintiff has not subpoenaed any documents.**

**Request 22:** Please produce any fee agreements entered into by Plaintiff with any attorney Plaintiff contacted in connection with her employment by Defendant and/or Plaintiff's allegations in this case.

**RESPONSE:**

**Objection. Relevance and the information requested is subject to attorney-client privilege.**

**/s/ W. Kash Stilz, Jr.**
**W. Kash Stilz, Jr.**

**Request 23:** Produce all postings you have made or correspondence that you have sent or received, via Facebook, LinkedIn, MySpace, Twitter, or any similar social networking site relating to Regal Beloit, your employment with Regal Beloit or its predecessors, the termination of your employment with Regal Beloit, or the allegations in your Complaint. (For reference, Facebook offers a simple "Download Your Information" feature that can export your Facebook postings.).

**RESPONSE:**

**The Plaintiff has never opened or operated a social media account.**

RESPECTFULLY SUBMITTED,

ROUSH & STILZ, P.S.C

/s/ W. Kash Stilz, Jr.
W. KASH STILZ, JR.
19 West Eleventh Street
Covington, Kentucky 41011-3003
(859) 291-8400
(859) 291-6555 facsimile
ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing was served via email and regular mail on this 26th day of April, 2017, on the following:

Mark Scudder, Esq.
Barnes & Thornberg LLP
888 South Harrison Street, Suite 600
Fort Wayne, IN 46802
mark.scudder@btlaw.com

and

Anthony K. Glenn, Esq.
Barnes & Thornberg LLP
11 South Meridian Street
Indianapolis, IN 46204
anthony.glenn@btlaw.com

/s/ W. Kash Stilz, Jr.
W. KASH STILZ, JR.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**COVINGTON DIVISION**
**NO. 2:16-cv-00134-DLB-CJS**

**SHEILA JACKSON** **PLAINTIFF**

**VS.**

**REGAL BELOIT AMERICA, INC.** **DEFENDANT**

**PLAINTIFF'S F.R.C.P. 26 INITIAL DISCLOSURES**

Comes now the Plaintiff, by and through counsel, and pursuant to F.R.C.P. 26 provides the following initial disclosures:

A. **F.R.C.P. 26(a)(1)(A)(i) – PERSONS WHO MAY HAVE DISCOVERABLE INFORMATION**

1. **Sheila Jackson.** 4210 Nolan Court, Apt. 5., Erlanger, KY 41018. Ms. Jackson is the Plaintiff in this matter and intends to testify concerning the events complained of in his Complaint.

2. **Daniel Flora, M.D.** 651 Centre View Boulevard, Crestview Hills, KY 41017. Dr. Flora has treated the Plaintiff for her cancer. And should information concerning her condition, treatment, diagnosis, and prognosis.

3. **M. Ryan Moon, M.D.** 7370 Turfway Road, Suite 150, Florence, KY 41042. Dr. Moon is a surgeon who operated on the Plaintiff in treatment of her cancer. He should have information related to her treatment, diagnosis, and prognosis. He may also have information concerning work status information requested by the Defendant relative to this matter.

4. **Brent Haskell, M.D.** 200 Medical Village Drive, Edgewood, KY 41017. Dr. Haskell was hired by the Defendant to perform a physical examination of the Plaintiff to qualify her to return to work. Upon information and belief, he has provided this service for the Defendant relative to other employees. He should have information concerning the Plaintiff's physical examination and the Plaintiff's medical leave.

5. **Beverly Clark.** Equal Employment Opportunity Commission, 477 Michigan Ave., Detroit, MI 48226. Ms. Clark is a Government Information Specialist for the EEOC out of the Detroit Field Office and responded to the Plaintiff's open record request and may have additional knowledge concerning the charge the Plaintiff filed with the EEOC.

KENTUCKIANA Date 6-26-17
Reporter KB Exhibit # 3
Case 2:16-CV-00134-DLB-CJS
Deponent Sheila Jackson

6. **Doug Kern.** Equal Employment Opportunity Commission, 950 Pennsylvania Ave., NW, Washington, D.C. 20530. Mr. Kern is a Trial Attorney with the U.S. Department of Justice, Civil Rights Division and provided the Plaintiff with her Right to Sue Letter in this matter and may have additional knowledge concerning the charge the Plaintiff filed with the EEOC.

7. **Melanie L. Breen.** Equal Employment Opportunity Commission, 550 Main St. #10019, Cincinnati, OH 45202. Ms. Breen is the Director of the Cincinnati Office of the EEOC and may have knowledge concerning the charge filed by the Plaintiff with the EEOC.

8. **Wilma L. Javey.** Equal Employment Opportunity Commission, 550 Main St. #10019, Cincinnati, OH 45202. Ms. Javey is a Director at the EEOC offices in Cincinnati, Ohio and may have information concerning the charge the Plaintiff filed with the EEOC.

9. **Vanita Gupta.** Equal Employment Opportunity Commission, 550 Main St. #10019, Cincinnati, OH 45202. Ms. Gupta is an employee at the EEOC offices in Cincinnati, Ohio and may have information concerning the charge the Plaintiff filed with the EEOC.

10. **Matthew Meisman.** Equal Employment Opportunity Commission, 550 Main St. #10019, Cincinnati, OH 45202. Mr. Meisman was the investigator assigned by the EEOC to the Plaintiff's charged filed with the EEOC and may have information concerning the charge.3

11. **Josh Wherlin.** Address Unknown. Upon information and belief, Mr. Wherlin was the Plaintiff's lead in the drive kits and UPS department during the Plaintiff's employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities.

12. **Robert Hatter**. Address Unknown. Upon information and belief, Mr. Hatter was a co-worker of the Plaintiff in the drive kit department and should have information concerning the Plaintiff's request for leave, her work activities, and the name of the person who replaced the Plaintiff following her termination from employment.

13. **Mike Spegiel**. Address Unknown. Upon information and belief, Mr. Spegiel was a co-worker in the drive kits department during the Plaintiff's employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities.

14. **Jason Greenwell.** Address Unknown. Upon information and belief, Mr. Greenwell was a co-worker in the drive kits department during the Plaintiff's employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities.

15. **Kirk (last name unknown).** Address Unknown. Upon information and belief, Kirk (last name unknown) was a co-worker in the drive kits department during the Plaintiff's employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities.

16. **Ronnie (last name unknown).** Address Unknown. Upon information and belief, Robbie (last name unknown) was a co-worker of the Plaintiff in the drive kits department during the Plaintiff's employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities.

17. **Brenda Hambry.** Address Unknown. Upon information and belief, Ms. Hambry was a co-worker of the Plaintiff who worked in the belts department during the Plaintiff's employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities. Additionally, upon information and belief, she was treated more favorably than the Plaintiff when she requested medical leave and/or reasonable accommodation.

18. **Joyce Lawson.** Address Unknown. Upon information and belief, Ms. Lawson was a co-worker who worked in the belts department during the Plaintiff's employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities. Additionally, upon information and belief, she was treated more favorably than the Plaintiff when she requested medical leave and/or reasonable accommodation.

19. **Judy Henson.** Address Unknown. Upon information and belief, Ms. Henson was a co-worker of the Plaintiff in the UPS packing department during the Plaintiff's employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities

20. **Kat Plunkett.** Address Unknown. Upon information and belief, Ms. Plunkett was a co-worker of the Plaintiff in the UPS packing department during the Plaintiff's employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities

21. **Paula (last name unknown).** Address Unknown. Upon information and belief, Paula (last name unknown) was a co-worker of the Plaintiff in the UPS packing department during the Plaintiff's employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities.

22. **Billy Spicer.** Address Unknown. Upon information and belief, Mr. Spicer was a co-worker who worked in the office located in Defendant's warehouse during the Plaintiff's employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities.

23. **Cindy Lay.** Address Unknown. Upon information and belief, Ms. Lay was a co-worker in the office located in the Defendant's warehouse during the Plaintiff's

employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities.

24. **Larry (last name unknown)**. Address Unknown. Upon information and belief, Larry (last name unknown) was a co-worker who worked in the UPS packing department during the Plaintiff's employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities.

25. **Sheila Lawson.** Address Unknown. 859-444-1189. Upon information and belief, Ms. Lawson was a co-worker in the Complex packing department during the Plaintiff's employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities. Additionally, upon information and relief, she was treated more favorably than the Plaintiff when she refused to release requested medical information to the Defendant.

26. **Calvin Jarvis.** Address Unknown. Upon information and belief, Mr. Jarvis was a co-worker in the cycle count department during the Plaintiff's employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities. Additionally, upon information and belief, Mr. Jarvis was treated more favorably than the Plaintiff such that he was not required to stop operating equipment when he refused to provide the Defendant with requested medical records.

27. **Monty Edwards.** Address Unknown. Upon information and belief, Mr. Edwards was a co-worker of the Plaintiff in the manufacturing department during the Plaintiff's employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities.

28. **Kenny (last name unknown)**. Address Unknown. Upon information and belief, Kenny (last name unknown) was a second shift lead of the Plaintiff during the Plaintiff's employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities.

29. **Carlos (last name unknown)**. Address Unknown. Upon information and belief, Carlos (last name unknown) was a co-worker of the Plaintiff and was a "specialist" who roamed between departments during the Plaintiff's employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities.

30. **Crystal (last name unknown)**. Address Unknown. Upon information and belief, Crystal (last name unknown) was a co-worker of the Plaintiff and was a "specialist" who roamed between departments during the Plaintiff's employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities.

31. **Sheila Stephens.** Address Unknown. Upon information and belief, Ms. Stephens was a co-worker of the Plaintiff in the UPS department during the Plaintiff's employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities.

32. **BB Ponds.** Address Unknown. Upon information and belief, (Mr./Ms.) Ponds was a co-worker of the Plaintiff in the UPS department during the Plaintiff's employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities.

33. **Chris (last name unknown).** Address Unknown. Upon information and belief, Chris (last name unknown) was a co-worker of the Plaintiff in the manufacturing department during the Plaintiff's employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities.

34. **Kitty (last name unknown).** Address Unknown. Upon information and belief, Kitty (last name unknown) was a co-worker of the Plaintiff in the manufacturing department during the Plaintiff's employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities.

35. **Jerry Oswald.** Address Unknown. Upon information and belief, Mr. Oswald was a supervisor in the UPS and drive kit departments during the Plaintiff's employment with the Defendant and should have information concerning the Plaintiff's request for leave and her work activities.

36. **Nicole George.** Address Unknown. Ms. George was employed with the Defendant in the Human Resources department and should have information concerning the Plaintiff's request for leave, the actions taken by the Defendant resulting from the leave request, Plaintiff's work activities and employment history with the Defendant, and information concerning her termination from employment.

37. **Mike Tobias.** Address Unknown. Mr. Tobias was a lead and co-worker of the Plaintiff during her employment with the Defendant. He should have information concerning the Plaintiff's request for leave, the actions taken by the Defendant resulting from the leave request, Plaintiff's work activities, and information concerning her termination from employment.

38. **DHL Express.** 570 Polaris Parkway, D110, Westerville, OH 43082. The Plaintiff is employed part time at DHL Express. It should have information concerning the Plaintiff's work status while an employee there, as well as wage and benefit information.

39. **MS Inspection and Logistics, Inc.** 2000 Industrial Blvd., Louisville, KY 40219. The Plaintiff is employed part time with MS Inspection and Logistics, Inc. It should have information concerning the Plaintiff's work status while an employee there, as well as wage and benefit information.

40. Any and all unknown and/or currently identified individuals who may be discovered by the parties in this matter during the course of litigation.

## B. F.R.C.P. 26(a)(1)(A)(ii) – DOCUMENTS THAT MAY LEAD TO DISCOVERABLE INFORMATION

1. Employee files and payroll information of the Plaintiff kept by Defendant.

2. Employee files and payroll information of the Plaintiff maintained by DHL Express and MS Inspection and Logistics, Inc.

3. Medical records of the Plaintiff. *

4. Documents received from the Equal Employment Opportunity Commission from the Plaintiff's open records request.

5. Plaintiff's tax documents filed with appropriate taxing authorities. *

6. Any and all unknown and/or unidentified documents that may be discovered by the parties in this matter during the course of litigation.

*The Plaintiff has requested this information and not received all of it yet.

## C. F.R.C.P. 26(a)(1)(A)(iii) – INITIAL COMPUTATION OF DAMAGES

1. **Lost Wages/Benefits/Job Rights/Front Pay;**

   Plaintiff calculates his current lost wages and front pay at: **$60,000.00 (27,500.00 per year).**

   Plaintiff calculates damages resulting from a loss of benefits at: **To be determined.**

   **The Plaintiff will supplement this disclosure upon receipt of benefit information from the Defendant.**

   Interest on the amounts provided above at the current prevailing rate.

2. **Liquidated damages: $60,000.00.**

   Interest on the amount provided above at the current prevailing rate.

