**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**COVINGTON DIVISION**

| | | |
|---|---|---|
| **SHEILA JACKSON** | : | |
| | : | |
| **Plaintiff,** | : | **Case No.: 2:16-cv-00134** |
| | : | |
| **V.** | : | **Judge Bunning** |
| | : | |
| **REGAL BELOIT AMERICA, INC.** | : | **Magistrate Judge Smith** |
| | : | |
| **Defendant.** | : | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Comes now the Plaintiff, Sheila Jackson, by and through counsel, and for her Response to Defendant's Motion for Summary Judgment, states as follows:

## SUMMARY OF RELEVANT FACTS

Sheila Jackson ("Jackson") filed this lawsuit following her termination from employment with the Defendant on February 11, 2016. (Doc. 40, Pltf. Dep. p. 133); (Doc. 41, George Dep. p. 47). Prior to the Defendant ending her employment, Jackson worked for the Defendant, and a predecessor company, since 2001. (Doc. 40, Pltf. Dep. p. 14). Defendant manufactures electric motors. (Doc. 36-2, Page ID # 171, Para. 3). Part of Defendant's manufacturing operation is located in Florence, Kentucky. *Id.* Employment at this location is categorized (perhaps colloquially by the employees) based on which "side of the facility" an employee works, the "manufacturing side" or the "warehouse side." (Doc. 40, Pltf. Dep. p. 14).

On July 14, 2014, Jackson received terrible news in the form of a colon cancer diagnosis. (Doc. 41, George Depo., ex. 3); (Doc. 40, Pltf. Dep. p. 31 – Jackson testified the diagnosis occurred in "January," however, the record clearly indicates July as the month of diagnosis). At

the time she received this news, she was working for the Defendant on the "warehouse side" of the Florence plant as a Value Added Packer, Grade V position. (Doc. 40, Pltf. Dep. p. 34-35, 48). Jackson was responsible for picking and packing "drive kits" manufactured on the other side of the facility. (Doc. 40, Pltf. Depo. p. 16-17). The parts, once picked and packed, were either stored in the warehouse or immediately shipped out of the facility. *Id.*

The written job description from the Defendant contains the "essential functions" of Jackson's job. (Doc. 41, George Depo. p. 35, ex. 6); (Doc. 40, Pltf. Depo. ex. 10). The purpose of the position was to "process specific customer orders which require special processing and a high degree of accuracy." (Doc. 40, Pltf. Depo. ex. 10). The description of the job reads in bullet point: "All duties as assigned by supervisor"; "Determine special instructions/rules for customer"; "Specific quality guidelines may require additional auditing, labeling, markings, etc."; "Report all questionable material or irregularities"; "Following established packing procedures." *Id.* Special skills and requirements indicate "high attention to detail"; "Ability to read and follow specific instructions"; and "Good judgment." *Id.* The job description also reveals the job was quite physical in nature, requiring the employee to lift up to 70 lbs. *Id.*

While not listed on the job description as an essential job function, Jackson also operated mobile equipment to help her perform the essential functions of her job. (Doc. 40, Pltf. Depo p. 17). Jackson's testimony reveals she was trained on two pieces of forklift-like equipment, a "Taylor-Dunn" and a "Crown." (Doc. 40, Pltf. Depo. p. 17-18). The Taylor-Dunn was a "golf cart" like piece of equipment with three wheels, a ladder, and traveled in forward and reverse. *Id.* Jackson was trained on this piece of equipment in-house, and the record does not indicate she had any incidents in the equipment. *Id.* The Crown was similar to a forklift. *Id.* Jackson was also trained on this piece of equipment in-house. *Id.* No specialized training was required for either

piece of equipment. *Id.* Jackson attempted to get cleared to operate a piece of equipment she refers to as a "Hyster." (Doc. 40, Pltf. Depo. p. 21). She did not pass the on-site test to operate this piece of equipment. *Id.* She was not disciplined for this, however, nor was the operation of the Hyster required as an essential job function. *Id.*

Jackson was working a "swing shift" at the time she received her cancer diagnosis. (Doc. 40, Pltf. Depo. p. 51); (Doc. 41, George Depo. p. 35). Under this schedule she worked 11:00 a.m. until 8:00 p.m. (Doc. 40, Pltf. Depo. p. 51). This shift was ideal for Jackson because it allowed her to work a second job for DHL. (Doc. 40, Pltf. Depo. p. 50). Jackson's shift at DHL started at 11:00 p.m. and ended at 5:00 a.m. *Id.* Jackson would sometimes nap between the end of her shift with the Defendant (8:00 p.m.) and the beginning of her shift with DHL (11:00 p.m.). (Doc. 40, Pltf. Depo. p. 53). She got most of her sleep between the end of her DHL shift (5:00 a.m.) and the beginning of her shift with the Defendant (11:00 a.m.). (Doc. 40, Pltf. Depo. p. 54). Needless to say, Jackson was an incredible worker.

After receiving the life-changing cancer diagnosis, Jackson applied for, and received, medical leave. (Doc. 40, Pltf. Depo. p. 31); (Doc. 41, George Depo. p. 21-25, ex. 3). The documents related to the medical leave indicate Jackson was approved for the leave to start on July 29, 2014. (Doc. 41, George Depo, ex. 3). This was the same date Jackson was scheduled for surgery to try and remove the cancer. *Id.* She was initially scheduled to return to work on September 2, 2014. *Id.* Jackson's surgery was, thankfully, a success. On August 21, 2014, a disability status report of the Defendant's predecessor indicates she was cleared to return to work with restrictions on September 2, 2014. *Id.* She was cleared for full duty on September 23, 2014. *Id.* Jackson took an additional week of her vacation time and actually returned to work on October 1, 2014. *Id.* Jackson was initially placed back in the same position she occupied when

she left on medical leave. (Doc. 40, Pltf. Depo. p. 31). Following her return, Jackson capably performed all the essential functions of her job. (Doc. 41, George Depo. p. 52). She also operated power equipment without incident. *Id.*

On January 15, 2014, Jackson was sent by the Defendant to St. Elizabeth Business Health for a medical evaluation. (Doc. 40, Pltf. Depo. p. 41-42); (Doc. 41. George Depo. p. 24). The Defendant and St. Elizabeth Business Health have a contract whereby St. Elizabeth Business Health performs Defendant's medical screenings. (Doc. 41, George Depo. p. 19). Medical screenings for employee license renewals to operate power equipment are administered according to Defendant's internal policy, and St. Elizabeth Business Health's screening guidelines. (Doc. 41, George Depo. p. 14-15, 19, ex. 2). Jackson was considered a "license renewal" and internal policy paragraph 4.15 applied to her medical screening. (Doc. 41, George Depo. p. 18, ex. 2). Paragraph 4.15.2.1 states "if operating powered industrial equipment is not a job requirement the employee may remain in their current position but are no longer eligible to operate powered industrial equipment." Paragraph 4.15.2.2 reads "if operating powered industrial equipment is a job requirement, and the employee is incapable of, or unwilling to take the necessary actions to pass the medical exam they will be displaced, and allowed to bid on a job that does not require a powered industrial equipment operator's license." (Doc. 41, George Depo., ex. 2).[1]

The medical screening process is provided by St. Elizabeth Business Health, which acts as an agent for the Defendant for purposes of administering medical screenings. (Doc. 41, George Depo. p. 19, 31, 32 ex. 2). In fact, Defendant allows St. Elizabeth Business Health to

[1] As previously described, Jackson's job description does not specifically indicate operation of powered equipment as a *required* part of her job duties. (George Depo. p. 35, ex. 6); (Pltf. Depo. ex. 10). Indeed, the job description provided by the Defendant does not even mention operation of power equipment.

make the ultimate decision to remove an employee from a job following a medical screening. (Doc. 41, George Depo. p. 33-34). The medical screening process states, "OSHA does not mandate specific medical standards for PIV contractors." (Doc. 41, George Depo., ex. 2). Medical requirements to pass the examination include testing of general, vision, hearing, and other medical conditions categories. *Id.* The examination can include vision testing, vital signs testing, completion of a medical history form, general physical examination, and other specific testing recommended by the medical provider to investigate any specific abnormality. *Id.* Absolutely nothing in these policies requires, or even warns an employee that they may have to turn over sensitive medical information contained in their medical records.

