# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION
## AT COVINGTON

CIVIL ACTION NO. 16-134-DLB-CJS

SHEILA JACKSON                                                    PLAINTIFF

vs.                    **MEMORANDUM OPINION AND ORDER**

REGAL BELOIT AMERICA, INC.                                       DEFENDANT

*  *  *  *   *  *  *  *   *  *   *  *   *  *

This matter is before the Court upon Defendant Regal Beloit America, Inc.'s Motion

for Summary Judgment, seeking judgment as a matter of law on Plaintiff Sheila Jackson's

employment-discrimination claims under the Americans with Disabilities Act ("ADA"), the

Kentucky Civil Rights Act ("KCRA"), the Family Medical Leave Act ("FMLA"), and the

Genetic Information Nondiscrimination Act ("GINA").  In its Motion, Regal Beloit America,

Inc. ("Regal") argues that Jackson has failed to create a genuine issue of material fact

regarding whether Regal violated the ADA, KCRA, FMLA, or GINA.  The Court has

federal-question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and

supplemental jurisdiction under 28 U.S.C. § 1367.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

In November of 2011, Plaintiff Sheila Jackson began working for Regal[1] at its

---

[1]     Regal purchased and acquired another company, Emerson Power Transmission, in
February of 2015.  (Doc. # 41-1 at 5-6).  Therefore, for most of her employment, Jackson actually
worked for Emerson.  However, the law imposes successor liability to remedy unfair labor
practices.  *See EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086 (6th Cir. 1974).  And,
at oral argument, Regal conceded its liability for Emerson's actions.  (Doc. # 53).  Accordingly, to
avoid confusion, the Court will refer to the defendant-employer as Regal throughout this
Memorandum Opinion and Order.

Florence, Kentucky location, where Regal operates the Power Transmission Solutions segment of its business and manufacturers couplings for Kop-Flex and components for System Plast. (Docs. # 40-1 at 19; 41-1 at 7). At all times relevant to this action, Jackson worked on a swing-shift (from 11:30 a.m. to 8:00 p.m.) as a Value Added Packer (Grade 5) on the Distribution side of Regal's facility. (Docs. # 40-1 at 14-17, 51; 51-2 at 2). As a Value Added Packer (Grade 5), Jackson picked and packed drive kits, "retriev[ing] parts ordered by customers from various areas in Regal's warehouse" and then "assembl[ing] those parts on a pallet for shipping to the customer." *Id.* To perform those job duties, Jackson operated powered industrial equipment. *Id.* Specifically, Jackson operated a Taylor-Dunn motorized three-wheel cart and a Crown forklift. (Doc. # 40-1 at 17-18).

In July of 2014, Jackson was diagnosed with colon cancer and underwent surgery. (Doc. # 40-1 at 31). As a result, Jackson requested, and was granted, leave under the FMLA. (Doc. # 40-1 at 232-240). Jackson's doctor cleared her to return to work on September 23, 2014. (Doc. # 40-1 at 242). After using vacation time, Jackson returned to Regal on October 1, 2014. *Id.* Upon her return to work, Jackson resumed her position as a Value Added Packer (Grade 5) and performed her job as she had before, with no restrictions and no performance issues. (Doc. # 41-1 at 52).

In the early part of 2015, Regal notified Jackson that she would need to undergo a medical screening. (Doc. # 40-1 at 34). Regal contracted with Saint Elizabeth Business Health to provide medical screenings of its employees. (Doc. # 41-1 at 19). On January 15, 2015, Jackson underwent a medical screening with Dr. Haskell. *Id.* at 111. During this appointment, Dr. Haskell obtained information regarding Jackson's medical history and conducted a medical examination. (Doc. # 36-5 at 10-11). The Occupation/Medical

Health Examination form shows that Jackson passed her vision test and that she had no physical abnormalities.  *Id.* at 11.

At some point during the appointment, Dr. Haskell inquired about Jackson's history of colon cancer and her prior surgery.[2]  (Doc. # 40-1 at 44).  Jackson, however, refused to discuss her colon cancer or her surgery with Dr. Haskell.  *Id.* at 37.  At the conclusion of the appointment, Dr. Haskell requested that Jackson provide her medical records for his review.  *Id.* at 39.  Dr. Haskell also sent a letter to Regal, detailing Jackson's visit and the status of her medical clearance:

> This is to inform you that Sheila Jackson was seen for a physical examination on 01/15/2015.  The examination has been placed on medical hold pending receipt of additional information concerning the individual. The patient has been instructed to provide the requested documentation within two weeks in order for the provider to make a medical determination. If the information is not received within the time allotted the physical results will be reported as incomplete.

*Id.* at 112.  Attached to Dr. Haskell's correspondence was a "Medical Condition Clarification" form, which identified Jackson's "medical condition of concern" as "surgery – all medical records" and requested that Jackson "provide the following information from [her] treating medical provider to the Business Health center within two weeks":

1.  Current diagnosis of your medical condition
2.  The treatment you have received to date
3.  The prognosis
4.  Any relevant tests
5.  List any medications you are receiving and any restrictions arising from their use
6.  Any restrictions or limitations that may limit your activities at home or at work and the time period during which those restrictions will be in effect

---

[2]     Although irrelevant, how the topic of Jackson's colon cancer came up is disputed.  Jackson maintains that she did not disclose her history of colon cancer to Dr. Haskell and believes that a representative of Regal told Dr. Haskell about her cancer.  (Doc. # 40-1 at 37-38).  Nicole George testified in her deposition that she did not provide any information or documentation about Jackson's colon cancer to Dr. Haskell, but did not know whether another individual at Regal may have done so.  (Doc. # 41-1 at 24-25).

7.  Any additional information that your medical provider thinks would help us to make our medical recommendation

*Id.* at 111.  The Medical Condition Clarification form also warned that the employee "may be unable to perform any work related duties until you provide the requested information." *Id.*

When Jackson returned to work, she met with Nicole George, Regal's Human Resource Manager, and explained that she had passed the medical screening and did not believe Dr. Haskell needed access to her medical records.  *Id.* at 39.  At the conclusion of that conversation, Jackson offered to provide a note from the doctor who had performed her colon-cancer surgery, Dr. Moon.  *Id.*  On January 16, 2015, Dr. Moon faxed a letter to Regal's Human Resources Department, which opined: "Sheila Jackson is able to drive any [t]ype of vehicles since she was released to go back to work without restrictions.  If you have any questions please contact my office."  (Doc. # 41-1 at 109-110).  That day, Nicole George forwarded Dr. Moon's correspondence to Dr. Haskell.  *Id.* at 28.  Dr. Haskell did not respond to the submission of Dr. Moon's letter.  *Id.*

After approximately two weeks had passed, Nicole George contacted Saint Elizabeth Business Health to inquire about the status of Jackson's medical clearance.  *Id.* at 33.  Although she confirmed that they had received the note from Dr. Moon, George was told that the information provided was inadequate.  *Id.*  George then informed Jackson's supervisor, Mike Tobias, that Jackson's medical clearance was still pending and summoned Jackson to a meeting.  *Id.*  At that meeting, George advised Jackson that she would need to provide the requested documentation to Dr. Haskell in order to operate powered industrial equipment, and warned Jackson that if she did not comply, "she could potentially be displaced per [Regal's] policy."  *Id.*

4

On February 10, 2015, Dr. Haskell rendered his final Occupational Determination on a pre-printed form, checking the box next to "Additional medical information has not been received concerning this individual. Physical results are incomplete." *Id.* at 113. Three days later—on February 13, 2015—George, Tobias, and Jackson had a meeting, where Regal notified Jackson that she was being displaced from her Value Added Packer (Grade 5) Position "due to [Jackson's] inability to operate a powered industrial vehicle per the incomplete medical screening results." *Id.* at 130. At that time, Jackson was offered three Grade 3 positions that did not require the use of powered industrial equipment. *Id.* Jackson was also informed that she had approximately one year, until February 11, 2016, "to bid into another internal opportunity that does not require the operation of a powered industrial vehicle" and warned that "[f]ailure to bid and take another opportunity before February 11, 2016, [would] result in [her] being placed into any open available job at the time" and that her "employment [would] be terminated" if she "refuse[d] the placement." *Id.* Jackson elected "displacement" in lieu of selecting an open position outside of the drive-kit department. *Id.*

Jackson was displaced into a Grade 3 position, and her job duties no longer included the operation of powered industrial equipment. (Doc. # 41-1 at 38). However, Jackson retained her swing-shift hours and her rate of pay stayed the same. (Doc. # 40-1 at 82). Approximately seven months after being displaced—on September 21, 2015—Jackson filed a discrimination charge with the EEOC, alleging that Regal had violated the ADA and GINA. (Docs. # 41-1 at 57; 31 at ¶ 4).