3. **Punitive Damages: $100,000.00.**

   Interest on the amount provided above at the current prevailing rate.

4. **Emotional Distress/Humiliation/Embarrassment;**

   **$100,000.00**

5. **Attorney's Fees/Costs/Interest;**

   **The Plaintiff will supplement this disclosure.**

6. Any and all currently unknown and/or unidentified damages which may be determined through discovery.

**D. F.R.C.P. 26(a)(1)(A)(iv)**

1. Any and all insurance agreements available to the Defendants to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.

The disclosures contained herein are based on information now currently available. The Plaintiff will supplement these disclosures in accordance with F.R.C.P. 26(e).

RESPECTFULLY SUBMITTED,

ROUSH & STILZ, P.S.C

/s/ W. Kash Stilz, Jr.
W. KASH STILZ, JR.
19 West Eleventh Street
Covington, Kentucky 41011-3003
(859) 291-8400
(859) 291-6555 facsimile
kash@roushandtilzlaw.com
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of November, 2016, a copy of the foregoing was served via email and regular U.S. mail on the following:

Mark Scudder, Esq.
Barnes & Thornberg LLP
888 South Harrison Street, Suite 600
Fort Wayne, IN 46802
mark.scudder@btlaw.com

and

Anthony K. Glenn, Esq.
Barnes & Thornberg LLP
11 South Meridian Street
Indianapolis, IN 46204
anthony.glenn@btlaw.com

and

Brent R. Baughman, Esq.
Bingham Greenbaum Doll LLP
3500 National City Tower
101 South 5th Street
Louisville, KY 40202
bbaughman@bgdlegal.com

/s/ W. Kash Stilz, Jr.
W. KASH STILZ, JR.

REGAL

KENTUCKIANA COURT REPORTERS Date 6-26-17
Reporter KB Exhibit # 4
Case 2:16-CV-00134-DLB-CJS
Deponent Sheila Jackson

**Power Transmission Solutions**

## EHS-009 Powered Industrial Equipment Licensing Procedure

**NOTE:** Per OSHA 1910.178(l)(2)(iii), training may only be delivered by an experienced, qualified, licensed equipment operator for that specific piece of equipment.

**1.0 Purpose:**
To ensure all Powered Industrial Equipment operators are properly trained and licensed.

**2.0 Scope:**
All personnel who operate Powered Industrial Equipment in the PTS Florence, KY facility.

**3.0 Medical Screening**
The Company will review each instance where an employee, or a prospective employee, does not pass the medical exam. In these situations, a representative from Human Resources and the department Supervisor or Manager will discuss the matter with the person to determine, if appropriate, whether any reasonable accommodation(s) exist that would allow the person to complete the essential functions of the position.

**4.0 Procedure:**
It is the policy of PTS to conduct a thorough assessment of each employee (new hire and current) whose job responsibilities involve operating Powered Industrial Equipment (PIE). The assessment includes medical screening, written quizzes, and demonstrated competencies by the employee for each piece of equipment they will operate.

### New Hires:

**Medical Screening:**

**4.1** HR will schedule medical exams, and advise the appropriate personnel of the results.

- **4.1.1** If the potential employee **passes** the medical exam they are eligible to proceed with the training and licensing process as described in this policy.
  - **4.1.1.1** If the employee passes the medical exam but with restrictions HR will review those restrictions, and involve other appropriate personnel as necessary.

**4.2** If the potential employee **does not pass** the medical exam:

- **4.2.1** But the medical situation is deemed to be **correctable** they may apply again in the future.
- **4.2.2** If the medical situation is deemed to be **uncorrectable** the potential employee will not be hired for the position.

**4.3 Equipment Licensing and Training (New Hires and Temporary Employees):** The supervisor/designee will deliver the classroom training to the trainee including:

- **4.3.1** The Overview - Powered Industrial Equipment Operator Training presentation.
- **4.3.2** The Powered Industrial Equipment Overview Quiz which is a written quiz.

REGAL

**4.3.2.1** A passing grade of 80% (which is 16 out of 20 questions correct) is required before the driving test may be administered.
**4.3.2.2** If necessary, the presentation may be reviewed again, and the written quiz taken up to three times.
**4.3.2.3** If the trainee has not successfully passed the written portion of the assessment within three attempts the EHS Supervisor must be advised.
**4.3.2.4** After the written quiz has been successfully completed it should be forwarded to the EHS Supervisor for filing.

**4.4** Upon successful completion of the steps outlined in **3.3**, the trainee's supervisor will schedule the operating portion of the training. The trainee will observe an experienced, licensed operator demonstrate the proper steps required to inspect and operate the equipment in a safe manner.

**4.4.1** The demonstration will include at a minimum the following elements:
**4.4.1.1** An explanation of all "controls" (buttons, levers, knobs, etc. on the equipment), and their purpose and function.
**4.4.1.2** How to operate the "controls" (see them in action).
**4.4.1.3** Equipment inspection procedures and completion of the Powered Industrial Equipment (PIE) Checklist.
**4.4.1.4** How to start, steer, move, accelerate, stop, park, and place controls in neutral.
**4.4.1.5** How to operate the equipment in a controlled and safe manner. Demonstrations of the major, and any relevant minor tasks that may be completed while operating the equipment should be demonstrated. (I.E. stacking and unstacking pallets, placing a pallet in, and removing a pallet from an elevated rack location, battery charging, etc.).
**4.4.1.6** Explain the safety rules and signs.
**4.4.1.7** Other elements not mentioned but deemed important by the supervisor/designee conducting the training.

**4.5** Under the observation of the supervisor/designee the trainee must perform the necessary inspection steps, and demonstrate how to properly, and safely operate **all** controls on each piece of equipment they are to be licensed for.

**4.5.1** The supervisor/designee will give the trainee verbal commands relative to the equipment's operation, and the trainee must successfully perform each task.
**4.5.2** The trainee will complete the Powered Industrial Equipment (PIE) Checklist.
**4.5.3** When the supervisor/designee feels the trainee is competent with the basic operating requirements of the equipment, an obstacle course will be set up that will test the necessary skills needed to safely operate that particular piece of equipment.

**4.5.3.1** The course should include realistic obstacles and tasks that the trainee will encounter in the normal course of operating the equipment. For example:

- Stacking pallets.
- Driving up/down a ramp.
- Maneuvering between obstacles without hitting them.
- Placing and retrieving pallets from an elevated rack location.
- Driving through intersections.
- Other, including elements outlined in the Powered Industrial Equipment Driving Test for that specific equipment.

**4.5.4** After the trainee has successfully passed the Powered Industrial Equipment Driving Test the supervisor/designee will update the Licensed Powered Industrial Equipment Operators Log for each appropriate piece of equipment.

**4.5.5** The supervisor/designee will generate a new Powered Industrial Equipment Operator's License highlighting or punching the equipment that the license certifies.

## Department Transfers/Changes in Responsibilities

**Medical Screening:**

**4.6** If an employee transfers to another department, and/or there is a change to the employee's job responsibilities that requires them to operate powered industrial equipment that they are not currently licensed to operate, and they have not had the required medical exam for operating powered industrial equipment within the last three years, must receive a medical exam prior to operating the equipment.

**4.7** HR will schedule medical exams, and advise the appropriate personnel of the results.

**4.7.1** If the employee **passes** the medical exam they are eligible to proceed with the training and licensing process as described in this policy.

**4.7.1.1** If the employee passes the medical exam but with restrictions HR will review those restrictions, and involve other appropriate personnel as necessary.

**4.8** If the employee **does not pass** the medical exam:

**4.8.1** But the medical situation is deemed to be **correctable** they may apply again in the future.

**4.8.2** If the medical situation is deemed to be **uncorrectable** the employee will not be permitted to operate powered industrial equipment, and will remain in their current position.

**4.9 Equipment Licensing and Training:** The supervisor/designee will deliver the classroom training to the trainee including:

**4.9.1** The Overview - Powered Industrial Equipment Operator Training presentation.

**4.9.2** The Powered Industrial Equipment Overview Quiz which is a written quiz.

**4.9.2.1** A passing grade of 80% (which is 16 out of 20 questions correct) is required before the driving test may be administered.

**4.9.2.2** If necessary, the presentation may be reviewed again, and the written quiz taken up to three times.

REGAL

**4.9.2.3** If the trainee has not successfully passed the written portion of the assessment within three attempts the EHS Supervisor must be advised.

**4.9.2.4** After the written quiz has been successfully completed it should be forwarded to the EHS Supervisor for filing.

**4.10** Upon successful completion of the steps outlined in **3.9**, the trainee's supervisor will schedule the driving portion of the training. The trainee will observe an experienced, licensed operator demonstrate the proper steps required to inspect and operate the equipment in a safe manner.

**4.10.1** The demonstration will include at a minimum the following elements:

**4.10.1.1** An explanation of all "controls" (buttons, levers, knobs, etc. on the equipment), and their purpose and function.

**4.10.1.2** How to operate the "controls" (see them in action).

**4.10.1.3** Equipment inspection procedures, and completion of the Powered Industrial Equipment (PIE) Checklist.

**4.10.1.4** How to start, steer, move, accelerate, stop, park, and place controls in neutral.

**4.10.1.5** How to operate the equipment in a controlled and safe manner. Demonstrations of the major, and any relevant minor tasks that may be completed while operating the equipment should be demonstrated. (I.E. stacking and unstacking pallets, placing a pallet in, and removing a pallet from an elevated rack location, battery charging, etc.).

**4.10.1.6** Explain the safety rules and signs.

**4.10.1.7** Other elements not mentioned but deemed important by the supervisor/designee conducting the training.

**4.11** Under the observation of the supervisor/designee the trainee must perform the necessary inspection steps, and demonstrate how to properly, and safely operate **all** controls on each piece of equipment they are to be licensed for.

**4.11.1** The supervisor/designee will give the trainee verbal commands relative to the equipment's operation, and the trainee must successfully perform each task.

**4.11.2** The trainee will complete the Powered Industrial Equipment (PIE) Checklist.

**4.11.3** When the supervisor/designee feels the trainee is competent with the basic operating requirements of the equipment, an obstacle course will be set up that will test the necessary skills needed to safely operate that particular piece of equipment.

**4.11.3.1** The course should include realistic obstacles and tasks that the trainee will encounter in the normal course of operating the equipment. For example:

- Stacking pallets.
- Driving up/down a ramp.
- Maneuvering between obstacles without hitting them.
- Placing and retrieving pallets from an elevated rack location.
- Driving through intersections.
- Other, including elements outlined in the Powered Industrial Equipment Driving Test for that specific equipment.

REGAL

4.11.4 After the trainee has successfully passed the Powered Industrial Equipment Driving Test the supervisor/designee will update the Licensed Powered Industrial Equipment Operators Log for each appropriate piece of equipment.

4.11.5 The supervisor/designee will generate a new Powered Industrial Equipment Operator's License highlighting or punching the equipment that the license certifies.

## Licenses Renewals:

**4.12** A Powered Industrial Equipment Operator License must be renewed every three years in the anniversary month of when the license was issued. For example, if the license was issued on May 3, 2012, it must be renewed in the month of May of 2015.

**4.13** Monthly, all involved supervisors/designees will review the Licensed Powered Industrial Equipment Operators Log to determine which of their employees require their licenses to be renewed.

**4.13.1** The names of each employee whose license is up for renewal must be provided to HR 60 days in advance of the renewal month.
***NOTE:*** *Every attempt should be made to plan ahead in order to avoid an expired license. Employees may not operate any equipment that they do not have a valid license for.*

**4.13.2** If during the review of the log it is discovered than an employee no longer operates a particular piece of powered industrial equipment, or they are no longer employed at PTS a note must be made that reflects those changes.

**4.13.2.1** The names must not be deleted, rather a note indicating any changes made.

**4.14** **Revoked/Expired Licenses:** Expired and/or revoked licenses will be confiscated by the employee's supervisor.

**4.15** **Medical Exams:** HR will schedule medical exams, and advise the appropriate personnel of the results.

**4.15.1** If the employee **passes** the medical exam, proceed with the renewal process as described in this policy.

**4.15.1.1** If the employee passes the medical exam but with restrictions, HR must review those restrictions, and involve other appropriate personnel as necessary.

**4.15.2** If the employee **does not pass** the medical exam their license must be suspended immediately!

**4.15.2.1** If operating powered industrial equipment is not a job requirement the employee may remain in their current position but are no longer eligible to operate powered industrial equipment.

**4.15.2.2** If operating powered industrial equipment is a job requirement, and the employee is incapable of, or unwilling to take the necessary actions to pass the medical exam they will be displaced, and allowed to bid on a job that does not require a powered industrial equipment operator's license.

REGAL

4.15.2.3 If operating powered industrial equipment is a job requirement, and the employee may be capable of passing the medical exam, and they show evidence of corrective actions being taken they will be temporarily reassigned until a final determination has been made.