Jackson was seen by Brent Haskell, M.D. (Doc. 40, Pltf. Depo. p. 34). Jackson is the only individual to provide testimony concerning the events of the examination, and the only other person present at the examination besides Dr. Haskell. Jackson attended the appointment willingly. (Doc. 40, Pltf. Depo. p. 34). She waited for some time in a waiting room before being seen by Dr. Haskell. (Doc. 40, Pltf. Depo. p. 36-37). During the examination she provided Dr. Haskell with a urine sample, completed an eye test, and completed a physical examination. *Id.* After the physical examination was complete, Jackson recalls Dr. Haskell initiating a conversation about her cancer. *Id.* Jackson found this shocking, considering she had not mentioned her cancer diagnosis to Dr. Haskell. *Id.* She explained to Dr. Haskell she was not going to discuss her cancer with him. *Id.* She assumed he had received medical information from the Defendant. *Id.*, (Doc. 41, George Depo. p. 25 – as of July 2014 members of Defendant's human resources department were aware of her cancer diagnosis). She recalls Dr. Haskell telling her to get him her medical records relative to her cancer so he could help "get her back on the equipment." (Doc. 40, Pltf. Depo. p. 39). Dr. Haskell provided no reason why he needed to see

all of Jackson's records related to her surgery/cancer treatment. (Doc. 40, Pltf. Depo. p. 42). He also did not verbally indicate he would accept a redacted set of the records requested (and indeed, Jackson was never informed of this by anyone at St. Elizabeth Business Health or the Defendant). (Doc. 40, Pltf. Depo. p. 132-133). The Defendant expected Jackson to comply with Dr. Haskell's request to provide him with what he requested, "Surgery – all medical records," including any information contained in those records. (Doc. 41, George Depo. p. 60).

Following the appointment, Dr. Haskell created a "Medical Condition Clarification" document, wherein he directed Jackson to provide him with "Surgery – All Medical Records" in reference to a "Medical Condition of concern." (Doc. 41, George Depo., ex 5). Part and parcel to this request for medical records were any records which described "treatment you have received to date" and "any relevant tests (include results)." *Id.* There is nowhere in this document where Dr. Haskell requests, or indicates he will accept, a redacted medical record. *Id.*[2] Jackson testified that she treated with OHC Specialists in Cancer and Blood Disorders. (Doc. 40, Pltf. Depo. p. 128-129, ex. 12). These records contained a significant part of the "treatment [she had] received to date." *Id.* (Doc.41, George Depo., ex. 5). Included in these medical records were Jackson's family history as it concerned cancer (stomach), high blood pressure, and stroke. (Doc. 40, Pltf. Depo. p. 128-129, ex. 12). Additionally, the health care providers at Tri-State Gastroenterology Associates provided Jackson treatment related to her cancer diagnosis. (Doc. 40, Pltf. Depo. p. 130-131, ex. 13). It also contains Jackson's sensitive family history concerning cancer. *Id.* Finally, Jackson primarily received her cancer treatment, and surgery, from Dr. Ryan Moon at St. Elizabeth Healthcare. (Doc. 40., Pltf. Depo. p. 131-132, ex. 14). These records also contained

[2] Compare the Defendant's forms related to Jackson's request for FMLA protected leave (in its possession prior to Jackson's appointment with Haskell), where it specifically states Defendant does not want information protected by the Genetic Nondiscrimination Act of 2008 (GINA). (Doc. 40, Pltf. Depo. p. 125, ex. 11).

sensitive information (including family history) related to cancer. *Id.* Accordingly, Dr. Haskell's request for "all medical records" related to treatment for her "surgery" (her cancer treatment) to date explicitly referred to any information in those treatment records. The overbreadth of Dr. Haskell's request is evident by the records Jackson provided to Defendant as part of her initial disclosures, specifically the records bates numbered JacksonInitialDisclosures00037-00041, 00061-00627, 00695- 0730. These medical records, which are responsive to Dr. Haskell's request, number approximately 600 pages.

After the appointment with Dr. Haskell, Jackson met with Defendant's human resources manager Nicole George. (Doc. 40, Pltf. Depo. p. 39). Jackson recalls that at the meeting she informed Ms. George that she passed the battery of Dr. Haskell's tests and examinations, but he wanted to see her cancer-related medical records, and she was not comfortable with providing him with those records. *Id.*[3] Ms. George agreed with Jackson, and instead suggested Jackson provide something from the physician who treated her cancer indicating she was medically able to operate any kind of vehicle. *Id.* Jackson provided a written note from her physician, Dr. Moon, the next day. *Id.* (Doc. 41, George Depo. p. 28, ex. 4). Ms. George forwarded Dr. Moon's note to Dr. Haskell. *Id.* Ms. George did not receive word back from Dr. Haskell as to whether this information was sufficient until "the final determination" was made on February 10, 2015. *Id.*, ex. 5. The "final determination" indicates "[a]dditional medical information has not been received concerning this individual. Physical results are incomplete." *Id.* Jackson did not operate any power equipment while employed with the Defendant after January 15, 2015. (Doc. 40, Pltf. Depo. p. 45).

[3] Despite later backtracking, Nicole George acknowledged Jackson did not fail Dr. Haskell's examination. (Doc. 41, George Depo. p. 47-49, ex. 11). If she had failed the physical examination and testing part of the screening, Ms. George would have been so informed. *Id.*

On February 13, 2015, Jackson was summoned to speak with Ms. George and her lead, Mike Tobias. (Doc. 40, Pltf. Depo. p. 46-47, ex. 6); (Doc. 41, George Depo. p .33). Ms. George learned earlier that the note provided by Dr. Moon concerning Jackson's ability to operate power equipment "wasn't adequate." (Doc.41, George Depo. p. 33). There was no reason provided as to why it was not adequate, nor was Jackson told the information requested by Dr. Haskell could be redacted. Instead, Jackson was informed by Ms. George that she was being displaced from her job position "due to the inability to operate a powered industrial vehicle per the incomplete medical screening results." (Doc. 41, George Depo. p. 33); (Doc. 40, Pltf. Depo. p. 47-49, ex. 6).