On February 2, 2016—as Jackson's one-year displacement deadline drew near—Nicole George and Joe DeVillez, the Director of Distribution at Regal's Florence,

Kentucky Facility, summoned Jackson to a meeting.  (Docs. # 51-2 at 2; 41-1 at 58).

During that meeting, Jackson was reminded that her displacement time would expire on

February 11, 2016, and was presented with a document that listed positions that had

been open for bidding during Jackson's displacement.  (Docs. # 40-1 at 63; 41-1 at 137).

Jackson was also offered another opportunity to complete a medical screening with Saint

Elizabeth Business Health.  *Id.*  When Jackson asked if the medical screening would

require her to submit her medical records, Regal responded in the affirmative and

explained that the doctor "needed to understand her history so they could authorize her

to be safe to operate [powered industrial equipment]."  (Doc. # 41-1 at 137).  Despite

Regal's assurance that it would not receive Jackson's medical records from Saint

Elizabeth Business Health, Jackson declined another medical examination because she

did not want to disclose her medical records.  (Docs. # 40-1 at 63-64; 41-1 at 137).

Because of her unwillingness to submit to a medical examination and provide her

medical records, Regal presented Jackson with five positions, which did not require the

use of powered industrial equipment: three Grade 3 positions in the Molding Department

covering first, second, and third shifts; a third-shift Grade 7 Extrusion Set-Up Tech

position; and a second-shift Grade 7 CNC Operator position.  (Doc. # 41-1 at 127).

Jackson refused to accept placement in any of those positions and Regal terminated her

employment, effective February 11, 2016.  *Id.*  When presented with her termination letter,

Jackson refused to sign.  (Docs. # 40-1 at 72; 41-1 at 127).  Shortly after her termination—

on April 25, 2016—Jackson filed another EEOC charge, claiming that Regal had

discriminated and retaliated against her in violation of the ADA and Title VII.  (Doc. # 31

at ¶ 4).  The EEOC issued Jackson right-to-sue letters for Charge One and Charge Two,

on April 14, 2016 and May 3, 2016, respectively.  *Id.* at ¶ 5.

On July 12, 2016, Jackson filed suit against Regal, alleging that Regal had discriminated and retaliated against her in violation of the ADA, KCRA, FMLA, and GINA.[3] (Doc. # 1).  After the parties completed discovery, Regal filed the instant Motion for Summary Judgment, seeking judgment as a matter of law on each of Jackson's claims. (Doc. # 36).  Jackson having filed her Response (Doc. # 42), Regal having filed its Reply (Doc. # 51), and the Court having heard oral argument on the Motion on June 15, 2018 (Doc. # 53), Regal's Motion for Summary Judgment is fully briefed and ripe for review. For the reasons stated herein, Regal's Motion for Summary Judgment (Doc. # 36) is **granted in part and denied in part**.

## II.    ANALYSIS

### A.    Standard of Review

Summary judgment is appropriate when the record reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists where "there is sufficient evidence … for a jury to return a verdict for" the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The "moving party bears the burden of showing the absence of any genuine issues of material fact."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008).  Once a party files a properly supported motion for summary judgment, by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at

---

[3]    With leave from the Court, Jackson amended her Complaint on November 29, 2017, removing her claim for race discrimination under Title VII.  (Docs. # 27, 28, and 29).

250.  However, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient."  *Id.* at 252.

The Court must "accept Plaintiff's evidence as true and draw all reasonable inferences in [her] favor."  *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Anderson*, 477 U.S. at 255).  The Court is not permitted to "make credibility determinations" or "weigh the evidence when determining whether an issue of fact remains for trial."  *Id.* (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001)).  "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Back v. Nestle USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251-52).  If there is a dispute over facts that might affect the outcome of the case under governing law, the entry of summary judgment is precluded.  *Anderson*, 477 U.S. at 248.

As the moving party, Regal must shoulder the burden of showing the absence of a genuine dispute of material fact.  Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  Assuming Regal satisfies its burden, Jackson "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial."  *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).

### B.    Discrimination and Retaliation under the ADA and KCRA

The ADA prohibits employers[4] from discriminating against "a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement,

---

4    Regal has admitted it is an "employer" under the ADA, as well as the KCRA.  (Doc. # 31 at ¶ 11).

or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Because the language of the KCRA "mirrors that of the ADA," Jackson's claims under the KCRA will be analyzed concurrently and "consistently with the standards developed under the ADA." *Bryson v. Regis Corp.*, 498 F.3d 561, 574 (6th Cir. 2007); *see also Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 592 (Ky. 2003).

If "the plaintiff seeks to establish discrimination through indirect, rather than direct, evidence," the tripartite burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), provides the proper approach for analyzing the discrimination claim. *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008). Under this approach, the initial burden is on the plaintiff to make out a prima facie case of discrimination by demonstrating that "(1) he or she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011); *see also Barlia v. MWI Veterinary Supply, Inc.*, No. 17-1185, 2018 WL 327448, at *4 (6th Cir. Jan. 9, 2018).

If the plaintiff establishes a prima facie case of discrimination under the ADA, then the burden "shifts to the defendant to set forth a legitimate, nondiscriminatory reason for the adverse employment action it took against the plaintiff." *Kocsis v. Multi-Care Mgmt.,*

*Inc.*, 97 F.3d 876, 883 (6th Cir. 1996) (citing *McDonnell Douglas*, 411 U.S. at 802). The defendant's burden of providing a legitimate, nondiscriminatory reason is not especially demanding. "The defendant bears only the burden of production; the burden of persuasion is with the plaintiff at all times." *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 377 (6th Cir. 2002); *see also Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 266 (6th Cir. 1986).

"If the defendant carries that burden of production, plaintiff must then prove by a preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but were merely a pretext for illegal discrimination." *Kocsis*, 97 F.3d at 883. A plaintiff "can demonstrate pretext 'by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 624 (6th Cir. 2006) (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003)). "To survive a motion for summary judgment, the plaintiff need not *prove* that the defendant's proffered rationale is pretextual, as that would be enough proof for summary judgment in favor of the plaintiff." *Whitfield*, 639 F.3d at 260. "Rather, the plaintiff must prove only enough to create a *genuine issue* as to whether the rationale is pretextual." *Id.* Again, "[a]t all times, the plaintiff bears the ultimate burden of persuading the trier of fact that illegal discrimination took place." *Kocsis*, 97 F.3d at 883.

Jackson claims that Regal violated the ADA and KCRA in three ways: (1) conditioning her continued employment on submitting to a medical examination and producing medical records, (2) displacing and demoting her for refusing to turn over all of her medical records related to her cancer treatment and surgery, and (3) terminating her

because of her continued refusal to turn over those medical records. (Doc. # 42 at 11). These allegations give rise to three distinct claims—one disability-discrimination claim and two retaliation claims. Each claim will be addressed in turn.

### 1. Medical Examination/Inquiry

Once an employee has been hired, the ADA prohibits an employer from "requir[ing] a medical examination" or making "inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A); *see also Denman v. Davey Tree Expert Co.*, 266 F. App'x 377, 379 (6th Cir. 2007). Although the statute clearly permits medical examinations and inquiries, "an employer's discretion to order employees to undergo examinations is hardly unbounded." *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999). In the post-hiring context, "demands for examinations can only be made where shown to be 'job-related and consistent with business necessity.'" *Id.* (quoting 42 U.S.C. § 12112(d)(4)(A)).