**4.16** The supervisor/designee will administer the Powered Industrial Equipment Driving Test to all employees whose licenses are up for renewal. Again, a driving test is required for each piece of equipment the employee is intended to operate.

**4.16.1** If an employee is licensed for multiple pieces of equipment with multiple renewal dates, all should be renewed at the same time.

**4.16.2** If the employee passes the medical exam and driving test their license will be renewed for the specific equipment involved.

**4.16.3** If an employee is unable to achieve a passing score for a piece of equipment that is necessary for them to perform their job duties, they may not operate that equipment. The supervisor should contact HR and the EHS Supervisor for further direction.

**4.17** As necessary, the supervisor/designee will update the Licensed Powered Industrial Equipment Operator Log, and generate the new Powered Industrial Equipment Operator's License.

## Refresher Training

**4.18** In the event of any of the following instances, the employee must receive refresher training and successfully demonstrate the skills to properly and safely operate the equipment involved.

**4.18.1** The employee is observed operating powered industrial equipment in an unsafe manner.

**4.18.2** The employee has been involved in an accident or near miss incident that is considered to be serious by supervision or management.

**4.18.3** The employee is assigned to operate a different type of powered industrial equipment.

**4.18.4** There is a change in the conditions of the workplace that could affect safe operation of the equipment. For example, now the employee is asked to operate the powered industrial equipment outside.

**4.19** If a member of management or supervision feels it is appropriate given a certain situation, the Powered Industrial Equipment Driving Test may be reissued at any time.

**4.20** **Contractors:** Prior to allowing a contractor to operate any PTS owned Powered Industrial Equipment their qualifications/licenses will be verified.

**5.0 Reference Documents:**

- Overview - Powered Industrial Equipment Operator Training
- Powered Industrial Equipment (PIE) Checklist
- Powered Industrial Equipment Overview Quiz
- Licensed Powered Industrial Equipment Operators Log
- Powered Industrial Equipment Driving Test
- Powered Industrial Equipment Operator's License

REGAL

**6.0 Revisions:**

| Revision | Date | Change |
|---|---|---|
| 1 | 2-27-13 | Added the PIE Checklist |
| 2 | 3-28-13 | Section 3.3 added New Hire training requirements. Section 3.20 added Contractor PIE qualification requirements. |
| 3 | 4-26-13 | Added a new section 3.0 Medical Screening. |

St. Elizabeth HEALTHCARE
Business Health Services

*"Partnering for Employee Health and Productivity"*

# Occupational Evaluation

Date: 02/10/2015

Company: Emerson Power Transmission Position Applying For: ______________

Name: Sheila Jackson DOB: [redacted]

This applicant had a ********** physical examination in our office on 01/15/2015. The recommendation is based on available medical information and the results of the physical examination.

☐ This individual can perform the essential functions of the job. There is no anticipated need for special considerations or accommodations for this individual. The applicant was advised of any medical findings and was advised to seek appropriate medical care.

☐ This individual can perform the essential functions of the job with the following recommended accommodations.

- ☐ No operation of powered industrial vehicles until vision is adequately corrected.
- ☐ Prescription medication use may adversely affect performance of safety sensitive work.
- ☐ I recommend the following restrictions and/or accommodations:

☐ This individual cannot perform the essential job functions and no reasonable accommodation can be made.

☐ Based on a significant risk of substantial harm, this individual poses a direct threat to the health or safety of himself/herself and/or others that cannot be reduced or eliminated by reasonable accommodations.

☑ Additional medical information has not been received concerning this individual. Physical results are incomplete.

If you have any questions concerning this examination do not hesitate to contact us. Thank you for allowing us to assist you in this matter.

Brent Haskell, MD



St Elizabeth Business Health - Mt Zion
10095 Investment Way, Suite 2
Florence, KY 41042
Phone: (859) 301-9050
Fax: (859) 301-9055

www.stelizabeth.com/businesshealth

KENTUCKIANA COURT REPORTERS
Date 6-26-17
Reporter KB Exhibit # 5
Case 2:16-cv-00134-DLB-CJS
Deponent Sheila Jackson

St. Elizabeth HEALTHCARE
Business Health Services

*"Partnering for Employee Health and Productivity"*

01/15/2015

Emerson Power Transmission
7120 New Buffington Road
Florence, KY 41042

Dear Valued Client,

This is to inform you that ___Sheila Jackson___ was seen for a physical examination on 01/15/2015. The examination has been placed on medical hold pending receipt of additional information concerning this individual. The patient has been instructed to provide the requested documentation within two weeks in order for the provider to make a medical determination. If the information is not received within the time allotted the physical results will be reported as incomplete.

Please feel free to contact St Elizabeth Business Health - Mt Zion (859) 301-9050 if you have any questions.

Sincerely,
Business Health Center
St. Elizabeth Healthcare

#1112 Rev 02/2012

St. Elizabeth PHYSICIANS

Patrica Abello M.D
Noreen Durrani M.D
Kenneth Glavan M.D
M. Ryan Moon M.D
Heidi Murley M.D
Magued Khouzam M.D
Susan Yelich M.D

General & Laparoscopic Surgery

## Fax Cover Sheet

Send To:

Attention:

Office Location:

Fax Number:

(859) 727 5215

From: DR. MOON'S OFFICE

Office Location: Edgewood

Phone Number: 859-578-5880

Total Number of pages including cover:

2

Comments:

Regarding Sheila Jackson
Jan 16 2015

20 Medical Village Dr. Suite 132 / Edgewood, KY 41017 Phone: 859-578-5880

Privileged & Confidential – The information contained in this facsimile is privileged and confidential medical information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipients, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any examination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via the U.S. postal service. Your message will be reimbursed for any telephone and postage expenses incurred.

Notice of Prohibition On Disclosure – The information contained in this facsimile is protected by federal and/or state confidentiality laws. These laws prohibit you from making any further disclosure of this information unless further disclosure is expressly permitted by the written consent of the person to whom it pertains or otherwise permitted by law. In the event that you receive a request for any or all of the information transmitted with this communication, that request must be referred to St. Elizabeth Medical Center. A disclosure that violates federal or state law may subject you to civil liability or criminal penalties

St. Elizabeth
PHYSICIANS

20 Medical Village Drive Ste 132 | Edgewood KY 41017-5406
Phone: 859-578-5880 | Fax: 859-578-5881

January 16, 2015

Patient: **Sheila L Jackson**
Date of Birth: [redacted]
Date of Visit: **1/16/2015**

To Whom it May Concern:
Sheila Jackson is able to drive any Type of vehicles since she was release to go back to work without restrictions.
If you any questions please contact my office.

Sincerely,

M Ryan Moon, MD

St. Elizabeth
HEALTHCARE
Business Health Services

*"Partnering for Employee Health and Productivity"*

## Medical Condition Clarification

Date: 1-15-15

Name: Sheila Jackson Date of Birth: [redacted]

SS#: [redacted] Position Seeking: Forklift

Please provide the following information from your treating medical provider to the Business Health Center within two weeks.
**Medical Condition of concern** SURGERY- ALL MEDICAL RECORDS

1. Current diagnosis of your medical condition
2. The treatment you have received to date
3. The prognosis
4. Any relevant tests (include results)
5. List of any medications you are receiving and any restrictions arising from their use
6. Any restrictions or limitations that may limit your activities at home or at work and the time period during which those restrictions will be in effect
7. Any additional information that your medical provider thinks would help us to make our medical recommendation.

Please fax or bring this information to the Business Health Center.
**ATTENTION Dr.** HASKELL. Fax numbers are listed below.
It is important that you inform your medical provider about your expected job duties so that he/she can provide the most complete information to us.

**You may be unable to perform any work related duties until you provide the requested information.**

If you or your medical provider has any questions, feel free to contact the medical provider named above. Contact numbers are listed below. After the requested information is provided, you will be contacted if additional medical information is required.

Comments:

Thank you,
St. Elizabeth Business Health Center

| Business Health - Hebron | Business Health - Mt. Zion | Business Health - Edgewood |
| --- | --- | --- |
| 2200 Conner Rd. | 10095 Investment Way | 200 Medical Village Drive |
| Hebron, KY 41048 | Florence, KY 41042 | Edgewood, KY 41017 |
| Phone (859) 344-2030 | Phone (859) 301-9050 | Phone (859) 301-2999 |
| Fax (859) 344-2027 | Fax (859) 301-9055 | Fax (859) 301-2997 |

www.stelizabeth.com/businesshealth

#1072 Rev. 06/2012

Power Transmission Solutions
7120 New Buffington Road
Florence, KY 41042
T 859 727 5251

February 11, 2015

I, Sheila Jackson, am being notified that I am being displaced from my 1st Shift Value Added Packer, Grade 5 position reporting to Jerry Oswald due to the inability to operate a powered industrial vehicle per the incomplete medical screening results. At this time, your options are:

To accept an open position that does not require the use of a powered industrial vehicle:

- 1st Shift Production Operator: Molding (Grade 3) reporting to Debbie Hilterbrand
- 3rd Shift Production Operator: Molding (Grade 3) reporting to Rob McQueen
- B/D Team Production Operator: Extrusion (Grade 3) reporting to Rob McQueen

To know that you have until February 11, 2016 to bid into another internal opportunity that does not require the operation of a powered industrial vehicle. Failure to bid and X take another opportunity before February 11, 2016, will result in you being placed into any open available job at the time. Should you refuse the placement, my employment will be terminated.

I confirm and understand the above. The option I choose is:

______ the open position of: ______________________________

__X__ Displacement

Sheila Jackson
Employee Signature — Date 2-13-15

Mike Tobin
Supervisor Signature — Date 2-13-15

Nicole George
Human Resources Signature — Date 2-13-15

KENTUCKIANA COURT REPORTERS
Date 6-26-17
Reporter KB Exhibit # 6
Case 2:16-CV-00134-DLB-CJS
Deponent Sheila Jackson

| Date | Position | Shift | Grade | Comments |
|---|---|---|---|---|
| 2/13/2015 | Production Operator - Stuffing | 1 | 3 | No Bids |
| 3/10/2015 | Team Lead (SP) | 1 | 7 | Interview Based - Unsure |
| 3/18/2015 | Process Technician II | 2 | 8 | Interview Based - Unsure |
| 3/23/2015 | Extrusion Set up Tech | B | 7 | No Bids |
| 3/23/2015 | Production Operator - Molding | 1 | 3/5 | Would have been successful candidate based on seniority |
| 3/23/2015 | Molding Set up Tech | 2 | 7 | No Bids |
| 3/30/3015 | Production Tech - Flex | 2 | 7 | No Bids |
| 4/7/2015 | Production Operator - Extrusion | A | 3 | No Bids |
| 4/7/2015 | Extrusion Set up Tech | A | 7 | No Bids |
| 4/7/2015 | Extrusion Set up Tech | D | 7 | Interview Based - Unsure |
| 4/22/2015 | Process Technician I/II | 2 | 5/8 | Interview Based - Unsure |
| 5/15/2015 | Distribution Clerk | 1 | 3 | Would have been successful candidate based on seniority |
| 6/4/2015 | Production Tech - Flex | 1 | 5 | Would have been successful candidate based on seniority |
| 6/4/2015 | Production Operator - Molding | 2 | 3/5 | No Bids |
| 7/6/2015 | Production Operator - Molding | 2 | 3/5 | No Bids |
| 7/6/2015 | Extrusion Set up Tech | D | 7 | No Bids |
| 7/6/2015 | Production Operator - Asseembly | 2 | 3 | No Bids |
| 7/6/2015 | Process Tech II | 1 | 8 | Interview Based - Unsure |
| 7/14/2015 | Extrusion Set up Tech | A,B,D | 7 | Interview Based - Unsure |
| 8/10/2015 | Production Tech - Flex | 1 | 5 | No Bids |
| 8/10/2015 | Distribution Clerk | 1 | 3 | Would have been successful candidate based on seniority |
| 8/24/2015 | Distribution Services - Team Lead | 1 | 7 | Interview Based - Unsure |
| 10/14/2015 | Production Tech - Flex | 2 | 5 | Would have been successful candidate based on seniority |
| 10/14/2015 | Extrusion Set up Tech | B, D | 7 | Interview Based - Unsure |
| 11/3/2015 | Production Operator - Asseembly | 1 | 3 | Would have been successful candidate based on seniority |
| 11/11/2015 | Production Operator - Molding | 1 | 3/5 | No Bids |
| 11/11/2015 | Extrusion Set up Tech | C | 7 | Interview Based - Unsure |
| 12/8/2015 | Set up Tech - Molding | 1 | 7 | Interview Based - Unsure |
| 12/28/2015 | Production Operator - Molding | 1,2,3 | 3/5 | Would have been successful candidate based on seniority |
| 1/5/2016 | Production Operator - Stuffing | 1 | 3 | No Bids |
| 1/5/2016 | Production Operator - Molding | 3 | 3/5 | No Bids |
| 1/15/2016 | Production Operator - Molding | 2 | 3/5 | No Bids |
| 1/28/2016 | Set up Tech - Molding | 3 | 7 | No Bids |

KENTUCKIANA COURT REPORTERS
Date 6-26-17
Reporter KB Exhibit # 7
Case 2:16-cv-00134-DLB-CJS
Deponent Sheila Jackson

# Power Transmission Solutions
# Florence, Kentucky

**Position:** Production Technician

**Number of Positions:** 1 (one)

**Department:** Flex

**Grade:** Grade Level 5

**Hours:** 7:00am – 3:30pm (1st shift)

**Supervisor:** Tim Fincham

**Educational Requirements:** High School diploma or equivalent

**Purpose of position:**

- Performs progressive assembly, manual machining and floor erecting operations. Sets up and operates various types of machine and hand held machine tools. Performs necessary hand operations such as filing, fitting, scraping, etc. Works from blueprints, routings and bills of material. Plans, lays out, and performs the varied operations to meet customer specification. Must work with materials where cosmetic appearance is extremely important.