Jackson was given a list of positions she could accept for her displacement. *Id.* All three positions were Grade 3 positions, lower grade positions than the Grade 5 position she was working in. *Id.* The "grading" system related to the Defendant's jobs delineates both pay scale and job responsibility/complexity. (Doc. 41, George Depo. p. 36-38). Jackson was able to retain her same wage level following her displacement. *Id.* The job duties in the displacement position were not substantially similar to the job duties she was working prior to displacement. *Id.* She was informed she had until February 11, 2016 to "bid into another internal opportunity that does not require operation of a powered industrial vehicle. Failure to bid and take another opportunity before February 11, 2016, will result in you being placed into any open available job at the time. Should you refuse placement, my [sic] employment will be terminated." *Id.* Jackson accepted the demotion because "it was the only option they gave me." (Doc. 40, Pltf. Depo. p. 48). It also allowed her to keep her current work schedule, which in turn allowed her to keep her second job at DHL. (Doc. 40, Pltf. Depo. p. 49-56).

Jackson accepted her displacement into the lower grade position, and worked in the position until February 11, 2016. On February 2, 2016, she was summoned to a meeting with

Nicole George and Defendant employee Joe DeVillez. (Doc. 41, George Depo. p. 47, ex. 11). She was called to the meeting to remind her about the displacement deadline looming on February 11, 2016. *Id.* Ms. George noted "I told her at this point, the only non-interview positions available at this time were in SP Molding and that if those were the only option on the 11th, she would need to choose one of the openings. I asked her if she wanted me to set her up for a Medical Screening since it wasn't because she failed that they hadn't cleared her. She asked if they would need her medical history and I told her yes. They needed to understand her history so they could authorize her to be safe to operate PIE. We also reiterated that we (Regal) do not see that, only St. Elizabeth's has that information." *Id.* Jackson's recollection is similar, though she also remembers Ms. George commenting that Dr. Haskell was "suspicious" of Jackson following her refusal to turn over all her medical records related to her cancer treatment or talk about her cancer treatment. (Doc.40, Pltf. Depo. p. 65).

On February 11, 2016, Jackson met with Ms. George and Mr. DeVillez to discuss her employment. (Doc.40, Pltf. Depo. p. 71-73, ex. 9); (Doc. 41, George Depo. p. 51). Ms. George provided Jackson with a document which presented five open positions, none of which were the position from which she was displaced. (Doc. 40, Pltf. Depo. p. 71-73, ex. 9). Three positions were grade 3 positions. *Id.* The other two positions were grade 7 positions. *Id.* The grade 3 positions would have paid less than Jackson was receiving prior to her displacement, and were not similar in job responsibilities. (Doc. 41, George Depo. p. 40). While representing job "offers" as opposed to simply job openings, there certainly was no guarantee Jackson was qualified to perform those jobs. (Doc. 41, George Depo. p. 39, 42-44). If Jackson were unable to perform the job duties of a grade 7, she would have been displaced again. (Doc.41, George Depo. p. 44).

Jackson declined the five positions, and her employment was terminated effective February 11, 2016. (Doc.41, George Depo. p. 51); (Doc. 40, Pltf. Depo. p. 72).

**STANDARD OF REVIEW**

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.*, 434 F.3d 810, 813 (6th Cir. 2006). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed." Fed. R. Civ. P. 56(c)(1). Moreover, any supporting or opposing affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted). In this case, there are significant

factual disputes on the issues raised by the Defendant in its Motion that are appropriate for consideration by a jury, and the Motion should be denied.

**ARGUMENT**

1. **Jackson has established facts sufficient for a reasonable jury to find Defendant violated the Americans with Disabilities Act of 1990 ("ADA"), as amended, and the disability discrimination provisions of the Kentucky Civil Rights Act, K.R.S. §344.010, *et seq.* ("KCRA").**

Jackson agrees with the Defendant that the same process is used to analyze claims arising under the ADA and KCRA. (Doc. 36-1, Page ID # 159). In Count I of the Amended Complaint, the facts alleged in the Amended Complaint establish the Defendant violated the ADA and disability related provisions of the KCRA. (Doc. 29, Para. 9-34). Jackson supports her contentions with the deposition testimony provided by herself and Defendant Human Resources manager Nicole George. Essentially, she believes the Defendant violated the ADA and KCRA when it 1) conditioned her continued employment in her then current job position on providing all of medical records to its agent, Dr. Haskell, following a medical examination; 2) by displacing and demoting her from her job duties on February 13, 2015 because she refused to turn over all of her medical records related to her cancer treatment and surgery; and 3) when it terminated her employment on February 11, 2016 because she continued to refuse to turn over all of her medical records related to her cancer treatment and surgery.

To make out a *prima facie* case of disability discrimination, a plaintiff must show that " 1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011). The Defendant's Motion for Summary Judgment only takes

umbrage with the allegation that 1) Jackson did not suffer an adverse employment action on February 11, 2015, and 2) she cannot establish she was qualified for the position from which she was displaced. (Doc. 36-1, Page ID # 160). The Defendant further argues that Jackson cannot establish that her termination from employment on February 16, 2016 was a pretext for disability discrimination. (Doc. 36-1, Page ID # 161). Defendant does not request the Court address the other elements of the *prima facie* case for purposes of requesting summary judgment, and Jackson assumes (for purposes of this motion) the remaining elements of her *prima facie* case are conceded as those elements are not addressed.

**A. Jackson suffered an adverse employment action on February 11, 2015.**

The Defendant asserts "[w]hen Plaintiff was displaced, she continued to work the same shift and received the same pay, even though she did not use PIE. As a result, the displacement does not rise to the level of an adverse employment action." (Doc 36-1, Page ID # 160). The Defendant cites the Court to a case it says stands for the proposition that "written reprimands which result in no loss of pay, demotion, or suspension do not constitute adverse employment actions." *Id.* Jackson, however, was not only reprimanded for refusing to provide Dr. Haskell with all of her cancer related medical records, she was demoted.

Well established precedent provides in the ADA and KCRA context, that an adverse employment action is one that creates a "materially adverse change in the terms or conditions . . . of employment because of [the] employer's conduct. *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 443 (6th Cir. 2008). While "[n]ot every action that the employee dislikes is an 'adverse employment action' " examples of adverse employment actions may include "termination of employment, a demotion in wage, salary or *job title*, a loss of benefits, or *a decrease in responsibilities*." *Trepka v. Bd. of Educ.*, 28 Fed.Appx. 455, 462 (6th Cir. 2002),

(citing *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) and *Crady v. Liberty Nat. Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993)) (emphasis added).

The facts established in this case are that, upon refusing to provide Dr. Haskell with all of her medical records, Jackson was downgraded from a Grade 5 position to a Grade 3 position. (Doc. 41, George Depo. p. 33); (Doc. 40, Pltf. Depo. p. 47-49, ex. 6). The "grading" system related to the Defendant's job relates to both pay scale and job responsibilities/complexities. (George Depo. p. 36-38). While Jackson retained her level of wages, she was demoted and her job responsibilities changed. *Id.* She changed job duties from her Value Added Packer position to one in molding, where she was not permitted to operate power equipment. (Doc. 40, Pltf. Depo. p. 47-49, ex. 6). This demotion was the only option given to Jackson on the date she was demoted. (Doc. 40, Pltf. Depo. p. 48).