Jackson claims that Regal's request that she submit to a medical examination was unlawful because it was neither job-related nor consistent with business necessity. (Doc. # 42 at 14-18). And relatedly, Jackson claims that Regal's request, and the subsequent demand for Jackson's past medical records, was overly broad. *Id.* at 18. Regal, by contrast, argues that it was permitted to require a medical examination and that its request for Jackson's medical records was lawful. (Doc. # 51 at 5-6). Thus, Regal contends that it did not violate the ADA by making such requests and claims that Jackson's refusal to comply with Regal's requests constituted "legitimate grounds" for her termination. *Id.* at

8-9.

Armed with their arguments, both parties attempt to analyze Jackson's unlawful-medical-examination claim under the typical five-element test for ADA discrimination claims, focusing much of their attention on the second element—whether Jackson was qualified for her position, despite the lack of Dr. Haskell's medical clearance. Such an approach, however, is akin to shoving a square peg into a round hole. Jackson's unlawful-medical-examination claim simply does not fit into the typical five-element test for ADA discrimination claims.

To begin, "a plaintiff need not prove" the first element—that he or she is disabled—"to contest an allegedly improper" medical examination or inquiry under § 12112(d)(4)(A). *Lee v. City of Columbus*, 636 F.3d 245, 252 (6th Cir. 2011); *see also Kroll v. White Lake Ambulance Auth.* (*Kroll I*), 691 F.3d 809, 816 (6th Cir. 2012) ("The importance of § 12112(d)(4)(A) in preventing discrimination is underscored by the fact that, in contrast to many other provisions of the ADA, all individuals—disabled or not—may bring suit in aid of its enforcement."). Similarly, then, the fourth element—whether the defendant-employer knew or had reason to know of the plaintiff's disability—makes little sense in the unlawful-medical-examination context. The second, third, and fifth elements—which focus on whether the plaintiff was qualified for her position, whether the plaintiff suffered a materially adverse change in the terms and conditions of her employment, and the defendant-employer's actions with respect to plaintiff's position after the adverse employment action—are also ill-suited for a claim that does not require that the plaintiff-employee have suffered an adverse employment action. Moreover, for unlawful-medical-examination claims, it is the defendant who has the burden of persuasion, not the plaintiff.

*Kroll II*, 763 F.3d at 623.

Recognizing, at least implicitly, that the five-element test for ADA-discrimination claims is not well-suited for an unlawful-medical-examination claim, recent Sixth Circuit cases have applied a more straight-forward analysis, avoiding the five-element test and analyzing only the lawfulness of the medical examination or inquiry. *See, e.g.*, *Kroll v. White Lake Ambulance Auth.* (*Kroll II*), 763 F.3d 619, 623 (6th Cir. 2014); *Bates v. Dura Auto. Sys., Inc.* (*Bates II*), 767 F.3d 566 (6th Cir. 2014).[5] Accordingly, the Court will adopt the Sixth Circuit's recent approach and analyze Jackson's unlawful-medical-examination claim without resort to the typical five-element test.

Under that approach, Jackson's unlawful-medical-examination claim "reduces to two essential inquiries: (1) whether the employer performed or authorized a medical examination or disability inquiry ('the regulated conduct'); and if so, (2) whether the exam/inquiry was job-related and consistent with business necessity ('the justification')." *Bates II*, 767 F.3d at 569. Put another way, Jackson must first establish that Regal has performed or authorized a medical examination or disability inquiry. If she does so, Regal will then "bear[ ] the burden of proving that" the medical examination or inquiry was "job-related and consistent with business necessity." *Kroll II*, 763 F.3d at 623.

---

[5]     Prior Sixth Circuit cases have considered the lawfulness of an employer's request for a medical examination/inquiry under the typical five-element analysis. *See, e.g.*, *EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1097 (6th Cir. 1998) (concluding that the defendant-employer's requests for a medical evaluation did not "rise to the level of adverse employment decisions based on stereotypes and generalizations"); *Sullivan*, 197 F.3d 804 (analyzing request for medical examination under the first element as evidence that the plaintiff was "regarded as" disabled by the employer and then concluding that valid request for medical examination could not "count as an adverse job action"); *James v. Goodyear Tire & Rubber Co.*, 354 F. App'x 246, 248 (6th Cir. 2009) (analyzing request for medical examination as an "adverse employment action"). As discussed, however, more recent Sixth Circuit cases appear to have abandoned this approach.

For purposes of the first element, a "medical examination" is "a procedure or test that seeks information about an individual's physical or mental impairments or health." *Bates II*, 767 F.3d at 574 (citing EEOC, *Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act ("EEOC Guidance")*, Part B.2 (July 27, 2000)).[6]  A "disability-related inquiry," on the other hand, is a "question (or series of questions) that is likely to elicit information about a disability."  *Id*. (quoting *EEOC Guidance*, Part B.1).

Jackson has easily carried her burden with respect to the first element.  It is undisputed that Regal required Jackson to submit to a medical examination.  (Docs. # 31 at ¶ 17; 36-1 at 3; 36-3).  During that medical examination and afterwards, Regal also made a "disability-related inquiry" by requesting Jackson's medical records related to her colon-cancer surgery.  (Docs. # 31 at ¶ 20; 36-3 at 9; 36-5 at 10-11).  Therefore, the burden shifts to Regal to "prov[e] that [the] medical examination" and the disability inquiry were "job-related and consistent with business necessity."  *Kroll II*, 763 F.3d at 623.

### i.    Justification

Regal argues that it was permitted to require a medical examination "given the constantly changing nature of every employee's health," which is reflected in "Regal's policy requir[ing] a medical screening every three years to ensure that employees can

---

[6]     The Sixth Circuit has repeatedly relied upon the EEOC's Enforcement Guidance as "the best interpretative aid" for "explain[ing] and clarify[ing] the terms of § 12112(d)(4)."  *Kroll I*, 691 F.3d at 815; *see also Bates II*, 767 F.3d at 574-75.

continue to safely use [powered industrial equipment]." [7]  (Doc. # 51 at 5).  Specifically, Regal asserts that "ensuring that all employees, including Plaintiff, are able to safely operate [powered industrial equipment] by confirming his/her physical health is both job-related and consistent with business necessity."  *Id.*  Regal further claims that "Dr. Haskell's request for Plaintiff's medical records relating to her FMLA leave was not only lawful, but appropriate to determine whether Plaintiff was medically qualified to operate [powered industrial equipment]."  *Id.* at 6.

Regal's reasoning, however, merely begs the question.  Regal's policy, which requires an employee to submit to a medical screening every three years, is only permissible if it is job-related and consistent with business necessity.  That Regal repeatedly asserts that it is "job-related and consistent with business necessity" does not make it so.  Nor does Regal's reliance on "the constantly changing nature of every employee's health" satisfy its burden.  (Doc. # 51 at 5).  "The business-necessity standard

---

[7]      In the parties' briefing, there seems to be some confusion about the exact statutory provisions at play here.  In its Reply, Regal cites to 42 U.S.C. § 12112(b)(6) and argues that Regal "is entitled to" inquire into "qualification standards."  (Doc. # 51 at 5).  Subsection (b)(6) provides that "'discriminat[ion] against a qualified individual on the basis of disability' includes … using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity."  42 U.S.C. § 12112(b)(6); *see also* 42 U.S.C. § 12113.  Jackson, however, has invoked the protections of (d)(4), not (b)(6).  And, the Sixth Circuit has held that (b)(6) and (d)(4) provide distinct protections and apply in different situations.  *Bates v. Dura Auto. Sys., Inc.* (*Bates I*), 625 F.3d 283, 285-86 (6th Cir. 2010).  While (b)(6) applies only to individuals with qualifying disabilities under the ADA, (d)(4)'s protections apply to disabled and non-disabled employees alike.  *Id.*  By conflating the ADA's provisions regarding unlawful medical examinations and qualification standards, which may be tested in some sort of medical screening, Regal's arguments regarding "qualification standards" under (b)(6) miss the mark.  Thus, Regal's argument will instead be construed as an argument that the medical examination was "job-related and consistent with business necessity," as required by (d)(4).  *See Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 568-69 (1999) (concluding that employer could use visual-acuity job qualification standard as support for its argument that plaintiff was not a "qualified individual with a disability under the ADA").

cannot be satisfied by an employer's bare assertion that a medical examination was merely convenient or expedient." *Kroll II*, 763 F.3d at 623. Rather, Regal must satisfy the business-necessity standard in one of two ways: by offering a particularized rationale that justifies a medical examination of an individual employee or by falling within a narrow category of circumstances that justify periodic and indiscriminate medical examinations.