**Position Description:**

- Ability to operate all general machines to accomplish daily production goals.
- Must read blueprints, sketches, drawings, manuals, specifications, or sample part to determine dimensions of finished work piece, sequence of operations, and setup requirements.
- Measures, marks, and scribes dimensions and reference points on material or work piece as guides for subsequent machining and assembly.
- Selects, aligns, and secures holding fixtures, cutting tools, attachment accessories, and materials on machines.
- Verifies conformance of component work pieces to specifications.
- Fits and assembles parts into complete assembly.
- Verifies dimensions and alignment of assembly.
- Confers with engineers, production personnel, or other responsible to resolve machining and assembly problems.
- Maintains efficiency of production and inventory.
- Must be able to effectively communicate (verbally and written) in a business, professional manner with internal and external staff and/or customers.

**Required Qualifications:**

- Min. 3+ years plastics / metal / machining manufacturing environment experience, demonstrated ability to read and understand prints, drawings, schematics, proficient use of measurement instruments (scales, calipers, protractor, etc.) have proficient basic mathematical skills.

**Physical Demands:**

- Responsibilities require prolong periods of time sitting, standing, pushing, pulling, lifting, bending, standing, seeing, talking, hearing, walking, stooping, reaching, and walking up stairs or ladders. Must be able to lift up to 70 lbs.

**Special Skills\Requirements:**

- Ability and demonstrated experience with mechanical aptitude, skills. Must be able to work independently or in a team environment, accomplishing the daily work goals.

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (72 hours)

| | | | |
|---|---|---|---|
| Date Posted: | 4/28/16 | Time: | 10:00am |
| Removal Date: | 5/3/16 | Time: | 10:00am |

EMERSON
Industrial Automation

# Power Transmission Solutions
# Florence, Kentucky

| | |
|---|---|
| **Number of Positions:** | Position(s) – 1 (one) |
| **Position:** | **Production Operator** |
| **Shift:** | 3:00pm – 11:30pm (2nd shift) |
| **Grade:** | Hourly – Labor Grade 3 |
| **Department:** | Solus Production – Assembly |
| **Supervisor:** | Connie Hand |
| **Educational Requirements:** | Must have High school or equivalent |
| **Purpose of position:** | Serve as a team member performing multi-tasked duties as required to produce quality parts. These tasks include but are not limited to light assembly, injection molding, and guide rail assembly. |

**Position Description:**

- Setup and operate as required to produce quality parts.
- Read and interpret oral, written and visual instruction for operation and setup.
- Monitor machine performance and make adjustments as necessary.
- Monitor quality of parts using visual and inspection techniques.
- Perform daily housekeeping duties as required to keep entire work area clean and organized.
- Actively participate in group problem solving and continuous improvement techniques.
- Assist others as required.
- Rotate job assignments as required to assure cross-functional training of the group.
- Communicate status of operations to co-workers at shift change on a daily basis.
- Actively participate in the development and attainment of group goals.
- Other work related duties as assigned.

**Physical Demands**

- Extensive use of machinery, hand tools, walking, stooping, sitting, standing, reaching, lifting up to 70 pounds.

**Special Skills\Requirements:**

- Able to understand, interpret and carry out job instructions.
- Able to indentify dimensions and tolerances from drawings.
- Able to convert decimals to fractions and vice versa.
- Able to add and subtract decimals and fractions.
- Able to accurately measure parts using micrometers, calipers, scale, etc.

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (72 hrs)

| | | | |
|---|---|---|---|
| Date Posted: | 9/16/14 | Time: | 10:30am |
| Removal Date: | 9/19/14 | Time: | 10:30am |

# Power Transmission Solutions
# Florence, Kentucky

**Number of Positions:** Position(s) – 1 (one)

**Position:** **Production Operator**

**Shift:** 7 a.m. to 3:30 p.m. – 1st shift

**Grade:** Hourly – Labor Grade 3

**Department:** Solus Production – Stuffing

**Supervisor:** Debbie Hilterbrand

**Educational Requirements:** Must have High school or equivalent

**Purpose of position:** Serve as a team member performing multi-tasked duties as required to produce quality parts. These tasks include but are not limited to light assembly, injection molding, and guide rail assembly.

**Position Description:**

- Setup and operate as required to produce quality parts.
- Read and interpret oral, written and visual instruction for operation and setup.
- Monitor machine performance and make adjustments as necessary.
- Monitor quality of parts using visual and inspection techniques.
- Perform daily housekeeping duties as required to keep entire work area clean and organized.
- Actively participate in group problem solving and continuous improvement techniques.
- Assist others as required.
- Rotate job assignments as required to assure cross-functional training of the group.
- Communicate status of operations to co-workers at shift change on a daily basis.
- Actively participate in the development and attainment of group goals.
- Other work related duties as assigned.

**Physical Demands**

- Extensive use of machinery, hand tools, walking, stooping, sitting, standing, reaching, lifting up to 70 pounds.

**Special Skills\Requirements:**

- Able to understand, interpret and carry out job instructions.
- Able to indentify dimensions and tolerances from drawings.
- Able to convert decimals to fractions and vice versa.
- Able to add and subtract decimals and fractions.
- Able to accurately measure parts using micrometers, calipers, scale, etc.

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (72 hours)

| | | | |
|---|---|---|---|
| Date Posted: | 1/5/16 | Time: | 8:30am |
| Removal Date: | 1/8/16 | Time: | 8:30am |

# Power Transmission Solutions
# Florence, Kentucky

**Number of Positions:** Position(s) –1 (one)

**Position:** **Production Operator**

**Shift:** 3:00pm – 11:45pm

**Grade:** Hourly – Labor Grade 3/5**

**Department:** Solus Production – Injection Molding

**Supervisor:** Connie Hand

**Educational Requirements:** Must have High school or equivalent

**Purpose of position:** Serve as a team member performing multi-tasked duties as required to produce quality parts. These tasks include but are not limited to light assembly, injection molding, and guide rail assembly.

**Position Description:**

- Setup and operate as required to produce quality parts.
- Read and interpret oral, written and visual instruction for operation and setup.
- Monitor machine performance and make adjustments as necessary.
- Monitor quality of parts using visual and inspection techniques.
- Perform daily housekeeping duties as required to keep entire work area clean and organized.
- Actively participate in group problem solving and continuous improvement techniques.
- Assist others as required.
- Rotate job assignments as required to assure cross-functional training of the group.
- Communicate status of operations to co-workers at shift change on a daily basis.
- Actively participate in the development and attainment of group goals.
- Other work related duties as assigned.

**Physical Demands**

- Extensive use of machinery, hand tools, walking, stooping, sitting, standing, reaching, lifting up to 70 pounds.

**Special Skills\Requirements:**

- Able to understand, interpret and carry out job instructions.
- Able to indentify dimensions and tolerances from drawings.
- Able to convert decimals to fractions and vice versa.
- Able to add and subtract decimals and fractions.
- Able to accurately measure parts using micrometers, calipers, scale, etc.

** Must meet and demonstrate ALL qualifications to progress to grade 5

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (72 hours)

| | | | |
|---|---|---|---|
| Date Posted: | 9/7/16 | Time: | 9:00am |
| Removal Date: | 9/12/16 | Time: | 9:00am |

# Power Transmission Solutions
# Florence, Kentucky

**Number of Positions:** Position(s) – 1 (one)

**Position:** **Production Operator**

**Shift:** 7:00am – 7:00pm (Team A)

(Will be on 24/7 rotation)
Hourly – Labor Grade 3

**Department:** Solus Production – Extrusion

**Supervisor:** Debbie Hilterbrand / Connie Hand

**Educational Requirements:** Must have High school or equivalent

**Purpose of position:** Serve as a team member performing multi-tasked duties as required to produce quality parts. These tasks include but are not limited to light assembly, injection molding, and guide rail assembly.

**Position Description:**

- Setup and operate as required to produce quality parts.
- Read and interpret oral, written and visual instruction for operation and setup.
- Monitor machine performance and make adjustments as necessary.
- Monitor quality of parts using visual and inspection techniques.
- Perform daily housekeeping duties as required to keep entire work area clean and organized.
- Actively participate in group problem solving and continuous improvement techniques.
- Assist others as required.
- Rotate job assignments as required to assure cross-functional training of the group.
- Communicate status of operations to co-workers at shift change on a daily basis.
- Actively participate in the development and attainment of group goals.
- Other work related duties as assigned.

**Physical Demands**

- Extensive use of machinery, hand tools, walking, stooping, sitting, standing, reaching, lifting up to 70 pounds.

**Special Skills\Requirements:**

- Able to understand, interpret and carry out job instructions.
- Able to indentify dimensions and tolerances from drawings.
- Able to convert decimals to fractions and vice versa.
- Able to add and subtract decimals and fractions.
- Able to accurately measure parts using micrometers, calipers, scale, etc.

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (72 hours)

| | | | |
|---|---|---|---|
| Date Posted: | 4/7/15 | Time: | 10:00am |
| Removal Date: | 4/10/15 | Time: | 10:00am |

EMERSON
Industrial Automation

# Power Transmission Solutions
# Florence, Kentucky

**Position:** **Process Technician III**

**Grade:** Hourly – Labor Grade 8

**Number of Positions:** Position(s) – 1(one)

**Department:** Kop-Flex

**Projected Start Date:** August 22nd – September 22nd

**Supervisor:** Bill Lynne

**Shift:** 1st shift (7:00am – 3:30pm)

**Educational Requirements:** Must have High School Diploma or equivalent

**Experience:** Over 3 years

****RESUME REQUIRED****

**Purpose of Position:** Performs setups, machine adjustments, minor repairs, test, calibrate and operate CNC and manual machinery and other equipment related to production. Involved with implementations programs to minimize production change over's and machine down time.

**Position Description:**

- Read and interpret complex oral, written and visual instructions for machine set up.
- Set up machines or cells of machines according to instructions or established practice.
- Ensure proper tools and set up sheet is used.
- Make checks, adjust tools and program parameters to maintain proper dimensions, maintain proper coolant and lubrication levels as required.
- Operate designated machines as instructed.
- Break down set ups and clean up work area as directed
- Responsible for creating, saving and establishing a set up sheet. Programs will be stored on the network for future use.
- Obtain first piece inspection when runs are more then 3 pieces.
- Responsible for approving set-up based on measurements made at the cell.
- Report equipment malfunctions, material discrepancies, and unusual conditions to supervisor.
- Complete all relevant training provided by Power Transmission Solutions.
- Maintain safe and clean work area.
- Promote team concept and train new employees.
- Adhere to all safety procedures.
- Understand and adhere to all relevant ISO 9001 QOP's and API 671 guidelines.
- Perform any other related duties as directed

**Special Skills / Physical Requirements:**

- Able to understand, interpret and carry out job instructions.
- Able to use arithmetic, decimals and fractions
- Complex products, machines, programming and processes such as heat treat, gear cutting, grinding, complex turning and milling utilizing multiple machine axis.
- Must be able to lift up to 55 lbs.
- Must be able to stand and/or walk for long periods of time

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (48 hours)

| | | | |
|---|---|---|---|
| Date Posted: | | Time: | |
| Removal Date: | | Time: | |

Maysville (72 hours)

| | | | |
|---|---|---|---|
| Date Posted: | | Time: | |
| Removal Date: | | Time: | |

EMERSON
Industrial Automation

# Power Transmission Solutions
# Florence, Kentucky

**Position:** **Process Technician I/II** **Grade:** Hourly – Labor Grade 5/8

**Number of Positions:** Position(s) – (8) eight **Department:** Kop-Flex

**Supervisor:** Adam Berger

**Shift:** 2nd shift (3:15pm – 11:45pm)

**Educational Requirements:** Must have High School Diploma or equivalent

**Experience:** Over one year up to and including 18 months ****RESUME REQUIRED****

**Purpose of Position:** Performs setups, machine adjustments, minor repairs, test, calibrate and operate CNC and manual machinery and other equipment related to production. Involved with implementations programs to minimize production change over's and machine down time.