**B. Plaintiff was qualified for her position as a Value Added Packer, Grade 5.**

The next element of Jackson's *prima facie* case at which Defendant takes aim is her qualification to perform her job as a Value Added Packer, Grade 5. As an initial matter, the facts established in this case demonstrate that from the date Jackson returned from medical leave in September 2014 until her displacement by the Defendant on February 13, 2015, she was ably performing the job, including the operation of power equipment. (Doc. 41, George Depo. p. 52). It is also clear she passed Dr. Haskell's physical examination. (Doc. 40, Pltf. Depo. p. 36-37); (Doc. 41, George Depo. p. 47, ex. 11 – "it wasn't because she failed that they hadn't cleared her.") Jackson was displaced from her job solely because she did not comply with Dr. Haskell's request to turn over to him all of her medical records related to her cancer treatment/surgery. *Id.* For that reason, he would not clear her for work. *Id.*[4] This lack of "medical clearance,"

[4] It is worth noting here, for purposes of determining who caused Jackson to be displaced from her job, Dr. Haskell is a statutory employer under the ADA. The ADA specifies that an "employer" includes "any agent of such person."

Defendant asserts, determines Jackson was not qualified for her job.

The lack of medical clearance does not demonstrate Jackson was not qualified for her job. It demonstrates that the Defendant, through Dr. Haskell, was requesting information forbidden by the ADA and KCRA. First, this is not a reasonable accommodation issue, as the Defendant seems to argue, where the "interactive process" comes into play. Indeed, Jackson never asked for a reasonable accommodation to perform the essential functions of her job because before she was displaced she was ably performing her job duties. The issue before the Court concerns an employer's request for medical examinations and inquiries.

The ADA states that "[t]he prohibition against discrimination as referred to in subsection (a) of this section shall include medical examinations and inquiries." 42 U.S.C. §12112(d)(1). Employers may require current employees to submit to involuntary medical screenings under some circumstances. The statute specifically allows employers to conduct medical screenings or inquiries when the employer can demonstrate their actions are "job-related and consistent with business necessity." 42 U.S.C. §12112(d)(4)(A).[5] An employer's request for a medical examination is job-related and consistent with business necessity when: 1) an employee requests a reasonable accommodation; 2) the employee's ability to perform the essential functions of the job is impaired; and 3) the employee poses a direct threat to himself or others." *Denman v. Davey Tree Expert Coo.*, 266 Fed. Appx. 377, 379 (6th Cir. 2007). As previously noted, Jackson

42 U.S.C. §12111 (5)(A). Jackson has established Dr. Haskell was an agent of the Defendant. St. Elizabeth Business Health (Dr. Haskell's employer) contracted with the Defendant to perform Defendant's medical screenings. (Doc. 41, George Depo. p. 19). Medical screenings are administered in accordance with both Defendant and St. Elizabeth Business Health policies. (Doc. 41, George Depo. p. 14-15, 19, ex. 2). Defendant provides St. Elizabeth Business Health with the ultimate authority to remove an employee following a medical screening. (Doc. 41, George Depo. p. 33-34). Finally, Nicole George admitted that for purposes of conducting medical screenings, St. Elizabeth Business Health is the Defendant's agent. (Doc. 41, George Depo. p. 31).

[5] This provision applies to disabled and nondisabled employees alike. *See Lee v. City of Columbus, Ohio*, 636 F.3d 245, 252 (6th Cir. 2011) ("A plaintiff need not prove that he or she has a disability in order to contest an allegedly improper medical inquiry under 42 U.S.C. § 12112(d).")

did not request a reasonable accommodation. Therefore, the Defendant must show proof that Jackson's ability to perform her essential job functions was impaired, or that she posed a direct threat. There is no contention in Defendant's Motion that Jackson posed a direct threat to anyone.

Defendant's proffered reason for sending Jackson to a medical screening was to "confirm that she could safely operate a forklift." (Doc. 36-1, Page ID # 153). Nicole George also testified Jackson was sent to a medical screening with other employees per Defendant's policy concerning re-licensing employees to operate power equipment. (Doc. 41, George Depo. p. 14-15, ex. 2).[6] The policy correctly states that "OSHA does not mandate specific medical standards for PIV operators." (Doc. 41, George Depo. ex. 2). Furthermore, the OSHA regulation cited in the policy, OSHA 1910.178(l)(2)(iii), does not mandate (or even mention) medical screening is necessary for safe operation. Instead, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his/her job. *James v. James Marine, Inc.*, 805 F. Supp.2d 340 (W. D. Ky. 2011), (citing *Sullivan v. River Valley School Distr.*, 197 F.3d 804, 811 (6th. Cir. 1999)). "[T]he ADA limits an employer's ability to request unfounded examination to prevent 'the unwanted exposure of the employee's disability and the stigma it may carry." *Id.* at 812.

There is no such "significant evidence" established in this case indicating Jackson could not perform her job. Prior to being sent to Dr. Haskell's examination, Jackson was ably performing her job. The only information which could have possibly been used by the Defendant to support sending Jackson to a medical examination was the information she provided in her

[6] While Jackson was using power equipment to complete her job duties prior to displacement, the formal job description provided by the Defendant does not indicate operation of power equipment as an essential job function. (Doc. 41, George Depo. p. 35, ex. 6); (Doc. 40, Pltf. Depo, ex. 10).

medical leave forms. (Doc. 40, Pltf. Depo. p. 31); (Doc. 41, George Depo. p. 21-25, ex. 3). However, by the time she was sent to Dr. Haskell, Jackson received clearance for a full return to work from her physician. (Doc. 41, George Depo., ex. 3). There was no evidence the Defendant could have reasonably relied upon to conclude Jackson could not perform her job.

Assuming for the sake of argument the Defendant could establish an acceptable reason for requiring Jackson to submit to medical examination and inquiry, an employer's discretion to order employees to undergo examination is "hardly unbounded." *Sullivan v. River Valley School Distr.*, 197 F.3d 804, 811 (6th. Cir. 1999); *see also Farmiloe v. Ford Motor Co.*, 277 F. Supp. 2d 778 (N.D. Ohio 2002) (while inquiry as to the ability of an employee to perform job-related functions "is allowed under the ADA, such inquiry is not without limits."). An employer may not request "wide ranging assessments of mental or physical debilitation that could conceivably affect the quality of an employee's job performance." *Id.*

In this case, Jackson was displaced from her job because she would not provide Dr. Haskell with *all of her medical records* related to her surgery and cancer treatment. Requiring an employee to turn over such vast amounts of medical information, without a job-related reason, is not permitted in this circuit. In the context of requesting medical records, guidance from the Equal Employment Opportunity Commission is telling, and has been cited favorably by the courts in this circuit. *Sullivan v. River Valley School Distr.*, 197 F.3d 804 (6th. Cir. 1999); *Farmiloe v. Ford Motor Co.*, 277 F. Supp. 2d 778 (N.D. Ohio 2002).[7] The facts in this case are

[7] "[A]ccording to the interpretation in Equal Employment Opportunity Commission regulations, any examination ordered by the employer must be restricted to discovering whether the employee can continue to fulfill the essential functions of the job. *See* 29 C.F.R. Part 1630, App. § 1630.14(c) (offering interpretive guidance to § 1630.14(c)). While not controlling authority, this administrative interpretation does represent "a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). *Sullivan v. River Valley School Distr.*, 197 F.3d 804 (6th. Cir. 1999).