### a. Particularized Justification

An employer "who decides to require a medical examination must have a reasonable belief based on objective evidence that the employee's behavior threatens a vital function of the business." *Id.* To show that a particular examination or inquiry was "job-related and consistent with business necessity," Regal must "demonstrat[e] that: '(1) the employee request[ed] an accommodation; (2) the employee's ability to perform the essential functions of the job [was] impaired; or (3) the employee pose[d] a direct threat to himself or others.'" *Id.* (quoting *Denman*, 266 F. App'x at 379).

It is undisputed that Jackson did not request an accommodation. Therefore, Regal must show either that Jackson's ability to perform the essential functions of her job was impaired or that Jackson posed a direct threat to herself or others. It has done neither. Regal does not argue, and there is no evidence in the record to suggest, that Regal "ha[d] a reasonable belief that [Jackson's] ability to perform the essential functions of [her] job might have been impaired." *Denman*, 266 F. App'x at 380. "[F]or an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing [her] job." *Sullivan*, 137 F.3d at 811. Regal has offered no evidence in this respect, aside from the "constantly changing nature of every employee's health." (Doc. # 51 at 5). Such

a generalized justification, however, cannot be said to give rise to a "genuine reason to doubt whether" Jackson could perform her "job-related functions." *Sullivan*, 137 F.3d at 811. Nor can Regal justify the medical examination or inquiry as a response to a "direct threat." Regal has not claimed or put forth evidence that Jackson posed a "significant risk to the health or safety of others."[8] *EEOC v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1095 (6th Cir. 1998) (citing 42 U.S.C. § 12111(3); 29 C.F.R. § 1630.15(b)(2)).

### b. Generalized Justification

Absent "evidence of current performance problems or observable evidence suggesting that a particular employee will pose a direct threat," employers can require periodic medical examinations of employees in only two instances: (1) where the employees are in positions affecting public safety (e.g., police officers and firefighters) or (2) where the medical examinations are required or necessitated by other law or regulation (e.g., Federal Aviation Administration and Department of Transportation medical certifications, Occupational Safety and Health Act standards). *EEOC Guidance*, Part D.18, 21.

Although Regal describes its "Medical Screening Program for Powered Industrial Vehicle Operators" as a periodic check for industrial safety, it does not apply to employees who are "in positions affecting public safety." *Id.* Nor is it required or necessitated by any federal, state, or local law or regulation. *See* 29 C.F.R. § 1910.178. In fact, Regal's "Medical Screening Program for Powered Industrial Vehicle Operators" explicitly concedes that "OSHA does not mandate specific medical standards for PIV operators."

---

[8] During oral argument on this Motion, Regal confirmed that it was not attempting to validate its policy with any particularized evidence showing that Jackson's ability to perform the essential functions of her job was impaired or that Jackson posed a direct threat to herself or others. (Doc. # 53).

(Doc. # 41-1 at 96).  Nevertheless, Regal's policy explains that "the requirements of the DOT Commercial Driver Medical Standards are used as a starting point," *id.*, and requires employees who operate powered industrial equipment to submit to similar medical screenings and standards as drivers of commercial motor vehicles.  *See* 49 C.F.R. Part 391.

While the Court agrees that Regal's "workplace safety" rationale is a "well-recognized business necessity," "the issue" is whether the required medical examination and disability inquiry were a "lawful means to that end."  *Miller v. Whirlpool Corp.*, 807 F. Supp. 2d 684, 687 (S.D. Ohio 2011) (finding that defendant-employer had failed to show that "OSHA required or necessitated" the disability inquiry for powered industrial vehicle operators).[9]  Again, there are only two circumstances where periodic, indiscriminate medical examinations are permissible: (1) where the employees are in positions affecting public safety or (2) where the medical examinations are required by law or regulation. *EEOC Guidance*, Part D.18, 21.[10]  At oral argument, Regal acknowledged that its policy did not fit within the public-safety or required-by-law categories, but attempted to argue for a third, "common sense" category, so that employers "do not have to wait for an

_____

[9]     In *Miller*, the district court did not grant summary judgment for the plaintiff and instead found that there was a "genuine issue of material fact as to whether all the questions in Whirlpool's form were a reasonably effective and necessary method of achieving workplace safety."  *Miller*, 807 F. Supp. 2d at 687.  That genuine issue of material fact arose because Whirlpool presented evidence that the company's medical director had demonstrated "a comprehensible link between each of these apparently needless questions and safe driving."  *Id.*  Regal has not offered any similar proof or evidence in support of its periodic-medical-examination policy.

[10]     Again, the Court relies on the EEOC's Enforcement Guidance, which the Sixth Circuit has repeatedly characterized as "the best interpretative aid" for "explain[ing] and clarify[ing] the terms of § 12112(d)(4)."  *Kroll I*, 691 F.3d at 815; *see also Bates II*, 767 F.3d at 574-75.

accident to justify screening employees."[11]   (Doc. # 53).   If the business-necessity standard were that low, however, it would amount to no standard at all.   Surely, one would not have to look hard to find an employer interested in "workplace safety" or employees with "constantly changing" health.   Regal's far-reaching rationale would therefore eviscerate the ADA's prohibition against medical examinations and disability inquiries that are not "job-related and consistent with business necessity."   Such a result is nonsensical, and finds no support in law.   Because Regal has not raised a genuine issue of material fact regarding whether its medical examination and inquiry were "job-related" and "consistent with business necessity," it has failed to carry its burden.

### ii.     Scope

Moreover, even if Regal had provided a sufficient justification for its request for a medical examination or disability inquiry, which it has not, the scope of the examination and the inquiry "must remain appropriately narrow."   *James v. Goodyear Tire & Rubber Co.*, 354 F. App'x 246, 249 (6th Cir. 2009).   A medical examination or inquiry under § 12112(d)(4) "is not an excuse for every wide-ranging assessment of mental or physical debilitation that could conceivably affect the quality of an employee's job performance";

---

[11]     Regal cites to *Wice v. Gen. Motors Corp.*, No. 07-cv-10662, 2008 WL 5235996 (E.D. Mich. Dec. 15, 2008)—an unpublished and non-binding case—to support its "common sense" suggestion.   *Wice*, however, is distinguishable for several reasons.   First, General Motors did not require the plaintiff-employee to "see the plant nurse or doctor, but allowed him to provide a medical certification from his own doctor."   *Id.* at *3.   Second, the Michigan Occupational Safety and Health Administration had enacted a regulation that "require[d] that employees assigned to operate mobile equipment meet certain minimum fitness standards, including that they have corrected vision that meets the same requirements as those for a valid Michigan's driver license, have effective use of all four limbs, be of a height sufficient to operate the controls, have an unobstructed view over the controls and dashboard, have coordination between the eyes, hands, and feet, and be free from known convulsive disorders and episodes of unconsciousness for a period of one year."   *Id.* at *1.   In this case, there were no similar requirements imposed by law or regulation.   And more significantly, it is undisputed that Regal refused to allow Jackson to provide a medical certification from her own doctor.   (Doc. # 41-1 at 33).   Moreover, to the extent that *Wice* is not distinguishable, the Court finds it unpersuasive.

rather, the examination and the inquiry must be "restricted to discovering whether the employee can continue to fulfill the essential functions of the job." *Sullivan*, 197 F.3d at 812-13. Therefore, "an employer may not request an employee's complete medical records under the disguise of job-relatedness and business necessity." *Farmiloe v. Ford Motor Co.*, 277 F. Supp. 2d 778, 782-83 (N.D. Ohio 2002); *see also EEOC Guidance*, Part B.10.

Here, any appropriate scope was far surpassed. At the medical examination, Jackson was "required to submit information regarding [her] past medical history, which clearly inquired into the nature and severity of any disabilities." *James v. James Marine, Inc.*, 805 F. Supp. 2d 340, 350 (W.D. Ky. 2011). Jackson was also required to submit medical records related to her colon-cancer surgery, even though her physical examination did not reveal any physical abnormalities or uncover any causes for concern. (Docs. # 31 at ¶ 20; 36-3 at 9; 36-5 at 10-11). Regal has put forth no rationale supporting its broad request.