**Position Description:**

- Read and interpret complex oral, written and visual instructions for machine set up.
- Set up machines or cells of machines according to instructions or established practice.
- Ensure proper tools and set up sheet is used.
- Make checks, adjust tools and program parameters to maintain proper dimensions, maintain proper coolant and lubrication levels as required.
- Operate designated machines as instructed.
- Break down set ups and clean up work area as directed
- Responsible for creating, saving and establishing a set up sheet. Programs will be stored on the network for future use.
- Obtain first piece inspection when runs are more then 3 pieces.
- Responsible for approving set-up based on measurements made at the cell.
- Report equipment malfunctions, material discrepancies, and unusual conditions to supervisor.
- Complete all relevant training provided by Power Transmission Solutions.
- Maintain safe and clean work area.
- Promote team concept and train new employees.
- Adhere to all safety procedures.
- Understand and adhere to all relevant ISO 9001 QOP's and API 671 guidelines.
- Perform any other related duties as directed.

**Special Skills / Physical Requirements:**

- Able to understand, interpret and carry out job instructions.
- Able to use arithmetic, decimals and fractions
- Complex products, machines, programming and processes such as gear cutting, grinding, complex turning and milling utilizing multiple machine axis.
- Must be able to lift up to 70 lbs.
- Must be able to stand and/or walk for long periods of time

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (72 hours)

| | | | |
|---|---|---|---|
| Date Posted: | 11/13/14 | Time: | 10:00am |
| Removal Date: | 11/18/14 | Time: | 10:00am |

# Power Transmission Solutions
# Florence, Kentucky

| | |
|---|---|
| **Number of Positions:** | Position(s) - 1 (one) |
| **Position:** | Distribution Clerk |
| **Shift:** | 8:00 am – 5:00 pm |
| **Grade:** | Hourly – Labor Grade 3 |
| **Department:** | Distribution Office<br>Reports to Kathy Hibbard |
| **Educational Requirements:** | Must have High School Diploma or equivalent |
| **Purpose of position:** | Maintain document files and provide administrative support |
| **Position Description:** | • Input, maintain and retrieve documents utilizing Trade Automation and Smart Search software<br>• Assist Regal Logistics and Trade Compliance with document retrieval<br>• Order Completion Distribution Clerk duties as required<br>• Provide administrative support for Shipping Supervisors<br>• All other duties as assigned by manager |
| **Special Skills\Requirements:** | • Attention to detail<br>• Strong communication skills<br>• Efficient data entry and PC skills |
| **Physical Requirements:** | • Must be able to lift up to 70 lbs.<br>• Must be comfortable with heights up to 20 ft.<br>• Must be able to stand and / or walk for long periods of time |

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (72 hours)

| | | | |
|---|---|---|---|
| Date Posted: | 8/8/16 | Time: | 8:00am |
| Removal Date: | 8/11/16 | Time: | 8:00am |

# Power Transmission Solutions
# Florence, Kentucky

**Number of Positions:** Position(s) – 1 (one)

**Position:** Team Leader

**Shift:** 7:00am – 3:30pm (1st shift)

**Grade:** Hourly – Labor Grade 7

**Department:** Production-Solus

**Supervisor:** Tim Fincham

**Educational Requirements:** Must have High School Diploma or equivalent

**Purpose of position:**

- Coordinate activities in assigned area of responsibility
- Advisor, counselor, and trainer for area of responsibility
- Maintain service levels and promote customer satisfaction
- Anticipate and avoid operational problems

**Position Description:**

- Perform all duties as assigned by Supervisor
- Perform all functions of jobs in department
- Help resolve problems by working with support areas
- Keep the flow of work moving in a positive direction
- Coordinate training new personnel
- Monitor employee performance
- Utilize proper care of equipment, observe good housekeeping practices and prescribed safety precautions.

**Special Skills\Requirements:**

- Good leadership and communication skills
- Ability to anticipate and avoid potential operational problems
- Ability to read and interpret special instructions
- **Resume required**

**Physical Requirements:**

- Must be able to lift up to 70 lbs.
- Must be comfortable with heights up to 20 ft.
- Must be able to stand and / or walk for long periods of time

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (72 hours)

| | | | |
|---|---|---|---|
| Date Posted: | 4/15/16 | Time: | 10:00am |
| Removal Date: | 4/20/16 | Time: | 10:00am |

# Power Transmission Solutions
# Florence, Kentucky

**Number of Positions:** Position(s) - 1 (one)
**Position:** Distribution Services Team Lead
**Shift:** 7:30 am – 4:30 pm
**Grade:** Hourly – Labor Grade 7
**Department:** Distribution Services
Reports to Kathy Hibbard
**Educational Requirements:** Must have High School Diploma or equivalent

**Purpose of position:**

- Coordinate activities in assigned area of responsibility
- Advisor, counselor, and trainer for area of responsibility
- Maintain service levels and promote customer satisfaction
- Anticipate and avoid operational problems

**Position Description:**

- Perform all functions of jobs in department as required
- Help resolve problems by working with support areas
- Provide support and direction to the Distribution International and Domestic Clerks
- Correspond with Customer Service/Transportation & Logistics
- All other duties as assigned by manager

**Special Skills\Requirements:**

- Self Motivated
- Efficient in analyzing and prioritizing tasks
- Attention to detail
- Strong communication skills
- Effective problem solving skills
- Strong data entry and PC skills
- Proficient in Excel and Word
- CSW and Control II system knowledge
- Flexible work schedule
- Excellent attendance
- **Resume Required**

**Physical Requirements:**

- Must be able to lift up to 70 lbs.
- Must be comfortable with heights up to 20 ft.
- Must be able to stand and / or walk for long periods of time

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (72 hours)

| | | | |
|---|---|---|---|
| Date Posted: | 8/24/15 | Time: | 9:00am |
| Removal Date: | 8/27/15 | Time: | 9:00am |

# Power Transmission Solutions
## Florence, Kentucky

| | |
|---|---|
| **Number of Positions:** | Position(s) – 1 (one) |
| **Position:** | Set-Up Technician |
| **Shift:** | 11:00pm – 7:30am (3rd shift) |
| **Grade:** | Hourly – Labor Grade 7 |
| **Department:** | Molding (Solus) |
| **Supervisor:** | Daniel Thompson |
| **Educational Requirements:** | Must have High School Diploma or equivalent |

**Purpose of position:**

- Maintain service levels and promote customer satisfaction

**Position Description:**

- Perform all duties as assigned by Supervisor
- Perform all functions of jobs in department
- Help resolve problems by working with support areas
- Keep the flow of work moving in a positive direction
- Utilize proper care of equipment, observe good housekeeping practices and prescribed safety precautions.
- Maintain high level of safety awareness in work area while performing tasks

**Special Skills\Requirements:**

- Blueprint reading
- Ability to use measurement tools (i.e. – calipers, micrometers, gauges as required)
- Ability to anticipate and avoid potential operational problems
- Ability to read and interpret special instructions
- **Resume required**

**Physical Requirements:**

- Must be able to lift up to 70 lbs.
- Must be comfortable with heights up to 20 ft.
- Must be able to stand and / or walk for long periods of time

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (72 hours)

| Date Posted: | 1/28/16 | Time: | 9:00am |
|---|---|---|---|
| Removal Date: | 2/2/16 | Time: | 9:00am |

# Power Transmission Solutions
# Florence, Kentucky

**Number of Positions:** Position(s) – 1 (one)

**Position:** Set-Up Technician

**Shift:** 7:00am – 7:00pm (Team A)

(Will be on 24/7 rotation)

**Grade:** Hourly – Labor Grade 7

**Department:** Solus Production – Extrusion

**Supervisor:** Debbie Hilterbrand / Adam Berger

**Educational Requirements:** Must have High School Diploma or equivalent

**Purpose of position:**

- Maintain service levels and promote customer satisfaction

**Position Description:**

- Perform all duties as assigned by Supervisor
- Perform all functions of jobs in department
- Help resolve problems by working with support areas
- Keep the flow of work moving in a positive direction
- Utilize proper care of equipment, observe good housekeeping practices and prescribed safety precautions.
- Maintain high level of safety awareness in work area while performing tasks

**Special Skills\Requirements:**

- Blueprint reading
- Ability to use measurement tools (i.e. – calipers, micrometers, gauges as required)
- Ability to anticipate and avoid potential operational problems
- Ability to read and interpret special instructions
- **Resume required**

**Physical Requirements:**

- Must be able to lift up to 70 lbs.
- Must be comfortable with heights up to 20 ft.
- Must be able to stand and / or walk for long periods of time

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (72 hours)

| | | | |
|---|---|---|---|
| Date Posted: | 8/31/16 | Time: | 9:00am |
| Removal Date: | 9/6/16 | Time: | 9:00am |

February 2, 2016

At 3:30pm, Joe DeVillez and myself met with Sheila Jackson. We told her that we wanted to remind her that her displacement time was up on February 11. She said that she remembered. I told her at this point, the only non-interview positions available at this time were in SP Molding and that if those were the only option on the 11th, she would need to choose one of the openings. I asked her if she wanted me to set her up for a Medical Screening since it wasn't because she failed that they hadn't cleared her. She asked if they would need her medical history and I told her yes. They needed to understand her history so they could authorize her to be safe to operate PIE. We also reiterated that we (Regal) do not see that, only St Elizabeth's has that information. She thought about it and I told her to give me an answer the next day. We asked her if she understood her options and she said yes.

February 3, 2016

At 3:05pm, Sheila stopped by to let me know that she was not interested in going for a medical screening.

KENTUCKIANA COURT REPORTERS Date 6-26-17 Reporter KB Exhibit # 8
Case 2:16-CV-00134-DLB-CJS
Deponent Sheila Jackson

KENTUCKIANA COURT REPORTERS Reporter KB Exhibit # 9
Case 2:16-cv-00134-DLB-CJS
Deponent Sheila Jackson

Power Transmission Solutions
7120 New Buffington Road
Florence, KY 41042
T 859 727 5251

February 11, 2016

Sheila Jackson,

Per the Displacement Agreement that you signed February 13, 2015, you understood that:

> you had until February 11, 2016 to bid into another internal opportunity that does not require the operation of a powered industrial vehicle. Failure to bid and take another opportunity before February 11, 2016, will result in you being placed into any open available job at the time. Should you refuse the placement, your employment will be terminated.

As of today, you have not bid into another position and you have elected not to go and get a medical screening that could have cleared you to operate a Powered Industrial Vehicle and have more opportunities within the facility.

At this time, your options are:

To accept an open position that does not require the use of a powered industrial vehicle:

- 1st Production Operator – Molding (Grade 3)
- 2nd Production Operator – Molding (Grade 3)
- 3rd Production Operator – Molding (Grade 3)
- Extrusion Set Up Tech - Team D (night) (Grade 7)
- 2nd shift CNC Operator - SP (Grade 7)

To refuse placement into an open position and terminate employment.

I confirm and understand the above. The option I choose is:

______ the open position of: ______________________________

______ Termination

______________________________ ____________
Employee Signature Date

[signature] 2-11-16
Supervisor Signature Date

[signature] 2/11/16
Human Resources Signature Date

*Employee has chosen not to accept an open position and will be terminated. Sheila elected not to sign the form. [signatures]

AD#1636914CA
Sheila Jackson

| | | |
|---|---|---|
| 7/6 | Production Operator - Molding | Grade 3/5 |
| | Set Up Tech Extrusion | Grade 7 |
| | Production Operator - Assembly | Grade 3 |
| | Process Tech II | Grade 8 |
| 7/14 | Set Up Tech Extrusion | Grade 7 |
| 8/10 | Production Tech - Flex | Grade 5 |
| | Distribution Clerk | Grade 3 |
| 8/24 | Distribution Services - Team Lead | Grade 7 |
| 10/14 | Production Tech - Flex | Grade 5 |
| | Set Up Tech Extrusion | Grade 7 |
| 11/3 | Production Operator - Assembly | Grade 3 |
| 11/11 | Production Operator - Molding | Grade 3/5 |
| | Set Up Tech Extrusion | Grade 7 |
| 12/8 | Set Up Tech - Molding | Grade 7 |
| | Production Operator - Molding | Grade 3/5 |
| 1/5 | Production Operator - Stuffing | Grade 3 |
| | Production Operator - Molding | Grade 3/5 |
| 1/15 | Production Operator - Molding | Grade 3/5 |
| 1/28 | Set Up Tech - Molding | Grade 7 |

* List of positions posted since July 2015 that did not require the use of a powered industrial vehicle.