The EEOC's stated position on the scope of medical inquiry is that an employer may not request an employee's complete medical records under the disguise of job-relatedness and business necessity. In addressing the scope of

that Jackson passed Dr. Haskell's battery of tests and examinations. Following the examination, Jackson testified Dr. Haskell tried to strike up a conversation about her cancer diagnosis. (Doc. 40, Pltf. Depo. p. 36-37). When she told him she was not comfortable discussing her cancer, she recalls him directing her to get him all of her medical records related to her treatment so he could "get [her] back on equipment." (Doc. 40, Pltf. Depo. p. 39). Dr. Haskell followed through on this conversation, and asked for "Surgery – all medical records," including "current diagnosis of your medical condition"; "the treatment you have received to date"; "the prognosis"; "any relevant tests (include results)"; "list of any medications you are receiving and any restrictions arising from their use"; "any restrictions or limitations that may limit your activities at home or at work and the time period during which those restrictions will be in effect"; and "any additional information that your medical provider things would help us to make our medical recommendation." (Doc. 41, George Depo., ex. 5). In other words, Dr. Haskell wanted to see everything in her medical file, whether or not it had any bearing on her ability to perform her job.

---

medical information that an employer may obtain about an employee, the EEOC states:

> An employer is entitled only to the information necessary to determine whether the employee can do the essential functions of the job or work without posing a direct threat. This means that, in most situations, *an employer cannot request an employee's complete medical records* because they are likely to contain information unrelated to whether the employee can perform his/her essential functions or work without posing a direct threat.

EEOC Enforcement Guidance: Disability–Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act, Question 13 (July 27, 2000) (emphasis added).

The EEOC further states:

> Employers that require physical agility or physical fitness tests may ask an employee to have a physician certify whether s/he can safely perform the test. In this situation, however, the employer is entitled to obtain only a note simply stating that the employee can safely perform the test or, alternatively, an explanation of the reason(s) why the employee cannot perform the test. *An employer may not obtain the employee's complete medical records* or information about any conditions that do not affect the employee's ability to perform the physical agility or physical fitness test safely.

*Id.* Question 14 (emphasis added).

*Farmiloe v. Ford Motor Co.*, 277 F. Supp. 2d 778 (N.D. Ohio 2002).

This is *exactly* the type of unfettered access to sensitive medical information that is not permitted, and is deemed discrimination under 42 U.S.C. §12112(d). .

Despite this overly broad and illegal request, Jackson did attempt to provide the Defendant with a medical opinion from her physician that specifically related to her ability to operate power equipment. (Doc. 41, George Depo., ex. 4). For reasons unknown, the medical opinion provided by Dr. Moon that Jackson "is able to drive any Type of vehicles since she was released to go back to work without restrictions" was not enough for Dr. Haskell. The Defendant asserts it attempted to continue to "work with [Jackson] to provide Dr. Haskell with the information he needed." (Doc. 36-1, Page ID # 161). However, Defendant's efforts simply consisted of requiring Jackson to turn over all of her medical records. In conclusion, there are facts from which a jury could reasonably conclude Jackson was qualified for the position from which she was displaced.

**C. Jackson has established sufficient facts demonstrating her termination from employment was the result of discrimination.**

The Defendant states its "legitimate" reason for terminating Jackson's employment on February 11, 2016 was "Plaintiff's failure to show that she could operate a PIE or accept another position." (Doc. 36-1, Page ID # 161). In the Sixth Circuit, a plaintiff can show pretext in three ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action. *Chen v. Dow Chemical Co.,* 580 F.3d 394, 400 (6th Cir. 2009). The Defendant's reason provided for terminating Jackson had no basis in fact, was patently false, and was illegal.

The facts in this case overwhelmingly demonstrate Jackson was perfectly capable of performing her job duties, including operation of power equipment. The reason the Defendant

terminated Jackson's employment was because she refused for a year to provide Dr. Haskell with information he was not legally allowed to ask for (as just previously established).

In the February 2, 2016 meeting, which preceded Jackson's termination from employment, she was reminded by Defendant's human resources employees that she could get set back up for medical screening "since it wasn't because she failed that they hadn't cleared her." (Doc. 41, George Depo. p. 47, ex. 11). What this meant was Jackson would be required to turn over all of her medical records as originally requested by Dr. Haskell. *Id.* The Defendant cannot rationally argue the reasons for Jackson's displacement and her termination from employment do not stem completely from her unwillingness to allow the Defendant to discriminate against her by requiring her to turn over medical information it is not permitted to ask for.

The Defendant also declares it was not motivated by discrimination because it "tried to help her remain in her position" and "[offered] her another position." (Doc. 36-1, Page ID # 161-162). There is no evidence the Defendant did anything to help Jackson remain in the Grade 5, Value Added Packer position. The Defendant's "help" consisted of nothing more than explaining to her she had to comply with Dr. Haskell's request to give him all of her medical records. Additionally, the jobs actually "offered" to Jackson on February 11, 2016 were three demotions, and two positions that she was arguably not even qualified to perform (and she would have been displaced from these two jobs if she were not able to perform them). (Doc. 41, George Depo. p. 39, 42-44).[8] Jackson has established sufficient facts such that a reasonable jury could decide the Defendant acted with discriminatory purpose. The Defendant required her to furnish

[8] The jobs referenced by the Defendant that were "posted" throughout the year have no relevance to the issues raised in the Defendant's Motion. These were not job offers, they were jobs Jackson could have bid on, but she was not assured of securing any of them. (Doc. 41, George Depo. p. 37). This is perhaps a mitigation of damages issue, but it does not concern the issues raised here.

information it was not permitted to request; when she would not turn over her entire medical record related to her surgery/cancer the Defendant displaced her from her position; after the Defendant's deadline passed to comply and turn over her complete medical record it terminated her employment.

**D. Jackson has established sufficient facts demonstrating retaliation.**

Jackson has also brought a claim against the Defendant for retaliating against her in violation of the ADA and KCRA. The ADA provides "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter." 42 U.S.C. §12203(a). The Defendant has correctly identified the elements of a retaliation claim. (Doc. 36-1, Page ID # 162). Defendant argues in its Motion that Jackson cannot establish a retaliation claim because there is evidence Defendant retaliated against her because she filed a charge of discrimination with the EEOC, and because she cannot overcome its "legitimate" reason for displacing her and terminating her employment. *Id.*[9] Jackson has previously addressed how and why she can overcome Defendant's "legitimate" reasons for the actions it took against her. Briefly, Jackson can show the Defendant took the employment actions it took against her because she refused to turn over her entire medical file related to her surgery (cancer treatment) over to Dr. Haskell. Defendant's request for this information violates the ADA. 42 U.S.C. §12112(d); *Sullivan v. River Valley School Distr.*, 197 F.3d 804 (6th. Cir. 1999), *Farmiloe v. Ford Motor Co.*, 277 F. Supp. 2d 778 (N.D. Ohio 2002), *James v. James Marine, Inc.*, F. Supp. 2d 340 (W.D. Ky. 2011).