Put simply, Regal has failed to carry its "burden of proving that" the medical examination or inquiry was "job-related and consistent with business necessity." *Kroll II*, 763 F.3d at 623. Given Regal's failure to provide any particularized reason and inability to satisfy the generalized justification, it appears that Regal simply made a decision to stand by its policy. By failing to limit the scope of the medical examination and inquiry and failing to put forth a legally valid justification for demanding it, Regal violated the ADA and the KCRA.

Accordingly, Jackson is entitled to partial summary judgment in her favor on her unlawful-medical-examination claim under the ADA and the KCRA.[12] "In order to prevail on this claim, however, [Jackson] must still establish that [she] suffered 'some cognizable injury in fact of which the violation is a legal and proximate cause.'" *James*, 805 F. Supp. 2d at 350 (quoting *Indergard v. Georgia-Pacific Corp.*, 582 F.3d 1049, 1060 (9th Cir. 2009)); *see also Armstrong v. Turner Indus., Inc.*, 141 F.3d 554, 562 (5th Cir. 1998); *Harrison v. Benchmark Elecs. Huntsville, Inc.*, 593 F.3d 1206 (11th Cir. 2010). Therefore, the matter of damages is best left for a jury.

### 2. Retaliation

The ADA prohibits discrimination "against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a). Therefore, an ADA-retaliation claim can arise from an individual's opposition to an unlawful employment practice or an individual's filing of a discrimination charge. "The ADA is not, however, a catchall statute creating a cause of action for any workplace retaliation, but protects individuals only from retaliation for engaging in, or aiding another who engages in, activity covered by the ADA." *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014).

---

[12] "[A] district court may enter summary judgment sua sponte, 'so long as the losing party was on notice that [it] had to come forward with all [its] evidence.'" *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 407 (6th Cir. 1999) (quoting *Celotex Corp.*, 477 U.S. at 326); *see also* Fed. R. Civ. P. 56(f)(1). Because it was Regal that sought summary judgment and because the Court discussed this issue with the parties at oral argument, the Court finds that Regal was "afforded notice and reasonable opportunity to respond to all the issues to be considered by the court" and that a sua sponte grant of summary judgment is appropriate. *Shelby Cty. Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Tr. Fund*, 203 F.3d 926, 931 (6th Cir. 2000)).

In the absence of direct evidence of retaliation, a claim of retaliation under the ADA is analyzed using the familiar *McDonnell Douglas* burden-shifting framework. *Id.* First, the plaintiff must establish a prima facie case of retaliation, "which requires a showing that (1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action." *Id.* The plaintiff's initial burden of "[e]stablishing a prima facie case of retaliation is a 'low hurdle.'" *Id.* (quoting *Gribcheck v. Runyon*, 245 F.3d 547, 551 (6th Cir. 2001)). "If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for the adverse employment action." *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997). Then, the burden shifts back to the plaintiff to show that the proffered reason for the adverse employment action was "merely pretext." *Id.*

The first three elements of the prima facie case are easily satisfied. Jackson engaged in activity protected under the ADA in two ways: (1) filing a charge with the EEOC and (2) opposing the medical examination and inquiry. *See Rorrer*, 743 F.3d at 1046 ("Protected activity typically refers to action taken to protest or oppose a statutorily prohibited discrimination."). And, it is undisputed that Regal was aware of Jackson's

activities and that Jackson suffered an adverse employment action.[13]  The fourth element, however, warrants more attention.

"To establish a causal connection, a plaintiff must 'proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action.'" *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)).  "Significantly, the causation prong requires [the plaintiff] to show but-for causation."  *Sharp v. Profitt*, 674 F. App'x 440, 450 (6th Cir. 2016); *see also Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 321 (6th Cir. 2012).  Although temporal proximity is a valid basis from which to draw an inference of retaliatory motivation in some circumstances, the Sixth Circuit has cautioned courts about "drawing an inference of causation from temporal proximity alone."  *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (collecting cases).  "Specifically, the more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement his claim with 'other evidence of retaliatory conduct to establish causality.'"  *Id.* (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)).

---

[13]     Although Regal admits that Jackson's termination was an adverse employment action, Regal contends that Jackson's "displacement" was not.  (Doc. # 36-1 at 10).  The Court disagrees. To find an "adverse employment action," there must have been a "materially adverse change in the terms and conditions of [a plaintiff's] employment."  *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir. 2004) (en banc).  "Reassignments without salary or work[-]hour changes do not ordinarily constitute adverse employment decisions."  *Kocsis*, 97 F.3d at 885. But, "even if a reassignment is not paired with a salary or work-hour change, it can nonetheless be considered an adverse employment action where there is evidence that the employee received a 'less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'"  *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010) (quoting *Kocsis*, 97 F.3d at 886).  Like the plaintiff in *White*, Jackson was transferred from being a forklift operator to a standard employee in her department.  *See White*, 364 F.3d at 803.  Because "the forklift operator position required more qualifications, which is an indication of prestige," Jackson's "displacement" was "in essence," a "demotion."  *Id.*

As evidence that her termination was in retaliation for filing her first EEOC charge, Jackson relies solely on temporal proximity. Approximately four months and twenty-one days elapsed between Jackson's filing of her first EEOC charge and her termination. (Docs. # 41-1 at 57, 137). But, that time period, without more, does not raise the inference that the adverse action would not have been taken but for Jackson engaging in the alleged protected activity. *See Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) ("The mere fact that Cooper was discharged four months after filing a discrimination claim is insufficient to support an [inference] of retaliation."); *see also Lahar v. Oakland Cty.*, 304 F. App'x 354, 359 (6th Cir. 2008) ("[A] five-month gap in time does not by itself suffice to get to a jury on causation."). Apart from the four-month-and-twenty-one-day time period, Jackson has not established a causal connection between filing her EEOC charge and her termination. As Regal has noted, Jackson testified in her deposition that no one at Regal ever mentioned her EEOC charge to her and conceded that she had no "reason to think that [her] EEOC charge caused [her] to be terminated in February 2016." (Doc. # 40-1 at 140). Therefore, Jackson's participation-based retaliation claim fails to survive summary judgment.

Jackson's opposition-based retaliation claim, on the other hand, is much stronger. Jackson refused to fully comply with the medical examination and inquiry by submitting medical records related to her colon cancer, and by doing so, opposed a practice made unlawful by the ADA. *See Barrett v. Lucent Techs., Inc.*, 36 F. App'x 835, 840 (6th Cir. 2002) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579-80 (6th Cir. 2000)) (The opposed act or practice need not actually be unlawful under the ADA, but the plaintiff "must have a reasonable and good faith belief that the opposed act or practice is unlawful

under the ADA.").  Immediately upon Jackson's refusal, Regal took action.  Thus, Jackson has established a prima facie case of retaliation under the ADA, and the "burden shifts to [Regal] to establish a legitimate, nondiscriminatory reason for the adverse employment action."  *Penny*, 128 F.3d at 417.

Regal has not put forth a legitimate rationale for Jackson's displacement or termination.  In fact, Regal has not denied that it displaced and terminated Jackson because of her refusal to comply with the medical examination and inquiry.  Instead, Regal argues that it was entitled to do so because "failure to cooperate with the employer regarding such medical inquiries constitutes legitimate grounds for termination."  (Doc. # 51 at 8).

Regal's argument assumes too much.  The Sixth Circuit and other district courts within this Circuit have permitted employers to terminate employees for refusal to submit to a medical examination or inquiry *only* when the request for the medical examination or inquiry was lawful.  *See Sullivan*, 197 F.3d at 812 (citing *Moore v. Bd. of Educ. of Johnson City Schs.*, 134 F.3d 781, 783 (6th Cir. 1998)) ("We have also upheld a finding of insubordination for refusing to submit to such exams."); *see also Sloan v. Repacorp, Inc.*, No. 3:16-cv-161-MJN, 2018 WL 1070502, at *7 (S.D. Ohio Feb. 27, 2018) ("A retaliation claim cannot stand where an employee refuses a *proper* request for a medical exam or medical inquiry under 42 U.S.C. § 12112(d)(4)(A).") (emphasis added).  Likewise, to the extent an employer's medical-examination request or disability-inquiry demand are unlawful, an employee's refusal to relent to such unlawful requests does not constitute a legitimate, nondiscriminatory reason for taking adverse employment action against that employee.  Rather, it is the opposite: an illegitimate and unlawful reason.