EMERSON.
Industrial Automation

Power Transmission Solutions
Florence, Kentucky

| | |
|---|---|
| **Number of Positions:** | Position(s) – 2 (two) |
| **Position:** | Value Added Packer |
| **Shift:** | 7:00 a.m. to 3:30 p.m. – 1st shift |
| **Grade:** | Hourly – Labor Grade 5 |
| **Department:** | Distribution – Drive Kits |
| **Supervisor:** | Mike Tobias |
| **Educational Requirements:** | Must have High School Diploma or equivalent |

**Purpose of position:**

- Process specific customer orders which require special processing and a high degree of accuracy

**Position Description:**

- All duties as assigned by supervisor
- Determine special instructions/rules for customer
- Specific quality guidelines may require additional auditing, labeling, markings, etc.
- Report all questionable material or irregularities
- Follow established packing procedures

**Special Skills\Requirements:**

- High attention to detail
- Ability to read and follow specific instructions
- Good judgment

**Physical Requirements:**

- Must be able to lift up to 70 lbs.
- Must be comfortable with heights up to 20 ft.
- Must be able to stand and / or walk for long periods of time

***If you are interested and qualified for this position, please complete a Job Opportunity Form and return it to the Human Resource Department by the removal date.***

Florence (48 hours)

| | | | |
|---|---|---|---|
| Date Posted: | 6/5/2013 | Time: | 8:00am |
| Removal Date: | 6/7/2013 | Time: | 8:00am |

Maysville (72 hours)

| | | | |
|---|---|---|---|
| Date Posted: | 6/5/2013 | Time: | 8:00am |
| Removal Date: | 6/10/2013 | Time: | 8:00am |

KENTUCKIANA COURT REPORTERS
Date 6-26-17
Reporter KB Exhibit # 10
Case 2:16-CV-00134-DLB-CJS
Deponent Sheila Jackson

EMERSON POWER ...
Statement of Claim – Weekly Indemnity ...

*Directions:*
1. *Employee must complete Part A.*
2. *Employee's Physician must complete Part B.*
3. *Employee must return original form to Emerson Power Transmission Solutions.*

| Part A - Employee Information | Date of Birth |
|---|---|
| Employee's Name (first, middle, last) Sheila L. Jackson | [redacted] |
| Home Address (street, city, state, zip) 4210 Nolin Ct, Erlanger, KY | |
| Reason for Claim ☒ Illness ☐ Accident ☐ Pregnancy | |
| If Accident, please provide dates, place and how it happened: | |
| Was illness or accident work related? ☐ Yes ☒ No | |
| If yes, do not continue with this form and contact the EH&S Supervisor. | |
| Who is your treating Physician for this Claim? | |
| First Date of Absence | Estimated Return to Work Date |

*My signature below certifies the information provided above as true.*

Upon receipt of the original or a photocopy of this signed authorization, I authorize any; (Physician, Medical Practitioner, Hospital, Clinic, other medical or medical related facility, insurance or reinsurance company, medical information bureau, consumer reporting agency, employer, or third party administrator having information available as to my diagnosis, treatment and prognosis with respect to any physical or mental condition and/or treatment of me or my dependents and any other non-medical information of me or my dependents) to give my employer, third party administrator, plan administrator, or their legal representatives, any and all such information. I understand that information obtained under this authorization shall be used to determine my eligibility for coverage and benefits and that such information may be released to persons or organizations performing business or services in connection with the processing of this claim.

Eligibility of this benefit will begin when an employee misses 7 calendar days. If the minimum days absent requirement have not been met, payments are not eligible to begin.

If the illness or injury causing disability is believed to have been sustained as a result of the act of omission or a third party, I agree to reimburse the plan for the compensation received (to the extent of any benefit paid by the Plan) whether compensation is received through the course of litigation, settlement or otherwise.

Signature of Employee: Sheila Jackson

Date signed:

Return to Emerson Power Transmission Solutions - HR Dept, PO Box 728, Florence KY 41042

KENTUCKIANA COURT REPORTERS
Date 6-26-17 Exhibit # 11
Reporter KB
Case 2:16-CV-00134-DLB-CJS
Deponent Sheila Jackson

EMERSON POWER TRANSMISSION SOLUTIONS
Statement of Claim - Weekly Indemnity Instructions

**Part B - Physician's Statement**

Employee Name: Sheila Jackson

The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information" as defined by GINA, includes an individuals's family medical history, the results of an individual's or famuly member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

Nature of Illness, Accident or Pregnancy (Describe complications, if any) Colon Cancer found on Colonoscopy; Surgery to remove on 7/29/14 with 6-8 weeks to recover

Is Illness or Accident work related? ☐ Yes ☒ No

Date of 1st Treatment of the Illness or Accident: 7/14/14

If claim is due to pregnancy, give estimated date of delivery:

Please refer to the Patient's attached job description. What elements of the job is the Patient unable to perform?

- ☐ No lifting over ______lbs
- ☐ No pushing/pulling over ______lbs
- ☐ No driving of Power Industrial Vehicles
- ☐ Limit twisting at the waist to ______hrs/day
- ☐ Limit overhead work to ______hrs/day
- ☐ Limit bending to ______hrs/day
- ☐ Limit standing to ______ hrs/day
- ☐ Limit walking to ______ hrs/day
- ☐ Limited repetitive motion to ______times per hour
- ☐ No repetitive use of______
- ☐ No use of ladders
- ☐ No climbing of stairs
- ☐ No overhead work
- ☐ No squatting
- ☐ No bending
- ☐ No kneeling
- ☐ Sitting work only
- ☐ No balancing

NO WORK Approx 6 weeks

Please provide the dates the Patient has been continuously unable to perform work: Approx date

From: 7/29/14 To: 9/2/14

When is the next appointment to review the Patient's condition? Surgery 7/29/14

When should the the Patient be able to return to work? Approx 9/2/14

Have you discharged Patient? ☐ Yes ☒ No

Medical Provider's Printed Name M Ryan Moon MD

Medical Provider's Signature [signature] Date 7/18/14

Area of Concentration

Address 20 Medical Village Dr Ste 132 Edgewood Ky

Phone 859-578-5880 Fax 859-578-5881

Return to Emerson Power Transmission Solutions - HR Dept, PO Box 728, Florence KY 41042

# REQUEST FOR LEAVE UNDER THE FAMILY AND MEDICAL LEAVE ACT

Name: Sheila Jackson Date: 7-23-14

Job Title: Value Add Packer Supervisor: J. Oswalt

Time of Leave

I request the following days:

Leave Start Date: 7-29-14 Return to Work Date: 9-2-14

The reasons for requesting this time off are: Sick Leave

Benefits and Other Provisions

Leave when taken under the FMLA policy will be counted against the twelve (12) weeks allowed for employees as outlined in the Family and Medical Leave Fact Sheet.

If I am eligible for any paid leave (vacation, sick leave, floating holidays, etc.) I understand that I will be required to use this paid leave at the start of the leave.* I also understand that the remainder of the leave will be unpaid.

*Note: If you request a medical leave under FMLA and are eligible for A &S benefits or salary continuation, you will not be required to use any accrued vacation time for the length of the A & S benefit or salary continuation period.

I understand that my health care coverage will be continued during my leave, provided that I continue paying the employee portion of the premium. If some or all of my leave is unpaid, the premium is due on the 1st of each month. If payment is not made within 30 days of that date, I understand that my benefits may be discontinued.

I understand that if I do not return to work on the date indicated above or on the medical certification form I will be considered to have voluntarily terminated my employment with the company. In order to extend the FMLA leave, another medical certification must be received by the Company prior to the expiration of the initial leave, unless impossible under the circumstances. In any event, the employer must be contacted by you prior to expiration of the leave to avoid being considered a voluntary termination. Depending upon my reason for not returning, I may be required to reimburse the Company for the Company's portion of health care premiums paid during the leave.

I understand that if I fail to provide medical certification regarding the serious health condition for myself or a family member within fifteen (15) days after the request for a FMLA leave, all the absences associated with the leave will be counted against me pursuant to the absentee control policy.

I have read and fully understand the above provisions. I also certify that the answers to the questions set forth above are true to the best of my knowledge and belief. I understand that if I falsify information on this form it will be grounds for termination.

Signature: Sheila Jackson Date: 7-23-14

HR USE ONLY:

Date/pay code 7/29-8/4 21.25 hrs sick, 18.75 hrs vac ✓ 8/5-9/2: STD

Kronos ✓ Log____ Letter ✓ Supervisor ✓

# Designation Notice (Family and Medical Leave Act)

U.S. Department of Labor
Wage and Hour Division

U.S. Wage and Hour Division

OMB Control Number: 1235-0003
Expires: 2/28/2015

Leave covered under the Family and Medical Leave Act (FMLA) must be designated as FMLA-protected and the employer must inform the employee of the amount of leave that will be counted against the employee's FMLA leave entitlement. In order to determine whether leave is covered under the FMLA, the employer may request that the leave be supported by a certification. If the certification is incomplete or insufficient, the employer must state in writing what additional information is necessary to make the certification complete and sufficient. While use of this form by employers is optional, a fully completed Form WH-382 provides an easy method of providing employees with the written information required by 29 C.F.R. §§ 825.300(c), 825.301, and 825.305(c).

To: Sheila Jackson

Date: 8/4/14

We have reviewed your request for leave under the FMLA and any supporting documentation that you have provided. We received your most recent information on ______________________ and decided:

X Your FMLA leave request is approved. All leave taken for this reason will be designated as FMLA leave.

The FMLA requires that you notify us as soon as practicable if dates of scheduled leave change or are extended, or were initially unknown. Based on the information you have provided to date, we are providing the following information about the amount of time that will be counted against your leave entitlement:

X Provided there is no deviation from your anticipated leave schedule, the following number of hours, days, or weeks will be counted against your leave entitlement: 7/29 - 8/4: 21.25 hrs sick + 18.75 hrs vacation

____ Because the leave you will need will be unscheduled, it is not possible to provide the hours, days, or weeks that will be counted against your FMLA entitlement at this time. You have the right to request this information once in a 30-day period (if leave was taken in the 30-day period).

Please be advised (check if applicable):

____ You have requested to use paid leave during your FMLA leave. Any paid leave taken for this reason will count against your FMLA leave entitlement.

X We are requiring you to substitute or use paid leave during your FMLA leave.

____ You will be required to present a fitness-for-duty certificate to be restored to employment. If such certification is not timely received, your return to work may be delayed until certification is provided. A list of the essential functions of your position ___ is ___ is not attached. If attached, the fitness-for-duty certification must address your ability to perform these functions.

____ Additional information is needed to determine if your FMLA leave request can be approved:

____ The certification you have provided is not complete and sufficient to determine whether the FMLA applies to your leave request. You must provide the following information no later than ______________________ (Provide at least seven calendar days), unless it is not practicable under the particular circumstances despite your diligent good faith efforts, or your leave may be denied.

______________________________________________________________

(Specify information needed to make the certification complete and sufficient)

______________________________________________________________

____ We are exercising our right to have you obtain a second or third opinion medical certification at our expense, and we will provide further details at a later time.

____ Your FMLA Leave request is Not Approved.

____ The FMLA does not apply to your leave request.

____ You have exhausted your FMLA leave entitlement in the applicable 12-month period.

## PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT

It is mandatory for employers to inform employees in writing whether leave requested under the FMLA has been determined to be covered under the FMLA. 29 U.S.C. § 2617; 29 C.F.R. §§ 825.300(d), (e). It is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 10 – 30 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. DO NOT SEND THE COMPLETED FORM TO THE WAGE AND HOUR DIVISION.

EMERSON.
Industrial Automation

July 23, 2014

Dear Sheila Jackson,

Your medical certification for your application for FMLA has been received and is approved through 9/2/2014. Your claim is approved under the following parameters:

Period of Incapacity: 7/29/14 – 9/2/14
Frequency: N/A
Duration: N/A

Please be sure to follow call in policy when you need to take FMLA time by contacting your supervisor and identifying your leave as FMLA.

You are required to make every effort to schedule doctor's appointments outside of working hours or at the beginning or end of your shift.

Failure to follow the call-in rules or policy will result in those absences being treated as unexcused absences and counted against your attendance or discipline as set forth in the attendance policy.

You are also required to complete a request form (enclosed) each time you need to take FMLA. If you have any questions on how to fill out the form, when to return the form, or regarding the Company's rules or policy for calling in your absences, please contact the Human Resources Department to discuss so you fully understand your rights and obligations under the FMLA.

Sincerely,

Megan

Megan Lueke
HR Representative

Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act)

U.S. Department of Labor
Wage and Hour Division

OMB Control Number: 1235-0003
Expires: 2/28/2015

**SECTION I: For Completion by the EMPLOYER**

**INSTRUCTIONS to the EMPLOYER:** The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider. Please complete Section I before giving this form to your employee. Your response is voluntary. While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308. Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies.

859 727 5798

Employer name and contact: Megan Lucke, Emerson Power Transmission

Employee's job title: Value Added Packer Regular work schedule: M-F 8 hrs + overtime

Employee's essential job functions: ______

Check if job description is attached: ✓

**SECTION II: For Completion by the EMPLOYEE**

**INSTRUCTIONS to the EMPLOYEE:** Please complete Section II before giving this form to your medical provider. The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition. If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections. 29 U.S.C. §§ 2613, 2614(c)(3). Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request. 20 C.F.R. § 825.313. Your employer must give you at least 15 calendar days to return this form. 29 C.F.R. § 825.305(b).