The other issue Defendant raises concerns the first element of Jackson's retaliation claim:

[9] Defendant does not raise any other issues with the elements of Jackson's retaliation claim. Therefore, for purposes of this Motion Jackson assumes Defendant concedes those elements.

whether or not she engaged in protected activity. The ADA retaliation statute reads similar to the anti-retaliation provision contained in Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e-3(a). As it concerns the issue of protected activity, both statutes indicate, and case law has interpreted, a plaintiff may prove the protected activity element of the claim in one of two ways. A plaintiff may prove she "opposed" practices made unlawful. *Crawford v. Metropolitan Gov't of Nashville and Davidson County, Tenn.,* 555 US 271 (2009). This is typically referred to as the "opposition clause." *Id.* A plaintiff may also prove she "participated" in any manner in an investigation, proceeding, or hearing involving the ADA. *Id.* This is typically referred to as the "participation clause." *Id.*

The Defendant's Motion indicates Jackson cannot prove the "protected activity" element of her retaliation claim because "[p]laintiff admits that no one at Regal ever mentioned her EEOC charge and that she has no reason to believe that her termination related to the filing of her EEOC charge." (Doc. 36-1, Page ID # 162). This is true enough. Employees rarely are told by their employers they were fired because they filed EEOC charges. However, Jackson can demonstrate her participation in the EEOC process was a motivating factor in the decision to terminate her employment if there is "evidence sufficient to raise an inference" that her participation was the "likely reason for the adverse action." *Brown v. Chase Brass & Copper Co., Inc.*, 14 Fed. Appx. 482 (6th Cir. 2001). While temporal proximity alone is not sufficient, when paired with other evidence of retaliatory conduct, Jackson can survive summary judgment. *Little v. B.P. Exploration & Oil Co.*, 265 F.3d 357, 363-364 (6th Cir. 2001).

Jackson filed her initial EEOC claim on September 21, 2015, shortly after her displacement from her Grade 5, Value Added Packer position. (Doc. 40, George Depo. p. 56); (Doc. 29, Para. 4). Defendant was aware Jackson filed the EEOC charge. *Id.* After filing the

EEOC charge, Defendant continued to work Jackson in her demoted position, refusing to relent on the mandate (established by their agent, Dr. Haskell) that she turn over all of her medical records. On February 2, 2016, Jackson was reminded in her meeting with Nicole George and Joe DeVillez that the only way she was going to get her job back was to turn over her entire medical file as initially requested. (Doc. 41, George Depo. p. 47, ex. 11). She refused to turn over her entire medical file, and as a result, she was fired on February 11, 2016. Jackson's termination occurred a mere five months after she filed her first EEOC charge. When viewed in context with Defendant's actions, as just described, a reasonable jury could find Defendant retaliated against Jackson for filing the EEOC charge.

Moreover, even if the Court decides Jackson has not provided facts sufficient to create a jury question that her EEOC participation was protected activity, she has provided more than sufficient facts to demonstrate she "opposed" a practice made unlawful by the ADA. The type of activity which constitutes "opposition" to illegal activity includes: complaining to management about alleged unlawful practices, refusing to obey an order because the employee believes the order is unlawful, and opposing unlawful acts by persons other than the employer (e.g. former employers, unions, co-workers.) *Johnson v. Univ. of Cincinnati*, 215 F.3d 5691, 579 (6th Cir. 2000). The activity does not have to violate the ADA, but the employee must have a "reasonable belief" the employer has committed an unlawful employment practice. *Id.* at 580. The facts established in this case profoundly display Jackson has met this element of her claim.

The primary issue in this case concerns Jackson's opposition to turning over her entire medical file related to her surgery and cancer treatment to Dr. Haskell, and then being displaced and terminated from employment because of her opposition. Not only did Jackson possess a "reasonable belief" the actions of the Defendant violated the ADA, she has previously

demonstrated that Defendant actually violated the ADA. Jackson has provided proof that is more than sufficient to create a jury question on this issue. Indeed, she has arguably provided unrebutted proof such that she should be granted summary judgment.

E. **Conclusion**

In sum, the Defendant asks the Court to grant summary judgment as it presumes Jackson cannot establish a *prima facie* case because 1) the February 13, 2015 displacement was not an adverse employment action; 2) because she was not qualified for her position as a Grade 5 Value Added Packer; and 3) because she cannot overcome its "legitimate" reason for her termination from employment on February 11, 2016. Jackson has demonstrated sufficient facts that a reasonable jury could find that her displacement on February 13, 2015 was an adverse employment action, that she was qualified for her Grade 5 Value Added Packer position when she was displaced (and terminated from employment), and that the reason Defendant fired her was because she would not turn over to Dr. Haskell her entire medical record related to her cancer/surgery.

The Defendant also moves for summary judgment on Jackson's retaliation claim under the ADA and KCRA. Jackson has shown, however, facts sufficient for a reasonable jury to conclude she engaged in protected activity, and the "legitimate" reason for her termination was based on pretext. She was demoted and then fired because she refused to turn over her entire medical file to Dr. Haskell. As a result, Defendant's Motion for Summary Judgment on her claims arising under the ADA and KCRA should be denied.

2. **Jackson has established facts sufficient for a reasonable jury to find Defendant violated the Family and Medical Leave Act of 1993 ("FMLA"), 28 U.S.C.S. § 2601, et seq., as amended when it interfered with job reinstatement and retaliated against her for taking FMLA leave.**

**A. Defendant interfered with Jackson's right to reinstatement.**

The FMLA makes it unlawful for any employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" under the act. 28 U.S.C. §2615(a)(1).[10] Defendant has correctly provided the elements of an FMLA interference claim in this circuit. (Doc 36-1, Page ID # 163). In addition, employer intent in interference claims is irrelevant. *Arban v. West Publ'g Corp.,* 345 F.3d 390, 401 (6th Cir. 2003). The right to reinstatement under the FMLA "is the linchpin of the [interference] theory because 'the FMLA does not provide leave for leave's sake, but instead provides leave with an expectation [that] an employee will return to work after the leave ends." *Edgar v. JAC Products, Inc.*, 443 F.3d 501 (6th Cir. 2006), (citing *Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972 (8th Cir. 2005)). The Defendant asserts it is entitled to summary judgment on this claim only because Jackson received all the FMLA leave requested, and because "Regal reinstated her to her position when she returned from her leave in September 2014." (Doc. 36-1, Page ID # 163). There is no precedent Jackson can locate which states that if an employer initially reinstates an employee, the employee cannot maintain an interference claim when she is later removed from the job position for reasons associated with her need for leave. If such were the case, employers who wished to violate FMLA reinstatement rights could simply reinstate an employee for a day, and then terminate the employee the next day.

Jackson agrees she received all the FMLA leave she requested. She also agrees she was *initially* reinstated to her job following her leave in October 2014. It is uncontested though that she was displaced and demoted from her job on February 13, 2015, a mere five months after she returned. (Doc. 41, George Depo. p. 33); (Doc. 40, Pltf. Depo p. 47-49, ex. 6). She was not

[10] In reference to any actions attributable to Dr. Haskell, the FMLA also indicates an "employer" is "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 28 U.S.C. §2611(4)(A)(ii)(I).

displaced until Dr. Haskell required her to turn over her entire medical file related to her surgery and cancer treatment. It is undisputed Jackson required FMLA because of her cancer diagnosis and the treatment she received. (Doc. 41, George Depo. p. 21-25, ex. 3). During her appointment with Dr. Haskell, Jackson testified that after the physical examination he told her he wanted to talk about her cancer. (Doc. 40, Pltf. Depo. p. 36-37). After she was hesitant to discuss her diagnosis with him, he required her to turn over all of her medical records related to her surgery and treatment. (Doc. 40, Pltf. Depo. p. 39); (Doc. 41, George Depo., ex. 5). According to Jackson, Nicole George informed her that Dr. Haskell became "suspicious" of her following her hesitancy to discuss her cancer treatment and turn over all of her medical records. (Doc. 40, Pltf. Depo. p. 65). Jackson's displacement and demotion occurred as a direct result of refusing to provide Dr. Haskell with her entire medical file. Clearly, the displacement and demotion touched upon the reason for her FMLA leave. She has provided sufficient facts for a jury to reasonably conclude she was denied her job because of her need for FMLA leave. Defendant's Motion for Summary Judgment should be denied.