Put simply, Regal has failed to satisfy its burden of producing evidence "that the employment decision would have been the same absent the protected conduct." *Baker v. Windsor Republic Doors*, 414 F. App'x 764, 778 (6th Cir. 2011). And for that reason, there is no need for Jackson "to show that the proffered reason was not [Regal's] true reason but merely a pretext for retaliation." *Id.* All parties agree that the reason for the adverse employment action was Jackson's refusal—and continued refusal—to fully comply with the medical examination and inquiry. But, because Regal's medical-examination request and disability-inquiry demand were not job-related or consistent with business necessity, Jackson's alleged insubordination does not provide a legitimate, nondiscriminatory reason for her displacement or termination. Therefore, Regal has failed to carry its burden and Jackson is entitled to partial summary judgment on her ADA-retaliation claim. The extent of Jackson's damages, however, must be decided by a jury.

### C. Discrimination and Retaliation under the FMLA

"The FMLA enables employees covered by the Act to take up to twelve weeks of leave per year for various purposes specified in the statute, including the employee's own 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Bryson*, 498 F.3d at 569 (quoting 29 U.S.C. § 2612(a)(1)(D)). "At the expiration of the employee's leave period, she must be reinstated to her position or to a position equivalent in pay, benefits, and other terms and conditions of employment." *Id.* at 569-70 (citing 29 U.S.C. § 2614(a)(1)).

The Sixth Circuit "recognizes two distinct theories of wrongdoing under the FMLA": interference and retaliation. *Id.* at 570. The "'interference' theory arises from §§ 2615(a)(1) and 2614(a)(1), which make it unlawful for employers to interfere with or deny

any employee's exercise of her FMLA rights … and which require the employer to restore the employee to the same or an equivalent position upon the employee's return." *Id.* (citing *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400-01 (6th Cir. 2003)). The "retaliation" theory "arises from § 2615(a)(2), which prohibits an employer from discharging or discriminating against an employee for 'opposing any practice made unlawful by' the Act." *Id.* Jackson claims that Regal has violated the FMLA in both ways: by interfering with her exercise of FMLA rights and by retaliating against her.

For both interference and retaliation claims that are based on circumstantial evidence, courts apply the *McDonnell Douglas* burden-shifting framework. *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012) (citing *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006); *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315-16 (6th Cir. 2001)). That is to say, if Jackson meets her burden of establishing a prima facie case, "the burden shifts to the employer to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action." *Bryson*, 498 F.3d at 570. If Regal "succeeds, the burden shifts back to" Jackson to show that Regal's "proffered reason is a pretext for unlawful discrimination." *Id.*

### 1. Interference

Under the interference theory, Jackson claims that Regal interfered with her right to restoration. To establish a prima facie case of interference, Jackson must show that:

> (1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of her intention to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled.

*Donald*, 667 F.3d at 761 (citing *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th

Cir. 2006)).   Jackson "must establish these elements by a preponderance of the evidence."  *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007).

The first, second, third, and fourth elements are not in dispute.   Jackson was an eligible employee, Regal is an "employer" subject to the FMLA, Jackson was entitled to leave, and she gave Regal notice of her intention to take leave.   Therefore, the Court's analysis is focused solely the fifth element—whether Regal denied Jackson the FMLA benefits to which she was entitled.   Because Jackson concedes that she received all of the FMLA leave she requested (Doc. # 42 at 24), the only basis for Jackson's claim is Regal's alleged interference with her right to be reinstated.

"Once an employee submits a statement from her health care provider which indicates that she may return to work, the employer's duty to reinstate her has been triggered under the FMLA."  *Brumbalough v. Camelot Care Ctrs., Inc.*, 427 F.3d 996, 1004 (6th Cir. 2005).   Although Jackson acknowledges that she "was *initially* reinstated to her job" after returning from her FMLA leave, Jackson argues that Regal interfered with her right to reinstatement by displacing her a "mere five months after she returned," and eventually terminating her.   (Doc. # 42 at 24).

"Interference occurs when an employer shortchanges an employee's leave time, denies reinstatement, or otherwise interferes with an employee's substantive FMLA rights."  *Marshall v. The Rawlings Co., LLC*, 854 F.3d 368, 384-85 (6th Cir. 2017) (internal citations and quotation marks omitted).   Because Jackson was neither shortchanged leave nor denied reinstatement to her position, she has failed to meet her burden of establishing a prima facie case.   The fact that Jackson was later displaced and terminated does not give rise to an FMLA-interference claim.   *See Seeger v. Cincinnati Bell Tel. Co.,*

*LLC*, 681 F.3d 274, 283 (6th Cir. 2012) (holding that employee, who was reinstated and resumed his normal work routine until he was terminated less than one month after reinstatement, had not made out an FMLA-interference claim); *see also Marshall*, 854 F.3d at 385; *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 308 (6th Cir. 2016). Rather, to the extent Jackson alleges that Regal took adverse employment actions against her after she had been reinstated in accordance with 29 U.S.C. § 2614(a)(1), those claims are more properly analyzed under the "retaliation" theory.

## 2.    Retaliation

To establish a prima facie case of retaliation under the FMLA, Jackson "must show that: (1) [she] was engaged in a statutorily protected activity; (2) [Regal] knew that [she] was exercising [her] FMLA rights; (3) [she] suffered an adverse employment action; and (4) a causal connection existed between the protected FMLA activity and the adverse employment action." *Seeger*, 681 F.3d at 283 (citing *Donald*, 667 F.3d at 761); *see also Stein v. Atlas Indus., Inc.*, No. 17-3737, 2018 WL 1719097 (6th Cir. Apr. 9, 2018). Only the fourth element—causation—is in dispute.

To make out her prima facie case, Jackson must point to evidence that "enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Seeger*, 681 F.3d at 283. Unlike with FMLA-interference claims, a "plaintiff proceeding under a[n] [FMLA] retaliation theory must show discriminatory or retaliatory intent." *Tennial*, 840 F.3d at 308. As proof of causation, Jackson relies on temporal proximity and argues that her displacement and demotion "touched upon" the reason for her FMLA leave because Dr. Haskell's request for medical records related to her colon cancer and surgery, the medical conditions that prompted her FMLA leave.

(Doc. # 42 at 25-26).

Although the Sixth Circuit has "concluded that temporal proximity alone is sufficient to establish a prima facie case of FMLA retaliation," Jackson's arguments stretch temporal proximity beyond reasonable bounds. *Krumheuer v. GAB Robins N. Am., Inc.*, 484 F. App'x 1, 5 (6th Cir. 2012). "[T]he relevant timeframe for [the Court] to consider in determining whether there was a causal connection between the plaintiff's FMLA leave and the adverse employment action is 'the time after an employer learns of a protected activity,' not the time after the plaintiff's FMLA leave expires." *Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 452 (6th Cir. 2017) (quoting *Mickey*, 516 F.3d at 525).

Jackson requested, and received, FMLA leave in July of 2014. She was displaced on February 13, 2015—approximately seven months after Regal learned of Jackson's FMLA-leave request—and terminated on February 11, 2016—approximately nineteen months after Regal learned of Jackson's FMLA-leave request. (Doc. # 41-1 at 127, 130). Such lengthy time periods, standing alone, are not sufficiently proximate to raise "an inference of retaliatory discrimination absent other compelling evidence." *Tennial*, 840 F.3d at 309 (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 566-67 (6th Cir. 2000)); *see also Burdett-Foster v. Blue Cross Blue Shield of Mich.*, 574 F. App'x 672, 683-84 (6th Cir. 2014) (finding seven-month gap between complaint and termination did not establish causation element of retaliation claim); *Johnson v. Donahoe*, 642 F. App'x 599, 606 (6th Cir. 2016) (concluding that nineteen-month gap between protected activity and alleged adverse action "suggests, by itself, no causality at all").