Your name: SHEILA L JACKSON
First Middle Last

**SECTION III: For Completion by the HEALTH CARE PROVIDER**

**INSTRUCTIONS to the HEALTH CARE PROVIDER:** Your patient has requested leave under the FMLA. Answer, fully and completely, all applicable parts. Several questions seek a response as to the frequency or duration of a condition, treatment, etc. Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient. Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage. Limit your responses to the condition for which the employee is seeking leave. Please be sure to sign the form on the last page.

Provider's name and business address: M. Ryan Moon MD

Type of practice / Medical specialty: 20 Medical Village Dr. St 132 Edgewood Ky 41C

Telephone: (859) 578-5880 Fax: (859) 578-5881

CONTINUED ON NEXT PAGE

PART A: MEDICAL FACTS

1. Approximate date condition commenced: 6/29/14

Probable duration of condition: Approx 6-8 weeks after Surgery

Mark below as applicable:
Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
___No ✓ Yes. If so, dates of admission:

7/29/14 to approx 8/3/14

Date(s) you treated the patient for condition:

Consult 7/14/14, Surgery 7/29/14 and follow up care

Will the patient need to have treatment visits at least twice per year due to the condition? ___No ✓ Yes.

Was medication, other than over-the-counter medication, prescribed? ___No ✓ Yes.

Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
___No ✓ Yes. If so, state the nature of such treatments and expected duration of treatment:

Patient May be referred to oncology

2. Is the medical condition pregnancy? ✓ No ___Yes. If so, expected delivery date: ___

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

Is the employee unable to perform any of his/her job functions due to the condition: ___ No ✓ Yes.

If so, identify the job functions the employee is unable to perform:

No work 6-8 weeks after surgery

4. Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

Cancer found in Colon by gastroenterology physician. Surgery To remove Mass from colon on 7/29/14. Patient Needs approx 6 weeks to heal properly before attempting work.



CONTINUED ON NEXT PAGE

PART B: AMOUNT OF LEAVE NEEDED

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? ___No X Yes.

If so, estimate the beginning and ending dates for the period of incapacity: 7/29/14 to approx 9/21

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition? ___No ✓ Yes.

If so, are the treatments or the reduced number of hours of work medically necessary?
___No ✓ Yes.

Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

3-4 office visits follow surgery

Estimate the part-time or reduced work schedule the employee needs, if any:

_______ hour(s) per day; _______ days per week from _________ through _________

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? ___No ___Yes. unknown until after surgery

Is it medically necessary for the employee to be absent from work during the flare-ups?
___ No ___Yes. If so, explain:

Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

Frequency: ____ times per ____ week(s) ____ month(s)

Duration: ____ hours or ___ day(s) per episode

ADDITIONAL INFORMATION: IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER.



CONTINUED ON NEXT PAGE

**The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information" as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.**

Signature of Health Care Provider

Date 7/18/14

PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT

If submitted, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616; 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.

**EMERSON POWER TRANSMISSION**

**DISABILITY STATUS REPORT**

This is to certify that Sheila Jackson SS # [redacted] has been under my care for the following condition SIGMOID CARCINOMA. PROCEDURE PERFORMED LAPROSCOPIC HAND ASSISTED SIGMOID COLECTOMY

**EMPLOYMENT: (Please check all that apply)**

☐ May return to work-Normal Duty

☒ May return to work – Restricted Duty 9-2-14 FROM A SURGICAL STANDPOINT

☐ May not return to work

**RESTRICTIONS: (Please check all that apply)** UNTIL 10-1-14

| | | |
|---|---|---|
| ☑ No lifting over 40 lbs. | ☑ No pushing/pulling over 40 lbs. | ☐ Sitting work only |
| ☐ No prolonged standing/walking | ☐ No use ____ | ☐ No squatting/kneeling |
| ☐ No climbing | ☐ Limit repetitive bending | ☐ No driving equipment |
| ☐ No overhead work | ☐ Cast/splint/brace/crutches | ☐ #hrs per day ____ |

☐ No more than one repetitive motion every ____ minutes.

**Next Appointment Date:** ☐ Date: NONE

**Confirmed Return to Full Duty Date:** ☑ Date: 9-2-14

RYAN MOON MD
Name of Doctor

8-21-14
Date

**Please return all work status reports to Emerson Power Transmission Solutions, PO Box 728, Florence, KY 41042 or via fax at 859-727-5237.**

**Thank you!**

Rev. Apr 2012

Gave to patient 8-21-14

DOB [redacted]

EMERSON POWER TRANSMISSION

DISABILITY STATUS REPORT

This is to certify that SHEILA JACKSON SS # [redacted] has been under my care for the following condition [illegible]

EMPLOYMENT: (Please check all that apply)

☒ May return to work-Normal Duty ☐ May return to work – Restricted Duty

☐ May not return to work

9-23-14 PATIENT ACTUALLY GOING BACK ON 10-1-14 BUT TAKING VACATION ON 9-23 to 10-1-14

RESTRICTIONS: (Please check all that apply) NA

☐ No lifting over ____lbs. ☐ No pushing/pulling over ____lbs. ☐ Sitting work only

☐ No prolonged standing/walking ☐ No use ____________ ☐ No squatting/kneeling

☐ No climbing ☐ Limit repetitive bending ☐ No driving equipment

☐ No overhead work ☐ Cast/splint/brace/crutches ☐ #hrs per day ______

☐ No more than one repetitive motion every ______ minutes.

Next Appointment Date: ☐ Date: NONE

Confirmed Return to Full Duty Date: ☐ Date: ____________

RYAN MOON — Name of Doctor

9-4-14 — Date

Please return all work status reports to Emerson Power Transmission Solutions, PO Box 728, Florence, KY 41042 or via fax at 859-727-5237.

Thank you!

Rev. Apr 2013

OHC
SPECIALISTS IN CANCER AND BLOOD DISORDERS

OHC ROI
5053 Wooster Road
CINCINNATI OH 45226
Facesheet

JACKSON,SHEILA L
MRN: 01047109
DOB: [redacted] Sex: F

## Patient Demographics

| Name | Patient ID | SSN | Sex | Birth Date |
|---|---|---|---|---|
| Jackson, Sheila L | 01047109 | [redacted] | Female | [redacted] |

| Address | Phone | EMail | Employer |
|---|---|---|---|
| 4210 NOLIN COURT UNIT 5 ERLANGER KY 41018 | 859-443-6040 (H) 859-443-6040 (M) | refuse@ohcare.com | REGAL POWER TRANSMISSION |

| Reg Status | PCP | Date Last Verified | Next Review Date |
|---|---|---|---|
| ELAPSED | Wyenandt, Robert L Jr., MD859-212-0003 | 03/18/16 | 04/17/16 |

## Guarantor Information

| Guarantor | Address | DOB | Phone | Employer | Pat Rel to Guar | Employment Status |
|---|---|---|---|---|---|---|

## Primary Coverage

| Payor | Plan | Sponsor Code | Group Number | Group Name |
|---|---|---|---|---|
| UNITED HEALTHCARE | UHC CHOICE PLUS | | 905224 | |

## Primary Subscriber

| Subscriber ID | Subscriber Name | Subscriber SSN | Subscriber Address |
|---|---|---|---|
| 938155322 | JACKSON,SHEILA L | xxx-xx-0917 | 4210 NOLIN COURT UNIT 5 ERLANGER, KY 41018 |

## H&P by Flora, Daniel B, MD at 8/19/2014 5:18 PM

Author: Flora, Daniel B, MD
Filed: 8/19/2014 6:00 PM
Status: Signed

Service: (none)
Note Time: 8/19/2014 5:18 PM
Editor: Flora, Daniel B, MD (Physician)

Author Type: Physician
Note Type: H&P

OHC
SPECIALISTS IN CANCER
AND BLOOD DISORDERS

**HEMATOLOGY/ONCOLOGY CONSULTATION**

**8/19/2014 5:18 PM**

**REASON FOR CONSULT:** Newly dx colon cancer

**PROVIDERS:**
Wyenandt, Robert L Jr., MD



KENTUCKIANA COURT REPORTERS
Date 6-26-17
Reporter KB Exhibit # 12
Case 2:16-CV-00134-DLB-CJS
Deponent Sheila Jackson

**CHIEF COMPLAINT**

**Chief Complaint**
Patient presents with
- Colon Cancer

**HISTORY OF PRESENT ILLNESS**

**HPI:**
This patient is accompanied in the office by her self.

Ms Jackson is a very kind 52 year old female referred for consideration of adjuvant chemotherapy for recently dx colorectal cancer. She was initially found to have rectosigmoid mass on screening colonoscopy. She did not have symptoms at onset. Colonoscopy showed a 5-cm mass at 15-20cm. Biopsies confirmed adenocarcinoma. There was no evidence of "DNA mismatch repair deficiency" in other words the tumor is *microsatellite stable.*

She underwent on 7/29/14:

**LAPAROSCOPIC HAND ASSISTED SIGMOID COLECTOMY**
**RIGID SIGMOIDOSCOPY**
**MOBILIZATION OF SPLENIC FLEXURE**

Pathology revealed:

Diagnosis
Sigmoid colon, resection:
- Invasive adenocarcinoma, moderately differentiated, 2.1 cm.
- Tumor invades through the muscularis propria into the subserosal adipose tissue.
- Margins are negative for carcinoma.
- 23 lymph nodes, all negative for metastatic carcinoma

Ms Jackson is doing well overall although she is tearful and anxious today re: the prospect of chemotherapy etc.

**PAST MEDICAL HISTORY**

**Past Medical History**

| Diagnosis | Date |
|---|---|
| • Arthritis<br>*fingers* | |
| • Depression | |

**PAST SURGICAL HISTORY**

Past Surgical History

OHC
SPECIALISTS IN CANCER AND BLOOD DISORDERS

OHC ROI
5053 Wooster Road
CINCINNATI OH 45226
OHC NOTES REPORT

JACKSON,SHEILA L
MRN: 01047109
DOB: [redacted] Sex: F
Enc. Date: 08/15/14

**H&P by Flora, Daniel B, MD at 8/19/2014 5:18 PM (continued)**

| Procedure | Laterality | Date |
|---|---|---|
| • Foot surgery<br>*hammertoe* | Right | |
| • Colectomy<br>*LAPAROSCOPIC HAND ASSISTED SIGMOID COLECTOMY RIGID SIGMOIDOSCOPY ; Surgeon: Moon, M Ryan, MD; Location: EDG MAIN OR; Service: General* | N/A | 7/29/2014 |

## SOCIAL HISTORY:

History

Social History

| | |
|---|---|
| • Marital Status: | Single |
| Spouse Name: | N/A |
| Number of Children: | N/A |
| • Years of Education: | N/A |

Occupational History
- Not on file.

Social History Main Topics

| | |
|---|---|
| • Smoking status: | Never Smoker |
| • Smokeless tobacco: | Never Used |
| • Alcohol Use: | No |
| • Drug Use: | No |
| • Sexual Activity: | Not on file |

Other Topics | Concern
- Not on file

Social History Narrative
- No narrative on file

## FAMILY HISTORY:

**Family History**

| Problem | Relation | Age of Onset |
|---|---|---|
| • Cancer<br>*stomach* | Sister | |
| • High Blood Pressure | Paternal Uncle | |
| • Stroke | Paternal Uncle | |

## ALLERGIES:

**Allergies as of 08/15/2014 - Verified 08/11/2014**

| Allergen | Reaction | Noted |
|---|---|---|
| • Tramadol | Nausea Only, Anxiety, and | 07/14/2014 |

Palpitations

**MEDICATIONS:**

**Current Outpatient Prescriptions on File Prior to Visit**

| Medication | Sig | Dispense | Refill |
|---|---|---|---|
| • fUROsemide (LASIX) 20 mg tablet | Take 1 Tab by mouth daily for 30 days. | 30 Tab | 0 |
| • multivitamin (THERAGRAN) tablet | Take by mouth daily. | | |
| • FEXOFENADINE HCL (ALLEGRA ORAL) | Take by mouth daily as needed. | | |
| • oxyCODONE-acetaminophen (PERCOCET) 5-325 mg per tablet | Take 1 Tab by mouth every 6 hours as needed for Pain. | 30 Tab | 0 |

No current facility-administered medications on file prior to visit.

Review of Systems
Constitutional: Negative for fever, chills, weight loss and malaise/fatigue.
HENT: Negative for sore throat and neck pain.
Eyes: Negative for photophobia.
Respiratory: Negative for cough, hemoptysis, shortness of breath and wheezing.
Cardiovascular: Negative for chest pain, orthopnea and PND.
Gastrointestinal: Negative for nausea, vomiting, abdominal pain and melena.
Genitourinary: Negative for dysuria, urgency and hematuria.
Musculoskeletal: Negative for back pain.
Skin: Negative for rash.
Neurological: Negative for dizziness, focal weakness, seizures, weakness and headaches.
Endo/Heme/Allergies: Does not bruise/bleed easily.
Psychiatric/Behavioral: Negative for depression.