**B. Jackson has provided facts sufficient for a jury to determine her termination was causally connected to her medical leave.**

Jackson has also alleged retaliation in violation of the FMLA. (Doc. 29, Para. 40). Defendant moves the Court for summary judgment on this claim alleging her displacement from employment in February 2015 was not an adverse employment action, and her termination from employment on February 11, 2016 was too remote in time to be causally related to her medical leave. (Doc. 36-1, Page ID # 163-164). In addition to a claim based on "interference" of FMLA rights, the FMLA also contains a "retaliation" or "discrimination" theory of liability under 28 U.S.C. §2615(a)(2). *Arban v. West Publ'g Corp.,* 345 F.3d 390, 401 (6th Cir. 2003). The statute reads, "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate

against any individual for opposing any practice made unlawful by this subchapter." 28 U.S.C. §2615(1)(2).

Jackson has previously addressed why her displacement and demotion in February 2015 was an adverse employment action in the context of her ADA discrimination claim. Retaliation claims typically expand on the definition of "adverse employment actions." *See Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006). To establish an adverse employment action in a retaliation claim, the plaintiff "must show that a reasonable employee would have found the challenged action materially adverse," which means it would dissuade a reasonable worker from making or supporting a charge of discrimination. *Id.* Because Jackson opposed providing her entire medical file, which clearly related to her leave, she was stripped of her ability to operate power equipment, sent to a completely different job, downgraded two position grades, and was informed if that she did not submit to the whim of Dr. Haskell's overly broad request, or reapply for employment in a different position in a year (with no guarantee of reemployment), her employment would be terminated. A reasonable jury could find from these facts that a reasonable employee would be dissuaded from challenging an illegal request like the one made by Dr. Haskell.

Defendant also states Jackson cannot establish a causal connection between her termination from employment on February 11, 2016 and her opposition to Defendant's illegal request, because of temporal proximity (proximity between FMLA leave and termination was "seventeen months.") (Doc 36-1, Page ID # 164). In addition to evidence of retaliation just described (and detailed throughout her Response herein), Jackson can also establish temporal proximity. It is uncontested that Jackson was informed on February 13, 2015, when she was displaced and demoted, that unless she capitulated to Dr. Haskell's unreasonable demand for her

entire medical file related to her surgery and cancer treatment, or reapplied for another position, she would be fired in a year. (Doc. 41, George Depo. p. 36-38); (Doc. 40, Pltf. Depo., ex. 6). In other words, Defendant made it quite clear in February 2015 it intended to terminate Jackson's employment. The threat of termination was made *the same day* Jackson was displaced and demoted. That is the temporal proximity at issue in this case. Simply because the Defendant waited a year to act on the threat is not relevant because the intent to discriminate was there from the date Jackson was displaced and demoted. In sum, there are sufficient facts for a reasonable jury to conclude Jackson endured retaliation and discrimination as the result of her need for FMLA leave.

**C. Conclusion**

The Defendant requests the Court grant summary judgment to the Defendant on Jackson's interference and retaliation/discrimination claims under the FMLA. It claims Jackson received the FMLA leave requested and she was reinstated to her position following her return from leave. Jackson has produced sufficient facts, however, that demonstrate she did not receive the true benefit of her right to reinstatement because shortly after she returned from work she was removed from her job. She was removed from her job because she refused to provide the Defendant her entire medical file related to her surgery and cancer treatment, which was directly related to her need for medical leave. Summary judgment on her FMLA interference claim should be denied.

Defendant also requests summary judgment on Jackson's FMLA retaliation/discrimination claim because it claims she did not suffer an adverse employment action in February 2015, and her termination from employment was too remote in time to establish a causal connection with her FMLA leave and associated rights. Jackson has provided

sufficient facts to defeat summary judgment here as well. She suffered an adverse employment action in February 2015 when she was displaced and demoted. Defendant's discriminatory intent to terminate Jackson's employment was established temporally on the very date she was displaced and demoted. Summary judgment on her FMLA retaliation/discrimination claim should be denied.

**3. Jackson has established facts sufficient for a reasonable jury to find Defendant discriminated against her, retaliated against her, and illegally requested protected genetic information in violation of the Genetic Information Nondiscrimination Act of 2008 ("GINA"), 42 U.S.C.S. § 2000ff, et seq., as amended.**

**A. Jackson can prove Defendant discriminated against her in violation of GINA.**

Defendant is correct that very few courts have reviewed claims arising under GINA. The purpose behind the law is included in Congress' findings which state, in pertinent part, "(4) Congress has been informed of examples of genetic discrimination in the workplace . . . Congress clearly has a compelling public interest in relieving the fear of discrimination and in prohibiting its actual practice in employment and health insurance." GINA prohibits an employer[11] from discriminating against an employee "because of genetic information with respect to the employee." 42 U.S.C. §2000ff-1(a). Genetic information is defined as 1) an individual's genetic tests, 2) genetic tests of family members, and 3) information about the manifestation of a disease or disorder in family members of such individual. 42 U.S.C. §2000ff(4)(A). Jackson has established that her medical records requested by Dr. Haskell contained information protected by GINA. (Doc. 40, Pltf. Depo. p. 128-132, ex. 12, 13, and 14). It also contained much more detail about the manifestation of her disease than the FMLA documents she submitted for her leave of absence. (Doc. 41, Geroge Depo., ex. 3).

[11] "Employer" is defined the same as in 42 U.S.C. §2000e(b). It includes any "agent" of an employer. In this case, that includes Dr. Haskell.

Because GINA borrows its language from similar laws protecting employees from discrimination based on other protected characteristics, particularly Title VII, analysis of Jackson's discrimination claim arising under GINA probably follows the traditional burden-shifting in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Defendant asserts as much, and appears to rehash most of it early arguments attacking Jackson's claims of disability discrimination. (Doc. 36-1, Page ID #164-165).

Defendant argues Jackson cannot establish she was qualified for the Grade 5 Value Added Packer position. There is no need for Jackson to restate her position on this issue, she has done so previously, citing to the pertinent facts which demonstrate she was qualified for the position at the time she was displaced and terminated from employment.

Defendant then alleges even if Jackson can establish a *prima facie* case of discrimination she cannot prove pretext. (Doc. 36-1, Page ID #164-165). Defendant states it did not discriminate against Jackson because it assisted her in providing more limited information to Dr. Haskell. *Id.* However, Jackson has already shown the Court that the Defendant did nothing to "assist" Jackson. Instead, the Defendant continued to compel her to comply with Dr. Haskell's unreasonable and illegal request for her entire medical record related to her surgery and cancer treatment. Defendant states it "assured Plaintiff it would not receive any medical information" from Dr. Haskell. *Id.* This is patently incorrect. For purposes of GINA, *Dr. Haskell is an agent of the Defendant*. 42 U.S.C. §2000ff(2), 42 U.S.C. §2000e(b). Receipt of the information protected by GINA by Dr. Haskell is receipt by the Defendant. Nicole George's Affidavit attached to Defendant's Motion indicates "[i]f Jackson had informed me of this concern, I would have suggested that she provide the records with family history information removed or redacted." (Doc.36-2, Page ID # 172, Para. 15). This is extremely convenient for Ms. George to state, after

Jackson's employment has been terminated, but it also indicates nothing was said to Jackson assuring her medical information would not be improperly used. Jackson has shown that the reason she was displaced from her position, and ultimately terminated from employment, was because she would not provide Defendant with detailed information about her colon cancer treatment. Jackson has provided sufficient facts to survive summary judgment on her claim for discrimination under GINA.