Therefore, given the lengthy "time that elapse[d] between the protected activity and the adverse employment action," Jackson "must supplement [her] claim with 'other

evidence of retaliatory conduct to establish causality.'" *Vereecke*, 609 F.3d at 400 (quoting *Mickey*, 516 F.3d at 524-25). Jackson, however, has failed to put forward any other evidence to support her FMLA-retaliation claim. Her assertion that her displacement and demotion "touched upon" the medical conditions underlying her FMLA leave is much too attenuated to establish a causal connection between her FMLA leave and the allegedly retaliatory adverse employment actions. Because Jackson has failed to raise a genuine dispute as to whether a causal connection exists between her FMLA leave and her displacement or termination, she has not established a prima facie case of FMLA retaliation. Therefore, Regal is entitled to summary judgment on both Jackson's FMLA-interference claim and her FMLA-retaliation claim.

### D.   Discrimination, Unlawful Request, and Retaliation under GINA

GINA prohibits an employer from discriminating or taking adverse employment actions against an employee "because of genetic information with respect to the employee." 42 U.S.C. § 2000ff-1(a)(1), (2). GINA also makes it an "unlawful employment practice for an employer to request, require, or purchase genetic information with respect to any employee or a family member of the employee," with some exceptions. 42 U.S.C. § 2000ff-1(b). For employees subjected to an unlawful employment practice, GINA provides a private right of action, incorporating the enforcement procedures and remedies of Title VII. 42 U.S.C. § 2000ff-6(a)(1).

For purposes of GINA, "genetic information" means information about an employee's "genetic tests," the "genetic tests of family members" of the employee, and "the manifestation of a disease or disorder in family members" of the employee. 42 U.S.C. § 2000ff-(4)(A)(i)-(iii). "Genetic test," in turn, "means an analysis of human DNA, RNA,

chromosomes, proteins, or metabolites, that detects genotypes, mutations, or chromosomal changes." 42 U.S.C. § 2000ff(7)(A). While GINA's definitions may be broad, there are established limits. For example, an employer does not violate GINA through "the use, acquisition, or disclosure of medical information that is not genetic information about a manifested disease, disorder, or pathological condition of an employee … including a manifested disease, disorder, or pathological condition that has or may have a genetic basis." 42 U.S.C. § 2000ff-9.

### 1.    Discrimination

Although there is a dearth of caselaw interpreting GINA, both parties and other courts have assumed that the familiar *McDonnell Douglas* burden-shifting framework applies to GINA-discrimination claims. (Docs. # 36-1 at 14; 42 at 29); *see also Ortiz v. City of San Antonio Fire Dep't*, 806 F.3d 822, 827 (5th Cir. 2015). Yet, the elements a plaintiff must establish to prove a prima facie case are unclear. Given GINA's heavy reliance on Title VII, however, a plaintiff will likely have to prove that she is entitled to protection under the statute, that she was qualified for her position, that she suffered an adverse employment action, and that the employer favored applicants or employees in a way that evinces discrimination on the basis of genetic information.

Although both Jackson and Regal advance arguments under the traditional discrimination analysis, Jackson's GINA claim is not premised upon any adverse employment action Regal took against her "because of [her] genetic information." 42 U.S.C. § 2000ff-1(a)(1), (2). Because Jackson refused to turn over her genetic information to Regal, Regal could not have taken any adverse employment action against Jackson based on the content of Jackson's genetic information. Rather, Jackson's GINA

claim arises from § 2000ff-1(b), which makes it an "unlawful employment practice for an employer to request, require, or purchase genetic information with respect to an employee or a family member of the employee."  Therefore, the Court's analysis of Jackson's GINA claims will focus first on the lawfulness of Regal's alleged request for genetic information, and then turn to Jackson's GINA-retaliation claim.

## 2.      Unlawful Request

Regal has put forth three arguments in support of its Motion for Summary Judgment on Jackson's unlawful-request claim.  First, Regal claims that "it did not request genetic information" and argues that Jackson has "improperly blend[ed] the concepts of medical information and genetic information."  (Doc. # 51 at 13).  An employer does not violate GINA "based on the use, acquisition, or disclosure of medical information that is not genetic information about a manifested disease, disorder, or pathological condition of the employee, *even if* the disease, disorder or pathological condition *has or may have a genetic basis or component*."  29 C.F.R. § 1635.12 (emphasis added).  For that reason, Regal appears to argue that Jackson's colon cancer had "manifested"[14] and therefore, information regarding Jackson's colon cancer, although it may have a genetic basis or component, does not constitute protected "genetic information."  (Doc. # 51 at 13). Jackson's claim, however, is not premised on Regal's acquisition of information or knowledge regarding her colon cancer.  Instead, Jackson claims that Regal requested protected "genetic information" in the form of family history—specifically, "the genetic tests of [Jackson's] family members" and "the manifestation of a disease or disorder in

---

[14]      The Regulations explain that "[m]anifestation or manifested means, with respect to a disease, disorder, or pathological condition, that an individual has been or could reasonably be diagnosed with the disease, disorder or pathological condition by a health care professional with appropriate training and expertise in the field of medicine involved."  29 C.F.R. § 1635.3(g).

[Jackson's] family members" under § 2000ff-(4)(A)(ii), (iii). (Doc. # 42 at 31). Because Jackson has put forward proof that the medical records requested contained protected "genetic information" in the form of her family history—a fact that Regal conceded at oral argument—she has proven that Regal made an unlawful request for genetic information.

Second, Regal seems to suggest that it was Dr. Haskell—and not Regal—who made the allegedly unlawful request and claims that Regal "assured" Jackson "that it would not receive any medical information—including genetic information—from Dr. Haskell," and would instead "simply receive a report on whether [Jackson] could safely operate" powered industrial equipment. (Doc. # 51 at 11). The plain language of GINA squarely rejects such an argument. GINA defines "employer" as a person employing a sufficient number of employees and "any agent of such a person." 42 U.S.C. § 2000ff(2)(B)(i); 29 C.F.R. § 1635.2(d). Therefore, for purposes of GINA, any request for protected genetic information by Dr. Haskell is tantamount to a request for protected genetic information by Regal.

Moreover, the Regulations specifically contemplate a situation where an employer requests or acquires genetic information through a health-care provider in the context of a medical examination related to employment and puts the onus on the employer:

> The prohibition on acquisition of genetic information, including family medical history, applies to medical examinations related to employment. A covered entity must tell health care providers not to collect genetic information, including family medical history, as part of a medical examination intended to determine the ability to perform a job, and must take additional reasonable measures within its control if it learns that genetic information is being requested or required. Such reasonable measures may depend on the facts and circumstances under which a request for genetic information was made, and may include no longer using the services of a health care professional who continues to request or require genetic information during medical examinations after being informed not to do so.

29 C.F.R. § 1635.8(d).  Thus, Regal had an affirmative duty to ensure Dr. Haskell did not violate GINA during the course of any medical examination.[15]

Lastly, Regal claims that any request for genetic information was merely "inadvertent."  (Docs. # 36-1 at 17; 51 at 13-14).  GINA provides that an employer's request for genetic information is not an unlawful employment practice "where an employer inadvertently requests or requires family medical history of the employee or family member of the employee."  42 U.S.C. § 2000ff-1(b)(1).  But, when the request for genetic information is made in conjunction with a request for medical information, the request for genetic information generally will not be considered inadvertent:

> If a covered entity acquires genetic information in response to a lawful request for medical information, the acquisition of genetic information will not generally be considered inadvertent unless the covered entity directs the individual and/or health care provider from whom it requested medical information (in writing, or verbally, where the covered entity does not typically make requests for medical information in writing) not to provide genetic information.