Physical Exam
Constitutional: She is oriented to person, place, and time. No distress.
HENT:
Head: Normocephalic and atraumatic.
Mouth/Throat: Oropharynx is clear and moist.
Eyes: EOM are normal. Pupils are equal, round, and reactive to light. No scleral icterus.
Neck: No JVD present.
Cardiovascular: Regular rhythm, normal heart sounds and intact distal pulses.
No murmur heard.
Pulmonary/Chest: Effort normal and breath sounds normal. She has no wheezes. She has no rales.
Abdominal: Soft. Bowel sounds are normal. She exhibits no distension and no mass. There is no tenderness.
**Healing laparotomy wound, staples intact**
Musculoskeletal: Normal range of motion. She exhibits no edema and no tenderness.
Lymphadenopathy:
She has no cervical adenopathy.
Neurological: She is alert and oriented to person, place, and time. No cranial nerve deficit. Coordination normal.
Skin: Skin is warm and dry. No rash noted.
Psychiatric: She has a normal mood and affect.

**LABS:**

Lab Results

| Component | Value | Date |
|---|---|---|
| WBC | 6.8 | 8/4/2014 |
| HGB | 11.6* | 8/4/2014 |
| HCT | 33.9* | 8/4/2014 |
| MCV | 87.8 | 8/4/2014 |
| PLT | 252 | 8/4/2014 |

Lab Results

| Component | Value | Date |
|---|---|---|
| BUN | 12 | 8/5/2014 |
| CREATININE | 0.84 | 8/5/2014 |
| K | 3.8 | 8/5/2014 |

No results found for this basename: ALKPHOS, ALT, AST, BILITOT, BILIDIRECT, PROT

No results found for this basename: MG

No results found for this basename: URICACID

No results found for this basename: LDH

No components found with this basename: PT, INR

No results found for this basename: IRON, TIBC, FERRITIN

**IMAGING:**

No procedure found.

**STAGING:**

Colon cancer
Primary site: Colon and Rectum (Bilateral)
Staging method: AJCC 7th Edition
Pathologic: Stage IIA (T3, N0, cM0) signed by Flora, Daniel B, MD on 8/19/2014 5:38 PM

H&P by Flora, Daniel B, MD at 8/19/2014 5:18 PM (continued)

Summary: Stage IIA (T3, N0, cM0)

**ASSESSMENT**

Problem List Items Addressed This Visit

Oncology Problems
**Colon cancer - Primary**

Discussed diagnosis, prognosis and natural hx of stage II colon cancer with patient. She is tearful and anxious today and I provided reassurance that she has several good prognostic findings and we expect her to do well long-term.

We reviewed indications for chemotherapy and that the overall benefit of adjuvant treatment is probably no more than 5% in terms of overall survival. Her tumor (intial bx) showed microsatellite stability which is the only identifiable high risk feature for recurrence.

Based on our discussion the patient seems to be leaning towards observation rather than chemotherapy. Reviewed principles of Oncotype Dx risk assessment in MMR proficient tumors -- she is interested in reviewing that report before making any treatment decisions. We will send off Oncotype testing and see her back to continue discussion in 2 weeks.

Thanks Dr. Moon for referring Ms. Jackson to our office. Please call with any concerns.

Daniel B Flora, MD
513-304-6825

Encounter-Level PLAN OF CARE SCANS:

There are no encounter-level plan of care scans.

Progress Notes by Flora, Daniel B, MD at 8/29/2014 9:48 AM

Author: Flora, Daniel B, MD
Filed: 8/29/2014 10:12 AM
Status: Signed
Service: (none)
Note Time: 8/29/2014 9:48 AM
Editor: Flora, Daniel B, MD (Physician)
Author Type: Physician
Note Type: Progress Notes

OHC
SPECIALISTS IN CANCER
AND BLOOD DISORDERS

KENTUCKIANA Reporter KB Exhibit # 13
Case 2:16-CV-00134-DLB-CJS
Deponent Sheila Jackson

TRI-STATE GASTRO...

Tri-State Gastroenterology Associates
425 Centre View Boulevard
Crestview Hills, KY 41017
859-341-3575

# olonoscopy Report

| | | | |
|---|---|---|---|
| ite: | 08/03/2015 08:40 AM | | |
| tient Name: | **SHEILA L. JACKSON** | Gender: | Female |
| count #: | 126863 | DOB (age): | [redacted] |
| doscopist(s): | Karlina Patton, MD | Instrument(s): | C-11(1C688G262) |


Previous Surgery in the 15 cm


cecum appendiceal orifice


cecum ileo-cecal valve


Normal mucosa in the whole colon


Normal mucosa in the whole colon


Normal mucosa in the whole colon


Normal mucosa in the whole colon


Previous Surgery in the 15 cm


Previous Surgery in the 15 cm


Grade 2 external hemorrhoids

**eferring Physician:** Robert L. Wyenandt, MD
2156 Chamber Center Drive, Ft. Mitchell, KY 41017
(859) 341-6255 (phone)
(859) 547-1197 (fax)

**esthesia Provider:** Nanci Burton, CRNA (Nurse anesthetist)

**irse(s):** Alicia Schneider, RN, BSN (Pre-Procedure)
Laura Herbe, RN, BSN (Post-Procedure)
Sheila Prew, RN (Intra-Procedure)

**SA Class:** P2 - 08/03/2015 08:24:27 AM Nanci Burton

**story of Present Illness:**

IEILA has been assessed and approved for moderate sedation. The History and Physical was reviewed and no changes ere noted regarding medications, allergies or medical history. She had colon cancer resected in 2014 and her sister had

'on cancer

**ministered :dications:** propofol 200 mg IV

**dications:** Colon CA - Large Intestine: V10.05 - Z85.038
Colon CA, Family History: V16.0 - Z80.0
Surveillance due to prior colonic neoplasia (adenoma): V12.72 - Z86.010

**al Signs:**

| *ght (lbs/oz)* | *Height (ft/in)* | *BMI* |
|---|---|---|
| 9 / | 5 / 6 | 27.27 |

| *mHg)* | *Pulse (ppm)* | *Rhythm* | *Resp/min* | *Temp* | *SPO2 (%)* |
|---|---|---|---|---|---|
| 56/99 | 62 | Regular | 18 | 98 (F) | 98 |

**ysical Exam:**

*/sical exam was performed on 08/03/2015 at 08:39:26 AM.*

**ınstitutional:**

*Appearance:* well nourished,well-developed, well groomed, in no acute distress..

**IMT:**

*s/teeth/gums:* normal oral mucosa, lips and gums; good dentition.

*Oropharynx:* tongue mid line, normal movement, mucous membranes pink and moist, no oral lesions or exudate.

**:ck:**

*Neck:* normal ROM.

**spiratory:**

*Effort:* non labored, normal effort.

*Auscultation:* clear to ausculatation bilaterally; no wheezes, rhonchi or rales.

**ırdiovascular:**

*Auscultation:* normal rate and rhythm; normal S1 and S2; no murmurs, rubs or gallops.

**ıstrointestinal/Abdomen:**

*Abdomen:* flat, soft, nontender, nondistended, no hepatosplenomegaly, no guarding, no rebound, no masses, normal bowel sounds.

*Liver/Spleen:* no hepatosplenomegaly.

**ychiatric:**

*Orientation:* oriented to time, space and person.

*ɔod and affect:* no evidence of depression, anxiety or agitation.

**ocedure:**

ıe procedure, indications, preparation and potential complications were explained to the patient, who indicated ıderstanding and signed the corresponding consent forms. This is a/an high risk patient undergoing a Surveillance lonoscopy... MAC with IV sedation was administered by a nurse anesthetist / anesthesiologist. Continuous pulse oximetry, art rate and blood pressure monitoring was performed. Supplemental oxygen was used. The quality of preparation was lequate. Patient was placed in left lateral decubitus position. The colonoscope was introduced through the rectum and vanced under direct visualization until cecum, appendiceal orifice and ileo-cecal valve was reached The appendiceal orifice d the ileo-cecal valve were identified.. The colonoscope was retroflexed within the rectum. Careful visualization was rformed as the instrument was withdrawn. Patient tolerance to procedure was good. The procedure was not difficult. ɡital rectal exam was normal

**nitations/Complications:** There were no apparent limitations or complications

**ıdings:**

| | |
|---|---|
| *men* | Evidence of a previous end to end colorectal anastomosis was seen in the 15 cm. |
| *ıcosa* | Normal mucosa was noted in the whole colon. There were no AVMs, diverticula, polyps, masses, evidence of colitis or other abnormalities seen. Retroflexion of the scope in the rectum revealed no abnormalities. |
| *ıtruding lesions* | Medium non-bleeding grade 2 external hemorrhoids were noted. |

**ıpressions:**

- Normal mucosa in the whole colon.

- Previous Surgery in the 15 cm.
- Grade 2 external hemorrhoids.

ın: Follow up with Dr. Patton as needed
Colonoscopy in 3 years.
Continue home medications
Maintain a high fiber diet

rlina Patton, MD
ronically signed on 8/3/2015 8:40:19 AM by Karlina Patton, MD

St. Elizabeth HEALTHCARE

ST. ELIZABETH EDGEWOOD
One Medical Village Dr.
Edgewood KY 41017
IP Encounter Report

JACKSON,SHEILA L
MRN: 01047109
DOB: [redacted] Sex: F
Acct #: 809044161
Adm: 6/27/2014, D/C: 6/27/2014

**Admission Information - Hospital Account/Patient Record**

| | | | | | |
|---|---|---|---|---|---|
| Arrival Date/Time: | None | Admit Date/Time: | 06/27/2014 7:44 AM | IP Adm. Date/Time: | None |
| Admission Type: | Elective | Point of Origin: | Physician Or Clinic Referral | Admit Category: | None |
| Means of Arrival: | None | Primary Service: | None | Secondary Service: | None |
| Transfer Source: | Home | Service Area: | St. Elizabeth Service Area | Unit: | Edg Ct |
| Admit Provider: | None | Attending Provider: | Patton, Karlina, MD | Referring Provider: | Patton, Karlina, MD |

**Discharge Information - Patient Record Only**

| Discharge Date/Time | Discharge Disposition | Discharge Destination | Discharge Provider | Unit |
|---|---|---|---|---|
| 06/27/2014 11:59 PM | Home Or Self Care | None | None | Edg Ct |

**Allergies as of 6/27/2014** — Verified On: **6/27/2014** By: **Rulli, Kristie Sue, RT**

No Known Allergies

**Current Immunizations** — Reviewed on 3/18/2016

No immunizations on file.

**ED Arrival Information**

**Patient not seen in ED**

**ED Disposition**

None

**Encounter-Level ED Scans:**

There are no encounter-level ed scans.

**Order-Level ANESTHESIA SCANS:**

There are no order-level anesthesia scans.

**All Results (06/27/14 - 06/27/14)**

**CT ABDOMEN PELVIS W CONTRAST [6629036]** — Resulted: 06/27/14 0823, Result status: Final result

| | | | |
|---|---|---|---|
| Ordering provider: | Patton, Karlina, MD 06/27/14 0744 | Resulted by: | Hurst, Darren R, MD |
| Performed: | 06/27/14 0800 - 06/27/14 0801 | Resulting lab: | PACS |

Result details

Narrative: CT abdomen and pelvis with contrast

INDICATION: Abnormal colonoscopy. Rectal mass.

PROCEDURE:

CT abdomen and pelvis. 75 mL Isovue-320 intravenous contrast. No prior examinations for comparison.

The lung bases are unremarkable. The liver spleen pancreas adrenals and kidneys are unremarkable. The visualized bowel and mesentery are normal. There are no lytic or sclerotic bone lesions. No soft tissue lesions. No abdominal lymph node enlargement.



KENTUCKIANA COURT REPORTERS Date 6-26-17 Reporter KB Exhibit # 14
Case 2:16-cv-00134-DLB-CJS
Deponent Sheila Jackson

**All Results (06/27/14 - 06/27/14) (continued)**

**CT ABDOMEN PELVIS W CONTRAST [6629036] (continued)**

Resulted: 06/27/14 0823, Result status: Final result

Impression: IMPRESSION:

Essentially normal CT of the abdomen and pelvis.

**All Orders (06/27/14 - 06/27/14)**

**CT ABDOMEN PELVIS W CONTRAST [6629035]**

Electronically signed by: **Myers, Joyce, Clerical Sta on 06/23/14 1444**

Status: **Completed**

Ordering user: Myers, Joyce, Clerical Sta 06/23/14 1444 Ordering provider: Patton, Karlina, MD
Authorized by: Patton, Karlina, MD

Frequency: 06/27/14 0744 - 1 Occurrences
Diagnoses:
Family history of malignant neoplasm of gastrointestinal tract [V16.0 (ICD-9-CM)]

**SUMMARY**

No orders found for this encounter