**B. Jackson has sufficiently demonstrated Defendant retaliated against her in violation of GINA.**

Defendants also seek summary judgment on Jackson's retaliation claim arising under GINA. Defendant, again, rehashes its arguments in reference to Jackson's retaliation claim arising under the ADA, KCRA, and FMLA. (Doc. 36-1, Page ID # 165). Jackson has addressed those arguments, and has shown she survives summary judgment as it relates to those claims. The same analysis applies here. Briefly, Jackson engaged in protected activity when she participated in the EEOC process, and the Defendant terminated her employment only five months after the filing of the EEOC charge. During this time period Defendant would not relent in its quest to see Jackson's entire medical file related to her surgery and cancer treatment. Jackson also engaged in protected activity by opposing the illegal request for her protected genetic information. Finally, Jackson has demonstrated Defendant took the employment actions it took against her as a direct result of her refusal to turn over her entire medical file related to her surgery (cancer treatment) over to Dr. Haskell. In sum, Jackson has provided sufficient facts for a reasonable jury to find that after filing a claim under GINA with the EEOC and opposing an unlawful request for her entire medical file, the Defendant displaced Jackson and ultimately terminated her employment. Summary judgment should be denied.

**C. Defendant unlawfully requested Jackson's protected genetic information.**

GINA makes it unlawful for an employer to "request, require, or purchase genetic information with respect to an employee," with some exceptions (none of which apply in this case). 42 U.S.C. §2000ff-1(b). Jackson has copiously demonstrated that Dr. Haskell's demand for her medical records related to her surgery (and cancer treatment) was extensive, over broad, and illegal. She testified his request was prompted by the conversation she had with Dr. Haskell when he specifically stated he wanted to discuss her cancer. (Doc. 40, Pltf. Depo. p. 36-37). She has also demonstrated the medical records which were encompassed by the request contained protected genetic information, specifically, her family history concerning various forms of cancer.

Defendant argues that Dr. Haskell's request was "inadvertent." (Doc. 36-1, Page ID # 167). It cites the Court to GINA's implementing regulations, which state an employer establishes inadvertence if its request was not "likely to result in a covered entity obtaining genetic information," with an example of when an "overly broad response is received in response to a tailored request for medical information." *Id.*; 29 C.F.R. §1635.8(b)(1)(i)(C). Defendant characterizes Dr. Haskell's request as "narrowly tailored" without explaining how it came to that conclusion. Simply reading Dr. Haskell's request indicates it is anything by "narrowly tailored."

Dr. Haskell wanted *all medical records* related to Jackson's surgery. It can easily be deduced from the conversation between Dr. Haskell and Jackson at the examination that he was referencing the surgery related to her colon cancer. Furthermore, while the Defendant seems to imply that the seven categories describing the information sought in those records is "narrowly tailored," it is clear those seven categories request everything possibly contained in a medical record, and indicate no limit to the information requested. There is no limit to the amount of information concerning the "treatment you have received to date"; no limit to the tests requested

("any" test); no limit on the amount of medications Dr. Haskell seeks to know about; no limit on the amount information on Jackson's restrictions of limitations; and finally, he included a "catch all" – "any additional information that your medical provider thinks would help up make our medical recommendation."[12] Dr. Haskell's request was actually *likely* to elicit protected genetic information, and in fact would have elicited the information if Jackson had complied.

Defendant's allegation that it "inadvertently" requested Jackson's protected genetic information dies on another hill as well. GINA's regulations related specifically to employer medical examinations state "[a] covered entity *must* tell health care providers not to collect genetic information, including family medical history, as part of a medical examination intended to determine the ability to perform a job, and *must* take additional reasonable measures within its control if it learns that genetic information is being requested or required. Such reasonable measures may depend on the facts and circumstances under which a request for genetic information was made, and may include no longer using the services of a health care professional who continues to request or require genetic information during medical examinations after being informed not to do so." 29 C.F.R. § 1635.8(d) (emphasis added). There is absolutely no evidence presented in this case that the Defendant informed Dr. Haskell not to collect genetic information, or that it took any steps to inform Dr. Haskell that his unreasonably broad request for Jackson's medical records could disclose protected genetic information. This is clearly an affirmative duty on the part of an employer, and a duty of which Defendant was well aware.[13]

In addition to the duty contained in the regulation, the Defendant knew, prior to Jackson's medical screening, that it needed to instruct Dr. Haskell against requesting information protected

---

[12] Jackson's physician provided Dr. Haskell with information that Jackson could, in his medical opinion, operate power equipment. (Doc. 41, George Depo. p. 28, ex. 4). This information was provided to Dr. Haskell and, for reasons unknown, he appears to have ignored it.

[13] *See Lee v. City of Moraine Fire Dept.*, No. 3:13-cv-222, 2015 WL 914440, (S.D. Ohio, Mar. 3, 2015).

by GINA, because it routinely did so when processing employee requests for FMLA leave. The FMLA related forms Defendant used to process Jackson's medical leave contain a GINA warning to Jackson's health care provider not to disclose information protected by GINA. (Doc. 40, Pltf. Depo. p. 124-125, ex. 11); (Doc. 41, George Depo. p. 26, ex, 3). There is no such warning, written or oral, that was provided to Dr. Haskell in this case. Dr. Haskell's overly broad request for medical records did not "inadvertently" request Jackson's protected genetic information. It was tailored such that the disclosure of protected genetic information was all but assured. Defendant's Motion for summary judgment should be denied.

### D. Conclusion

In sum, Jackson has provided facts such that a reasonable jury could find Defendant discriminated against her in violation of GINA by displacing her and terminating her employment. The Defendant displaced and fired Jackson because she would not provide it with detailed information concerning her colon cancer contained in her medical records. A jury could also easily find that her refusal to provide her entire medical file was also protected activity, and her refusal to comply with Defendant's illegal request was the reason she was displaced and ultimately fired. Finally, a reasonable jury could find that Defendant's request for Jackson's entire medical record related to her surgery and cancer treatment sought protected genetic information, and when Jackson refused to comply she was displaced and terminated from employment in violation of GINA. Defendant's Motion for Summary Judgment on Jackson's claims arising under GINA should be denied.

## CONCLUSION

For the foregoing reasons, Plaintiff Sheila Jackson requests the Court deny Defendant's Motion for Summary Judgment.

RESPECTFULLY SUBMITTED,

/s/ W. Kash Stilz, Jr.
W. Kash Stilz, Jr.
Roush & Stilz, P.S.C.
19 West Eleventh Street
Covington, Kentucky 41011-3003
Phone: 859-291-8400
Fax: 859-291-6555
kash@roushandstilzlaw.com
*ATTORNEY FOR PLAINTIFF*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of February, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ W. Kash Stilz, Jr.
W. KASH STILZ, JR.