29 C.F.R. § 1635.8(b)(1)(i)(A).  In fact, the Regulations provide suggested language, which a covered entity can use when requesting medical information, to avoid GINA liability.  29 C.F.R. § 1635.8(b)(1)(i)(B).  If an employer uses the suggested—or similar—language, "any receipt of genetic information in response to the request for medical information will be deemed inadvertent."  *Id.*  It is undisputed that Regal did not employ

---

[15]    Although Regal claims that "[i]f Plaintiff had expressed concern about producing family history, Regal would have suggested that she provide the records with whatever family history information removed or redacted," the Court is unpersuaded by such after-the-fact assurances.  (Doc. # 36 at 5, 18).  It is the employer's duty to comply with GINA's requirements; it is not the employee's responsibility to remind her employer of GINA's protections and prohibitions.  Moreover, Regal's argument rings hollow, given that Jackson filed an EEOC charge on September 21, 2015, alleging that Regal had violated the ADA and GINA.  (Docs. # 41-1 at 57; 31 at ¶ 4).  Despite having knowledge of Jackson's GINA claims, Regal did not rescind or tailor its medical-records request.  Rather, it continued to demand that Jackson comply with the request, and terminated Jackson for her failure to do so.

the safe-harbor language or similar language with respect to Jackson's medical examination or the request for medical records.

Despite Regal's "failure to give such a notice or to use" the suggested "or similar language," it is not "prevent[ed] … from establishing that a particular receipt of genetic information was inadvertent." 29 C.F.R. § 1635.8(b)(1)(i)(C). However, to prove that its request for genetic information was inadvertent, Regal must prove that "its request for medical information was not likely to result in a covered entity obtaining genetic information." *Id.* Regal claims that Dr. Haskell's request falls within the Regulation's delineated example: "where an overly broad response is received in response to a tailored request for medical information." (Docs. 36-1 at 17-18; 51 at 13-14). Jackson contests Regal's characterization of Dr. Haskell's request as "narrowly tailored" and argues instead that the demand for the "seven categories" of information was not limited in any way, but instead, sought "everything possibly contained in a medical record." (Doc. # 42 at 31). Thus, Jackson claims that Dr. Haskell's request was not only "likely to elicit protected genetic information," but "in fact would have elicited the information if Jackson had complied." *Id.* at 32.

A review of Dr. Haskell's request, which identified Jackson's "medical condition of concern" as "surgery – all medical records" and sought medical records containing Jackson's current diagnosis, treatment, medications, restrictions, limitations, prognosis, any relevant tests, and "any additional information that [Jackson's] medical provider [thought] would help" make the medical recommendation, reveals an extremely broad request. (Doc. # 40-1 at 111). Although Dr. Haskell did not explicitly request genetic information, any "broad response" Jackson would have provided in response to the

medical-records request, including protected genetic information, would have been elicited by Dr. Haskell's "overly broad" request. Because Dr. Haskell's request for Jackson's medical information was not "tailored" to avoid requesting genetic information, Regal's request was "likely to result in a covered entity obtaining genetic information" and was not "inadvertent." 29 C.F.R. § 1635.8(b)(1)(i)(C). Accordingly, Regal violated GINA by making an unlawful request for Jackson's genetic information, and Jackson is entitled to partial summary judgment on her GINA unlawful-request claim.[16] As with her other claims, however, Jackson's damages must be determined by a jury.

### 3. Retaliation

As with other employment-discrimination statutes, GINA prohibits an employer from discriminating against an employee because she "opposed any act or practice made unlawful" by GINA "or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" GINA. 42 U.S.C. § 2000ff-6(f). Assuming that GINA borrows the *McDonnell Douglas* burden-shifting framework, Jackson's first hurdle is to establish a prima facie case of retaliation, which requires a showing that (1) she engaged in a protected activity, (2) the exercise of the protected rights was known to the defendant, (3) the defendant thereafter took adverse employment action against the plaintiff, and (4) there was a causal connection between the protected activity and the adverse employment action. *Scott v. Metro. Health Corp.*, 234 F. App'x 341, 346 (6th Cir, 2007); *Morris v. Oldham Cty. Fiscal Court*, 201

---

[16] Other district courts in this Circuit have reached similar results. *See, e.g.*, *Lee v. City of Moraine Fire Dep't*, No. 3:13-cv-222-TMR, 2015 WL 914440, at *15 (S.D. Ohio Mar. 3, 2015) ("Because the City gathered genetic information, including family medical history, as part of a medical examination intended to determine the ability to perform a job, judgment on the question of liability on the claim of violation of GINA is awarded to Lee.").

F.3d 784, 792 (6th Cir. 2000). If Jackson establishes a prima facie case of retaliation, the burden shifts to Regal to establish a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. If Regal makes that showing, the burden shifts back to Jackson to show that the proffered reason for the adverse employment action was merely pretext. *Id.*

Jackson has easily satisfied the first three elements of her prima facie case. Jackson engaged in activity protected under GINA in two ways: (1) filing a charge with the EEOC and (2) opposing the allegedly unlawful request for genetic information. (Doc. # 42 at 30). And, it is undisputed that Regal was aware of Jackson's activities and that Jackson suffered an adverse employment action. Therefore, the remainder of the Court's analysis will focus on the fourth element: causation.

"To establish a causal connection, a plaintiff must 'proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action.'" *Dixon*, 481 F.3d at 333 (quoting *Avery Dennison Corp.*, 104 F.3d at 861). Because Jackson testified in her deposition that no one at Regal ever mentioned her EEOC charge to her and conceded that she had no "reason to think that [her] EEOC charge caused [her] to be terminated in February 2016," her participation-based retaliation claim, which is premised upon filing an EEOC charge, fails to survive summary judgment.

For her opposition-based retaliation claim, however, Jackson has established sufficient causality to establish a prima facie case. First, timing is on Jackson's side. After she refused to turn over her medical records, which contained protected genetic information, Regal immediately took adverse employment action against her—by displacing her and then terminating her after her continued refusal. *See Mickey*, 516 F.3d

at 525 ("In those limited number of cases—like the one at bar—where an employer fires an employee immediately after learning of a protected activity, [courts] can infer a causal connection between the two actions, even if [plaintiff] had not presented other evidence of retaliation."). Therefore, Jackson has established a prima facie case of retaliation under GINA, and the "burden shifts to [Regal] to establish a legitimate, nondiscriminatory reason for the adverse employment action." *Penny*, 128 F.3d at 417.

Regal has not put forth a legitimate rationale for Jackson's displacement or termination. In fact, Regal has not denied that it displaced and terminated Jackson because of her refusal to turn over the requested medical records. As with Jackson's ADA-retaliation claim, Jackson's refusal to relent to the unlawful genetic-information request does not constitute a legitimate, nondiscriminatory reason for taking adverse employment action against her. Rather, it is an illegitimate and unlawful reason. Therefore, Regal has failed to satisfy its burden of producing evidence "that the employment decision would have been the same absent the protected conduct," and there is no need for Jackson "to show that the proffered reason was not [Regal's] true reason but merely a pretext for retaliation." *Baker*, 414 F. App'x at 778. Again, all parties agree that the reason for the adverse employment action was Jackson's refusal—and continued refusal—to fully comply with the medical examination and turn over the requested medical records. Because Regal's broad medical-records request was unlawful under GINA, Jackson's insubordination does not provide a legitimate, nondiscriminatory reason for her displacement or termination. Accordingly, Regal has failed to carry its burden and Jackson is entitled to partial summary judgment on her GINA-retaliation claim. The issue of Jackson's damages, however, must be resolved by

a jury.

III.    **CONCLUSION**

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)    Defendant Regal Beloit America, Inc.'s Motion for Summary Judgment (Doc. # 36) is **GRANTED** as to **Count Three** (FMLA-interference and FMLA-retaliation claims); and **DENIED** as to **Count One** (ADA/KCRA-unlawful-medical-examination and ADA/KCRA-retaliation claims) and **Count Two** (GINA-unlawful-request and GINA-retaliation claims);

(2)    Summary judgment is **GRANTED** in favor of Defendant Regal Beloit America, Inc. as to **Count Three** of the Amended Complaint;

(3)    Partial summary judgment is **GRANTED** sua sponte in favor of Plaintiff Sheila Jackson as to liability on **Count One** and **Count Two** of the Amended Complaint;

(4)    The matter remains pending only as to damages for Counts One and Two; and

(5)    **Within twenty (20) days from the date of the entry of this Memorandum Opinion and Order**, the parties shall **filed a Joint Status Report**, setting forth available dates for a Final Pretrial Conference and Jury Trial, and whether they would be amenable to a court-facilitated settlement conference.

This 21st day of June, 2018.



Signed By:

*David L. Bunning*

United States District Judge